IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

                         Plaintiff,        :

                                             :

v.

                                    :            Civil Action File

BANK OF AMERICA MERCHANT            No. 1:19-cv-
SERVICES; BANK OF AMERICA       :
CORPORATION; FIRST DATA CORPORATION;    TRIAL BY JURY
FISERV, INC.,                            DEMANDED

                                         :

                        Defendants.    :

_____x

## **COMPLAINT**

     Plaintiff, Eric Slawin, by and through his counsel of record, Robert N. Marx

and Jean Simonoff  Marx of Marx & Marx, L.L.C., as and for his Complaint,

respectfully alleges as follows:

## **INTRODUCTION**

     1.  This is an action under federal laws that protect a whistleblower who

suffers retaliation by former employer and its individual agents, ending his

employment and damaging his professional reputation.  Plaintiff brings this action

under the Sarbanes-Oxley act of 2002, 18 U.S.C. §1514A, the Consumer Financial

Protection Act of 2010 ,12 U.S.C. 5567 and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C.§78u-6.  The Plaintiff was a former Vice President Operations Control Officer at Bank of America Merchant Services ("BAMS") whose job was to evaluate and assess compliance issues at BAMS, evaluate and assess risk for BAMS, and to develop and propose measures to mitigate identified risks. BAMS is jointly owned by First Data Corporation, now Fiserv, Inc., and Bank of America Corporation ("Bank of America" or "BOA"). First Data Corporation is a wholly owned subsidiary of Fiserv, Inc. as of July 29, 2019. Plaintiff was responsible for advising BAMS regarding client inquiries regarding data security, including what is known as "PAN" data. PAN data is primary account number data on consumers' credit and debit cards. BAMS is a provider of payment processing services to its customers which include private merchants and governmental organizations. Both BAMS and its customers receive, store and/or transmit credit/debit card information which contain PAN data. Any entity, whether BAMS or its customers, which receives, stores or transmits credit/debit card information, is required to be "PCI" (Payment Card Industry) compliant in order to protect the security of such PAN data.  BAMS was not PCI compliant so that credit card information that was transmitted to and from it, and handled by it, was not data security protected. Rather this PAN data was at risk, potentially exposing BAMS, its merchant and municipal customers, and their

customers to millions of dollars loss, such as occurred as a result of the data breach that occurred involving Target Corporation in 2013. BAMS misleadingly sought to create the impression that PAN data conveyed to it was protected through its own PCI compliant processes when in fact BAMS was not PCI compliant. On repeated occasions, the Plaintiff raised concerns to his superiors that BAMS was acting fraudulently in misleading and misdirecting its customers when issues of PCI compliance were raised by those customers, and that BAMS' misrepresentations and omissions regarding its non-PCI compliance could severely hurt investors. Based on Mr. Slawin's long banking career in which he held regulatory and compliance positions, and BAMS' stated acknowledgement of the impropriety being non-PCI compliant and stated refusal to become PCI compliant, Mr. Slawin reasonably believed that BAMS' deceptive practices regarding its being non-PCI compliant violated federal mail fraud, bank fraud, and wire fraud laws, as well as violated federal law regarding corporate financial disclosures by omitting any reference to the substantial risks attendant to BAMS' departure from standardized practices regarding PAN data security. In retaliation for Mr. Slawin's opposition to and refusal to participate in BAMS' continuing fraud, BAMS retaliated against him by terminating him.

**JURISDICTION AND VENUE**

2. The court has jurisdiction over this matter pursuant to 18 U.S.C.
§1514A(b), 12 U.S.C. § 5567, 15U.S.C. § 78u.6(h)(1)(B),  and 28 U.S.C. §§ 1331
and 1337. Venue is proper in this district under 28 U.S.C. §1391.

**CONDITIONS PRECEDENT**

3. Mr. Slawin timely filed a whistleblower complaint under the Sarbanes-
Oxley Act of 2002, 18 U.S.C. §1514A ("SOX") with OSHA on December 12,
2017, the same day that he was terminated. Plaintiff complained that he had
objected to BAMS' strategy of misleading its customers to believe that it was PCI
compliant when it was not, and that BAMS retaliated against him when he
objected to participating in BAMS fraud on its customers and the SEC.

4. Mr. Slawin amended that complaint on April 27, 2018.

5. After more than 180 following Mr. Slawin's filing his original complaint,
and in addition after more than 180 days following  Mr. Slawin's filing his
amended Complaint with OSHA, OSHA administratively closed its file to allow
Mr. Slawin to pursue this action in federal court since the Secretary of Labor had
not issued any final decision.

6. Mr. Slawin brings this action more than 210 days after he filed his
original complaint and in addition after more than 210 days following Mr. Slawin's

filing his amended complaint with OSHA during which time the Secretary of Labor had not issued any final decision.

