IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

                                                                    :

                                        Plaintiff,

                                                                    :

v.

                                                                    :

                                                                              Civil Action File

                                                                              No. 1:19-cv-04129-AT

BANK OF AMERICA MERCHANT
SERVICES; BANK OF AMERICA                           :
CORPORATION; FIRST DATA CORPORATION;
FISERV, INC.,

                                        Defendants.    :
_____x

PLAINTIFF'S REPONSE IN OPPOSITION TO DEFENDANTS' FIRST
DATA CORPORATION'S AND FIRSERV, INC.'S MOTION TO DISMISS[1]

Statement of the Facts

A. First Data/Fiserv is Joint Venturer and Parent Company to BAMS

        BAMS is a joint venture between BOA and First Data (now Fiserv),

providing payment processing services, with BOA and First Data having roughly

equivalent ownership stakes in BAMS. (Complaint ¶¶1,8). SEC filings of First

Data, a publicly traded company, list BAMS as a subsidiary, and BAMS'

_____

[1] Although there are two other Defendants in this matter, Bank of America
Merchant Services and Bank of America Corporation ("BOA"), for ease of
reference, Defendants First Data and Fiserv will be referred to collectively herein
as "Defendants."

financials are consolidated within First Data's financial information therein. (Complaint ¶¶8, 9, 14, 19).

In January 2019, Fiserv, a publicly traded company, entered into a merger agreement to acquire First Data in an all-stock transaction for an equity value of approximately $22 billion. (Complaint ¶¶11, 12, 14).  Fiserv completed its merger with First Data on July 29, 2019, with First Data surviving as a wholly owned subsidiary of Fiserv (¶¶1, 13).

Fiserv's Form 10-Q filed with the SEC on November 7, 2019[2] states that Fiserv acquired 100% of First Data stock and that Fiserv's reported financial results include the financial results of First Data from the date of acquisition. (10-Q, p. 5). "[T]he combined company provides . . . financial services, including account processing and digital banking solutions; card issuer processing and network services; payments; e-commerce; merchant acquiring and processing" and others. (*Id*.) Fiserv's acquiring 100% of First Data increases Fiserv's "footprint as a global payments and financial technology provider . . .to financial institutions, corporate and merchant clients, and consumers." (*Id*., p. 11)  Fiserv "owns 51% of BAMS and BAMS' financial results are consolidated into the Company's financial

---

[2] This Court may take judicial notice of SEC filings on a 12(b)(6) motion to dismiss without converting the motion to summary judgment. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1272–87 (11th Cir. 1999). In any event, a motion for summary judgment would need to be denied in order to allow discovery of facts unavailable to the non-movant under Fed.R.Civ.P. 56(d)

statements." (*Id*., p.36).

B. Fiserv's Announcement that BAMS will be dissolved

"In July 2019 the Company and Bank of America jointly announced the dissolution of the Banc of America Merchant Services joint venture ("BAMS"), to be effective June 2020. . . .Upon dissolution of the joint venture, the Company is entitled to receive a 51% share of the joint venture's value via an agreed upon contractual process. . . . In addition, Bank of America has the right to require the Company to continue providing merchant processing and related services to the joint venture clients allocated to Bank of America in the dissolution of the joint venture through June 2023 at current pricing. The Company anticipates an ongoing relationship with Bank of America to provide processing and other support services to other Bank of America merchant clients following the joint venture's dissolution." (November 7, 2019, 10-Q, p. 36).

C. BAMS and First Data's Service to Customers was a Package Deal

BAMS and First Data/Fiserv are fully entwined *vis à vis* their joint provision of payment processing services to their merchant and municipal customers. BAMS sold First Data products to customers, solicited business, and operated as the face of the payment processing business which it engaged in with First Data. (Complaint, ¶¶33, 34). First Data handled the payment processing from the back end, processing credit and debit card transactions, for which BAMS charged a fee.

(Complaint, ¶34). In this relationship, First Data was in essence the back office so that private merchants' and municipalities' point of contact was BAMS. (Complaint, ¶35). When a retail merchant or municipality processes credit or debit card transactions, those transactions were handled through First Data, using First Data's terminals which BAMS sold to its customers. (Complaint, ¶36). However, chargebacks by merchants, requiring credit and debit card refunds, were handled by BAMS. (Complaint, ¶38). BAMS' direct handling of credit and debit card refunds and chargebacks necessarily required BAMS to obtain, utilize, store, and convey PAN (personal account number) data, requiring BAMS to be PCI complaint, which it was not. (Complaint, ¶¶1, 20-23, 39). BAMS' handling of PAN data without being PCI compliant, especially in its role in the chargeback process, created a significant data breach risk. (Complaint, ¶47). Vast amounts of PAN data were regularly transmitted between First Data and BAMS in non-PCI compliant batch files and spreadsheets, so that BAMS acquired, hosted, and transmitted that data in violation of PCI-DDS, and in breach of its Merchant Processing Agreements with its customers, rendering that PAN data vulnerable to data security breach. (Complaint, ¶77). Client inquiries and concerns about PCI compliance were deflected to First Data to cover up that BAMS' non-PCI compliance when it received, retained and transmitted customers' PAN data. (Complaint, ¶76). Mr. Slawin repeatedly raised concerns to numerous superiors,

4

objecting to being in a position of having to go along with this deflection and

information strategy, and raising his concerns about First Data's huge potential

financial exposure and risks emanating from this situation. (Complaint, ¶¶79-94).

