IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

                                     :

               Plaintiff,

                                       :

v.

                                       :

                                         Civil Action File

BANK OF AMERICA MERCHANT            No. 1:19-cv-04129-AT
SERVICES; BANK OF AMERICA
CORPORATION; FIRST DATA CORPORATION;   :
FISERV, INC.,

               Defendants.   :
_____x

**DECLARATION OF JEAN SIMONOFF MARX**

I, JEAN SIMONOFF MARX pursuant to 28 U.S.C. §1746, declare and state as follows under penalty of perjury:

1. This firm represents the Plaintiff herein, Eric Slawin.

2. I annex as Exhibit A, selected pages from Fiserv's Form 10-Q filed with the SEC on November 7, 2019 which is linked to FISERV's webpage at https://investors.fiserv.com/sec-filings/sec-filing/8-k/0000798354-19-000023.

3. I annex as Exhibit B, a copy of the LinkenIn profile of Joseph Moll, referred to in Plaintiff's Complaint. (Complaint ¶¶53, 54, 60, 64-66, 69-69, 81-82, 93-95, 98).

1

Executed on this 17th day of January 2020.

JEAN SIMONOFF MARX

# EXHIBIT A

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

---

## FORM 10-Q

---

**QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the quarterly period ended September 30, 2019

OR

**TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

For the transition period from_____ to _____

Commission File Number 1-38962

---

# FISERV, INC.
### (Exact Name of Registrant as Specified in Its Charter)

---

| | |
|---|---|
| **Wisconsin** | **39-1506125** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I. R. S. Employer Identification No.) |

**255 Fiserv Drive    Brookfield,    WI   53045**
(Address of Principal Executive Offices and zip code)

**(262) 879-5000**
(Registrant's Telephone Number, Including Area Code)

Securities registered pursuant to Section 12(b) of the Act

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.01 per share | FISV | The NASDAQ Stock Market LLC |
| 0.375% Senior Notes due 2023 | FISV23 | The NASDAQ Stock Market LLC |
| 1.125% Senior Notes due 2027 | FISV27 | The NASDAQ Stock Market LLC |
| 1.625% Senior Notes due 2030 | FISV30 | The NASDAQ Stock Market LLC |
| 2.250% Senior Notes due 2025 | FISV25 | The NASDAQ Stock Market LLC |
| 3.000% Senior Notes due 2031 | FISV31 | The NASDAQ Stock Market LLC |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes    No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).    Yes    No

Table of Contents

**Fiserv, Inc.**
**Notes to Consolidated Financial Statements**
(Unaudited)

## 1. Basis of Presentation and Summary of Significant Accounting Policies

*Basis of Presentation*

The consolidated financial statements for the three and nine months ended September 30, 2019 and 2018 are unaudited. In the opinion of management, all adjustments necessary for a fair presentation of the consolidated financial statements have been included. Such adjustments consisted of normal recurring items. Interim results are not necessarily indicative of results for a full year. The consolidated financial statements and accompanying notes are presented as permitted by Form 10-Q and do not contain certain information included in the annual consolidated financial statements and accompanying notes of Fiserv, Inc. (the "Company"). These interim consolidated financial statements should be read in conjunction with the consolidated financial statements and accompanying notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2018.

On January 16, 2019, the Company entered into a definitive merger agreement to acquire First Data Corporation ("First Data"). The Company completed the acquisition on July 29, 2019 by acquiring 100% of the First Data stock that was issued and outstanding as of the date of acquisition. The consolidated financial statements as of and during the three and nine months ended September 30, 2019 include the financial results of First Data from the date of acquisition. The combined company provides technology capabilities that enable a range of payments and financial services, including account processing and digital banking solutions; card issuer processing and network services; payments; e-commerce; merchant acquiring and processing; and the Clover™ cloud-based point-of-sale solution.

