## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

ERIC SLAWIN,

      Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT SERVICES,

      Defendant.

Civil Action File
Case No. 1:19-cv-04129-AT

## DEFENDANT BANC OF AMERICA MERCHANT SERVICES, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................1

II. FACTUAL BACKGROUND..........................................2

    A.  The Parties. ....................................................2

    B.  BAMS Terminated Slawin For Policy Violations. ............................2

    C.  Additional Facts Related To Slawin's Claim Of Retaliation. ...............5

    D.  Slawin's Actions Post-Termination. ....................................11

III. LEGAL STANDARD ................................................12

IV. ARGUMENT AND CITATION OF AUTHORITIES .................................13

    A.  The Elements of Plaintiff's Prima Facie Case ...................13

    B.  Slawin Did Not Engage In A Protected Activity. ...............14

    C.  Slawin Cannot Show Any Protected Activity Contributed To His Termination.....................................................21

    D.  Plaintiff's Damages Should Be Limited. ............................24

V.  CONCLUSION............................................................25

## I.    INTRODUCTION

Slawin was terminated effective December 8, 2017 for violating the policies of his employer BAMS. Slawin sent confidential business information to his personal email address and did not provide a business justification for his actions when questioned by BAMS's human resources ("*HR*") department.

Slawin now asserts retaliation claims under Sarbanes-Oxley ("*SOX*"), 18 U.S.C. § 1514A and the Consumer Financial Protection Act ("*CFPA*"), 12 U.S.C. § 5567 (collectively, the "Acts").[1] Slawin contends "he repeatedly engaged in protected activity by objecting to BAMS' fraudulent misrepresentations . . . regarding its [sic] not being PCI compliant . . . ."  (ECF No. 1 at ¶¶ 117, 129.)  It is undisputed, however, that Slawin never told *anyone* at BAMS that he thought BAMS violated the Acts.  (Slawin Dep. 186:25-187:8.)   Additionally, Slawin lacked even a subjective belief or understanding of whether the Acts had been violated.  (Slawin Dep. 162:17-21; 223:19-224:7.)

Without a contemporaneous belief that BAMS was violating the Acts, and without conveying that belief to others, Slawin did not engage in a protected activity. Moreover, Slawin cannot show any protected activity contributed to his termination,

---

[1] The Court dismissed Slawin's claim under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 15 U.S.C. § 78u-6.  (ECF No. 47 at 27.)

as even his generalized concerns were never shared with those who made the decision to terminate him. BAMS therefore moves for summary judgment.

## II.    FACTUAL BACKGROUND

### A.    The Parties.

BAMS was a joint venture. (MSJ Ex. 40 at Nos. 3-5.) Slawin was employed at BAMS from December 2015 to December 8, 2017 in a role that required him to appropriately handle confidential information. (Slawin Dep. 51:16-18, 147:5-148:9, Ex. 5; Solan Decl. ¶¶ 8-9, 70-73; Collins Decl. ¶ 3.) Slawin has experience working in and investigating fraud related to capital markets. (ECF No. 1 at ¶ 75; Slawin Dep. 193:13-194:4.)

### B.    BAMS Terminated Slawin For Policy Violations.

BAMS terminated Slawin on December 8, 2017 for policy violations related to the mishandling of confidential information following an investigation by Michael Solan, a member of BAMS's HR department.[2] (Solan Dep. 13:7-23, 15:11-16:6, 18:4-7, 105:8-111:18, Ex. 51; Solan Decl. ¶¶ 3-7, 15-20, 56.) Solan began his investigation on December 6, 2017 after being notified by Information Security ("InfoSec") that Slawin sent confidential emails from his work email address to his personal email address. (Solan Decl. ¶¶ 21-26; Solan Dep. 65:9-66:16, Ex. 51;

---

[2] Solan Deposition Exhibit 51 contains Solan's notes of his investigation. (Solan Dep. 105:8-111:18, Ex. 51; Solan Decl. ¶¶ 6, 15-20, 56.)

Kendall Decl. ¶¶ 21; MSJ Ex. 42 at Nos. 1-2.)  Solan reviewed those emails, communicated with Slawin's manager Mark Kendall ("Kendall") to understand the substance of the emails, and assessed potential business justifications for Slawin's conduct.  (Solan Decl. ¶¶ 27-31, 34-42; Solan Dep. 56:10-57:20, 179:12-188:15, 239:7-23, Exs. 30-39, 51; Kendall Decl. ¶¶ 5-6, 9; *see also* Slawin Dep. 239:7-25, Ex. 20.)  The emails included confidential information regarding ongoing efforts by BAMS to investigate and remediate issues related to potential noncompliance with the Payment Card Industry's Data Security Standard ("PCI DSS").[3]  (Solan Decl. ¶¶ 32-33; Solan Dep. 179:12-188:15, Exs. 30-39; Kendall Decl. ¶¶ 7-8.)  None of the emails expressed concerns (by Slawin or otherwise) of fraud, misrepresentations, or illegal conduct.  (Solan Dep. Exs. 30-39; Slawin Dep. 198:23-199:12, 200:3-8.)

