## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| ERIC SLAWIN, | |
| Plaintiff, | Civil Action File |
| | Case No. 1:19-cv-04129-AT |
| v. | |
| BANC OF AMERICA MERCHANT SERVICES, LLC, s/h/a BANK OF AMERICA MERCHANT SERVICES, | |
| Defendant. | |

## DEFENDANT BANC OF AMERICA MERCHANT SERVICES, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(b)(1), and in support of its Motion For Summary Judgment, Defendant Banc of America Merchant Services, LLC n/k/a JV Wind Down, LLC s/h/a Bank of America Merchant Services ("BAMS") sets forth the following separate and concise material facts to which BAMS contends no genuine issue exists to be tried. An index of record materials is filed contemporaneously herewith. For purposes of clarity, declarations, depositions, and exhibits to depositions or declarations are identified by name and/or their original exhibits numbers. Other record materials are generally identified by their exhibit number in connection with this motion (e.g., "MSJ. Ex. 1").

1

## I.    PARTY BACKGROUND.[1]

1.    BAMS was a joint venture between FDS Holdings, Inc., then a subsidiary of First Data Corporation, and BAMS Solutions, Inc., an indirect subsidiary of Bank of America ("BOA"). (MSJ Ex. 40 at Requests for Admissions Nos. 3-5.)

2.    BAMS is now known as JV Wind Down, LLC. (MSJ Ex. 40 at Requests for Admissions No. 3.)

3.    Plaintiff Eric Slawin ("Slawin") is a former employee of BAMS. (Slawin Dep. 51:16-18.)

4.    Slawin began employment with BAMS in December 2015, and his signed offer letter from BAMS establishes December 7, 2015 as the effective date of employment. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 (offer letter identifying start date).)

5.    Slawin's job title while at BAMS was Vice President, Operations Control Officer. (Solan Decl. ¶ 8.)

6.    Slawin's position and job responsibilities at BAMS required that he appropriately handle proprietary, confidential, and/or sensitive information. (Solan Decl. ¶ 9; Collins Decl. ¶ 3.)

---

[1] The headings herein are used for organization only.

7. The decision to terminate Slawin's employment with BAMS was made and was effective December 8, 2017. (Solan Decl. ¶¶ 70-73; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-20, 129:12-130:13, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 51; Kendall Decl. ¶ 17.)

8. Slawin's compensation at BAMS was not reduced prior to his termination. (Solan Decl. ¶ 10; Slawin Dep. 124:23-125:4.)

9. Slawin's benefits at BAMS were not reduced prior to his termination. (Solan Decl. ¶ 11; Slawin Dep. 124:23-125:4.)

10. Slawin's title at BAMS was not taken away prior to his termination. (Solan Decl. ¶ 12; Slawin Dep. 125:5-7.)

11. Slawin's duties and responsibilities at BAMS were not curtailed prior to his termination. (Solan Decl. ¶ 13; Slawin Dep. 125:8-10.)

12. Slawin's office was not changed prior to his termination. (Solan Decl. ¶ 14; Slawin Dep. 125:11-13.)

## II.    BAMS'S HUMAN RESOURCES PERSONNEL.

13. Michael "Mike" Solan ("Solan") worked for BAMS from 2017 to 2019. (Solan Dep. 13:7-23; Solan Decl. ¶ 3.)

14. While at BAMS, Solan served as an associate relations partner in BAMS's associate relations department, which is more colloquially referred to as

the human resources ("HR") department. (Solan Dep. 15:11-16:6; Solan Decl. ¶ 4)

15.    Solan's job responsibilities at BAMS involved helping to investigate and to resolve a number of different employment-related matters, including investigations into alleged policy violations. (Solan Dep. 15:18-16:3, 18:4-7; Solan Decl. ¶ 5)

16.    Solan's job responsibilities at BAMS further included documenting the investigations and reviews that he was working on. (Solan Dep. 108:17-109:3; Solan Decl. ¶ 6.)

17.    Solan led the investigation that resulted in Solan's recommendation to terminate Slawin's employment with BAMS. (Solan Decl. ¶ 7.)

18.    Solan, as a requirement of his job, maintained contemporaneous notes (the "HR Notes") of his investigation of the activities related to Slawin's termination from BAMS, including information regarding Slawin's violations of BAMS's policies.  (Solan Decl. ¶¶ 15, 56; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

19.    Solan prepared the HR Notes at or near the events described therein. (Solan Decl. ¶ 16; Solan Dep. 105:8-109:20.)

20.    Solan prepared the HR Notes based on his personal knowledge of the activities recorded therein, or from information provided by others with

knowledge of the recorded activities. (Solan Decl. ¶ 17; *see also* Solan Dep. 105:8-111:18.)

21.    Solan prepared the HR Notes as part of his job responsibilities at BAMS. (Solan Decl. ¶ 18; Solan Dep. 105:8-111:18.)

22.    HR investigations and terminations, such as the one recorded in the HR Notes, were a regularly conducted activity at BAMS. (Solan Decl. ¶ 19; *see also* Solan Dep. 105:8-109:20.)

23.    Members of BAMS's HR department kept notes (including the HR Notes) as a regular practice in the course of investigations and terminations in which they were involved. (Solan Decl. ¶ 20; Solan Dep. 105:8-109:20.)

## III.    BAMS'S HR LEARNS SLAWIN SENT EMAILS TO HIS PERSONAL EMAIL ADDRESS.

24.    On November 30, 2017, Dan Mong of BAMS's information security ("InfoSec") team emailed BAMS's HR at AssociateRelations@BankofAmericaMerchant.com indicating that First Data's data loss prevention ("DLP") team had detected multiple instances of Slawin sending emails from his work email address (Eric.Slawin@bankofamericamerchant.com) to his personal email address (eslawin116@gmail.com).  (Solan Decl. ¶ 21; MSJ Ex. 42 at Requests for Admissions Nos. 1-2.)

25.    As detected by First Data's InfoSec team, between August 25, 2017 and November 28, 2017, Slawin sent at least ten emails from his work email

address to his personal email address. (Solan Dec. ¶ 22; MSJ Ex. 42 at Requests for Admissions Nos. 1-2.)

26.    Further investigation revealed that Slawin sent more than just the ten emails initially identified by First Data's InfoSec team. (Solan Decl. ¶¶ 23-24; Kendall Decl. ¶ 21.)

## IV.    SOLAN INVESTIGATES SLAWIN.

27.    Solan initiated his investigation into the conduct identified by First Data's DLP team on December 6, 2017. (Solan Decl. ¶ 25; Solan Dep. Ex. 51.)

28.    On December 6, 2017, Solan emailed First Data's DLP team requesting copies of the emails that Slawin forwarded to himself. (Solan Decl. ¶ 26; Solan Dep. 65:9-66:16, 105:8-111:18; Solan Dep. Ex. 51.)

29.    In accordance with BAMS's standard practice for DLP incidents, on December 6, 2017, Solan communicated with Mark Kendall ("Kendall"), Slawin's manager at the time, regarding Slawin's apparent policy violations. (Solan Decl. ¶ 27; Kendall Decl. ¶ 5; *see also* Solan Dep. 56:10-57:20.)

30.    Kendall became Slawin's manager in September 2017. (Slawin Dep. 149:16-150:14; Kendall Decl. ¶ 4.)

31.    Before becoming Slawin's manager, Kendall was Slawin's peer. (Slawin Dep. 149:16-150:14, 197:6-12, 239:6-25; Kendall Dec. ¶ 4.)

32.    On December 7, 2017, First Data's InfoSec team provided Solan with the incident reports for the ten emails that the DLP team identified as having been forwarded by Slawin to his personal email account, which Solan reviewed as part of his investigation. (Solan Decl. ¶¶ 28-29; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39.)