## THE PARTIES

7. Mr. Slawin is a male natural born citizen residing in Fulton County in the State of Georgia.

8. BAMS is a joint venture between Bank of America Corporation ("BOA") and First Data Corporation ("First Data") to provide payment processing services. BOA and First Data have roughly equivalent ownership stakes in BAMS, with a third-party investor owning a very small stake. BAMS is a subsidiary of First Data Corporation and is listed as such on First Data's SEC filings. BAMS is denominated as an affiliate of BOA and included in BOA's financial reports filed with the SEC.

9. At all times relevant to the complaint, First Data Corporation was a publicly traded company.

10. BOA is also a publicly traded company.

11. In January 2019, Fiserv, Inc. entered into a merger agreement to acquire First Data Corporation in an all-stock transaction for an equity value of approximately $22 billion as of January 16, 2019.

12. Fiserv, Inc.'s 10-K filed with the SEC on June 30, 2019 reflects this merger agreement.

13. Pursuant to a Prospectus Supplement filed with the SEC on July 29, 2019, Fiserv, Inc. completed its merger with First Data on July 29, 2019, with First Data surviving as a wholly owned subsidiary of Fiserv, Inc.

14. Fiserv, Inc. is a publicly traded company.

15. After the merger, and as of the date of this Complaint, according to the website of the Georgia Secretary of State, First Data remains a foreign corporation authorized to do business in Georgia and its agent for service of process in Georgia is Corporation Service Company, at 40 Technology Parkway South, #300, Norcross GA 30092.

16. BOA is a foreign corporation  authorized to do business in Georgia. BOA's registered agent for service of process in Georgia is CT Corporation System at 289 S. Culver Street, Lawrenceville, GA 30046-4895.

17. Fiserv, Inc. is a Wisconsin Corporation not registered with the Georgia Secretary of State and may be served where it is doing business within the Northern District of Georgia at 2900 Westside Parkway, Alpharetta, GA 30004.

18.  BAMS may be served by service upon either of its joint venturers, BOA or First Data, with Fiserv being served as successor to First Data, and by service upon an appropriate individual at BAMS' office located at 5565 Glenridge Connector Atlanta, GA 30342.

## FACTS

BAMS Is a Covered Employer Under Sarbanes Oxley

19. Defendant BAMS is a subsidiary of First Data Corporation as reflected in First Data Corporation's SEC filings and its financial information is included in those filings. Additionally, BAMS is listed as an affiliate of BOA and included in its financial statements filed with the SEC.  Accordingly, BAMS is a covered employer within the meaning of §806 of the Sarbanes-Oxley Act,18 U.S.C. Sec. 1514A. Since First Data Corporation, Fiserv, Inc. and BOA file financial statements with the SEC, they are covered employers under §806 of Sarbanes-Oxley.

PAN Data and PCI Compliance

20. Processing credit and debit card transactions involves the acquisition of and access to "Primary Account Number " ("PAN") data which is a key piece of information on consumers' credit or debit cards.

21. Given the vast number of debit and credit card transactions around the world on a daily basis involving a huge network of financial institutions, financial institutions and credit card processors have issued rules and standards regarding the security of transactional financial data including PAN data. .

22. The Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements promulgated by the Payment Card

Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed, or transmitted and require financial institutions and providers of payment processing services such as BAMS to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies. "PCI compliance" refers to adherence to this set of security standards embodied in the Payment Card Industry Data Security Standard (PCI DSS), to which all companies, including providers of payment processing services such as BAMS must, since it accepts, processes, stores or transmits credit or debit card information. As a payment processor, BAMS comes within the meaning of  the Consumer Financial Protection Act, 12 U.S.C. §5481(15)(A)(vii) ("CFPA").

23. In addition to the PCI DSS, credit card companies such as VISA and MASTERCARD have rulebooks which set forth rules that apply to merchants and acquiring banks such as BAMS. These rules include the right of companies like VISA and MASTERCARD to fine non-PCI compliant companies like BAMS up to $100,000 a month for each month that the company is not PCI compliant.

24. For example, when there was a data breach at GENESCO, VISA fined Wells Fargo and Fifth Third Bank (acquiring banks, like BAMS) combined over $13,000,000.00.

The Relationship between BAMS, First Data and BOA

25. BAMS provides payment processing services to major private merchants such as Home Depot, Target, Amazon, Exon Mobile, Royal Caribbean Lines, MGM and others, as well as to numerous municipalities, to facilitate credit and debit card transactions between those entities and their customers.

26. On its website, BOA describes its affiliate companies under the heading "Bank of America" as Bank of America Corporation and Bank of America, N.A.

27. BAMS together with its parent, BOA, under the name Bank of America, N.A. enters into agreements to provide payment processing services to its customers.

28. In "Merchant Processing Agreements" BAMS along with BOA through its affiliate, Bank of America, N.A. are the "Servicer" providing to its customers, including retail merchants and municipalities, processing services regarding credit, debit and other delineated card transactions and service.

29. BAMS and BOA warrant under these Merchant Processing Agreements that they are operating in compliance with "Card Organization Rules" which agreements specifically state includes rules promulgated by the Payment Card Industry Security Standards Council.