POINT I<br>
FIRST DATA/FISERV AND BAMS ARE "ONE AND THE SAME"

A. The Statutes

On July 21, 2010, Congress enacted  Public Law 111-203, entitled the

"Dodd-Frank Wall Street Reform and Consumer Protection Act." 124 Stat. 1376.

The act amended or enacted all three statutes in this action:

- Section 929A of the act amended Sarbanes-Oxley (hereinafter

  "SOX") to clarify that parent companies are liable under SOX for the

  unlawful discharge of  an employee of a wholly owned subsidiary

  whose financials are included in the consolidated financials of the

  parent company. 124 Stat. 1852.

- Section 922(a) of the act extended protection to employees who report

  fraudulent practices to the SEC. 124 Stat. 1841.  It is codified as 15

  U.S.C. §78u-6 and is generally referred to as "Dodd-Frank."

- Section 1057 of the act extended protection to employees who report

  fraudulent practices internally. 124 Stat. 2031.  It is codified as 12

  U.S.C. §5667 and is generally referred to as the "Consumer Financial

  Protection Act" (or "CFPA").

All three amendments/enactments were enacted to ". . . promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail', to protect the American taxpayer by ending bailouts, [and] to protect consumers from abusive financial services practices . . ." 124 Stat. 1376.  None of the statutes were enacted for the stated purpose of providing protections to employees, except insofar as such protections served the aforesaid expressed purposes.  All three amendment/statutes, passed on the same day as part of the same act, are read *in pari materia*. *Consumer Fin. Prot. Bureau v. Universal Debt & Payment Sols., LLC*, 2015 WL 11439178, at *7 (N.D. Ga. Sept. 1, 2015), citing *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)(CFPA as part of Dodd-Frank Act is read in *pari materia* to Dodd-Frank, because "statues relating to the same subject matter should 'be construed' as if they were one law.'")

B. <u>Sarbanes-Oxley</u>

Publicly traded companies and their subsidiaries are "one and the same for Section 806[3] coverage purposes" *Johnson v. Siemens Building Technologies, Inc.,*

---

[3] 18 U.S.C. §1514A was enacted on July 30, 2002 as part of Public Law 107-204, 116 Stat. 745.  Title VIII of the statute was entitled, "Corporate and Criminal Fraud Accountability." Section 806 of Title VIII, entitled, "Protection for employees of publicly traded companies who provide evidence of fraud", which provided that it be  codified as 18 U.S.C. §1514A, is found at 116 Stat. 802.  Thus, courts and administrative agencies often refer to Section 806 when referring to SOX's whistleblower protection for employees, codified as 18 U.S.C. §1514A.

*et al*., 2011 WL 1237202 (DOL Adm. Rev. Board, ARB Case, No.08-032, ALJ

Case No. 2005-SOX-015, March 31, 2011) ("*Johnson v. SBT*").

Defendants quote SOX but omit the key statutory language:

> <u>No company</u> . . .<u>*including any subsidiary or affiliate*</u>
> <u>*whose financial information is included in the*</u>
> <u>*consolidated financial statements of such company*</u> . . .
> may discharge, demote, suspend, threaten, harass, or in
> any other manner discriminate against an employee in the
> terms and conditions of employment because of any
> lawful act done by the employee.

18 U.S.C.A. § 1514A (West)(emphasis added). Thus, an entity covered by the anti-

retaliation provision of SOX is a company which is required to file reports with the

SEC and *includes* a subsidiary or affiliate whose financial information is included

in the company's consolidated financial statements. Mr. Slawin's complaint alleges

that First Data and its parent successor, Fiserv are publicly traded companies, and

that BAMS is a subsidiary whose financials are included in the consolidated

financials of those companies filed with the SEC. (Complaint ¶¶1,8,9,11-14,19).

As described above, on July 21, 2010, Section 929A of the Dodd-Frank Wall

Street Reform and Consumer Protection Act amended Section 806 of SOX to

define "company" as "*including* any subsidiary or affiliate whose financial

information is included in the consolidated financial statements of such company."

124 Stat. 1852. Prior to this amendment, the issue of subsidiary coverage was

unsettled, and both the Department of Labor and courts had been divided on

SOX's coverage of subsidiaries, relying on different theories such as agency, "integrated enterprise" or "single employer" for their divergent results. *Johnson v. SBT,* 2001 WL 1247202 at *8; *Leshinsky v. Telvent GIT, S.A.*, 873 F.Supp 2d 582, 596-97 (S.D.N.Y. 2012) (noting that courts had considered subsidiary coverage unsettled before Dodd-Frank).