Effective January 1, 2019, the Company adopted Accounting Standards Update ("ASU") No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"), and its related amendments using the optional transition method applied to all leases. Prior period amounts have not been restated. Additional information about the Company's lease policies and the related impact of the adoption is included in Notes 2 and 15 to the consolidated financial statements.

*Principles of Consolidation*

The consolidated financial statements include the accounts of Fiserv, Inc. and its subsidiaries in which the Company holds a controlling financial interest. Control is normally established when ownership and voting interests in an entity is 50% or greater. Investments in less than 50% owned affiliates in which the Company has significant influence but not control are accounted for using the equity method of accounting. Significant influence over an affiliate's operations generally coincides with an ownership interest in an entity of between 20% and 50%. All intercompany transactions and balances have been eliminated in consolidation.

In connection with the acquisition of First Data, the Company acquired majority controlling interests in certain entities, mostly related to consolidated merchant alliances (see Note 21). Noncontrolling interests represent the minority shareholders' share of the net income or loss and equity in consolidated subsidiaries. The Company's noncontrolling interests presented in the consolidated statements of income include net income attributable to noncontrolling interests and redeemable noncontrolling interest. Noncontrolling interests are presented as a component of equity in the consolidated balance sheet and reflect the minority shareholders' share of acquired fair value in the consolidated subsidiaries, along with their proportionate share of the earnings or losses of the subsidiaries, net of dividends or distributions. Noncontrolling interests that are redeemable at the option of the holder are presented outside of equity and are carried at their estimated redemption value (see Note 22).

*Cash and Cash Equivalents*

Cash and cash equivalents consist of cash and investments with original maturities of 90 days or less. Cash and cash equivalents are stated at cost in the consolidated balance sheets, which approximates market value. Cash and cash equivalents that were restricted from use due to regulatory or other requirements are included in other long-term assets in the consolidated balance sheet and totaled $42 million as of September 30, 2019.

*Reserve for Merchant Credit Losses*

With respect to the merchant acquiring business obtained through the acquisition of First Data (see Note 4), the Company's merchant customers have the legal obligation to refund any charges properly reversed by the cardholder. However, in the event the Company is not able to collect the refunded amounts from the merchants, the Company may be liable for the reversed charges. The Company's risk in this area primarily relates to situations where the cardholder has purchased goods or services to be delivered in the future. The Company requires cash deposits, guarantees, letters of credit or other types of collateral from

Case 1:19-cv-04129-AT   Document 23-1   Filed 01/17/20   Page 6 of 15

*Transaction Price Allocated to Remaining Performance Obligations*

The following table includes estimated revenue expected to be recognized in the future related to performance obligations that are unsatisfied (or partially unsatisfied) at the end of the reporting period.

| (In millions) | Remainder of: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| September 30, 2019 | 2019 | | 2020 | | 2021 | | 2022 | | Thereafter |
| Processing and services | $ | 618 | $ | 2,211 | $ | 1,787 | $ | 1,332 | $ 2,478 |
| Product | | 9 | | 38 | | 24 | | 14 | 13 |

The Company applies the optional exemption in paragraph 606-10-50-14(b) and does not disclose information about remaining performance obligations for account- and transaction-based processing fees that qualify for recognition in accordance with paragraph 606-10-55-18. These multi-year contracts contain variable consideration for stand-ready performance obligations for which the exact quantity and mix of transactions to be processed are contingent upon the customer's request. The Company also applies the optional exemptions in paragraph 606-10-50-14A and does not disclose information for variable consideration that is a sales-based or usage-based royalty promised in exchange for a license of intellectual property or that is allocated entirely to a wholly unsatisfied performance obligation or to a wholly unsatisfied promise to transfer a distinct good or service in a series. The amounts disclosed above as remaining performance obligations consist primarily of fixed or monthly minimum processing fees and maintenance fees under contracts with an original expected duration of greater than one year.