On December 8, 2017, Solan interviewed Slawin regarding his conduct. (Solan Decl. ¶¶ 43-48; Solan Dep. Ex. 51.)  Kendall attended but did not participate in the questioning.  (Solan Decl. ¶ 49; Solan Dep. Ex. 51; Kendall Decl. ¶ 10.) Slawin was apathetic, flippant, and unforthcoming, and he failed to provide a defensible business justification for his actions.  (Solan Decl. ¶¶ 50-54; Solan Dep. Ex. 51; Kendal Decl. ¶¶ 11-15.)   During the interview, Slawin did not express concerns about any fraud or illegal activity; moreover, Slawin represented he had not further disclosed the information at issue, and he admitted having no intent to do

---

[3] Throughout this Motion, "PCI compliance" refers to complying with PCI DSS.

so.  (Solan Decl. ¶¶ 53-55; Kendall Decl. ¶¶ 14-16; Slawin Dep. 159:22-160:23, 205:23-206:18.)  Slawin's behavior confirmed he could no longer be trusted to handle confidential business information, which was a core requirement of his job. (Solan Decl. ¶¶ 9, 56, 58; Kendall Decl. ¶ 17; Solan Dep. 44:1-11, 105:8-114:22; Solan Dep. Ex. 51.)

Solan recommended to his manager Maryann De Castro ("De Castro") that Slawin be terminated on December 8, 2017 based on Slawin's policy violations and the complete loss of trust that Slawin could appropriately handle confidential information as required by his job.  (Solan Decl. ¶¶ 58-70, Exs. 1-3; Solan Dep. 44:1-11, 42:22-44:18, 105:8-114:22, 120:12-124:19, 127:8-12, 141:11-24, 155:14-160:11, 160:22-161:19, 162:9-165:22, 167:14-22, 170:22-171:22, 172:22-173:8, Exs. 51, 69-72; Kendall Decl. ¶ 17; Slawin Dep. 147:5-148:9, 148:14-149:10, Exs. 5-6, MSJ Ex. 41 at Ex. A-D; MSJ Ex. 42 at Nos. 4, 7-8, 12-14.)  De Castro approved the recommendation on December 8, 2017 and Slawin's termination became effective, relevant stakeholders were informed, and Slawin lost access to BAMS's systems on the same day.  (Solan Dec. ¶¶ 71-74; Solan Dep. 70:14-75:9,  88:13-19,  105:8-111:25,  122:3-20,  129:12-130:13,  139:10-17, 141:11-24, 151:14-153:24, Exs. 45, 47, 51; Kendall Decl. ¶ 17.)  The decision was made exclusively by BAMS's HR department (Solan and De Castro) in conjunction

with BAMS's legal department.  (Solan Decl. ¶¶ 68-69, 92-98; Solan Dep. 111:19-112:10; 120:12-124:2; Kendall Decl. ¶ 31.)

Despite repeated attempts, Solan was not able to reach Slawin by telephone to inform him of his termination until December 12, 2017.  (Solan Decl. ¶¶ 75-82; Solan Dep.133:25-134:11, 136:17-137:20, Exs. 48, 50-51.)  Nevertheless, by early on December 11, 2017, Slawin was aware that he could no longer access BAMS's systems.  (Solan Decl. ¶ 79; Solan Dep. 136:17-137:20, Exs. 48.)  On December 12, 2017, Solan informed Slawin (again with Kendall on the call) of the termination and provided written notice thereafter.  (Solan Decl. ¶¶ 83-87; Solan Dep. 128:12-129:4, 129:12-132:15, 133:25-134:11, 151:14-153:24; Solan Dep. Exs. 45, 50, 51; Kendall Decl. ¶¶ 18-20.)  During the call, Slawin asked if Kendall agreed with the decision, and Kendall responded affirmatively, which is the sole basis for Slawin's contention that Kendall was a decision-maker.  (Slawin Dep. 201:10-25.)

## C.    Additional Facts Related To Slawin's Claim Of Retaliation.

Slawin claims his termination was in retaliation for his "objecting to BAMS' fraudulent representations to its customers and potential customers and stated refusal to be complicit in such misrepresentations regarding not being PCI compliant and

regarding credit card data security issues."[4]  (*See* ECF No. 1 ¶¶ 111-135.)  BAMS therefore submits the following undisputed facts:

> ### 1.  BAMS began assessing issues related to PCI compliance in 2017.

PCI DSS are industry-established security standards regarding the handling of credit card data, not government requirements; instead, they are governed by contract.  (Davis Decl. ¶ 25; Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34; *see also* MSJ Ex. 44 at § 24.7.)  As early as January 2017, BAMS became aware of potential instances in which BAMS personnel were attempting to transmit unencrypted full Primary Account Number ("PAN") data externally, which was outside of BAMS's expectations and raised concerns with respect to PCI compliance.  (Davis Decl. ¶¶ 4-7.)  Slawin did not identify the issue; instead, this activity was detected through the Data Loss Prevention processes managed by Joe Moll and reported up the chain to others, including Ali Davis (SVP, Risk and Compliance) and Tom Fontana (Chief Risk Officer).  (Davis Decl. ¶¶ 3-4, 8-10; Slawin Dep. 180:24-181:16.)