33.    The incident reports contain a variety of information about the emails to which each report pertains, including a section on the message body of the forwarded email. (Solan Decl. ¶ 30; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39.)

34.    Solan communicated with Kendall to understand the substance of the emails at issue.  (Solan Decl. ¶ 31; Kendall Decl. ¶ 6.)

35.    Multiple emails that Slawin sent to his personal account contained confidential information related to BAMS's business, including information related to the preparation of a self-identified audit issue ("SIAI") that Slawin was tasked with preparing. (Solan Decl. ¶ 32; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39; Kendall Decl. ¶ 7.)

36.    This SIAI pertained to concerns stemming from BAMS employees accessing and transmitting full primary account number ("PAN") data in a manner that was not compliant with Payment Card Industry ("PCI") Data Security Standards ("DSS"). (Solan Decl. ¶ 33; Kendall Decl. ¶ 8.)

37.     Solan further communicated with BAMS Asset Recovery as part of his investigation about possible reasons why Slawin may have forwarded business emails to his personal address. (Solan Decl. ¶ 34; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

38.     For example, when BAMS HR personnel investigated DLP incidents, it was common for such incidents to result from BAMS employees emailing themselves documents for purposes of printing the materials for a client meeting, business travel, or in case of VPN issues. (Solan Decl. ¶ 35; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

39.     Based on Solan's investigation, Slawin had a personal printer and cell phone, neither of which were issued by BAMS. (Solan Decl. ¶ 36; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

40.     Based on Solan's investigation, Slawin did not travel frequently for work. (Solan Decl. ¶ 37; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

41.     Based on Solan's investigation, Slawin worked from home except for one or two days each month. (Solan Decl. ¶ 38; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

42.     Based on Solan's investigation, Slawin had no prior history of emailing himself confidential business documents. (Solan Decl. ¶ 39; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

43.    Slawin had, for example, sent to himself a June 2, 2017 email by cc'ing his personal account in which Slawin copied and pasted instant message communications complaining about Brian Rubin, who was Slawin's manager at the time.  (Slawin Dep. 239:7-23; Slawin Dep. Ex. 20; Kendall Decl. ¶ 9; *see also* Solan Decl. ¶ 40.)

44.    The substance of the June 2, 2017 email communication was sufficiently high level so as not to pose a concern regarding the potential mishandling of confidential business information.  (Solan Decl. ¶ 40; *see also* Slawin Dep. Ex. 20; Kendall Decl. ¶ 9.)

45.    Although Kendall was a recipient of the June 2, 2017 email, Kendall was Slawin's peer at the time of the email and, in any event, did not notice that Slawin had cc'd his personal email.  (Kendall Decl. ¶ 9; Slawin Dep. 239:7-25; Slawin Dep. Ex. 20.)

46.    Because Slawin did not frequently travel for work, was able to print work documents directly from his work laptop, and did not have a history of routinely emailing himself documents despite primarily working from home, Solan determined it was unlikely that Slawin sent the emails flagged by First Data's DLP team in order to print them for work purposes. (Solan Decl. ¶ 41; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

47. The lack of any prior history by Slawin of routinely forwarding business emails to his personal account was particularly concerning given the confidential and sensitive nature of a number of emails that Slawin sent to himself. (Solan Decl. ¶ 42; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

## V.    SOLAN INTERVIEWS SLAWIN.

48. When investigating DLP incidents, members of BAMS's HR department routinely interviewed the employee responsible for the conduct at issue. (Solan Decl. ¶ 43.)

49. One of the purposes of interviewing the employee responsible for a DLP incident was to assess whether the employee had a defensible business justification for their conduct. (Solan Decl. ¶ 44; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

50. Another purpose of interviewing the employee responsible for a DLP incident was to determine whether the employee had disclosed the information to anyone else. (Solan Decl. ¶ 44.)

51. Another purpose of interviewing the employee responsible for a DLP incident was to provide any instructions to the employee that were necessary to protect the information at issue, including the potential return or destruction of the information at issue. (Solan Decl. ¶ 44.)

52.    If the employees were honest and candid during the investigation interview, provided a defensible business justification for their conduct and acknowledged the concern with their conduct, and followed any instructions from members of BAMS's HR department regarding the return or destruction of the information at issue, the policy violation would not necessarily result in the employee's termination. (Solan Decl. ¶ 45.)

53.    On December 8, 2017, Solan scheduled a call with Slawin and Kendall to interview Slawin concerning the emails that Slawin sent to his personal account. (Solan Decl. ¶ 46; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

54.    Solan anticipated that Slawin would provide a business justification for his conduct. (Solan Decl. ¶ 47; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

55.    Prior to the December 8, 2017 interview, Solan prepared a variety of probing questions to assess whether any business justification offered by Slawin for his conduct would validate why the behavior was exclusive only to emails/content, why the conduct occurred over multiple months, and whether the justification made sense when Slawin primarily worked from home. (Solan Decl. ¶ 48; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

56.    While Kendall attended the December 8, 2017 call as an observer, Solan conducted the interview and asked all questions. (Solan Decl. ¶¶ 49, 56; Kendall Decl. ¶ 10; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

57.    During the December 8, 2017 call, Slawin was provided an opportunity to explain why he sent the emails to his personal account.  (Solan Decl. ¶¶ 50, 56; Kendall Decl. ¶ 11; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

58.    During the December 8, 2017 call, Slawin failed to provide any business need for sending the emails to his personal email account. (Solan Decl. ¶¶ 51, 56; Kendall Decl. ¶ 12; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

59.    Instead, Slawin's behavior during the December 8, 2017 call was apathetic, flippant, and unforthcoming in a manner that demonstrated a complete lack of care for his actions, the risks or ramifications of those actions to BAMS, and the risks or ramifications of those actions to his own job (about which he did not even ask).  (Solan Decl. ¶¶ 52, 56; Kendall Decl. ¶ 13; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

60.    During the December 8, 2017 call, Slawin never expressed concerns related to noncompliance with PCI DSS by BAMS or related to any intent to act as a whistleblower with respect to any of the information within the emails that he forwarded to his personal account. (Solan Decl. ¶ 53; Kendall Decl. ¶ 14.)

61.    During the December 8, 2017 call, Slawin confirmed that he did not usually send emails from his BAMS email address to his personal email address.

(Solan Decl. ¶¶ 54, 56; Kendall Decl. ¶ 15; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

62.    During the December 8, 2017 call, Slawin represented that he did not send or save the emails anywhere other than his personal email address. (Solan Decl. ¶¶ 55-56; Kendall Decl. ¶ 16; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

63.    After the December 8, 2017 call, Solan emailed Slawin to provide a cease-and-desist letter from Meg Troughton, BAMS's Senior Vice President Associate General Counsel, as well as a declaration for Slawin to execute related to his nondisclosure and handling of the information that Slawin emailed himself. (Slawin Dep. 207:13-208:6, 212:8-215:19; Slawin Dep. Exs. 8-9, 43; Solan Decl. ¶ 57.)

64.    The letter from Troughton provides, in part: "May we remind you that BAMS information shall be handled in such a way as to ensure that it is protected from unauthorized use, access, disclosure, modification, destruction, damage, delay, or removal, either intentional or accidental." (Slawin Dep. 207:13-208:6, 212:8-215:19; Slawin Dep. Exs. 9, 43.)

65.    Based on Slawin's behavior during the December 8, 2017 call, Solan concluded (and Kendall agreed) there was a complete loss of trust that Slawin could continue to handle proprietary, confidential, and/or sensitive information, which was a core requirement of Slawin's position and employment at BAMS.

(Solan Decl. ¶¶ 56, 58; Kendall Decl. ¶ 17; Solan Dep. 44:1-11, 105:8-114:22; Solan Dep. Ex. 51.)