30. Accordingly, the Merchant Processing Agreements  under which BAMS operates with its clients, specifically require BAMS to comply with the PCI DSS

rules regarding PAN data, that are set forth at

hppts:1/www.pdsecuritystandards.org/document.

31. The Merchant Processing Agreements provide that any breach by BAMS regarding its use of PAN data could result in immediate and irreparable harm to its customers and that money damages could be inadequate to compensate for that harm.

32. Similarly, the merchant or municipal customers receiving the payment processing services of BAMS and BOA, N.A. warrant that they are PCI compliant in handling PAN data.

33. BAMS contracts with its parent, First Data, to process payments, including *inter alia* to sell First Data products to its merchant and municipal customers such as credit machines to process those payments.

34. BAMS solicits the business, *i.e.* merchant and municipal customers, and is the "face" of the relationship between its customers, while First Data handles the payment processing from the back end. BAMS manages sales or leasing of point-of-sale equipment and customer service to merchants. BAMS obtains a portion of its revenue by charging fees for each transaction it handles. BAMS also earns revenues from offering other products and services such as advanced cybersecurity protection. First Data processes the transactions, for which BAMS charges a fee, at its processing centers, provides the products, equipment and other services that

BAMS sells to merchants.

35. In this relationship, First Data is in essence the back office so that private merchants' and municipalities' point of contact is BAMS.

36. When a retail merchant or municipality processes credit or debit card transactions, those transactions are handled through First Data, using First Data's terminals which BAMS has sold to its customers.

37 At all relevant times, First Data was PCI compliant.

38. Credit and debit card refunds were handled differently, with BAMS being the point of contact for the merchant or municipality, and BAMS was the entity which would investigate and handle any chargebacks.

39. BAMS' direct handling of its customer credit and debit card refunds and chargebacks necessarily required BAMS to obtain, utilize, store, and convey PAN data.

BAMS' Non- PCI Compliance, It's Coverup, and Mr. Slawin's
Objections to that Fraud

40. Mr. Slawin was hired by Defendant BAMS for the position of  BAMS' VP Operations Control Officer on November 5, 2015. Mr. Slawin started his employment in that position on December 7, 2015. In that position, Mr. Slawin was the liaison between BAMS' Independent Risk Management, Compliance and Internal Audit segments.

41. In general, Mr. Slawin's job duties involved identification and

assessment of risk and compliance issues, his development of risk and compliance strategies, and his oversight of attainment of milestones, including remediation if necessary, to ensure successful Internal Audit results.  Central to Mr. Slawin's core job function and responsibilities was to evaluate BAMS' compliance issues and risk and to develop measures to mitigate risk, and to advise BAMS about responding to client inquiries regarding data security which embodies the aforementioned PAN data.

42.  During his employment, Mr. Slawin reported directly to Natasha Collins, Mark Kendall and Brian Rubin.

43.  Natasha Collins was Senior Vice President, Head of Sales Operations and Planning.  Mr. Slawin reported to Ms. Collins during the late summer and early fall of 2017.

44.  On information and belief, sometime during the summer of 2017, Ms. Collins started to report directly to Tim Tynan, BAMS' CEO.

45.  Mark Kendall was Director of Risk and Control and also reported to Ms. Collins.

46.  Brian Rubin was Business Management, PMO and Process Engineering Executive.

47. During all relevant times, BAMS was *not* PCI compliant, so that PAN data which it handled, especially in BAMS' role in the chargeback process, was at

great risk for data security breach.

48. Beginning in or around May 2017, the issue of BAMS being non-PCI compliant with respect to PAN data arose among the highest level of BAMS executives and became a subject of discussion.

49. One area in which the issue of BAMS' non-PCI compliance rose was in the context of how BAMS should respond to client questionnaires that raised questions regarding how data was secured by BAMS, and direct inquiries about whether BAMS was PCI compliant.

50. BAMS' highest level executives knew that BAMS was required to be PCI compliant and that it was not.

51. During May and throughout the summer of 2017, there were email exchanges including among the highest level of BAMS' executives regarding the magnitude of the PCI non-compliance issue given the large volume of PAN data that BAMS handled.

52. These emails also reflect the decision among BAMS' management that it was too costly for BAMS to become PCI complaint, and therefore that it would not become PCI compliant.

53. Joseph Moll had been Vice President Corporate Information Security Officer, Risk and Compliance at BAMS in the summer of 2017.[1]

---

[1] Mr. Moll left that position at BAMS on information and belief in August 2017.

54. In or about July 2017 Mr. Moll described thousands of instances in which "PAN data was being mishandled by BAMS", noting that that figure was under-representative of all PCI violations since those numbers only reflected instances of emailing PAN data and did not include all instances in which PAN data was stored, processed or otherwise transmitted.

55.  Previously, in or about June 2017 David Ades, Executive Vice President, General Manager and Head of Sales at BAMS reporting directly to Tim Tynan, BAMS' CEO, sent out an email which corroborated his conversations with other senior BAMS' executives regarding BAMS' non-PCI compliance.