However, Dodd-Frank's amendment clarified[4] that "company" within the meaning of Section 806 of SOX includes its subsidiaries and affiliates whose financials are consolidated with the company, so that consolidated subsidiaries are "part of the publicly traded company for purposes of Section 806 coverage." *Johnson v. SBT,* 2001 WL 1247202 at *9 "[O]nly by effectively viewing publicly traded companies and their subsidiaries as one and the same for Section 806 coverage purposes can the critical role that Congress envisioned for whistleblowers be achieved." *Id.* at *10. SOX's provisions, its history and role as a *securities* and not employment law provide the statutory and regulatory backdrop "to support the conclusion that publicly traded parent companies and their consolidated

---

[4] Although not critical here, the courts as well as the Department of Labor concluded that the 2010 amendment of Section 806 was a clarification and not a change in the law, allowing retroactive application. *Leshinsky v. Telvent GIT, S.A.*, 873 F.Supp 2d 582, 591-92 (S.D.N.Y. 2012), *Johnson v. Siemens Building Technologies, Inc. et al*., (U.S. Dep't. of Labor Administrative Review Board, March 31, 2011) 2001 WL 1247202 *11.

subsidiaries constitute *a single, unitary company* for Section 806 purposes."
*Johnson v. SBT*, E. Cooper Brown, concurring, 2001 WL 1247202 at *15-21.

Defendants' central argument is that they are not proper defendants because they did not employ Mr. Slawin but cite no case law for their argument.  Their "employment law" argument is a red herring because they confuse SOX, CFPA and Dodd-Frank as employment laws, when in fact they are securities laws. The ARB rejected precisely the same arguments as Defendants make here, that they are not Mr. Slawin's employer, that they did not control his employment and did not know of BAMS' fraudulent non-PCI compliance schemes. In *Johnson v. SBT,* 2001 WL 1247202 at *12, the ARB reversed the ALJ's dismissal of the parent Siemens AG which had been based on the ALJ's conclusion that there was no evidence that Siemens AG controlled employment decisions at the employing subsidiary, SBT, that Siemens AG knew of Johnson's concerns about accounting irregularities or played any role in the termination of her employment.**[5]**

---

[5]Defendants' "integrated enterprise" argument at pages 12-14 of their brief is irrelevant because as discussed herein, consolidated subsidiaries and the public parent are *a single, unitary company* for Section 806 whistleblower protection purposes. Moreover, *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930 (11th Cir. 1987), relied upon by Defendants, does not help them. The 11th Circuit reversed *summary judgment* dismissing the case on the issue of "single entity" in light of evidence of common ownership of the companies, that they "market[ed] the companies as twins to the public", and that "customers who purchase Protective insurance are encouraged to utilize Davenport-Harris burial arrangements". 834 F.2d at 933-34. Giving a liberal construction to the term "employer" in the Title VII *employment law* context, this evidence was sufficient

This is because, as recognized by courts and the ARB, SOX is a securities law, and guidelines and standards developed for labor laws do not control SOX's whistleblower protections.

In *Leshinsky v. Telvent GIT, S.A.*, 873 F.Supp 2d 582 (S.D.N.Y. 2012), the court agreed that the plaintiff there could likely not meet the single-integrated enterprise test to hold the parent corporation liable for the unlawful discharge by the wholly owned subsidiary and then stated, "[b]ut this only illustrates the inappropriateness of the labor law approach to this issue . . . . Sarbanes–Oxley,

---

to raise a disputed issue of fact as to whether the companies were an "integrated enterprise" for *employment law* purposes. *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d at 933.

Here, the Complaint reflects both an identity and intermeshing of the operations of BAMS and First Data/Fiserv. BAMS was the face of the business relationship. In order to deflect any questions regarding BAMS' non-PCI compliance, part of the fraud was to mislead customers by directing them to First Data. BAMS and First Data were integrated with respect to payment processing, with First Data handling charges and BAMS handling chargebacks, so that PAN data information flowed between them. These facts support the inference that BAMS and First Data "were marketed as twins", and indeed their business operations concerning the matters raised by the Plaintiff's concerns were intimately entwined. First Data, and now Fiserv, is the ultimate financial beneficiary of BAMS' business on a consolidated financial basis, and Defendants' shareholders were/are put at risk in the event of a data breach as a result of BAMS' non-PCI compliance. Fiserv's intent to dissolve BAMS and to honor BAMS' contractual arrangements in continuation of the business, and Fiserv's decisions regarding terminating or retaining the BAMS workforce not only support a finding that Defendants' and BAMS' business operations were/are entwined, but also that Defendants have and at all relevant times had ultimate control over BAMS' employees. Defendants cannot demonstrate that Plaintiff's claims lack plausibility.

however, is not a labor or employment statute—it is an anti-fraud statute concerned with corporate transparency." 873 F.Supp. 2d at 604.