**4. Acquisitions**

*Acquisition of First Data*

On July 29, 2019, the Company completed the acquisition of First Data, a global leader in commerce-enabling technology and solutions for merchants, financial institutions and card issuers, by acquiring 100% of the First Data stock that was issued and outstanding as of the date of acquisition. The acquisition increases the Company's footprint as a global payments and financial technology provider by expanding the portfolio of services provided to financial institutions, corporate and merchant clients, and consumers.

As a result of the acquisition, First Data stockholders received 286 million shares of Fiserv, Inc.'s common stock, at an exchange ratio of 0.303 Fiserv, Inc. shares for each share of First Data common stock, with cash paid in lieu of fractional shares. The Company also converted approximately 15 million outstanding First Data equity awards into corresponding equity awards relating to Fiserv, Inc. common stock pursuant to an exchange ratio in the merger agreement as described in further detail within Note 7. In addition, concurrent with the closing of the acquisition, the Company made a cash payment of approximately $16.4 billion to repay existing First Data debt. The Company funded the transaction-related expenses and the repayment of First Data debt through a combination of available cash on-hand and proceeds from debt issuances as discussed in Note 14.

The total purchase price paid for First Data is as follows:

| (In millions) | | |
|---|---|---|
| Fair value of stock exchanged for Fiserv, Inc. shares[1] | $ | 29,293 |
| Repayment of First Data debt | | 16,414 |
| Fair value of vested portion of First Data stock awards exchanged for Fiserv, Inc. awards[2] | | 768 |
| Total purchase price | $ | 46,475 |

[1] The fair value of the 286 million shares of the Company's common stock issued as of the acquisition date was determined based on a per share price of $102.30, which was the closing price of the Company's common stock on July 26, 2019, the last trading day before the acquisition closed the morning of July 29, 2019. This includes a nominal amount of cash paid in lieu of fractional shares.

[2] Represents the portion of the fair value of the replacement awards related to services provided prior to the acquisition. The remaining portion of the fair value is associated with future service and will be recognized as expense over the future service period. See Note 7 for additional information.

The acquisition was accounted for as a business combination using the acquisition method of accounting in accordance with ASC 805 *Business Combinations* ("ASC 805"). The purchase price was allocated to the assets acquired and liabilities assumed based on the estimated fair values at the date of acquisition. The excess of the purchase price over the fair value of the net assets acquired was allocated to goodwill, none of which is expected to be deductible for tax purposes. Goodwill is primarily

11

Table of Contents

The weighted-average rate assumptions used in the measurement of the Company's projected benefit obligations as of July 29, 2019 and net periodic benefit expense during the three and nine months ended September 30, 2019 were as follows:

|  | Projected Benefit Obligation | Net Periodic Benefit Expense |
|---|---|---|
| Discount rate | 2.35% | 2.74% |
| Expected long-term return on plan assets | n/a | 2.79% |

The estimated future benefit payments are expected to be as follows:

**(In millions)**

| Year ended December 31, | | |
|---|---|---|
| 2019 | $ | 28 |
| 2020 | | 30 |
| 2021 | | 32 |
| 2022 | | 34 |
| 2023 | | 36 |
| Thereafter | | 194 |
| Total | $ | 354 |

The components of net periodic benefit expense were as follows:

| (In millions) | Three and Nine Months Ended September 30, 2019 | |
|---|---|---|
| Service costs | $ | 1 |
| Interest costs | | 3 |
| Expected return on plan assets | | (5) |
| Net periodic benefit expense | $ | (1) |