---

[4] Slawin testified he believed a September 2017 coaching form was retaliation, but ultimately conceded he "was behind on some task" and that he does "not recall disputing the accuracy" of the coaching form with HR, only its tone.  (Slawin Dep. 122:21-123:1; 154:1-159:19; *see also* Collins Decl. ¶¶ 12-15.)  Regardless, the coaching form never negatively affected Slawin's pay, benefits, title, or responsibilities.  (Solan Decl. ¶¶ 10-14; Slawin Dep. 124:23-125:13.)

In June 2017, Davis and Moll discussed the issue with David Ades (SVP, Digital Payments), to whom Davis recommended creating a self-identified audit issue ("SIAI") with respect to the use of PAN data by his team. (Davis Decl. ¶¶ 11-15; Ades Dep. 93:11-96:16.) On June 13, 2017, Ades contacted Natasha Collins (then Slawin's manager) and others to discuss self-identifying the issue and options for potential remediation, including adding a new layer of PCI compliance for BAMS (which would be costly and time-consuming) or revising internal processes to prevent BAMS employees from transmitting full PAN data (aligning with BAMS's original expectations and avoiding the need for PCI compliance). (Ades Dep. 29:15-30:14, 96:17-100:19, Ex. 16; Collins Decl. ¶¶ 3-8; Davis Decl. ¶¶ 14, 16-19; Kendall Decl. 30; Slawin Dep. 147-148:9, 149:13-23, Ex. 5.) Because the latter option could result in a reduction in force among those whose roles were affected, Ades asked that the issue be treated as confidential so as not to raise unwarranted concerns within the workforce prior to any final decisions. (Collins Decl. ¶ 7; Davis Decl. ¶ 17; Ades Dep. 98:11-100:19.)

Slawin was tasked with preparing the SIAI with the goal of developing new requirements for Ades's team regarding the handling of PAN data. (Collins Decl. ¶ 9; Kendall Decl. ¶ 23.) Slawin did not timely prepare the SIAI, and the initial draft of the SIAI was not prepared until after Slawin's termination. (Collins Decl. ¶¶ 10-

13, 16-17; Kendall Decl. ¶¶ 22, 24-29; Davis Decl. ¶¶ 19-24; Slawin Dep. 61:7-63:17.)

> ### 2. *Slawin's theory of fraudulent conduct.*

Slawin contends BAMS engaged in fraud with respect to various representations concerning PCI compliance. (Compl. at ¶¶ 117, 129.) Slawin describes this purported fraud as "a twofold omission that the firm [BAMS] needs to be PCI compliant and that . . . it's being represented to clients that the firm's [sic] PCI compliant." (Slawin Dep. 175:25-176:7.) Slawin also contends he "was positioned to being forced to represent that the company [BAMS] was PCI compliant." (Slawin Dep. 204:2-205:2.)

One of Slawin's responsibilities at BAMS was to respond to client questionnaires regarding PCI compliance. (Collins Decl. ¶¶ 21-23.) FDMS was the intended service provider responsible for processing merchant transactions and thus maintained PCI compliance for itself, its systems (on which BAMS conducted business), and its services. (Collins Decl. ¶ 24.) In response to questionnaires (as was familiar to Slawin), BAMS disclosed FDMS's role as the service provider and provided information concerning FDMS's PCI compliance, including the then-current attestation of compliance for FDMS, but there is nothing in the record evidencing that BAMS further represented it was independently PCI complaint. (*See* Collins Decl. ¶¶ 25-26.)

### 3. *Slawin's claims of protected activity.*

Slawin never, in writing, raised any concerns regarding any purported fraud to anyone at BAMS. (Slawin Dep. 188:21-25, 198:23-199:12, 200:3-8; *see also* MSJ Ex. 46 (limiting documents Slawin may use to support his claim).) Instead, Slawin testified he expressed some form of concern to seven individuals (including four superiors), of which only Kendall (who was Slawin's peer until September 2017) had any connection with his termination; but, as the record reflects, Kendall was not a decision maker with regards to Slawin's termination.[5] (Slawin Dep. 149:13-151:4, 184:21-185:6, 187:5-192:1, 194:5-11 197:6-16, 198:23-199:7, 200:9-201:25, 215:24-220:13, 239:21-25, 224:14-225:15, 233:24-235:22, 239:6-25, Ex. 13; Solan  Dep. 111:19-112:10, 123:19-124:2; Solan Decl. ¶¶ 92-98; Kendall Decl. ¶¶ 4, 31; Collins Decl. ¶¶ 3, 18-20; Davis Decl. ¶¶ 30-31; MSJ Ex. 38.) Slawin also claims an email that he sent to Mike Solan on December 11, 2017 (after the effective date of his termination and after he was already aware that he could not access BAMS's systems) was protected activity. (Slawin Dep. 203:17-205:2, 205:23-207:4; *see also* Slawin Dep. 124:12-17; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-20, 129:12-130:13, 136:17-137:20, 139:10-17,

---

[5] Further, as to Kendall, Slawin contends he first told Kendall he believed BAMS's handling of the PAN data issue was fraud in July 2017. (Slawin Dep. 191:21-192:1, 194:5-11, 218:11-219:13.)