## VI.    SLAWIN'S POLICY VIOLATIONS.

66.    BAMS informed Slawin of his nondisclosure obligations with respect to BAMS's confidential information as early as the November 5, 2015 offer letter, which formally offered Slawin employment at BAMS. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152.)

67.    The November 5, 2015 offer letter to Slawin required Slawin to agree to nondisclosure restrictions. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152.)

68.    The November 5, 2015 offer letter to Slawin provides, in part, "The Company's trade secrets and confidential information include, but are not limited to, . . . technical information, business information and plans, manner of conducting business, . . . and similar information where: (a) such information has been treated as confidential by Company, or (b) such information is not publicly available and could be used in order to gain competitive advantage ('Confidential Information')." (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151.)

69.    The November 5, 2015 offer letter to Slawin provides, in part, "You agree that, except as authorized by Company during the course of my

employment, you will not, at any time during or after cessation of your employment, use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any of the Company's trade secrets or Confidential Information. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151.)

70.    Slawin signed the November 5, 2015 offer letter. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000152.)

71.    Based upon Solan's personal investigation and evaluation of the facts at hand, Solan independently determined that Slawin violated the following BAMS policies: Slawin's Proprietary Rights and Information Agreement with BAMS, the Associate Handbook, the Information Security Policy (which incorporates and by extension includes the End User Policy), and the Code of Ethics. (Solan Decl. ¶¶ 59-63; Solan Decl. Exs. 1-2; Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 155:14-160:11, 160:22-161:19, 162:9-165:22, 167:16-22, 170:22-171:22, 172:22-173:8; Solan Dep. Exs. 51, 69-72.)

72.    Slawin executed a Proprietary Rights and Information Agreement at the beginning of his employment. (Slawin Dep. 148:14-149:10; Slawin Dep. Ex. 6; MSJ Ex. 42 at Request for Admission No. 4; Ex. 41 at Request for Admission No. 4 and Ex. A; Solan Dep. 105:8-111:18; Solan Dep. Exs. 51, 69.)

73.    In sending confidential business emails to his personal email account, Slawin violated section 5 of his Proprietary Rights and Information Agreement with BAMS. (Solan Decl. ¶ 60; Solan Dep. Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 160:22-161:19; Solan Dep. Exs. 51, 69.)

74.    In sending confidential business emails to his personal email account, Slawin violated the Confidential Information section of the Associate Handbook. (Solan Decl. ¶ 61; Solan Dep. Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 162:9-165:22; Solan Dep. Exs. 51, 72.)

75.    Slawin received and acknowledged the Associate Handbook while employed by BAMS. (Solan Decl. ¶ 61; Solan Decl. Ex. 3; MSJ Ex. 42 at Requests for Admissions Nos. 7-8; MSJ Ex. 41 at Requests for Admissions Nos. 7-8 and Exs. B-C.)

76.    In sending confidential business emails to his personal email account, Slawin violated the Information Security Policy and the incorporated End User Policy. (Slawin Decl. ¶ 62; Solan Decl. Exs. 1-2; Solan Dep. Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 155:14-160:11; Solan Dep. Exs. 51, 70.)

77.    In sending confidential business emails to his personal email account, Slawin violated the Code of Ethics. (Slawin Decl. ¶ 63; Solan Dep.

42:22-44:18, 105:8-113:22, 122:3-123:18, 167:16-22, 170:22-171:22, 172:22-173:8; Solan Dep. Exs. 51, 71.)

78.    Slawin received and acknowledged the Code of Ethics while employed by BAMS. (Solan Decl. ¶ 63; Solan Decl. Ex. 3; MSJ Ex. 42 at Requests for Admissions Nos. 12-14; MSJ Ex. 41 at Requests for Admissions Nos. 12-14 and Exs. C-D; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

79.    While the substance of the policies varies, together they establish a comprehensive set of expectations for BAMS employees regarding the handling of confidential company information in order to adequately protect it. (Solan Decl. ¶ 64.)

80.    While disclosing BAMS's confidential information to third parties without authorization or an adequate business justification would violate BAMS's policies, such disclosure is not necessary for a violation of BAMS's policies to occur. (Solan Decl. ¶ 65.)

81.    Mishandling BAMS's confidential information in a manner that compromises the measures undertaken to protect that confidential information—such as by sending BAMS's confidential information to unapproved email accounts beyond BAMS's control and outside of its firewall—violates BAMS's policies regardless of whether the confidential information is in fact disclosed to others. (Solan Decl. ¶ 66.)

82.     While employed at BAMS, Slawin received training on the Code of Ethics, the Associate Handbook, and global information security.  (Solan Decl. ¶ 67; Solan Decl. Ex. 3; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

## VII.  THE ONLY DECISION MAKERS IN SLAWIN'S TERMINATION WERE SOLAN AND DE CASTRO IN CONJUNCTION WITH BAMS'S LEGAL DEPARTMENT.

83.     The only people who Slawin contends retaliated against Slawin are those who made the decision to terminate Slawin's employment at BAMS. (Slawin Dep. 184:21-185:1.)

84.     Slawin does not contend Rubin had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

85.     Slawin does not have any knowledge of whether Rubin had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-220:13.)

86.     Rubin did not have any role in the termination of Slawin's employment at BAMS.  (Solan Decl. ¶ 92.)

87.     Rubin did not make or recommend the decision to terminate Slawin's employment at BAMS.  (Solan Decl. ¶ 92.)

88.     Slawin does not contend Leonard Ebel had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

89.    Slawin does not have any knowledge of whether Ebel had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

90.    Ebel did not have any role in the termination of Slawin's employment at BAMS.  (Solan Decl. ¶ 93.)

91.    Ebel did not make or recommend the decision to terminate Slawin's employment at BAMS.  (Solan Decl. ¶ 93.)

92.    Slawin does not contend the relationship manager with Home Depot had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

93.    Slawin does not have any knowledge of whether the relationship manager with Home Depot had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

94.    The relationship manager with Home Depot did not have any role in the termination of Slawin's employment at BAMS.  (Solan Decl. ¶ 94.)

95.    The relationship manager with Home Depot did not make or recommend the decision to terminate Slawin's employment at BAMS.  (Solan Decl. ¶ 94.)

96.    Slawin does not contend Treicia Brooks had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 190:17-24, 215:24-218:10.)

97.    Brooks was a peer of Slawin. (Slawin Dep. 190:10-16.)

98.    Slawin does not have any knowledge of whether Brooks had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 190:17-24, 215:24-218:10.)

99.    Brooks did not have any role in the termination of Slawin's employment at BAMS.  (Solan Decl. ¶ 95.)

100.  Brooks did not make or recommend the decision to terminate Slawin's employment at BAMS.  (Solan Decl. ¶ 95.)

101.  Slawin does not contend Sherra Grissom had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 189:24-190:9, 215:24-218:10.)

102.  Slawin does not have any knowledge of whether Grissom had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 187:15-190:9, 215:24-218:10.)

103.  Grissom did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 96.)

104.    Grissom did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 96.)

105.    Slawin does not have any knowledge of whether Collins had any role in the termination of Slawin employment at BAMS. (Slawin Dep. 200:9-201:9.)

106.    The only people who Slawin contends made the decision to terminate Slawin's employment at BAMS are Kendall, Collins, BAMS HR, and BAMS's General Counsel.  (Slawin Dep. 185:2-6.)

107.    Slawin only assumes Collins had input in the decision to terminate Slawin's employment at BAMS.  (Slawin Dep. 200:9-14.)

108.    No one has told Slawin that Collins was involved in the decision to terminate Slawin's employment at BAMS.  (Slawin Dep. 200:15-201:2.)

109.    Slawin's only basis for his assumption that Collins had input in the decision to terminate him is that BAMS produced "some type of verification or something to -- questions or something."  (Slawin Dep. 200:9-201:9.)