56. In his email, Mr. Ades confirmed that BAMS uses full PAN data and that BAMS was not PCI compliant.

57. In his email Mr. Ades also wrote that BAMS did not want to become PCI compliant because it is "very costly and time consuming."

58. Emails among BAMS' highest level executives, reflect that Allie Davis, Senior Vice President Risk Governance and Merchant Compliance at BAMS, and Bryan Glynn, Senior Vice President, Account Management and Operations at BAMS, were involved in discussions regarding BAMS' non-PCI compliance.

59.  Other emails similarly reflected high level corporate knowledge of BAMS' non-PCI compliance, and BAMS' consideration of how to deflect questions and handle representations to customers regarding data security without

BAMS becoming PCI compliant.

60. Throughout the summer and continuing through the fall of 2017 Mr. Slawin participated in numerous conversations in which he discussed with his immediate superiors and other senior executives at BAMS, including Allie Davis and Joseph Moll, the problems surrounding BAMS' being non-PCI compliant, and his concerns and objections to BAMS' actions, which it intended to continue,  to mislead and defraud its customers into believing that it was PCI compliant when it was not and had no intention to become PCI compliant.

61. Among the numerous individuals who Mr. Slawin spoke to about BAMS' non-PCI compliance and his concerns about fraud and the ramifications if this information were to become public, were Brian Rubin, Sherra Grissom, Mark Kendall, Natasha Collins, and Larry Brennan, BAMS' Senior Vice President of Merchant Data Security and Cyber Security Director.

62. Sherra Grissom was a Senior Vice President, Business Controls Manager of Respondent BAMS who reported to Thomas Fontana.

63. Thomas Fontana was BAMS' Chief Risk Officer and reported to CEO Tim Tynan.

64. Mr. Slawin discussed his concerns about how BAMS would respond to inquiries by potential and existing customers (large retail merchants and municipalities) regarding PCI compliance and PAN data.

65. Mr. Slawin was very concerned about BAMS' strategy of sidestepping its customers' concerns and inquiries about PAN data security and PCI compliance instead of becoming PCI compliant.

66. Mr. Slawin repeatedly expressed his concern that BAMS was engaging in fraud by not disclosing its non-PCI compliance, instead misleading its potential and existing customers into believing that it was PCI compliant by having First Data (which was PCI compliant) answer those questions.

67.  Mr. Slawin was employed by BAMS from December 7, 2015 until December 12, 2017, when he was notified of his termination.

68. At the time of his termination, Mark Kendall was Mr. Slawin's immediate supervisor.

<u>Plaintiff's Reasonable Belief</u>

69. Mr. Slawin reasonably believed on an objective and subjective basis that BAMS' deliberate strategy to mislead its merchant and municipal customers into erroneously believing that BAMS was PCI compliant violated federal laws against bank fraud, wire fraud, mail fraud, reporting requirements to the SEC, and violated the controls provisions in section 404 of the Sarbanes-Oxley Act of 2002.

70. In addition to the aforementioned conversations in which clear efforts were discussed to mislead existing and potential clients about BAMS' non-PCI compliance, Mr. Slawin also knew that BAMS had entered into municipal

contracts that were fraudulent. Thus,  for example, BAMS had a merchant card processing services contract with the State of New Hampshire to provide credit card processing services for a contract period 2013-2018. In this contract with the State of New Hampshire, BAMS warranted that it would "ensure security on all data transmissions. . . . comply with all Payment Card Industry Standards, (PCI) and shall timely notify the designated State contact of all material changes in PCI Standards. Contractor shall remain in compliance with PCI DSS during the initial term of this Contract and any subsequent renewal period."

71. BAMS had a similar merchant services agreement with the State of Delaware that it had entered into in February 2017, and which similarly was fraudulent inasmuch as BAMS represented that it was PCI compliant, which it was not. However, at all relevant times, BAMS was in knowing breach of the agreements with the States of Delaware and New Hampshire, and other similar agreements.

72. Mr. Slawin was aware that First Data and BOA submitted filings with the SEC which included the financials of BAMS, but which omitted the financial risks to those companies as a result of BAMS non-PCI compliance and its fraud on its private and municipal customers.

73. Mr. Slawin's belief that BAMS' non-PCI compliance and fraudulent misrepresentations to its customers and First Data's and BOA's failure to disclose

this huge potential financial exposure of a main subsidiary was a securities

violation, was reasonable because a securities violation occurs when a company

intentionally misrepresents or omits certain facts to investors, which are material

and which risk huge losses.

74. Mr. Slawin also believed that BAMS' non-PCI compliance and

fraudulent misrepresentations to its customers regarding credit/debit card data

security violated laws enforced by the Consumer Financial Protection Bureau

covering consumer credit and electronic financial transactions.