In explaining why the labor law standard was inappropriate, and contrary to Congressional intent as reflected in the statute, the court stated that,

> . . . as a matter of policy under Sarbanes–Oxley, it makes more sense to focus on whether a subsidiary was the parent's agent for purposes of producing accounting or financial information which is consolidated into the parent's financial reports, than whether the subsidiary was the parent's agent with respect to human resources matters . . . .

> Although day-to-day operational and personnel decisions were largely performed by the subsidiaries independently of the parent, the subsidiaries directly contributed to the financial state of the company, and the financial information of the subsidiaries was included in the consolidated financial statements of the parent. A whistleblower statute that protects investors in Telvent GIT [the parent company] would be concerned not so much with who made the day-to-day employment decisions, but rather with decisions that affect the value of the company.

*Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d at 605 (internal quotation marks omitted).

In *Johnson v. SBT,* 2001 WL 1247202 a*21, n. 24, the ARB noted the importance Congress gave to subsidiaries as impacting the valuation of the parent company as a basis for effecting Congressional intent to extend liability under the statue to a parent company for the unlawful acts of a wholly owned subsidiary:

> In his remarks on the Senate floor at the time of SOX's
> passage, Senator Leahy, co-author of Section 806, noted
> Enron's "hidden corporations" . . . . 148 Cong. Rec.
> S7358 (July 25, 2002). The Senate Report accompanying
> Sarbanes-Oxley's passage . . . cited Enron's layers of
> subsidiaries and partnerships that "under a code of
> corporate silence" were "used essentially to cook the
> books and trick both the public and federal regulators
> about how well Enron was doing financially." S. Rep.
> No. 107-146, at 2-5.

The ARB noted that, "Congress recognized the important role that subsidiaries could play in deceiving investors and in affecting the financial health of publicly traded companies." 2011 WL 1247202, at *11. In his concurrence, E. Cooper Brown further explained the *unitary status of a company along with its consolidated subsidiaries* makes perfect sense within the securities law framework, since,

> financial information of majority-owned or controlled
> subsidiaries are consolidated on the registration statement
> and annual reports *because these subsidiaries are
> controlled by, and thus considered part of and wholly
> inseparable from, the parent company* for the purposes of
> complying with sections 12 and 15(d) of the Exchange
> Act.

*Johnson v. SBT,* 2001 WL 1247202 at *20 (emphasis added). As the majority in *Johnson v. SBT*, explained, the SEC also supported extending liability to parents of wholly owned subsidiaries in order to give effect to the Congressional intent:

> Interpreting Section 806 not to cover consolidated
> subsidiaries would mean that whether a whistleblower
> was protected would turn on whether he worked for the

> parent or an unincorporated division rather than for a
> subsidiary, even though the consequences of his
> reporting misconduct would be exactly the same in both
> situations. It seems quite unlikely that Congress intended
> that outcome. Nor would it make sense to exclude from
> whistleblower protection the employees most likely to
> know of misstatements in consolidated financial
> statements, such as misstatements concerning inventory
> and sales at subsidiaries where inventory is maintained
> and sales staff is actually located.

*Johnson v. SBT*, 2011 WL 1247202 at *11, *citing*, SEC *Amicus* Brief at 11).

## C.  Dodd-Frank

Since Dodd-Frank incorporates by reference the protections of SOX, similar

principles apply. 15 U.S.C. §78u-6(h)(1)(A)(iii). Defendants cite to 15 U.S.C.

§78u-6(h)(1)(A) to argue that Dodd-Frank refers to an "employer" (Def. Br. 6), but

sub-section (iii) of that same section expressly incorporates SOX's protections.

Accordingly, Congress's intent to include subsidiaries and affiliates whose

financials are included in the consolidated financials of the public company, as a

"one and the same" entity, applies to Dodd-Frank as well. Defendants do not point

to any contrary definition of "employer" in Dodd-Frank, nor could they since

Dodd-Frank does not contain any.

## D. CFPA

The CFPA, like SOX and Dodd-Frank, is a securities law, not an

employment law. Law derived from the employment law context is irrelevant to

the stated Congressional intent to protect the stability of the American financial

system by encouraging employees to report fraudulent practices that might impact the valuation of publicly traded companies. The same Congressional intent to encourage employees of wholly owned subsidiaries to report fraudulent practices that might impact the valuation of the parent companies militates in favor of extending liability to the parent companies for unlawful acts of their wholly owned subsidiaries, irrespective of the technicalities of corporate organization.

Defendants emphasize (Br. p. 6) CFPA's reference to a "covered employee" but the key wording is at the beginning of the sentence quoted by Defendants, referring to a "covered person." The CFPA makes it unlawful for covered persons to engage in certain acts which under the CFPA's definition of "covered person" includes Defendants.