## 21. Related Party Transactions

*Merchant Alliances*

A significant portion of the Company's business within the First Data segment is conducted through merchant alliances between the Company and financial institutions. To the extent the Company maintains a controlling financial interest in an alliance, the alliance's financial statements are consolidated with those of the Company and the related processing fees are treated as an intercompany transaction and eliminated in consolidation. To the extent the Company has significant influence but not control in an alliance, the Company uses the equity method of accounting to account for its investment in the alliance. As a result, the Company's consolidated revenues include processing fees, administrative service fees, and other fees charged to alliances accounted for under the equity method. Such fees totaled $31 million for both the three and nine months ended September 30, 2019. No directors or officers of the Company have ownership interests in any of the alliances. The formation of each of these alliances generally involves the Company and the bank contributing contractual merchant relationships to the alliance and a cash payment from one owner to the other to achieve the desired ownership percentage for each. The Company and the bank enter into a long-term processing service agreement as part of the negotiation process. This agreement governs the Company's provision of transaction processing services to the alliance. As of September 30, 2019, the Company had approximately $35 million of amounts due from unconsolidated merchant alliances included within trade accounts receivable, net in the Company's consolidated balance sheet.

In July 2019, the Company and Bank of America jointly announced the dissolution of the Banc of America Merchant Services joint venture ("BAMS"), to be effective June 2020. The Company owns 51% of BAMS and BAMS' financial results are consolidated into the Company's financial statements. Upon dissolution of the joint venture, the Company is entitled to receive a 51% share of the joint venture's value via an agreed upon contractual process. In addition, Bank of America has the right to require the Company to continue providing merchant processing and related services to the joint venture clients allocated to Bank of America in the dissolution of the joint venture through June 2023 at current pricing. The Company anticipates an ongoing relationship with Bank of America to provide processing and other support services to other Bank of America merchant clients following the joint venture's dissolution.

36

Table of Contents

## 22. Redeemable Noncontrolling Interest

One of the Company's noncontrolling interests assumed through the acquisition of First Data (see Note 4) is presented outside of equity and carried at its estimated redemption value as the agreement with the minority partner that owns 1% of the joint venture contains redemption features whereby interests held by the minority partner are redeemable either (i) at the option of the holder or (ii) upon the occurrence of an event that is not solely within the Company's control. Specifically, under the terms of the agreement, either party may terminate for convenience any time after September 1, 2021 upon six months prior notice. In the event of termination for cause, as a result of a change in control, or for convenience after September 1, 2021, the Company must purchase the minority partner membership interests at a price equal to the fair market value of the minority interest's portfolio multiplied by a percentage that varies between 28.5% and 30% depending upon the date of termination.

The following table presents a summary of the redeemable noncontrolling interest activity during the nine months ended September 30, 2019:

| (In millions) | | |
|---|---|---|
| Balance as of December 31, 2018 | $ | — |
| Acquired | | 88 |
| Share of income | | 4 |
| Balance as of September 30, 2019 | $ | 92 |

## 23. Commitments and Contingencies

*Litigation*

In the normal course of business, the Company or its subsidiaries are named as defendants in lawsuits in which claims are asserted against the Company. In connection with the acquisition of First Data, the Company assumed certain legal proceedings, including without limitation merchant matters associated with alleged processing errors or disclosure issues and claims that one of the subsidiaries of First Data has violated a federal or state requirement regarding credit reporting or collection in connection with its check verification guarantee and collection activities or other claims arising from its merchant business. The various matters are not expected to be material to the financial statements.

*Electronic Payments Transactions*

In connection with the Company's processing of electronic payments transactions, funds received from subscribers are invested from the time the Company collects the funds until payments are made to the applicable recipients. These subscriber funds are invested in short-term, highly liquid investments. Subscriber funds, which are not included in the Company's consolidated balance sheets, can fluctuate significantly based on consumer bill payment and debit card activity and totaled approximately $1.2 billion at September 30, 2019.

*Indemnifications and Warranties*

Subject to limitations and exclusions, the Company may indemnify its clients from certain costs resulting from claims of patent, copyright or trademark infringement associated with its clients' use of the Company's products or services. The Company may also warrant to clients that its products and services will operate substantially in accordance with identified specifications. From time to time, in connection with sales of businesses, the Company agrees to indemnify the buyers of businesses for liabilities associated with the businesses that are sold. Payments, net of recoveries, under such indemnification or warranty provisions were not material to the Company's consolidated results of operations or financial position.