141:11-24, 151:14-153:24, Exs. 45, 47, 48, 51; Solan Decl. ¶¶ 99-102; Kendall Decl. ¶ 17.)

> ### 4. *Slawin's testimony precludes any other claim of protected activity.*

Slawin cannot identify any other purported protected conduct. While employed at BAMS, Slawin neither filed a complaint with any regulatory body nor alerted any government regulator regarding any inappropriate conduct; and, he had no intention of doing so. (Slawin Dep. 159:22-160:23, 161:24-162:16, 169:20-2, 175:3-21, 183:1-21, 205:23-206:18, 243:8-245:5, 248:4-250:18, Exs. 36, 37, 49.) Besides purportedly believing in July 2017 that "the SEC would be interested in" BAMS's actions, Slawin readily disclaimed any knowledge or belief as to whether any statutes or regulations had been violated. (Slawin Dep. 27:21-24, 160:24-163:1, 223:19-224:7.) Slawin testified to a complete lack of knowledge of any CFPA violation during his employment, and when asked in deposition testified, "I don't know who the CFPA is." (Slawin Dep. 27:21-24, 162:17-163:1.) Regardless, a reasonable person in Slawin's position could not reasonably believe any such violation had occurred. (Davis Decl. ¶¶ 26-28; Slawin Dep. 173:11-175:2, 179:14-21, 193:10-194:4, Ex. 34.)

Slawin admits he did not convey any belief of a statutory violation to anyone at BAMS during his employment. (Slawin Dep. 186:20-187:8; 216:15-218:5; *see also* Davis Decl. ¶ 29.) Slawin also did not express concerns regarding potential

harm to consumers while at BAMS; instead, Joe Moll (not Slawin) discussed risks posed by a potential data breach with Slawin and Kendall, which Slawin did not communicate to others within BAMS. (Slawin Dep. 197:22-198:16.) With respect to shareholders, Slawin testified he only verbally discussed "it could become an issue with it getting out that data wasn't secure at merchants and that could affect their [merchants'] bottom line" and could lead to lower "earnings per share/shareholders" for merchants' shareholders, but not that he believed shareholders were being defrauded. (Slawin Dep. 218:11-220:13.)

Lastly, Slawin consistently denies raising any concerns concerning PCI compliance, fraud, or *any* illegal or other inappropriate conduct with BAMS's legal department or HR, despite having the means to do so.[6] (Slawin Dep. 127:17-128:13, 131:22-134:19, 135:10-138:4, 139:11-24, 176:18-22, 183:22-24, 185:15-186:19, 230:22-231:10, Ex. 4; Solan Decl. ¶¶ 88-91.)

### D.    Slawin's Actions Post-Termination.

In December 2018 Slawin accepted a position with Wells Fargo Securities. (Slawin 38:4-19.) Slawin's role at Wells Fargo Securities was comparable in title, responsibilities, compensation, and benefits to his prior role with BAMS. (Slawin Dep. 38:20-21, 39:15-40:1, 40:6-23, 42:18-21; MSJ Ex. 43 at No. 4; Solan Decl. ¶

---

[6] The same is true with respect to BAMS's joint venturers and customers. (Slawin Dep. 176:8-17; 176:23-177:10.)

8.) Wells Fargo Securities terminated Slawin's employment in June 2019 for policy violations after he became intoxicated at a company event. (Slawin Dep. 42:22-43:11, 45:4-7.)

## III.    LEGAL STANDARD

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "To defeat a motion for summary judgment, the nonmovant must raise 'significant probative evidence' that would be sufficient for a jury to find for that party." *Lewis v. Home Depot U.S.A.*, 2017 WL 11633802, at *1 (N.D. Ga. Jan. 9, 2017) (Salinas, M.J.) (quoting *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998)), *report and recommendation adopted by* 2017 WL 11633787 (N.D. Ga. Mar. 17, 2017) (Totenberg, J.); *see also Solliday v. Federal Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) ("Conclusory, uncorroborated allegations by a plaintiff in . . . [a] deposition will not create an issue of fact for trial sufficient to defeat a well supported summary judgment motion."). "A plaintiff cannot raise at summary judgment new theories not pled in the complaint." *Johnson v. 3M Company*, No. 4:20-cv-00008-AT, slip op. [ECF No. 1616] 28 n.6 (N.D. Ga. Dec. 10, 2024).

## IV.   ARGUMENT AND CITATION OF AUTHORITIES

BAMS is entitled to summary judgment on Slawin's retaliation claims. Slawin lacked a reasonable belief that any applicable law had been violated, and Slawin cannot create an issue of fact as to whether the decision-makers in his termination were aware of any purported protected activity.