110.    Collins verified interrogatory responses from BAMS, but this verification does not reflect any involvement by Collins in the decision to terminate Slawin's employment at BAMS.  (MSJ Ex. 38; Collins Decl. ¶ 18.)

111.    Collins did not have any role in the termination of Slawin's employment at BAMS.  (Solan Decl. ¶ 97; Collins Decl. ¶ 19.)

112. Collins did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 97; Collins Decl. ¶ 20.)

113. Slawin's only basis for his contention that Kendall was involved in the determination to terminate Slawin's employment at BAMS is that "[h]e was at the meeting where they terminated" Slawin and Kendall responded "yes" when Slawin asked him, "Are you in agreement with this, Mark?" (Slawin Dep. 201:10-25.)

114. Kendall did not make or recommend the decision to terminate Slawin's employment at BAMS, though he was supportive of HR's recommendation. (Solan Decl. ¶ 98; Kendall Decl. ¶ 31; Solan Dep. 111:19-112:10, 123:19-124:2.)

115. Because Slawin's termination was based on violations of company policy, the final termination decision was made exclusively by BAMS's HR department—namely, Solan and De Castro—in conjunction with BAMS's legal department. (Solan Dep. 111:19-112:10; 120:12-124:2; Solan Decl. ¶¶ 68-69, 92-98; Kendall Decl. ¶ 31.)

## VIII. SLAWIN'S EMPLOYMENT WAS TERMINATED DECEMBER 8, 2017.

116. Based on the interview of Slawin and on Slawin's policy violations, Solan recommended on December 8, 2017 that Slawin be terminated to Maryann

De Castro, Solan's supervisor. (Solan Decl. ¶ 68; Solan Dep. 42:22-44:18, 105:8-114:22, 120:12-124:19, 127:8-12, 141:11-24; Solan Dep. Ex. 51.)

117.   Solan did not base his termination recommendation on any information besides Slawin's policy violations and the loss of trust that resulted from Slawin's conduct during his interview with Solan. (Solan Decl. ¶ 69; Solan Dep. 42:22-44:18, 105:8-114:22, 120:12-124:19; Solan Dep. Ex. 51.)

118.   The specific subject matter of the emails that Slawin sent to himself was irrelevant to Solan's recommendation; instead, what mattered was that the emails contained BAMS's confidential, proprietary, and sensitive information. (Solan Decl. ¶ 70.)

119.   De Castro approved the recommendation on December 8, 2017. (Solan Dec. ¶ 71; Solan Dep. 105:8-111:25, 122:3-20, 139:10-17, 141:11-24, Solan Dep. Ex. 51.)

120.   Also on December 8, 2017 Solan informed members of BAMS management and InfoSec team that Slawin's employment had been terminated. (Solan Decl. ¶ 72; Solan Dep. 70:14-75:9,  88:13-19, 141:11-24; Solan Dep. Ex. 47.)

121.   Slawin's employment with BAMS terminated effective December 8, 2017. (Solan Decl. ¶ 73; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-

20, 129:12-130:13, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 51; Kendall Decl. ¶ 17.)

122.   Slawin's access to BAMS's systems terminated with his employment on December 8, 2017. (Solan Decl. ¶¶ 56, 74; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51; Kendall Decl. ¶ 17.)

## IX.    SOLAN COULD NOT REACH SLAWIN TO PROVIDE VERBAL NOTICE OF THE TERMINATION UNTIL DECEMBER 12, 2017.

123.   Solan attempted to contact Slawin via telephone and instant message to inform him of the termination on December 8, 2017, but Slawin did not respond to Solan's calls or messages on December 8, 2017. (Solan Decl. ¶ 75; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

124.   BAMS's typical practice was to notify individuals of termination verbally before providing notice in writing. (Solan Dep. 133:25-134:11; Solan Decl. ¶ 76.)

125.   Solan attempted to call Slawin multiple times from December 8, 2017 to December 11, 2017. (Solan Decl. ¶ 77; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

126.   Solan emailed Slawin again on December 11, 2017 to attempt to schedule a call. (Solan Decl. ¶ 78; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

127.   Slawin responded to Solan on December 11, 2017, confirming that he was "unable to log into the network this morning." (Solan Decl. ¶ 79; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

128.   Slawin was aware he was unable to access BAMS's systems as of the morning of December 11, 2017.  (Solan Decl. ¶ 79; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

129.   After Slawin's initial response on December 11, 2017, Solan again emailed Slawin on December 11, 2017 to schedule a call. (Solan Decl. ¶ 80; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

130.   Thereafter Slawin emailed Solan on December 11, 2017 to indicate that he would not sign the declaration. (Solan Decl. ¶ 81; Solan Dep. 105:8-111:18, 136:17:137:20; Solan Dep. Exs. 48, 51.)

131.   On December 12, 2017, Slawin and Solan engaged in further email exchanges in which Slawin finally agreed to speak with Solan over the phone. (Solan Decl. ¶ 82; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

132.   On December 12, 2017, Solan (joined by Kendall) spoke with Slawin over the phone and informed Slawin of his termination. (Solan Decl. ¶ 83; Kendall Decl. ¶ 18; Solan Dep. 105:8-111:18, 128:12-129:4, 132:6-18, 133:25-134:11; Solan Dep. Ex. 51.)

133.   Kendall attended the call as an observer, but Solan conducted the call. (Solan Decl. ¶ 83; Kendall Decl. ¶ 19.)

134.   During the December 12, 2017 call, Solan further informed Slawin that BAMS still required Slawin to execute the declaration regarding the nondisclosure, return, and destruction of the confidential information, a version of which Solan emailed to Slawin on December 8, 2017 following Solan's interview of Slawin. (Solan Decl. ¶ 84; Kendall Decl. ¶ 20; Solan Dep. 105:8-111:18, Ex. 51.)

135.   After the December 12, 2017 call, Solan emailed Slawin to provide him with a termination notice letter, an amended declaration letter, and the previously provided cease-and-desist letter. (Solan Decl. ¶ 85; Solan Dep. 105:8-111:18, 129:12-132:5; Solan Dep. Exs. 45, 50, 51.)

136.   The termination notice contains typographical errors identifying Slawin's date of termination as December 7, 2017, when in fact his date of termination is December 8, 2017. (Solan Decl. ¶ 86; Solan Dep. 105:8-111:18, 129:12-130:13, 151:14-153:24; Solan Dep. Ex. 45, 51.)

137.   During the December 12, 2017 call, Slawin neither affirmed nor denied that he would execute the declaration concerning the nondisclosure, return, and destruction of the confidential information that Slawin sent to himself, but previously indicated via email on December 11, 2017 that he would not

execute the declaration provided to him on December 8, 2017. (Solan Decl. ¶ 87; Solan Dep. 105:8-111:18, Ex. 51.)

138.  Even after the decision was made to terminate Slawin, BAMS continued its investigation into the nature of the information that Slawin emailed to himself, including information beyond the ten emails initially identified by First Data's InfoSec team, in order to continue assessing the risks related to such information. (Solan Decl. ¶¶ 23-24; Kendall Decl. ¶ 21.)

## X.    PLAINTIFF'S POST-TERMINATION ACTIVITIES

139.  Slawin began work at Wells Fargo Securities in December 2018. (Slawin Dep. 38:4-19.)

140.  Slawin's job title while at Wells Fargo Securities was Operational Risk Consultant. (Slawin Dep. 38:20-21.)

141.  Slawin's job responsibilities at Wells Fargo Securities included handling operational risk matters for securities trading. (Slawin Dep. 42:18-21.)

142.  Slawin's base salary at Wells Fargo Securities was approximately $125,000 per year. (Slawin Dep. 39:15-21.)

143.  Slawin's compensation at Wells Fargo Securities also included the opportunity to receive a bonus. (Slawin Dep. 39:22-40:1.)