75. At the time of his employment by BAMS, Mr. Slawin had had almost 25

years in the Securities and Banking Regulatory and Compliance field, having

started in this area in 1991. Prior to working at BAMS Mr. Slawin had held

numerous regulatory and compliance positions both for governmental regulatory

agencies as well as for other banks.

76. BAMS' response to the PAN data issue and its non-PCI compliance was

to deflect its non-PCI compliance by trying to get its parent, First Data, to answer

customer questionnaires regarding data security, in order to camouflage that

BAMS, which received, retained and transmitted its customers' PAN data, was not

PCI compliant.

77. Vast amounts of PAN data were regularly transmitted between First Data

and BAMS in non-PCI compliant batch files and spreadsheets, so that BAMS

acquired, hosted, and transmitted that data in violation of PCI-DDS, and in breach of its Merchant Processing Agreements with its customers, rendering that PAN data vulnerable to data security breach.

78. First Data's being PCI compliant did not resolve the PAN data security issues endemic to BAMS' not being PCI compliant.

79. Mr. Slawin was expected to go along with BAMS' deflection and information omission strategy.

80. Mr. Slawin had at least four or five conversations with Mr. Kendall in which Mr. Slawin affirmatively told Mr. Kendall that BAMS was acting fraudulently and misleading its customers, and that he was not comfortable being a part of BAMS' conspiracy to mislead its clients.

81. During these conversations, Mr. Slawin stated that BAMS' fraud was bad for the clients, and bad for BAMS and its parents since the deception could expose the whole organization to massive financial exposure if it got out that BAMS was not PCI compliant. As noted above, there are huge fines that attach to PCI non-compliance violations, and the potential costs of a data security breach were astronomical. Mr. Slawin believed that BAMS' failure to disclose or correct its non-PCI compliance was a massive fraud, including on the shareholders of First Data, since BAMS' financials were included in First Data's consolidated financial disclosures to the SEC, and since there were no references to any potential risks

arising from BAMS' non-PCI compliance.

82. Mr. Slawin clearly raised his concern about and objection to BAMS' misleading its clients by misdirecting them to First Data.

83.  During the period August through September 2017, Mr. Slawin had biweekly meetings with Natasha Collins. During these meetings Mr. Slawin discussed the creation of a self-identified audit issue and mitigation of BAMS' non-PCI compliance. Mr. Slawin clearly and repeatedly advised Ms. Collins about his concerns regarding BAMS' non-PCI compliance including expressing his concerns about fraud on BAMS' clients. Mr. Slawin reiterated several times that he was uncomfortable being asked to represent to BAMS' clients and to internal BAMS' teammates that BAMS was PCI compliant when he knew that it was not.

84. In or around November 2017, some of Mr. Slawin's conversations with Mark Kendall about BAMS' non-PCI compliance and fraudulent conduct also included Larry Brennan who was Sr. VP in charge of merchant data security and cyber security. As Sr. VP in charge of merchant data security and cyber security, Mr. Brennan had a clear understanding of the huge and potentially devasting and costly risks of PCI non-compliance since his job entailed helping BAMS' merchant customers to prevent data compromise, and to identify, contain and remediate data breaches.

85. Mr. Slawin also had at least one conversation with Walt Zimmerman

who was a Senior Sales executive at BAMS assigned to the Home Depot

relationship. Mr. Slawin objected to answering Home Depot's question in its

questionnaire it sent to BAMS about whether BAMS was PCI compliant in any

way that would indicate that BAMS was PCI compliant, when it was not. Mr.

Slawin was unequivocal that he would not indicate that BAMS was PCI compliant.

86. Mr. Zimmerman expressed extreme concern to Mr. Slawin about BAMS

not being PCI compliant and indicated that he had been led to believe that BAMS

was PCI complaint.

87. Mr. Slawin was aware that Home Depot, one of BAMS' customers, was

very concerned about PCI compliance issues since Home Depot's own auditors

had been brought in to evaluate the handling of PAN data.

88. It was part of Mr. Slawin's job to provide answers to customers'

inquiries, like those from Home Depot, about whether BAMS was PCI compliant.

89. Mr. Slawin told his superiors that he was not going to answer that

BAMS was PCI compliant when it was not.

90. Invariably the question was not answered, and other BAMS' employees

who handled the Home Depot relationship, actively mislead Home Depot, and

other similar BAMS' merchant and municipal customers, into believing that

BAMS was PCI compliant by diverting the response to First Data.

91. However, BAMS owned the relationship with Home Depot, and did not

want First Data to usurp its primacy in the relationship with Home Depot.

92. BAMS' response to Home Depot's concern and direct inquiry about BAMS' PCI compliance was to omit any disclosure that it was not PCI compliant. Such a disclosure would have been cataclysmic for the relationship since BAMS handled all the chargeback issues, not First Data, which meant that all the involved PAN information was being mishandled.

93. Mr. Slawin repeatedly and consistently raised the issue about the need to tell the customers the truth about BAMS' non-PCI compliance, and he repeatedly and consistently objected to BAMS' fraud which was clearly evinced by BAMS' abject misrepresentation about its PCI compliance in its Merchant Processing Agreements with its retail merchant and municipal customers.