12 U.S.C. §5481, also enacted on July 21, 2010 as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1955, provides definitions for words and phrases contained in the act. §5481(6) defines "covered person as follows:

> The term "covered person" means –
> (A) any person that engages in offering a consumer financial product or service; and
> (B) any affiliate of a person described in subparagraph (A) if such affiliate acts as a service provider to such person.

A "consumer financial product or service" is defined as,

> . . . any financial product or service that is described in

one or more categories under . . . paragraph (15) and is offered or provided for use by consumers primarily for personal, family, or household purposes . . .

12 U.S.C. §5481(5).

Under paragraph 15(A)(vii) a "financial product or service" includes:

(vii) providing payments or other financial data processing products or services to a consumer by any technological means, including processing or storing financial or banking data for any payment instrument, or through any payments systems or network used for processing payments data, including payments made through an online banking system or mobile telecommunications network . . .[6]

12 U.S.C. §5481 (15) (vii).

The Complaint pleads that BAMS was in the business of processing consumer payments for purchases from merchants through online banking systems and First Data's terminals. (Complaint, ¶¶22, 25, 125).  Thus, BAMS <u>and</u> First Data were involved in providing a "consumer financial product or service" as defined in the CFPA.

A "person" includes a ". . . company, corporation . . . or other entity."  12 U.S.C. §5481 (19). First Data, as a corporation, was thus a person under the statute. Since First Data was involved in the processing of credit card payments, it was a

_____

[6] The exceptions – for the merchants themselves or for website hosts (12 U.S.C. §5481 (15) (vii) (I) and (II) – are not applicable to BAMS' business as a third-party processor of payments for consumers' payments to merchants.

"service provider" under the statute:

> The term "service provider" means any person that
> provides a material service to a covered person in
> connection with the offering or provision by such
> covered person of a consumer financial product or
> service, including a person that –
> (i) participates in designing, operating, or maintaining the
> consumer financial product or service; or
> (ii) processes transactions relating to the consumer
> financial product or service . . .

12 U.S.C. §5481(26).  The Complaint pleads that "BAMS solicits the business, *i.e.*,

merchant and municipal customers and is the 'face' of the relationship between its

customers, while First Data handles the payment processing from the back end."

(¶34). The Complaint also pleads that First Data "is in essence the back office"

(¶35) and that the payment processing is handled through First Data using First

Data's terminals. (¶36).  Thus, First Data is clearly a "service provider" under the

statute.

The statute defines "affiliate" as "any person that controls, is controlled by,

or is under common control with another person." 12 U.S.C. §5481(1).  The

Complaint pleads that BAMS is a joint venture between First Data and Bank of

America Corporation.  Since BAMS is "controlled by" First Data, First Data is

thus an affiliate under the statute, and thus a "covered person" under the statute. It

is thus liable for the unlawful acts of BAMS under the statute, irrespective of any

corporate technicalities, irrespective of any lack of participation in the termination

decision and irrespective of any alleged lack of *scienter* on its part[7].  As shown above regarding SOX and Dodd-Frank that is precisely what Congress intended, in order to protect shareholders of First Data, a publicly traded company valued with reference to its wholly owned subsidiary, BAMS.

POINT II
DEFENDANTS ARE LIABLE AS JOINT VENTURERS,
ALTER EGOS AND/OR SUCCESSORS

A. Defendants are Liable as Joint Venturers

Under both Georgia law and Delaware[8] law, a joint venture is regarded as a single employer. *Boatman v. George Hyman Const. Co*., 157 Ga. App. 120, 122–23(1981) "Joint venturers bear the same relation to each other as do the partners in a partnership. Each is an agent of the entity." *Id.* "*[A]n employee engaged in activities of the joint venture is an employee of each of the joint adventurers under*

---

[7] Joe Moll, BAMS' Vice President Corporate Information Security Officer, Risk and Compliance, knew of thousands of instances of BAMS non-PCI compliance, BAMS' decision to remain non-PCI complaint, and the vast potential data breach catastrophe and resulting huge financial losses including to shareholders of First Data. (Complaint, ¶¶53, 54, 60, 64-66, 69-79, 81-82, 93-95, 98). Mr. Moll's Linked-In Profile reflects that he moved into his position at BAMS from the position of Director Enterprise Security Risk and Compliance at First Data, supporting the appropriateness of discovery regarding First Data's information and knowledge.

[8] Bank of America Merchant Services has stated that it was incorrectly named under its trade name, Bank of America Merchant Services instead of under its corporate name, Banc of America Merchant Services, LLC, which the Georgia Corporations website lists as a Delaware corporation.