EXHIBIT 31.2

CERTIFICATION PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002

I, Robert W. Hau, certify that:

1.  I have reviewed this Quarterly Report on Form 10-Q of Fiserv, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: November 7, 2019               By:  /s/ Robert W. Hau
                                          Robert W. Hau
                                          Chief Financial Officer and Treasurer

# EXHIBIT B

https://www.linkedin.com/in/josephmoll/

**Joseph Moll**
Cybersecurity and Risk Management
Connect
Message
More...

- 
- 
- 

Connect
Message
More...

- 
- 
- 
- Joseph Moll
-  2nd degree connection2nd
- 

# Cybersecurity and Risk Management

- Greater Denver Area

- 500+ connections

- **Contact info**



- **Kaiser Permanente**

- **Clemson University**

# Highlights

-



## 1 mutual connection
You and Joseph both know J Allen Hurst, MBA

# About

20+ years of experience in Information Technology, Information Security, and Risk Management spanning multiple industries (Education, Engineering, Commerce/Payments). International experience in risk management, systems and network architecture, application selection and deployment, contract negotiation, technology operations, an... see more

# Experience

- 


## Executive Director / Information Risk Officer

Company Name

Kaiser Permanente
Dates EmployedAug 2017 – Present
Employment Duration2 yrs 6 mos
LocationGreater Denver Area

- 


## Vice President, Corporate Information Security Officer, Risk and Compliance

Company Name

Bank of America Merchant Services
Dates EmployedMar 2014 – Aug 2017
Employment Duration3 yrs 6 mos
LocationGreater Denver Area

2



## Director Enterprise Security Risk and Compliance

Company Name

First Data Corporation
Dates EmployedJul 2007 – Feb 2014
Employment Duration6 yrs 8 mos

Third Party Information Security Risk Management

## Principal / Owner

Company Name

Autoproxy Networks
Dates EmployedJan 2006 – Jul 2007
Employment Duration1 yr 7 mos

Primarily CISO services to ESC / TSYS Loyalty Division of Total Systems, a Loyalty Services processor. PCI DSS Compliance, ITIL / ISO 20000, ISO 2700x, and SAS70 program development and subject matter expertise. Ethical Hacking program coordination.



## Specialist, Enterprise Operations Service Area

Company Name

The North Highland Company
Dates EmployedJan 2005 – Jan 2006
Employment Duration1 yr 1 mo

Consultant focusing on Enterprise Operations. Managed Change and Configuration Management and Disaster Recovery projects. Primary customers Cox Communications and Georgia Pacific.
Show 1 more experience

# Education

●



**Clemson University**
Degree NameBachelor of Science
Field Of StudyComputer Engineering

Studied Computer Engineering; worked at the Division of Computing and Information Technology as well as Engineering Research. USAF ROTC

# Volunteer Experience

●



**IT**
Company NameAmateur Radio Emergency Service of Douglas and Elbert Counties
Dates volunteeredMar 2015 – Present

Volunteer duration4 yrs 11 mos

# Skills & Endorsements

1. **Security**
   **See 102 endorsements for Security**99+

○ 
   Endorsed by **John Hellickson and 22 others who are highly skilled at this**
○ 
   Endorsed by **3 of Joseph's colleagues at Kaiser Permanente**
2. **Information Security**
   **See 100 endorsements for Information Security**99+

○ 
   Endorsed by **John Hellickson and 10 others who are highly skilled at this**
○ 

Endorsed by **3 of Joseph's colleagues at Kaiser Permanente**

3. **PCI DSS**

   **See 83 endorsements for PCI DSS**83

   o 

   Endorsed by **3 of Joseph's colleagues at First Data Corporation**

   Show moreShow all of Joseph's skills

# Recommendations