### A.   The Elements of Plaintiff's Prima Facie Case

The Court has previously addressed the prima facie elements of Plaintiff's claims in its order on various motions to dismiss:

> The elements of a prima facie case under each of the statutes are similar. "To assert a whistleblower claim under SOX, the Plaintiff 'must show by a preponderance of the evidence that (1)[he] engaged in protected activity; (2) the employer knew of the protected activity; (3)[he] suffered an unfavorable personnel action; and (4) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action.'" *Bozeman v. Per-Se Techs., Inc.*, 456 F. Supp. 2d 1282, 1358 (N.D. Ga. 2006) (quoting *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp.2d 1365, 1375 (N.D. Ga.2004)) (alterations in original).
>
> Likewise, to state a claim for retaliation under the CFPA, 12 U.S.C. § 5567, a plaintiff must establish "that (1) he engaged in protected activity; (2) the employer knew or suspected, either actually or constructively, that he engaged in the protected activity; (3) he suffered an unfavorable personnel or employment action; and (4) the protected activity was a contributing factor in the unfavorable action." *Veard v. F&M Bank*, 704 F. App'x 469, 473 (6th Cir. 2017) (internal quotation marks omitted).

(ECF No. 47 at 7.)

**B.     Slawin Did Not Engage In A Protected Activity.**

Both SOX and the CFPA provide protection for employees who engage in a protected activity, i.e., "providing information to a supervisory authority about conduct that the employee 'reasonably believes' constitutes a violation" of certain laws.  *Gale v. U.S. Dept. of Labor*, 384 Fed. App'x 926, 929 (11th Cir. 2010) (citing 18 U.S.C. § 1514A(a)(1)); *see Veard v. F&M Bank*, 704 Fed. App'x 469, 473 (6th Cir. 2017) (quoting 12 U.S.C. § 5567(a)).  The CFPA also protects an employee who "objected to, or refused to participate in" certain illegal conduct.  12 U.S.C. § 5567(a)(4).  Not all forms of illegal or fraudulent conduct qualify, and "[r]eports of wrongdoing that are not enumerated . . . are not considered protected activity." *Cruzan v. Hewlett Packard Enter. Co.*, 2020 WL 10574160, at *10 (N.D. Ga. Sept. 23, 2020) (Ray, J.); *see also Gale*, 384 Fed. App'x at 930 ("[Section] 1514A(a)(1) requires an employee to demonstrate . . . [a] belief that  the  company's conduct violated  a  law  listed  in  that section."); *Veard*, 704 Fed. App'x at 474 ("Veard must show that he actually believed F&M's conduct violated the CFPA and that a reasonable person in his position would have believed F&M violated the act."). Additionally, "reasonably believes" has both subjective and objective components, as "a common sense interpretation . . . dictates that the employee has an actual belief, as  well  as  an  objectively  reasonable  belief,  that  his  conduct  is  illegal  or fraudulent . . . ."  *Gale*, 384 Fed. App'x at 929; *Veard*, 704 Fed. App'x at 474.

>  1. *Slawin did not reasonably believe any pertinent law had been violated.*

Slawin's testimony forecloses any triable issue of fact on whether Slawin reasonably believed BAMS was violating a covered law or regulation. While Slawin "will not be penalized for failing to identify the *specific* . . . provision at issue," *Ronnie v. Office Depot, LLC*, 81 F.4th 1345, 1351 (11th Cir. 2023) (emphasis added), Slawin's testimony conclusively shows he lacked a subjective belief that *any* statute was violated. Slawin admits he never informed anyone at BAMS that he believed any conduct violated the CFPA or SOX, and he could not articulate any subjective understanding of how such statutes were violated. (Slawin Dep. 186:25-187:8; 223:19-224:7.) Additionally, Slawin understood PCI DSS is a contractual rather than a government requirement, and he conceded he lacked an understanding of whether resolving the PAN data issue—*with which he himself was tasked*—would have avoided any need for BAMS to become PCI compliant. (Slawin Dep: 179:5-180:18.) Slawin even admits that he did not come to believe BAMS violated the CFPA until *after* he was already terminated. (Slawin Dep. 162:17-21.)

Such testimony entitles SOX and CFPA defendants to summary judgment. For example, in *Gale*, the plaintiff (in addition to simply admitting a lack of subjective believe) "made several . . . statements indicating his lack of a subjective belief." *Gale*, 384 Fed. App'x at 930. Those statements included the employee's admissions that he "did not personally know at the time whether this practice was

15

prohibited," he did not know whether the practice was prohibited or illegal, and he "could not recall ever communicating any concerns that the" conduct at issue "violated or potentially violated any law or regulation." *Id.* The Eleventh Circuit accordingly affirmed summary judgment for the defendant on plaintiff's SOX claim due to lack of a protected activity. *Id.* The same outcome is warranted here.