144.  Slawin's base salary at BAMS at the time of his termination was $125,000. (MSJ Ex. 43 at Interrogatory No. 4.)

145.   Slawin's compensation at BAMS also included the opportunity to receive a bonus.  (MSJ Ex. 43 at Interrogatory No. 4.)

146.   Slawin received health benefits through his employment at Wells Fargo Securities. (Slawin Dep. 40:6-14.)

147.   Slawin received retirement benefits through his employment at Wells Fargo Securities, including a matching 401(k) plan. (Slawin Dep. 40:15-23.)

148.   Wells Fargo Securities terminated Slawin's employment in June 2019. (Slawin Dep. 45:4-7.)

149.   Wells Fargo Securities terminated Slawin's employment for policy violations after he became intoxicated at a company event. (Slawin Dep. 42:22-43:11.)

## XI.    BAMS WAS ACTIVELY ASSESSING AND REMEDIATING ISSUES RELATED TO PCI COMPLIANCE.

150.   At least as of January 2017, BAMS identified potential instances in which BAMS personnel were accessing or transmitting unencrypted full Primary Account Number ("PAN") data through the DLP process managed by Joe Moll ("Moll"). (Davis Decl. ¶ 4.)

151.   Slawin did not first identify the issue, but rather learned of it from others.  (Slawin Dep. 180:24-181:16.)

152.   The accessing or transmitting of unencrypted full PAN data by BAMS personnel would potentially require BAMS to be Payment Card Industry ("PCI") Data Security Standard ("DSS") compliant. (Davis Decl. ¶ 5.)

153.   The accessing or transmitting of full PAN data was outside of the expectations for BAMS personnel.  (Davis Decl. ¶ 6.)

154.   Instead, it was expected that BAMS personnel would not access or transmit full PAN data, such that PCI DSS would not be applicable and BAMS would not be required to certify its compliance with the same. (Davis Decl. ¶ 7.)

155.   Moll informed Ali Davis ("Davis") of the DLP findings concerning the use of PAN data by BAMS employees. (Davis Decl. ¶ 8.)

156.   Davis's role at BAMS during 2017 was Senior Vice President, Risk and Compliance at BAMS. (Davis Decl. ¶ 3.)

157.   Davis oversaw the Information Security Product Governance Group in the Risk Department. (Davis Decl. ¶ 9.)

158.   Davis informed BAMS's Chief Risk Officer Tom Fontana ("Fontana") of the issues identified by Moll concerning the use of PAN data by BAMS employees. (Davis Decl. ¶ 10.)

159.   The population of BAMS employees attempting to transmit full PAN data included members of David Ades's ("Ades") team. (Davis Decl. ¶ 11.)

160.   In June 2017, Davis and Moll had a call with Ades to discuss issues related to members of his team using full PAN data. (Davis Decl. ¶ 12.)

161.   On the call, Davis recommended that the accessing or transmitting of unencrypted full PAN data by Ades's team be self-identified as an audit issue. (Davis Decl. ¶ 13.)

162.   A self-identified audit issue ("SIAI") is a potential issue identified by the owner of the activity and investigated internally by BAMS for assessing the scope of the issue, identifying and implementing appropriate remediation, and ultimately reporting to external or third-party auditors or regulators during an audit or similar evaluation. (Davis Decl. ¶ 14.)

163.   It was not uncommon for SIAIs to be treated as confidential until the issue was fully assessed and appropriate remediation was determined such that it could be disseminated more broadly within BAMS. (Davis Decl. ¶ 14; Kendall Decl. ¶ 30.)

164.   BAMS personnel were encouraged to self-identify issues as part of their job, and annual performance goals of a number of BAMS employees, , including a ratio for the number of self-identified audit issues raised by the employee versus issues raised by other internal and external auditors. (Davis Decl. ¶ 15; Ades Dep. 93:11-95:11.)

165.   BAMS personnel were never punished for self-identifying issues. (Davis Decl. ¶ 15; Ades Dep. 95:7-11.)

166.   Ades agreed with Davis's recommendation to self-identify the issue related to the accessing or transmitting of unencrypted full PAN data by BAMS personnel on Ades's team. (Ades Dep. at 95:12-96:16.)

167.   On June 13, 2017, Ades sent an email to Natasha Collins, Brian Glynn, and Monica Kennedy regarding his discussion with Davis and Moll. (Ades Dep. 29:15-30:14; Ades Dep. Ex. 16; Collins Decl. ¶ 4.)

168.   Natasha Collins was Slawin's manager until September 2017. (Slawin Dep. 149:13-23; *see also* Slawin Dep. 147:5-148:9, Ex. 5 (offer letter identifying Collins as Slawin's manager); Collins Decl. ¶ 3.)

169.   Ades's email discusses potential forms of remediation. (Collins Decl. ¶ 4; Ades Dep. 96:17-100:19; Ades Dep. Ex. 16.)

170.   One possible form of remediation included allowing the use and transmission of full PAN data to continue, in which case BAMS would potentially be required to become PCI compliant, which in turn would be costly and time-consuming. (Collins Decl. ¶ 5; Davis Decl. ¶ 16; Ades Dep. 96:17-97:21.)

171.   Another possible form of remediation was to revise internal processes such that BAMS employees would no longer use or transmit full PAN

data, in which case BAMS would not need to become PCI compliant. (Collins Decl. ¶ 6; Davis Decl. ¶ 17; Ades Dep. 96:17-100:19.)

172. A revision of internal processes may have resulted in the need to terminate the employment of a number of BAMS employees on certain teams. For that reason, Ades informed those dealing with the SIAI regarding PCI compliance that the matter should be treated as confidential to the team discussing and investigating the issue so as not to raise unwarranted concerns within the workforce prior to any final decisions on direction were made. (Collins Decl. ¶ 7; Davis Decl. ¶ 17; Ades Dep. 98:11-100:19.)

173. It was decided that members of Ades's team would work with Davis to initiate an SIAI to ensure Ades's team developed new requirements around the handling of PAN data so as not to require a new level of PCI compliance. (Collins Decl. ¶ 8; Davis Decl. ¶ 18.)

174. On June 13, 2017, Natasha Collins tasked Slawin with initiating the SIAI. (Collins Decl. ¶ 9; *see also* Kendall Decl. ¶ 23.)

175. Slawin did not timely initiate the SIAI related to the use of PAN data by Ades's team. (Collins Decl. ¶10; Kendall Decl. ¶ 24.)

176. Slawin's delay in initiating the SIAI caused a corresponding delay in BAMS's ability to fully assess and remediate issues related to the use of PAN data by Ades's team. (Collins Decl. ¶ 11; Kendall Decl. ¶ 25.)

177.  In fact, as of September 2017, there were four audit issues from the start of 2017 or earlier that Slawin had failed to timely resolve and that remained open. (Collins Decl. ¶¶ 12-13.)

178.  On September 26, 2017, Collins provided a coaching form to Slawin. (Collins Decl. ¶ 13.)

179.  The coaching form was provided to Slawin due to his failure to timely complete tasks and meet deadlines. (Collins Decl. ¶ 14.)

180.  The coaching form was issued due to Slawin's failure to timely develop and submit audit and remediation plans, his failure to adequately  follow up to ensure the remediation plan was being implemented in a timely fashion, and his failure to provide reporting on status or to escalate challenges unless requested to do so. (Collins Decl. ¶¶ 13, 15.)

181.  In his deposition, Slawin stated he believed a September 2017 coaching form was retaliation, but ultimately conceded he "was behind on some task" and that he does "not recall disputing the accuracy" of the coaching form with HR, only its tone. (Slawin Dep. 122:21-1231; 154:1-159:19.)

182.  Slawin failed to finalize the draft SIAI by the time of his termination. (Davis Decl. ¶ 19; Collins Decl. ¶ 16; Kendall Decl. ¶ 26.)