94. Mr. Slawin was particularly concerned about BAMS' PCI noncompliance because of the seriousness of data security and risk to BAMS' customers' and their customers in light of such risk, BAMS' exposure to large fines and losses as a result of being non PCI compliant, and the fraud being perpetuated by BAMS through both solicitation of new customers, and to existing customers by deliberately misleading such customers regarding the PCI compliance issue. Indeed, since new business relationships were cultivated and existing business relationships were serviced through the internet, mail, email, and over the phone, omissions and misleading communications regarding data security and PCI

compliance implicated mail and wire fraud issues. In addition, Mr. Slawin was concerned about SEC fraud as well as fraud upon shareholders as a result of BAMS' financial status inclusion in BAMS' parent company, First Data's reports filed with the SEC, as well as BOA's financial statements filed with the SEC in which BAM's results were included on a consolidated basis.

95. Despite communication of his concerns and objections, Mr. Slawin was expected to keep quiet, and to participate in BAMS' practice of misleading its merchant and municipal customers, to perpetuate their erroneous belief that BAMS was handling their PAN data in a PCI compliant manner.

96. Other BAMS' employees who were not aware that BAMS was not PCI compliant could not believe it when Mr. Slawin discussed the issue with them.

97. For example, Mr. Slawin had a conversation with Leonard Ebel regarding a potential customer, L Brands. Mr. Ebel had not been aware that BAMS was not PCI compliant and had just assumed that it was, since PCI compliance is standard in the industry. Mr. Ebel expressed disbelief at this situation and understood the huge risks to potential customers like L Brands.

98. BAMS' own senior management understood the seriousness of this issue, directing that all written references to BAMS being non-PCI compliant be deleted.

99. Accordingly, Mark Kendall specifically had directed that discussion of

the PAN data and PCI non-compliance issue be kept quiet, and that written references to this issue be deleted.

100. During the month of July 2017, Mr. Slawin began to download emails to his personal email regarding the PAN data and BAMS' PCI non-compliance issue because he was concerned about being drawn into fraudulent and improper data security practices by BAMS, and in light of his intent to go to the SEC.

BAMS' Retaliation

101. On December 8, 2017 Mr. Slawin was approached by Mike Solan, BAMS' VP of Human Resources, and Mark Kendall, concerning the emails regarding the PAN data and PCI non-compliance issue that Mr. Slawin had sent to his personal email address.

102. Mr. Solan and Mr. Kendall wanted Mr. Slawin to execute an affidavit affirming that he (Mr. Slawin) had destroyed all emails that he had sent to his personal email address.

103. On December 11, 2018 at approximately 10:00 AM and 2:17 PM, Mr. Solan sent to Mr. Slawin  emails asking Mr. Slawin to contact him to discuss "next steps" in light of their conversation the prior Friday regarding the emails, and Mr. Solan's attempt to get Mr. Slawin to sign the affidavit regarding email deletion that he had sent to Mr. Slawin.

104. Mr. Slawin responded by email on December 11, 2018 at 3:44 PM that

24

he would not sign the affidavit because doing so "could make it appear" that he agreed with BAMS' actions to cover up its non-PCI compliance, and that he did "not at any time" agree with these actions.

105. BAMS terminated Mr. Slawin's employment on December 12, 2017.

106. Mr. Slawin filed a whistleblower complaint with the SEC on December 12, 2017 online through the SEC's website at www.sec.gov.

107. In his online complaint filed with the SEC, Mr. Slawin alleged the aforementioned facts regarding BAMS' PCI non-compliance, its refusal to become PCI compliant and fraudulent representations to its customers and shareholders, and that he was terminated when he protested the effort to make him complicit in BAMS' fraud on its customers and shareholders.

Economic Damages

108. As a result of the actions of BAMS alleged here, Mr. Slawin has suffered injury in the form of monetary damages. Mr. Slawin has lost pay, bonuses, benefits, and the expectation of increased pay and benefits in the future. Mr. Slawin has had to expend funds in furtherance of his efforts to obtain employment.

109. As a result of the very small job pool for comparable jobs at Mr. Slawin's level, it has been very difficult for Mr. Slawin to replace the job he had at BAMS causing him ongoing lost pay.

Non-Economic Damages

110. As a result of the actions of BAMS, Mr. Slawin has experienced and continues to experience emotional distress, pain and suffering, physical sickness and injury, depression, humiliation, embarrassment, indignity, damage to his family and personal relationships, and harm to his professional reputation.