*ordinary principles of agency." Id*. (Emphasis added). *Hudson v. A.C. & S. Co.*, 535 A.2d 1361, 1363 (Del. Super. Ct. 1987) ("an employee of the joint venture is an employee of each of the joint venturers and each joint venturer is jointly and severally liable. . ."). "[T]he mere fact that one corporation is a subsidiary of another does not alone serve to insulate the parent" where the evidence supports a joint venture relationship. *Kissun v. Humana, Inc*., 267 Ga. 419, 419–21, 479 S.E.2d 751, 751–54 (1997). Defendants' liability is vicarious. *New York v. Grand River Enterprises Six Nations, Ltd.*, 2019 WL 516955, at *8–10 (W.D.N.Y. Feb. 11, 2019) (denying motion to dismiss; allegations support joint venture, "plausibly implicat[ing] GRE under a theory of vicarious liability").  Federal law similarly recognizes joint ventures in various contexts. *Sasportes v. M/V Sol de Copacabana*, 581 F.2d 1204, 1208 (5th Cir. 1978) (in the maritime context); *Nat'l Coal. Gov't of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 358–59 (C.D. Cal. 1997)(denying motion to dismiss under Alien Tort Claims Act on joint venture theory).

B. Defendants Can Be Held Liable Under an Alter Ego Theory

"Under the alter ego doctrine, equitable principles are used to disregard the separate and distinct legal existence possessed by a corporation where it is established that the corporation served as a mere alter ego or business conduit of another." *Kissun,* 267 Ga. at 419-20. The corporate form is disregarded if: (1) the

corporation is a "mere instrumentality" of the parent company or the shareholders, and (2) to observe the corporate form would "work an injustice." *Ralls Corp. v. Huerfano River Wind, LLC*, 27 F. Supp. 3d 1303, 1328 (N.D. Ga. 2014). As an equitable doctrine, the alter ego doctrine can be applied where there is no other legal remedy, such as when there "are insufficient corporate assets to satisfy the plaintiff's claim." *Johnson v. Lipton*, 254 Ga. 326, 327 (1985); *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("veil-piercing. . .is usually invoked when the…corporate entity is insolvent"). Fiserv's SEC filings establish that Fiserv and BOA will dissolve BAMS as of June 2020, so that an alter ego theory of liability is appropriate since BAMS will cease to exist to satisfy any judgment in this case against it. *Baker's Bay at Great Guana, LLC v. Discovery Baker's Bay Inv'rs, LLC*, 2018 WL 3093960, at *6 (N.D. Ga. Feb. 16, 2018) (motion to dismiss corporate parent denied given subsidiary's insolvency, and where plaintiff should have discovery regarding the interrelatedness of the parent and subsidiary corporations).

C. Plaintiff will be Able to Substitute Fiserv after BAMS is dissolved

Similarly, the Complaint and Fiserv's SEC filings establishing Fiserv as a successor joint venturer in the BAMS venture and Fiserv's joint intent with BOA to dissolve BAMS in June 2020, is sufficient to retain Defendants both under a successor theory and on the ground that Fed.R.Civ.P. Rule 25(c) would allow Mr.

Slawin to move for substitution in June 2020 when BAMS is terminated. *Virgo v. Riviera Beach Associates*, 30 F.3d 1350, 1358 (11th Cir. 1994) (allowing substitution of corporate party which purchased all of the assets of corporation originally named in Title VII case); *Wallace v. DM Customs, Inc.*, 2006 WL 8440090, at *4–5 (M.D. Fla. May 12, 2006) (granting motion to add successor corporation as a defendant). Fiserv's November 7, 2019 10-Q filed with the SEC references litigation in connection with First Data's merchant business. (10-Q, p.37).

POINT III
*DIGITAL REALTY* DOES NOT CONTROL THIS CASE

The Supreme Court's decision in *Digital Realty Tr., Inc. v. Somers*, 138 S.Ct. 767 (2018) does not control this case because here Mr. Slawin filed information of Defendants' fraudulent actions with the SEC. (Complaint, ¶¶106, 107).  He is thus a whistleblower under the clear wording of the statute:

> The term "whistleblower" means any individual who provides . . . information relating to a violation of the securities laws to the Commission [SEC] . . .

15 U.S.C. §78u-6(a)(6).

While it is true that the filing with the SEC was after he was fired, the Supreme Court acknowledged that the wording of the statute does not contain any temporal requirement. 138 S.Ct. at 780-781.  As the Supreme Court itself noted in *Digital Realty*,  "When a statute includes an explicit definition, we must follow that

20

definition, 'even if it varies from a term's ordinary meaning.'" *Digital Realty*, 138 S.Ct. at 776-77, *citing*, *Burgess v. United States,* 553 U.S. 124, 130, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008).

It admittedly might make sense to require an employee to file with the SEC before being fired, just like – as the plaintiff argued in *Digital Realty* – it might make sense for an employee who has reported fraud to a person other than the SEC to be deemed a whistleblower under Dodd-Frank – but as the Supreme Court held in *Digital Realty*, courts must apply the law as specifically written, and are not empowered to make "common sense" adjustments to the statute where its wording is clear and unambiguous.  The clear and unambiguous wording of Dodd-Frank requires only a report of a violation to the SEC; it does not say when the report needs to be made.  This Court is simply not empowered to say when it must be made, even if it would "make sense" to the Court that the report to the SEC should be made before the discharge.