### 2. *Slawin's purported concerns about fraud were not a protected activity.*

Even if Slawin's general concerns about "fraud" could be assessed separately from the various admissions above, there would still be no triable issue of fact. As an initial matter, Slawin was required to "report conduct that falls into one of the . . . categories" enumerated in the whistleblower statutes. *Ronnie*, 81 F.4th at 1350 (discussing SOX). Slawin's testimony regarding what he reported to others, however, is decidedly nonspecific. For example, when asked to explain what he told Kendall, Slawin testified as follows: "I can't remember absolutely, precisely, but it was that we discussed next steps, what a large mess this was. And I routinely told him that this needs to be disclosed, that it's omission. It's a fraud." (Slawin Dep. 194:5-11.) As noted in *Cruzan*, "[s]imply saying the word 'illegal' is insufficient to constitute a report of a SOX violation." *Cruzan*, 2020 WL 10574160 at *12. While (unlike in *Cruzan*) Slawin at least used the word "fraud," such a discussion amounts to little more than a conclusory allegation that does not constitute a protected

activity.  *See Ronnie*, 81 F.4th at 1351 (noting employee "must make more than a conclusory allegation.").

Regardless, there is no material dispute of fact that Slawin did not and could not reasonably believe any such violations occurred.  As to the CFPA, the analysis is simple: while Slawin alleged in his Complaint that he believed BAMS violated the CFPA, he testified under oath that he had no such belief while he was employed. (*Compare* ECF No. 1 ¶ 130 *with* Slawin Dep. 162:17-20.)  The only other statute referenced in the Complaint in connection with Slawin's CFPA claim is the Electronic Fund Transfer Act (15 U.S.C. § 1693 *et seq.*), which is not a fraud statute and has no factual connection at all to the concerns Slawin claims to have raised to others.  Because none of Slawin's testimony concerning his purported protected activities "even gestures at a possibility that" BAMS engaged in any conduct within the scope of the EFTA, it is not reasonable to believe BAMS violated that statute.[7] *See Brown v. Morehouse College*, 829 Fed. App'x 942, 945 (11th Cir. 2020) (holding in context of Federal Claims Act that no protected activity existed).

Similarly, Plaintiff's generalized expressions of concern about purported "fraud" do not constitute a protected activity under SOX.  For SOX, the employee

---

[7] At most, the EFTA requires certain "terms or conditions of electronic fund transfers" to "consumers," none of which reasonably touch upon PCI compliance. 15 U.S.C. § 1693c(a).  Moreover, under the EFTA, "the term 'consumer' means natural person," necessarily excluding the commercial merchants at issue under Slawin's theory of fraud.  15 U.S.C. § 1693a(6).

must report information "about conduct that the employee 'reasonably believes' constitutes a violation of federal laws against mail fraud, wire fraud, bank fraud, securities fraud, any SEC rule or regulation, or any provision of federal law relating to fraud against shareholders." *Gale*, 384 Fed. App'x at 929 (citing 18 U.S.C. § 1514A(a)(1)). Objective reasonableness is assessed under a "totality of the circumstances test based on knowledge available to a reasonable person in the same factual circumstances—and with the same training and experience—as the complainant," including "whether the employer acted with the requisite scienter, whether the misstatement was material, whether the misstatement was relied upon, and whether it yielded economic loss." *Ronnie*, 81 F.4th at 1351.

First, despite referring to fraud on shareholders in the Complaint, Slawin's limited concern with respect to shareholders was simply that data security issues could affect merchants' "bottom line" which "ultimately" affects "earnings per share/shareholder," not that BAMS was somehow defrauding the shareholders themselves. (*Compare* Compl. ¶ 118 *with* Slawin Dep. 218:11-219:13.) The only purported fraud identified by Slawin in his deposition, however, pertained to representations or omissions to the merchants themselves regarding PCI compliance. (*E.g.*, Slawin Dep. 175:25-176:7, 204:2-205:2.) Without some "objectively reasonable belief that the company intentionally misrepresented or omitted certain facts *to investors*," it is not objectively reasonable to believe shareholder fraud

18

occurred. *Cruzan*, 2020 WL 10574160, at *6 (emphasis added) (quoting *Northrop Grumman Sys. Corp. v. U.S. Dep't of Labor*, 927 F.3d 226, 234-35 (4th Cir. 2019)) ("Moreover, 'the reasonableness of an employee's belief must be considered in the context of what is required to establish shareholder fraud[.]'").

Second, no person with Slawin's experience and training could reasonably believe BAMS's conduct implicated *any* of the categories of conduct enumerated within SOX. *See Cruzan*, 2020 WL 10574160, at *6 ("The objective reasonableness of an employee's belief is 'evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.'") (citation omitted). Slawin has decades of experience in the banking industry, testifies to having experience investigating fraud, and contends he is knowledgeable about fiduciary relationships and when they arise; moreover, he knew that any requirement to be PCI compliant was assumed by contract, not mandated by the government. (*E.g.*, Slawin Dep. 179:14-21, 193:13-194:4.) No one with such experience could reasonably believe that BAMS committed "fraud" by purportedly breaching contractual obligations to merchants to meet certain data security standards and to respond to information requests. (Davis. Decl. ¶¶ 25-28.) To borrow Judge Ray's language in *Cruzan*:

> [A] reasonable person in Plaintiff's position could not have believed that a potential breach of the contractual provision Plaintiff cites could constitute fraud on [merchants'] shareholders rather than a mere breach of contract by [BAMS], which [merchants] presumably could have

addressed by bringing a breach of contract claim against Defendant if [merchants] had elected to do so.