183.   In fact, Slawin often day traded during ordinary business hours and admitted the same to Mark Kendall, then Slawin's peer. (Kendall Decl. ¶ 22; Slawin Dep. 61:7-63:17.)

184.   The SIAI related to the use of PAN data by Ades's team continued after Slawin's termination. (Davis Decl. ¶ 20; Kendall Decl. ¶ 27.)

185.   An initial draft of the SIAI related to the use of PAN data by Ades's team was prepared by Mark Kendall on December 15, 2017. (Davis Decl. ¶ 21; Kendall Decl. ¶ 28.)

186.   The issue identified by the SIAI was accepted on January 26, 2018. (Davis Decl. ¶ 22.)

187.   The action plan identified by the SIAI was accepted on February 28, 2018. (Davis Decl. ¶ 22.)

188.   The SIAI for Ades's group was closed on December 19, 2018. (Davis Decl. ¶ 22.)

189.   At the same time as the SIAI for Ades's group, other SIAIs for other groups within BAMS were opened regarding the handling of PAN data by BAMS employees. (Davis Decl. ¶ 23.)

190.   For example, there was an SIAI for the processing of PAN data by BAMS contact centers. (Davis Decl. ¶ 23.)

191.    In addition, there was an SIAI for the processing of PAN data by the BAMS settlement exceptions team. (Davis Decl. ¶ 23.)

192.    Aside from Slawin, there is no evidence that anyone else working on any of the PAN data SIAIs were terminated from BAMS. (Davis Decl. ¶ 24; Kendall Decl. ¶ 29; Collins Decl. ¶ 17.)

193.    Moll, who initially identified the issue, was not terminated from BAMS nor was Ali Davis. (Davis Decl. ¶ 24.)

## XII.  SLAWIN LACKED REASONABLE BELIEF IN ANY STATUTORY VIOLATION.

194.    Slawin did not learn or believe any conduct at BAMS violated any provision of the Consumer Financial Protection Act until after his termination from BAMS.  (Slawin Dep. 27:21-24, 162:17-21.)

195.    Slawin did not understand any conduct at BAMS violated the Dodd-Frank Act until after his termination from BAMS.  (Slawin Dep. 162:22-163:1.)

196.    Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding how BAMS was handling credit card data would violate the Consumer Financial Protection Act.  (Slawin Dep. 223:19-24.)

197.    Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding

how BAMS was handling credit card data would violate Sarbanes-Oxley. (Slawin Dep. 223:19-224:3.)

198. Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding how BAMS was handling credit card data would violate the Dodd-Frank Act. (Slawin Dep. 223:19-224:7.)

199. PCI DSS are set forth by the PCI Security Standards Council and governed by the card brand networks (Visa and MasterCard), not government requirements. Instead, entities operating in the payment industry agree to comply with PCI DSS through various contractual agreements. (Davis Decl. ¶ 25.)

200. A person working within the payment processing or financial industries could not reasonably believe PCI DSS are government requirements. (Davis Decl. ¶ 26.)

201. A person working within the payment processing or financial industries could not reasonably believe that the failure to be compliant with PCI DSS is fraud or somehow illegal. (Davis Decl. ¶ 27.)

202. A person working within the payment processing or financial industries could not reasonably believe that the failure to disclose any noncompliance with PCI DSS is fraud or somehow illegal; instead, such a person would instead understand that any disclosure obligation would be governed by a

contractual relationship, and that the failure to meet that obligation is a breach of said contract.  (Davis Decl. ¶ 28.)

203.   Slawin at all relevant times was aware that PCI DSS are not government requirements.  (Slawin Dep. 179:14-21.)

204.   Slawin lacked an understanding of whether resolving the PAN data issue at BAMS would have avoided any need for BAMS to become PCI compliant.  (Slawin Dep: 179:5-180:18.)

205.   At the time of his employment by BAMS, Slawin had nearly 25 years of experience in the Securities and Banking Regulator and Compliance field. (ECF No. 1 at ¶ 75.)

206.   Prior to working with BAMS, Slawin held numerous regulatory and compliance positions both for governmental regulatory agencies as well as for banks.  (ECF No. 1 at ¶ 75.)

207.   Prior to working with BAMS, Slawin had experience investigating fraud including stock manipulations and misrepresentations to clients.  (Slawin Dep. 193:10-17.)

208.   Slawin has familiarity with fiduciary obligations and the circumstances in which fiduciary obligations arise between contracting parties. (Slawin Dep. 193:18-194:4.)

209.    Slawin reviewed one such agreement in connection with his purported concerns about fraud.  (Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34.)

210.    A true and correct copy of PLAINTIFF 000612-PLAINTIFF 000695, which is the full version of the agreement that Slawin stated he reviewed in connection with his purported concerns about fraud, is attached hereto as MSJ Exhibit 44 which has been redacted to omit pricing information.  (Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34; MSJ Ex. 44.)

211.    Slawin describes this purported fraud as "a twofold omission that the firm [BAMS] needs to be PCI compliant and that . . . it's being represented to clients that the firm's PCI compliant." (Slawin Dep. 175:25-176:7.)

212.    Slawin also contends that he "was positioned to being forced to represent that the company [BAMS] was PCI compliant."  (Slawin Dep. 204:2-205:2.)

## XIII. SLAWIN DID NOT EXPRESS CONCERNS ABOUT STATUTORY VIOLATIONS TO ANYONE, AND HE NEVER PUT ANY CONCERNS OF ANY KIND IN WRITING.

213.     Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated the Dodd-Frank Act.  (Slawin Dep. 186:20-24.)

214.   Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated Sarbanes-Oxley.  (Slawin Dep. 186:25-187:4.)

215.   Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated the Consumer Financial Protection Act.  (Slawin Dep. 186:25-187:8.)

216.   Prior to the termination of his employment at BAMS, Slawin did not put any of his concerns that BAMS was engaged in illegal conduct or fraud in writing and provide them to anyone within BAMS.  (Slawin Dep. 188:21-25, 198:23-199:12, 200:3-8.)

## XIV.  SLAWIN DID NOT EXPRESS CONCERNS ABOUT ANY FORM OF WRONGDOING WITH BAMS'S HR OR LEGAL DEPARTMENTS.

217.   Slawin did not express concerns to anyone in BAMS's Office of the General Counsel that BAMS was somehow engaged in fraudulent conduct. (Slawin 185:15-20.)

218.   Slawin did not tell anyone in BAMS's HR department that BAMS was engaged in fraudulent conduct.  (Slawin Dep. 185:21-23; Solan Decl. ¶¶ 88-89.)

219.   Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated Sarbanes-Oxley.  (Slawin Dep. 185:24-186:5; Solan Decl. ¶¶ 88-89.)

220.   Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated the Consumer Financial Protection Act.  (Slawin Dep. 186:6-11; Solan Decl. ¶¶ 88-89.)

221.   Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated Dodd-Frank Act.  (Slawin Dep. 186:12-15; Solan Decl. ¶¶ 88-89.)

222.   Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was defrauding its customers.  (Slawin Dep. 186:16-19; Solan Decl. ¶¶ 88-89.)

223.   While employed at BAMS, Slawin did not raise any concern to anyone in BAMS's HR that he felt he was being placed in an inappropriate position by his managers.  (Slawin Dep. 135:10-14; Solan Decl. ¶¶ 88-89.)

224.   Through the investigation into Slawin's conduct, no one ever told anyone in BAMS's HR that Slawin had expressed that he believed BAMS was engaged in fraudulent conduct; that BAMS was defrauding its customers; that BAMS was engaged in conduct that violated Sarbanes-Oxley, the Consumer Financial Protection Act, or the Dodd-Frank Act; or that Slawin was being placed in an inappropriate position by his managers. (Solan Decl. ¶¶ 88-89.)