111. As a result of the actions of BAMS, Plaintiff has experienced and continues to experience major depression, which he has been diagnosed with by medical professionals. Arising from his termination and continuing, Mr. Slawin experiences constant sadness, hopelessness, ongoing frustration even over small matters, loss of interest or pleasure in most or all normal activities, sleep disturbances such as insomnia or sleeping too much due to feelings of hopelessness, increased food cravings resulting in weight gain, anxiety, agitation, feelings of worthlessness, suicidal thinking and headaches without an explainable physical condition to cause such headaches.  Mr. Slawin's termination from BAMS has also strained his personal and family relationships causing him to have angry outbursts at his spouse and children which prior to his termination were out of character for him. His need to search for employment in cities where his family does not reside so that he can provide financial support for their basic necessities, where employment opportunities are not only distant but at far less compensation than he was making at BAMS, has strained his familial relationship to the point

where he and his wife have decided to separate in order to lessen the impact on their family. Prior to his termination, Mr. Slawin had and enjoyed an intact family life, and there was no prospect of the breakup of his family. Due to lack of income since his termination Mr. Slawin has not been able to maintain his prescription medication regimen that was prescribed to help deal with his resulting depression from his termination. When Mr. Slawin has not been able to afford prescription medication he has resorted to self-medicating with alcohol, causing cascading and serious deleterious ramifications for his family, friend and employer relationships.

COUNT I
SARBANES-OXLEY ACT OF 2002
18 U.S.C. §1514A

112. Mr. Slawin realleges Paragraphs 1-111 with the same force and effect as if set forth fully herein.

113. In particular Mr. Slawin realleges the allegations regarding the Introduction (¶1), parties (¶¶7-18),  jurisdiction (¶2), venue (¶2), and conditions precedent (¶¶3-6).

114. Mr. Slawin realleges the allegation in ¶19 that Defendants are covered employers within the meaning of Sarbanes-Oxley.

115. Mr. Slawin realleges ¶¶3-6 establishing that he timely exhausted administrative requirements by filing a complaint with the Secretary of Labor within the 180-day time period.

116. The Secretary of Labor did not issue a final decision within 210 days of Mr. Slawin's filing his complaint. See also ¶6 *supra.*

117. Mr. Slawin realleges ¶¶20-109 establishing that he repeatedly engaged in protected activity by objecting to BAMS' fraudulent misrepresentations to its customers and potential customers and stated refusal to be complicit in such misrepresentations regarding its not being PCI compliant and regarding credit card data security issues. Mr. Slawin's protests were to the highest levels of BAMS management and included Mark Kendall, his immediate supervisor who wanted Mr. Slawin to delete the emails concerning BAMS fraud and participated in the decision to terminate him.

118.  Mr. Slawin realleges ¶¶69-100, 104, 106, and 107 regarding his good faith subjectively held and objectively based belief that BAMS' conduct violated the securities laws and numerous other fraud statutes covered by Sarbanes-Oxley. Mr. Slawin held a good faith subjective belief that BAMS' conduct violated the securities laws and numerous other fraud statutes covered under Sarbanes-Oxley, and his belief was objectively based on his quarter century experience in the banking industry during which time he held several regulatory and compliance positions. Mr. Slawin was aware of the huge potential risks and losses that could result from a data breach, and that failure to disclose these risks was fraudulent to shareholders of publicly traded companies, including those of Defendants as well

as those of the publicly traded customers who Defendants served.

119. Mr. Slawin realleges ¶¶101-107 that his protected activity contributed to his termination.

120. BAMS' decision to terminate Mr. Slawin was inextricably entwined with his protected activity.

121. BAMS terminated Mr. Slawin in retaliation for his protected activity.

122. As a result of BAMS unlawful termination, Mr. Slawin has suffered economic and non-economic injury as described in ¶¶108-111.

COUNT II<br>
CONSUMER FINANCIAL PROTECTION ACT OF 2010 ("CFPA")<br>
12 U.S.C. 5567

123. Mr. Slawin realleges Paragraphs 1-111 with the same force and effect as if fully set forth herein.

124. In particular Mr. Slawin realleges the allegations regarding the Introduction (¶1), parties (¶¶7-18),  jurisdiction (¶2), venue (¶2), and conditions precedent (¶3-6).

125. The Defendants are covered service providers employers within the meaning of the CFPA since they provide consumer financial products/services through their provision of credit card services and products within the meaning of the CFPA. See also ¶22 *supra*.

126. Mr. Slawin is a covered employee within the meaning of the CFPA.

29

127. As set forth in ¶¶3-6 Mr. Slawin timely exhausted administrative requirements by filing a complaint with the Secretary of Labor within the 180-day time period.

128. The Secretary of Labor did not issue a final decision within 210 days of Mr. Slawin's filing his complaint. See also ¶6 *supra.*

129. Mr. Slawin realleges ¶¶20-109 establishing that he repeatedly engaged in protected activity by objecting to BAMS' fraudulent misrepresentations to its customers and potential customers and stated refusal to be complicit in such misrepresentations regarding its not being PCI compliant and regarding credit card data security issues. Mr. Slawin's protests were to the highest levels of BAMS management and included Mark Kendall, his immediate supervisor who wanted Mr. Slawin to delete the emails concerning BAMS fraud and participated in the decision to terminate him.