Defendants' argument (Br., p. 10) that the discharge must be "because of" the report to the SEC misreads the statute and is based on non-binding *dicta* in *Digital Realty* because there, the Plaintiff never reported to the SEC. Here, Mr. Slawin is a <u>dual reporter</u>, internally as well as to the SEC, so that he is presently covered under Dodd-Frank even under *Digital Realty*. The Supreme Court's discussion of hypothetical facts in *dicta*, where a whistleblower makes reports of

fraudulent activities both to the SEC and other individuals covered under SOX, does not constitute the Court's holding since the *Digital Realty* plaintiff never filed any report with the SEC.  Moreover, again, the clear wording of Dodd-Frank protects employees who ". . . provide information to the Commission . . . " [15 U.S.C. §78u-6(h)(1)(A)(i)] . . . "**or** (iii) . . . mak[e] disclosures . . . protected under Sarbanes-Oxley . . ." [15 U.S.C. §78u-6(h)(1)(A)(iii)] (emphasis added).  Thus, the assertion that the discharge must be "because of" the report *to the SEC* misreads the statute.

Currently pending legislation clarifies that Dodd-Frank's anti-retaliation provision protects a corporate whistleblower who complains internally even without having gone to the SEC. On July 10, 2019 the House passed the Whistleblower Protection Reform Act of 2019 (H.R. 2515) by an overwhelming bipartisan majority to clarify that an internal corporate whistleblower is protected under the anti-retaliation provision of  Dodd-Frank. (165 Cong.Rec. No. 114, Whistleblower Protection Reform Act of 2019 (daily ed. July 9, 2019), Pages H5276-H5278. On September 23, 2019 Senator Charles Grassley introduced the companion Senate Bill, the Whistleblower Programs Improvement Act (WPIA) similarly clarifying that Dodd-Frank protects internal corporate whistleblowers. The WPIA is presently in Committee.  Whistleblower Programs Improvement Act, H.R. 4816, 116th Cong. (2019).

As Senator Grassley explained in his Senate floor remarks, Congress did not intend to deny anti-retaliation protection under Dodd-Frank to whistleblowers who report internally, or to protect them only if they disclosed wrong-doing to the SEC. 165 Cong.Rec. No. 166, Whistleblower Programs Improvement Act (daily ed. Oct. 21, 2019) (statement of Sen. Grassley). The unintended anomaly here addressed in *Digital Realty* emanated from a drafting error in Section 922 Dodd-Frank Act which contained a definition of "whistleblower" in the statute that was inconsistent with the text of <u>its</u> own anti-retaliation provision, which expressly protects internal disclosures (by incorporating Sarbanes-Oxley protected conduct within the ambit of Dodd-Frank protected conduct).  The definition of "whistleblower" in Section 922 appears to have been drafted solely for the provision creating the SEC whistleblower reward program and was not intended to apply to the anti-retaliation provision.

<u>POINT IV</u>
<u>PLAINTIFF DOES NOT HAVE TO PLEAD OR PROVE</u>
<u>SPECIFIC KNOWLEDGE ON THE PART OF FIRST DATA</u>

"Fundamentally, a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted tests whether a plaintiff's complaint satisfies Rule 8(a)'s liberal pleading requirements." *Nester v. Hampton Inn Princeton*, 2013 WL 2468576, at *2–3 (S.D.W. Va. June 7, 2013). For purposes of Rule 8, pleading "[s]pecific facts [is] not necessary; the statement need only give the defendant fair

notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007).  Listing the elements that make out a *prima facie* claim is unnecessary, and the plaintiff need not plead a *prima facie* case in order to survive a motion to dismiss. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 511 (2002). The question on a (12)(b)(6) motion is whether the Plaintiff has stated a *plausible* claim for relief. *Erickson,* 551 U.S. at 93.  Dismissal is only appropriate when there is a lack of a cognizable legal theory or on the absence of facts that would support a valid theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.1990).

A.  Defendants are "one and the same" with BAMS under the statutes

Defendants' argument (Def. Br., pp. 7-9) that Plaintiff has to plead and prove *scienter* specifically on the part of First Data and Fiserv is met by the fact that for purposes of SOX, CFPA and Dodd-Frank, First Data and BAMS were one and the same. *See*, Point I, *supra*.   In addition and alternatively, Defendants would be vicariously liable under joint venture, alter ego and successor theories. *See*, Point II, *supra*. In addition, upon completion of the dissolution of BAMS, Fiserv will be substituted as a Defendant under Fed.R.Civ.P. 25.