*Cruzan*, 2020 WL 10574160 at *12. Additionally, the agreements (at least one of which Slawin claims to have reviewed while employed) provide for exactly such a contingency by requiring BAMS to indemnify the merchants for various losses flowing from the failure to meet prescribed data security standards. (Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34; MSJ Ex. 44 §§ 24.7, 27.2.) There is simply no evidence in the record that the merchants in fact experienced—or that Slawin contemporaneously believed they experienced—*any* economic loss flowing from any purported misrepresentation, without which Slawin cannot have had a reasonable belief that fraud was occurring. *See Ronnie*, 81 F.4th at 1351. Last, Slawin could not have reasonably believed any fraud even occurred. Slawin was tasked with responding to merchant questionnaires and was aware that BAMS provided merchants accurate information concerning the PCI status of First Data as BAMS's service provider. (Collins Decl. ¶¶ 22-26.)

Additionally, and for avoidance of doubt, Slawin's email refusing to delete the information that he provided to himself is not a protected activity. Besides occurring three days after the decision terminating his employment (*e.g.*, Solan Decl. ¶ 99), Slawin cannot show how BAMS's demand that he destroy confidential company information that he sent to himself (especially information that he claims was sent to himself simply for purposes of self-preservation, not whistleblowing)

violated any legal requirement covered by SOX or the CFPA. Additionally, the email on its face does not report any misconduct covered by either the CFPA or SOX (*e.g.*, Solan Dep. Ex. 48), and Slawin specifically denies informing BAMS HR (the email's recipient) of any such concern (*e.g.*, Slawin Dep. 185:21-186:19).

### C. Slawin Cannot Show Any Protected Activity Contributed To His Termination.

Slawin is separately unable to demonstrate that any of his alleged protected activities contributed to the decision to terminate him.[8] An employer is entitled to summary judgment when no reasonable jury "could find that the relevant decision makers were aware of [the employee's] protected conduct when they made the decision to fire [him]." *Thomas v. Tyco Int'l Mgmt. Co., LLC*, 416 F. Supp. 3d 1340, 1363 (S.D. Fla. 2019). Additionally, "in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and

---

[8] Slawin's termination is the only form of retaliation identified in his Complaint. (ECF No. 1 ¶¶ 119-122, 132-135.) This is therefore the only form of retaliation at issue at summary judgment. *See Johnson v. 3M Company*, No. 4:20-cv-00008-AT, slip op. [ECF No. 1616] 28 n.6 (N.D. Ga. Dec. 10, 2024). Regardless, Slawin's claim during his deposition that his coaching form constituted retaliation also fails. First, as found in Title VII contexts, a coaching form is not in and of itself a qualifying adverse employment decision when it did not otherwise impact other aspects of his employment (e.g., pay, benefits, etc.). *See Holmes v. Fulton Cnty. Sch. Dist.*, 2007 WL 9650147, at *26 (N.D. Ga. Dec. 24, 2007). Courts have applied Title VII standards regarding adverse employment decisions to other retaliation contexts. *Kapp v. United Techs. Corp.*, 2019 WL 13225064, at *4 n.2 (N.D. Ga. Oct. 30, 2019). Second, Slawin acknowledged being behind on at least one deadline, which was the basis of the coaching form, and states he did not dispute the accuracy of it with HR. (Slawin Dep. 154:1-159:19.)

the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

The Eleventh Circuit's recent analysis in *Hitt v. CSX Transp. Inc.*, 116 F.4th 1309 (11th Cir. 2024) is instructive. *Hitt* is an FRSA retaliation case, which has substantially identical *prima facie* elements as CFPA and SOX claims. *See Hitt*, 116 F.4th at 1315-16. Although the employee was terminated for failing a test set up by a supervisor who was aware of the employee's protected activity, the Eleventh Circuit still found summary judgment was appropriate because the employee's "ultimate termination was not 'due, in whole or in part, to' his protected activity":

> None of the decision-makers knew about Hitt's protected conduct. Smith, the allegedly biased supervisor, had no control over the termination decision. CSX's investigation into the incident did not consider any arguably biased report from Smith. The key decision-makers separately determined that the fact that Hitt used the emergency brake during the banner test, which Hitt admitted during his internal company hearing, meant that Hitt violated CSX's rules and should receive his third offense in three years. And they independently determined that he should be fired for that third offense.

*Id.* at 1317-1318. Moreover, the Eleventh Circuit noted the "several month gap" between the protected activity and the test, which could not establish causation. *Id.* at 1317.

Under these standards, none of Slawin's claimed protected conduct contributed to his termination. BAMS's HR department (in coordination with the legal department) had exclusive authority over terminations for policy violations.