225.  While employed at BAMS, Slawin did not contact BAMS's Legal Department to indicate that he felt he was being placed in an inappropriate position by his managers.  (Slawin Dep. 135:15-19.)

226.  While employed at BAMS, Slawin did not reach out to anyone in BAMS's Office of the General Counsel to express concern about the way he was being treated by management.  (Slawin Dep. 136:22-137:1.)

227.  While employed at BAMS, Slawin did not reach out to anyone in the General Counsel's Office to express that he was being placed in an inappropriate position based on decisions being made by his managers with respect to the handling of primary account numbers by BAMS.  (Slawin Dep. 137:2-138:4.)

228.  Slawin was aware of how to contact BAMS's General Counsel's Office as part of his job.  (Slawin Dep. 136:14-17.)

229.  Slawin frequently contacted BAMS's Legal Department as part of his job duties.  (Slawin Dep. 136:6-13, 136:18-21.)

230.  BAMS maintained an Ethics hotline through which employees could anonymously report conduct that they believed was inappropriate or unethical. (Solan Decl. ¶ 90.)

231.  Slawin possessed contact information for the HR Service Center Associates Line, the Employee Assistance Program, and the Discrimination and

Harassment Hotline.  (Slawin Dep. 128:10-13, 131:22-134:19; Slawin Dep. Ex. 4 at PLAINTIFF 000149; Solan Decl. ¶ 91.)

232.   The same documentation provided instructions for accessing BAMS's Code of Ethics and Associate Handbook, as well as a link to the same. (Slawin Dep. 128:10-13; Slawin Dep. Ex. 4, Solan Decl. ¶ 91.)

233.   Exhibit 4 to the Deposition of Eric Slawin is an onboarding toolkit that all new BAMS employees received upon the commencement of their employment.  (Solan Decl. at ¶ 91; Slawin Dep. Ex. 4.)

## XV.   SLAWIN DID NOT EXPRESS CONCERNS TO BAMS'S JOINT VENTURERS OR CLIENTS

234.   Slawin did not contact any clients of BAMS about concerns related to any fraudulent conduct by BAMS. (Slawin Dep. 176:8-17.)

235.   Slawin did not reach out to Bank of America about concerns related to fraudulent conduct by the management of BAMS. (Slawin Dep. 176:23-177:6.)

236.   Slawin did not reach out to First Data about concerns related to fraudulent conduct by the management at BAMS. (Slawin Dep. 176:23-177:10.)

## XVI.  SLAWIN IDENTIFIES ONLY THREE INDIVIDUALS TO WHOM HE EXPRESSED CONCERNS ABOUT FRAUD.

237.   Slawin admits he did not disclose any concern that BAMs was engaged in illegal conduct or fraud to anyone besides Mark Kendall, Treicia Brooks, and Sherra Grissom.  (Slawin Dep. 198:23-199:7.)

238. Slawin contends he orally told Sherra Grissom that not disclosing the conduct with which BAMS was engaged concerning PCI compliance was fraud. (Slawin Dep. 187:15-189:23.)

239. Slawin stated he raised concerns with Grissom on two different occasions in November 2017. (Slawin Dep. 188:16-189:6.)

240. Slawin testifies Grissom was his superior. (Slawin Dep. 188:5-11.)

241. Slawin does not know if Grissom ever discussed Slawin's concerns with anyone else. (Slawin Dep. 189:19-23.)

242. Slawin contends he had "numerous conversations" during October and November 2017 with Brooks in which they "talked about how -- what a mess this was and can't believe it's going on. And every time I say something to somebody about it no one's doing anything." (Slawin Dep. 190:25-191:20.)

243. Brooks was Slawin's peer at BAMS. (Slawin Dep. 190:10-16.)

244. Slawin contends that he began expressing concerns to Kendall in July 2017. (Slawin Dep. 191:21-192:1.)

245. Slawin said he had an opinion that the SEC could be "interested" in the conduct at BAMS as of July 2017, but he did express those concerns to the SEC, the CFPB, or any government regulator at the time. (Slawin Dep. 160:24-162:16.)

246.  Slawin cannot remember precisely what he conveyed to Kendall in July 2017, but states they "discussed next steps, what a large mess it was." (Slawin Dep. 191:21-192:1, 194:5-11.)

247.  Slawin further contends he "routinely told [Kendall] that this needs to be disclosed, that it's omission.  It's a fraud."  (Slawin Dep. 194:5-11.)

248.  Slawin further contends he told Kendall and Grissom "it could become an issue with it getting out that data wasn't secure at merchants and that could affect their bottom line.  And ultimately, the bottom line leads to earnings per share/shareholders," referring to the shareholders of merchants.  (Slawin Dep. 218:11-219:13.)

249.  Kendall was Slawin's peer until September 2017 when he became Slawin's manager.  (Slawin Dep. 150:5-14, 197:6-16, 239:21-25; Kendall Decl. ¶ 4.)

250.  Mark Kendall is the only person who Slawin contends directed him to delete written references to BAMS not being PCI compliant.  (Slawin Dep. 224:14-225:15.)

251.  The only instance of any such directive about which Slawin complains occurred in a November 8, 2017 email.  (Slawin Dep. 224:14-225:15, 233:24-235:22; Slawin Dep. Ex. 13.)

252.  In the November 8, 2017 email communication in which Slawin contends Kendall directed him to delete written references to BAMS not being PCI complaint, Slawin asked Kendall whether such references should be deleted prior to Kendall providing him the purported directive.  (Slawin Dep. 224:14-225:15, 233:24-235:22; Slawin Dep. Ex. 13.)

253.  Slawin did not object in the November 8, 2017 email chain to Kendall's purported directive to delete written references to BAMS not being PCI complaint.  (Slawin Dep. 233:24-235:22; Slawin Dep. Ex. 13.)

## XVII. ANY CONCERNS THAT SLAWIN PURPORTEDLY EXPRESSED TO OTHERS WERE NOT ABOUT FRAUD OR ILLEGAL CONDUCT.

254.  Slawin further contends he expressed concerns regarding merchant questionnaires to Natasha Collins, Brian Rubin, Leonard Ebel, and the relationship manager for Home Depot.  (Slawin Dep. 215:24-218:10.)

255.  Slawin reported to Collins until September 2017 when he began reporting to Mark Kendall.  (Slawin Dep. 149:13-150:14; *see also* Collins Decl. ¶ 3.)

256.  Slawin reported to Rubin from April or May 2017 until September 2017 when Rubin was replaced by Mark Kendall.  (Slawin Dep. 150:5-151:4.)

257.  Slawin contends he told Collins, Rubin, Ebel, and the relationship manager for Home Depot "that the questionnaires I was being asked to complete,

I was not going to do that because representing that was not appropriate." (Slawin Dep. 215:24-216:14.)

258.  Slawin contends as to Collins, Rubin, Ebel, and the relationship manager for Home Depot that "I was just expressing my concerns routinely about being positioned to misrepresent the facts . . . ."  (Slawin Dep. 215:24-217:11.)

259.  Slawin further contends he told Collins and Rubin "it could become an issue with it getting out that data wasn't secure at merchants and that could affect their bottom line.  And ultimately, the bottom line leads to earnings per share/shareholders," referring to the shareholders of merchants.  (Slawin Dep. 218:11-220:13.)

260.  Slawin contends he expressed the aforementioned concerns regarding merchant shareholders to Collins in September 2017.  (Slawin Dep. 218:11-219:22.)

261.  Slawin contends he expressed the aforementioned concerns regarding merchant shareholders to Rubin in October 2017.  (Slawin Dep. 218:11-220:10.)

262.  In October 2017, Rubin's duties had changed and he was no longer Slawin's manager.  (Slawin Dep. 150:19-23, 219:23-220:10.)