130. Mr. Slawin had a good faith belief that BAMS' non-PCI compliance and fraudulent conduct related to its refusal to be PCI compliant violated laws subject to the jurisdiction of the Consumer Financial Protection Bureau including *inter alia* the CFPA and the Electronic Fund Transfer Act (15 U.S.C. 1693 et seq.) ("EFTA"). See also ¶¶69-100, 104, 106 and 107 *supra*.

131. Mr. Slawin objectively believed that BAMS' non-PCI compliance and fraudulent conduct related to its refusal to be PCI compliant violated the

aforementioned laws based on his quarter century employed in the banking industry during which time he had held several regulatory and compliance positions. See also ¶¶ 69-100, 104, 106 and 107 *supra*.

132. Mr. Slawin's protected activity contributed to the decision to terminate him. See also ¶¶101-107 *supra*.

133. BAMS' decision to terminate Mr. Slawin was inextricably entwined with his protected activity.

134. BAMS terminated Mr. Slawin in retaliation for his protected activity.

135. As a result of BAMS unlawful termination, Mr. Slawin has suffered economic and non-economic injury as described in ¶¶108-111.

COUNT III
DODD-FRANK WALL STREET REFORM
AND CONSUMER PROTECTION ACT
15 U.S.C.§78u-6

136. Mr. Slawin realleges Paragraphs 1 -122 with the same force and effect as if fully set forth herein.

137. Mr. Slawin is a whistleblower as defined by Dodd-Frank since he filed a whistleblower complaint online with the SEC through the SEC's website at www.sec.gov. relating to violation of the securities laws by BAMS.

138. By filing a complaint online, Mr. Slawin reported possible violations of the securities laws via one of the methods provided by the SEC for reporting such violations under  15 U.S.C. 78u-6(h).

139. Mr. Slawin's numerous and repeated disclosures about BAMS' fraud on its customers and shareholders deriving from its known non-PCI compliance, refusal to become PCI compliant, and intentional deception regarding its non-PCI compliance constitute disclosures that are protected under the Sarbanes-Oxley Act of 2002, and amount to protected activity under 15 U.S.C.§78u-6.

140. Mr. Slawin was terminated in retaliation for his repeated disclosures regarding BAMS fraud on its existing customers, potential customers, and shareholders which is protected under the Sarbanes-Oxley Act of 2002.

141. Mr. Slawin's protected activity contributed to the decision to terminate him.

142. BAMS' decision to terminate Mr. Slawin was inextricably entwined with his protected activity.

143. As a result of BAMS unlawful termination, Mr. Slawin has suffered economic and non-economic injury as described in ¶¶108-111, and under 15 U.S.C.§78u-6  is entitled to double economic recovery.

Relief Requested

WHEREFORE, Plaintiff has suffered substantial damages and requests that the following relief be awarded:

1.  An Order declaring that each of the Defendants unlawfully retaliated and/or discriminated against Mr. Slawin in violation of the Sarbanes Oxley Act;

2.  An Order declaring that each of the Defendants unlawfully retaliated and/or discriminated against Mr. Slawin in violation of Title X of the Consumer Financial Protection Act ("CFPA"), 12 U.S.C. §5567(a).

3. An Order declaring that each of the Defendants unlawfully retaliated and/or discriminated against Mr. Slawin in violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C.§78u-6.

4.  An Order prohibiting any further retaliation or discrimination against Mr. Slawin, including but not limited to, acting upon or publishing the untrue assertion that he was fired "for cause", or words to that effect;

5.  An Order expunging from Plaintiff's employment record of any negative references or inferences that may have been caused by or can be attributed to the unlawful retaliation and/or discrimination;

6.  An Order requiring that Bank of America Merchant Services reinstate the Plaintiff;

7. An Order for front pay in lieu of reinstatement in the event that reinstatement is not possible or practicable;

8. An Order requiring back pay and lost benefits to be paid to the Plaintiff from the date of his termination and continuing;

9. An Order awarding monetary relief to the Plaintiff and against the Defendants, jointly and severally for emotional distress and mental anguish;

10. An Order awarding special damages to the Plaintiff and against the Defendants, jointly and severally including to compensate him for damage to his reputation;

11. An Order awarding payment of all attorneys' fees and costs (including but not limited to transcripts, travel, and expert witness fees) to the Plaintiff and against the Defendants, jointly and severally;

12. An Order awarding interest on all monetary sums awarded compounded daily from the date of his termination;

13. Trial by Jury; and

14. An Order providing such other and further relief as may be requested or determined by the Court to be just and proper.

Respectfully submitted, this 12th day of September 2019.

s/Jean Simonoff Marx_____
JEAN SIMONOFF MARX
Georgia Bar No. 475276
ROBERT N. MARX
Georgia Bar No. 475280
ATTORNEYS FOR PLAINTIFF
1050 Crown Pointe Parkway
Suite 500
Atlanta, GA 30338
jeannie.marx@marxlawgroup.com
robert.marx@marxlawgroup.com
lawyers@marxlawgroup.com
Tel. (404) 261-9559