B.  Defendants' cases are distinguishable

All of the cases cited at pp. 7 – 9 of Defendants' brief involved either summary judgment after full discovery, or a motion for judgment *n.o.v.* after a

trial. *Gale v. U.S. Dep't of Labor*, 384 F. App'x 926 (11th Cir. 2010) is inapposite because there the court granted summary judgment under SOX because the plaintiff acknowledged at his deposition that he had not had a reasonable belief that his employer had engaged in fraudulent acts under the statute. In *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797 (6th Cir. 2015), there was a jury verdict for the plaintiff after full discovery and a trial. Moreover, while Defendants cite *Rhinehimer* for a purported standard under the CFPA, that case involved only SOX. *Hall v. Teva Pharm. USA, Inc.*, 214 F. Supp. 3d 1281 (S.D. Fla. 2016), also decided on summary judgment, does not forth any *scienter* requirement under Dodd-Frank as Defendants state. *Kruchoski v. MiMeds Grp., Inc.* 2017 WL 3433697 (N.D. Ga. June 13, 2017) was not decided on the merits. The court held that the Plaintiff was bound to litigate his Dodd-Frank action in state court, and absent a transfer to federal court, dismissed the case without prejudice.

As the cases cited by Defendants illustrate, Plaintiff should be allowed discovery to prove the elements of each of his causes of action in this matter.

Plaintiff submits that his 143-paragraph Complaint is sufficiently detailed to give Defendants notice of each of his causes of action. However, if the Court finds it necessary for Plaintiff to more particularly set forth any element of any cause of action, the appropriate remedy is to grant Plaintiff leave to replead in lieu of dismissal.

<u>CONCLUSION</u>
<u>DEFENDANTS' MOTION TO DISMISS SHOULD</u>
<u>BE DENIED, OR PLAINTIFF SHOULD BE GRANTED</u>
<u>LEAVE TO REPLEAD IN LIEU OF DISMISSAL</u>

Respectfully submitted, this 17th day of January 2020.

<u>s/Jean Simonoff Marx</u>
Georgia Bar Number 475276
Robert N. Marx
Georgia Bar Number 475280
Attorneys for Plaintiff
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
Tel: (404) 261-9559
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


ERIC SLAWIN,

                                 :

            Plaintiff,

                                 :

v.

                                 :
                                             Civil Action File

BANK OF AMERICA MERCHANT          No. 1:19-cv-04129-AT
SERVICES; BANK OF AMERICA
CORPORATION; FIRST DATA CORPORATION;   :
FISERV, INC.,

                 Defendants.  :
_____x

CERTIFICATE OF SERVICE

    This is to certify that on January 17, 2020, I electronically filed: **Plaintiff's Response in Opposition to Defendants' First Data Corporation's and Fiserv's Motion to Dismiss, and Declaration of Jean Simonoff Marx, with exhibits**, with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

**Elena D. Marcuss**
McGuire Woods, LLP
Suite 1000
Seven Saint Paul Street
Baltimore, MD 21202
410-659-4454
Fax: 410-659-4547
Email:
emarcuss@mcguirewoods.com

**Meredith Laughlin Allen**
McGuire Woods LLP-GA
1230 Peachtree Street, N.E.

Promenade, Suite 2100
Atlanta, GA 30309-3534
404-443-5738
Fax: 404-443-5773
Email: mlallen@mcguirewoods.com

**Joseph D. Magrisso**
Morgan Lewis & Bockius-FL
200 South Biscayne Boulevard
Suite 5300
Miami, FL 33131-2339
305-415-3424
Email: joseph.magrisso@morganlewis.com

**Mark E. Zelek**
Morgan Lewis & Bockius-FL
200 South Biscayne Boulevard
Suite 5300
Miami, FL 33131-2339
305-415-3303
Email: mzelek@morganlewis.com

**Charles Edward Solley**
Moser Law Company
The Stove Works
Suite 26
112 Krog Street, N.E.
Atlanta, GA 30307
404-537-5330
Fax: 404-537-5340
Email: tsolley@moserlawco.com

**Christopher Paul Galanek**
Bryan Cave Leighton Paisner LLP - ATL
One Atlantic Center, 14th Floor
1201 West Peachtree St., N.W.
Atlanta, GA 30309-3471
404-572-6600
Email: chris.galanek@bclplaw.com

28

**Aiten Musaeva McPherson**
Bryan Cave Leighton Paisner LLP - ATL
One Atlantic Center, 14th Floor
1201 West Peachtree St., N.W.
Atlanta, GA 30309-3471
404-572-6716
Email: aiten.mcpherson@bclplaw.com

      Respectfully submitted, this 17th day of January 2020.

                    s/Robert N. Marx
                    Georgia Bar Number 475280
                    Marx & Marx, L.L.C.
                    Attorneys for Plaintiff
                    1050 Crown Pointe Parkway
                    Suite 500
                    Atlanta, Georgia 30338
                    Telephone: (404) 261-9559
                    Email:  lawyers@marxlawgroup.com