(*E.g.*, Solan Decl. ¶¶ 68-69, 92-98.)  Slawin repeatedly denied *ever* sharing *any* concerns about purported misconduct with BAMS's HR or legal departments, and there is no evidence they were aware of his purported claims of fraud.  (E.g., Slawin Dep. 185:21-186:19.)  Instead, the decision to terminate Slawin was based upon Solan's independent assessment of Slawin's policy violations and of Slawin's conduct during the December 8, 2017 interview.  (*E.g.*, Solan Decl. ¶ 68; Solan Dep. 42:22-44:18, 105:8-114:22, 120:12-124:19, 127:8-12, 141:11-24; Solan Dep. Ex. 51.)  The mere fact that Kendall provided information in response to Solan's requests does not create a triable issue of fact when, as here, Kendall was not a decision maker in the termination, the actual decision makers were not aware of any protected activity, and the decision makers made their decision based on an independent assessment of the policy violation.  *See Hitt*, 116 F.4th at 1318.

Last, Slawin claims he first expressed concerns about purported fraud *in July*, several months before HR became aware of his policy violations and ultimately decided to terminate him.  (Slawin Dep. 191:21-192:1.)  This, however, is too distant from his termination to allow an inference that the former in any way influenced the latter.  *Hitt*, 116 F.4th at 1317 ("'A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough' to establish causation from temporal proximity."); *Thomas v. Tyco*, 416 F. Supp. 3d at 1363-64 (citing cases).

23

Finally, insofar as Slawin contends HR was aware of a "protected activity" in the form of the December 11, 2017 email, that email is not a protected activity for the reasons already discussed. In any event, it cannot contribute to a decision that had already been made and internally communicated three days prior.

As a result, Slawin cannot establish a prima facie case for his retaliation claims, and BAMS is entitled to summary judgment.

### D. Plaintiff's Damages Should Be Limited.

Finally, though BAMS is entitled to judgment on all claims, BAMS is alternatively entitled to partial summary judgment on the issue of damages. Slawin has a duty to mitigate his damages "by seeking employment 'substantially equivalent' to the position [from which] []he was [terminated.]" *Reiner v. Family Ford, Inc.*, 146 F. Supp. 2d 1279, 1287 (M.D. Fla. 2001). "The same mitigation of damages analysis applies to back pay and front pay awards." *Smith v. Diamon Dev. & Invs., Inc.*, 2014 WL 11930588, at *8 (N.D. Ga. June 19, 2014) (quotations omitted), *report and recommendation adopted*, 2014 WL 12042533 (N.D. Ga. July 9, 2014); *see also Gryder v. Dennin*, 427 Fed. App'x 844, 847 (11th Cir. 2011); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1562 (11th Cir. 1988). When an employee is later involuntarily terminated from subsequent employment, such actions cut off further damages. *Richardson v. Tricom Pictures & Productions, Inc.*,

334 F. Supp. 2d 1303, 1313 (S.D. Fla. 2004) (concluding plaintiff "failed to mitigate her damages by acting in a manner that caused her involuntary termination").

The record establishes that BAMS terminated Slawin on December 8, 2017 and he began work in a comparable position at Wells Fargo Securities in December 2018. (Slawin Dep. 38:4-1938:20-21, 39:15-40:1, 40:6-23, 42:18-21; MSJ Ex. 43 at No. 4; Solan Decl. ¶ 8.) Slawin was terminated from Wells Fargo Securities approximately six months later for inappropriate behavior at an outside work function. (Slawin Dep. 42:22-43:11, 45:4-7.) In light of this involuntary termination, Slawin failed to mitigate his damages. *See Richardson*, 334 F. Supp. 2d at 1313. BAMS is accordingly entitled to partial summary judgment, limiting Slawin's available back-pay and front-pay damages to at most the period between his termination at BAMS and the commencement of his employment at Wells Fargo Securities.

## V.    CONCLUSION

For the foregoing reasons, BAMS respectfully requests that summary judgment be entered in its favor on all claims.

This 8th day of January, 2025.

/s/ Brian M. Underwood, Jr.
Christopher P. Galanek
Georgia Bar No. 282390
E-Mail: chris.galanek@bclplaw.com
Brian M. Underwood, Jr.

Georgia Bar No. 804091
E-Mail:  brian.underwood@bclplaw.com
**BRYAN CAVE LEIGHTON PAISNER LLP**
One Atlantic Center, Fourteenth Floor
1201 W. Peachtree Street, NW
Atlanta, GA  30309

*Counsel for Defendant Banc of America Merchant Services, LLC s/h/a Bank of America Merchant Services*

## CERTIFICATION UNDER L.R. 7.1.D

I hereby certify that the foregoing filing has been prepared with Times New Roman 14-point font, one of the font selections approved by the Court in L.R. 5.1, N.D. Ga.

This 8th day of January, 2025.

/s/ Brian M. Underwood, Jr.
Brian M. Underwood, Jr. (Ga. Bar 804091)

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send email notification of such filing to all counsel of record.

This 8th day of January, 2025.

/s/ Brian M. Underwood, Jr.
Brian M. Underwood, Jr. (Ga. Bar 804091)