263.  Slawin does not know if Rubin communicated Slawin's concerns further. (Slawin Dep. 219:23-220:13.)

264.   Slawin did not use the word "fraud" with Collins, Rubin, Ebel, or the relationship manager with Home Depot.  (Slawin Dep. 216:15-21.)

265.   Slawin did not use the word "illegal" with Collins, Rubin, Ebel, or the relationship manager with Home Depot.  (Slawin Dep. 216:22-217:11.)

266.   Slawin did not tell Collins, Rubin, Ebel, or the relationship manager with Home Depot that the conduct that BAMS was engaging in somehow violated any state or federal law or regulation.  (Slawin Dep. 217:20-218:5.)

## XVIII.    OTHER FACTS RELATED TO PLAINTIFF'S CLAIM OF PROTECTED ACTIVITY.

267.   A Merchants occasionally submitted questionnaires regarding data security, including PCI compliance, to BAMS pursuant to their contractual agreements. (Collins Decl. ¶ 21.)

268.   Slawin had a role in responding to client questionnaires regarding PCI compliance. (Collins Decl. ¶ 22.)

269.   Slawin's role with to merchant questionnaires was to define a process for handling those requests, respond to questions where he was able, and to work with others to answer any remaining questions so that the completed questionnaire could be returned to the clients. (Collins Decl. ¶ 23.)

270.   First Data Merchant Services ("FDMS") was the intended service provider responsible for processing merchant transactions and thus maintained

PCI compliance for itself, its systems (on which BAMS conducted business), and its services. (Collins Decl. ¶ 24.)

271.   In response to merchant questionnaires, BAMS disclosed FDMS's role as the service provider and providing information concerning FDMS's PCI compliance, including the then-current attestation of compliance for FDMS. Slawin, in his role regarding responding to merchant questionnaires, was familiar with BAMS responding to merchant questionnaires in this manner. (Collins Decl. ¶ 25.)

272.   Collins is unaware of any instance in which BAMS responded to a merchant questionnaire by affirmatively representing that it maintained an independent certification of its own PCI compliance.  (Collins Decl. ¶ 26.)

273.   Slawin did not intend to disclose any of the emails that he forwarded from his work email address to his personal email address, including to regulators. (Slawin Dep. 159:22-160:23.)

274.   Instead, Slawin forwarded the emails from his work email address to his personal email address for purposes of preserving them so that he could exonerate himself "should the fraud become known broadly" because he did not want to be "set up." (Slawin Dep. 159:22-160:23, 205:23-206:18.)

275.   Slawin did not file any complaints with any regulatory agencies until after his termination. (Slawin Dep. 243:8-245:5, 248:4-250:18; Slawin Dep. Exs. 36, 37, 49.)

276.   Slawin did not express concerns regarding potential harm to consumers while at BAMS; instead, Joe Moll (not Slawin) discussed risks posed by a potential data breach with Slawin and Kendall, which Slawin did not communicate to others within BAMS.  (Slawin Dep. 197:22-198:16.)

277.   In addition, Slawin claims an email that he sent to Mike Solan on December 11, 2017 refusing to execute the declaration was a protected activity. (Slawin Dep. 203:17-205:2, 205:23-207:4; *see also* Slawin Dep. 124:12-17; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

278.   The December 11, 2017 email in which Slawin refused to execute the declaration was sent by Slawin after BAMS made the decision to terminate him. (Solan Decl. ¶ 99; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

279.   The December 11, 2017 email in which Slawin refused to execute the declaration was sent by Slawin after the effective date of his termination.  (Solan Decl. ¶ 100; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-20, 129:12-130:13, 136:17-137:20, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 48, 51; Kendall Decl. ¶ 17)

280.   The December 11, 2017 email in which Slawin refused to execute the declaration does not use the word "fraud."   (Solan Decl. ¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

281.   The December 11, 2017 email in which Slawin refused to execute the declaration does not disclose any allegations of fraud.  (Solan Decl. ¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

282.   The December 11, 2017 email in which Slawin refused to execute the declaration does not mention any statute or regulation.  (Solan Decl. ¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

283.   The December 11, 2017 email in which Slawin refused to execute the declaration does not disclose any regulatory or statutory violations.  (Solan Decl. ¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

284.   Solan did not interpret Slawin's December 11, 2017 email refusing to execute the declaration as reporting or objecting to any fraud, regulatory violation, or statutory violation.  (Solan Decl. ¶ 102.)

285.   Slawin did not express any concerns to Ali  Davis that he believed BAMS was engaged in fraudulent conduct; that BAMS was defrauding its customers; that BAMS was engaged in conduct that violated Sarbanes-Oxley, the Consumer Financial Protection Act, or the Dodd-Frank Act; or that Slawin was being placed in an inappropriate position by his managers.  (Davis Decl. ¶ 29.)

286. Davis did not have any role in the termination of Slawin's employment at BAMS. (Davis Decl. ¶ 30.)

287. Davis did not make or recommend the decision to terminate Slawin's employment at BAMS. (Davis Decl. ¶ 31.)

288. In response to an interrogatory asking him to "identify those documents [he] contend[s] support his claim that [he] was retaliated against by BAMS," Slawin identified only the following bates labeled documents from his own production: 000001-2; 000007-8; 000009-000014; 000015-17; 000018-19; 000020; 000021-24; 000025-31; 000032-33; 000034-36; 000037-39; 000040-41; 000042-43; 000045-46; 000047-50; 000051-55; 000056-57; 000058-59; 000060-63; 000064-67; 000068-69; 000070-71; 000072-73; 000076-80; 000084-000138; 0000141-148; 0000149; 000153-156; 0000157-000241; 0000242-274; 000330-364; 000365-405; 000406-505; 000612-659; 0000711-713; 000720-21. (MSJ Ex. 46.)

289. In response to an interrogatory asking him to "identify those documents [he] contend[s] support [his] claim [his] employment with BAMS was terminated not as a result of a violation of BAMS policy, but instead because of [his] engagement in protected activity," Slawin identified only the following bates labeled documents from his own production: 000001-2; 000007-8; 000009-000014; 000015-17; 000018-19; 000020; 000021-24; 000025-31; 000032-33;

000034-36; 000037-39; 000040-41; 000042-43; 000045-46; 000047-50; 000051-55; 000056-57; 000058-59; 000060-63; 000064-67; 000068-69; 000070-71; 000072-73; 000076-80; 000084-000138; 0000141-148; 0000149; 000153-156; 0000157-000241; 0000242-274; 000330-364; 000365-405; 000406-505; 000612-659; 0000711-713; 000720-21. (MSJ Ex. 46.)

Respectfully submitted his 8th day of January, 2025.

> */s/ Brian M. Underwood, Jr.*
> Christopher Paul Galanek
> Georgia Bar No. 282390
> E-Mail: chris.galanek@bclplaw.com
> Brian M. Underwood, Jr.
> Georgia Bar No. 804091
> E-Mail: brian.underwood@bclplaw.com
> **BRYAN CAVE LEIGHTON PAISNER LLP**
> One Atlantic Center, Fourteenth Floor
> 1201 W. Peachtree Street, NW
> Atlanta, GA  30309
> Telephone: 404-572-6600
>
> *Counsel for Defendant Banc of America Merchant Services, LLC s/h/a Bank of America Merchant Services*

## CERTIFICATION UNDER L.R. 7.1.D

I hereby certify that the foregoing filing has been prepared with Times New Roman 14-point font, one of the font selections approved by the Court in L.R. 5.1, N.D. Ga.

This 8th day of January, 2025.

/s/ Brian M. Underwood, Jr.
Brian M. Underwood, Jr. (Ga. Bar 804091)

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send email notification of such filing to all counsel of record.

This 8th day of January, 2025.

/s/ Brian M. Underwood, Jr.
Brian M. Underwood, Jr. (Ga. Bar 804091)