# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
ERIC SLAWIN,                    )
4                               )
     Plaintiff,                 )
5                               ) Civil Action File
vs.                             )
6                               ) Case No. 1:19-cv-04129-AT
BANC OF AMERICA MERCHANT        )
7  SERVICES, LLC, s/h/a BANK OF )
AMERICA MERCHANT SERVICES,      )
8                               )
     Defendant.                 )
9
10
11          VIRTUAL VIDEOTAPED DEPOSITION OF
12                    ERIC SLAWIN
13               Tuesday, July 19, 2022
14                     9:31 a.m.
15
16          Robin K. Ferrill, CCR-B-1936, RPR
17
18
19
20
21
22
23
24
25

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 2

```
1           APPEARANCES OF COUNSEL
2  On behalf of the Plaintiff
   ROBERT N. MARX, Esquire
3     Marx & Marx, L.L.C.
      1050 Crown Pointe Parkway, Suite 500
4     Atlanta, Georgia  30338-7702
      404.261.9559
5     lawyers@marxlawgroup.com
6
7  On behalf of the Defendant
   CHRISTOPHER P. GALANEK, Esquire
8  AITEN M. McPHERSON, Esquire
      Bryan Cave Leighton Paisner LLP
9     1201 West Peachtree Street, N.W., 14th Floor
      Atlanta, Georgia  30309-3471
10    404.572.6600
      chris.galanek@bclplaw.com
11    aiten.mcpherson@bclplaw.com
12
13 ALSO PRESENT:
14    Jill Poole, Associate General Counsel FiServ
15    MIKE BROWN, Videographer
16    SHEILA LAFFERTY, Client Services Rep, BAMS
17    GEORGE LIBBARES, Concierge
18
19
20
21
22
23
24
25
```

Page 3

```
1                INDEX
2    VIRTUAL VIDEOTAPED DEPOSITION OF
3              ERIC SLAWIN
4         Tuesday, July 19, 2022
5  EXAMINATION BY                    PAGE
6  By Mr. Galanek                      9
7
8
9
10
11        DESCRIPTION OF EXHIBITS
12 EXHIBIT        IDENTIFICATION        PAGE
13 Exhibit 4  Bank of America Merchant Services    128
14    onboarding information, Bates
15    labeled PLAINTIFF 000141 - 149
16 Exhibit 5  Offer Letter from Brian Dieckhoff    147
17    to Eric Slawin, dated 11/5/2015,
18    Bates labeled PLAINTIFF 000150 -
19    152
20 Exhibit 6  Proprietary Rights and Information   148
21    Agreement, Bates labeled PLAINTIFF
22    000155 - 156
23
24
25
```

Page 4

```
1           INDEX CONTINUED
2        DESCRIPTION OF EXHIBITS
3  EXHIBIT        IDENTIFICATION        PAGE
4  Exhibit 7  City of Deland, Florida Request    170
5     for Commission Action, dated
6     10/7/2013, Bates labeled PLAINTIFF
7     000157 - 158
8  Exhibit 8  E-mail from Mike Solan to Eric      212
9     Slain, dated 12/8/2017, Subject:
10    Action Required - Legal Affidavit
11    & Cease and Desist Letter -
12    Information Security Violation,
13    Bates labeled PLAINTIFF 000001 - 2
14 Exhibit 9  Letter from Meg Troughton to Eric   213
15    Slawin, dated 12/8/2017 with
16    attachment, Bates labeled
17    PLAINTIFF 000016 - 17
18 Exhibit 10  E-mail string Bates labeled        225
19    PLAINTIFF 000020 - 24
20 Exhibit 11  E-mail chain Bates labeled         228
21    PLAINTIFF 000025 - 31
22 Exhibit 13  E-mail string Bates labeled        233
23    PLAINTIFF 000037 - 39
24
25
```

Page 5

```
1           INDEX CONTINUED
2        DESCRIPTION OF EXHIBITS
3  EXHIBIT        IDENTIFICATION        PAGE
4  Exhibit 16  E-mail string Bates labeled        237
5     PLAINTIFF 000047 - 50
6  Exhibit 17  E-mail string Bates labeled        238
7     PLAINTIFF 000056 - 57
8  Exhibit 20  E-mail from Eric Slawin to Mark    239
9     Kendall, dated 6/2/2017, Subject:
10    check it out, Bates labeled
11    PLAINTIFF 000074 - 75
12 Exhibit 21  E-mail string Bates labeled        240
13    PLAINTIFF 000076 - 80
14 Exhibit 30  Georgia Form 500, Individual       108
15    Income Tax Return 2018, Bates
16    labeled PLAINTIFF 000589 - 592
17 Exhibit 32  North Carolina Department of       112
18    Revenue 2018 Individual Income Tax
19    Return, Bates labeled PLAINTIFF
20    000596 - 600
21
22
23
24
25
```

2 (Pages 2 - 5)

Case 1:19-cv-04129-AT    Document 175-4    Filed 01/08/25    Page 4 of 40
Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 6

1          INDEX CONTINUED
2        DESCRIPTION OF EXHIBITS
3 EXHIBIT        IDENTIFICATION        PAGE
4 Exhibit 33  North Carolina Department of    115
5        Revenue 2019 Individual Income Tax
6        Return, Bates labeled PLAINTIFF
7        000602 - 609
8 Exhibit 34  Bank of America Merchant Services  173
9        Merchant Processing Agreement
10        (Government), Bates labeled
11        PLAINTIFF 000612
12 Exhibit 36  U.S. Securities and Exchange    243
13        Commission TCR Summary, Bates
14        labeled PLAINTIFF 000665 - 671
15 Exhibit 37  E-mail string Bates labeled    244
16        PLAINTIFF 000672 - 673
17 Exhibit 42  Letter from Michael Solan to Eric    209
18        Slawin, dated 12/12/2017, Bates
19        labeled PLAINTIFF 000711 - 712
20
21
22
23
24
25

Page 7

1          INDEX CONTINUED
2        DESCRIPTION OF EXHIBITS
3 EXHIBIT        IDENTIFICATION        PAGE
4 Exhibit 43  Letter from Meg Troughton to Eric    207
5        Slawin, dated 12/8/2017, Bates
6        labeled PLAINTIFF 000713
7 Exhibit 49  Whistleblower Online Complaint,    248
8        Bates labeled PLAINTIFF 000739 -
9        743
10 Exhibit 51  E-mail chain Bates labeled BAMS    250
11        00000111 - 112
12 Exhibit 52  E-mail chain Bates labeled BAMS    251
13        00000129 - 131
14 Exhibit 53  E-mail string Bates labeled BAMS    253
15        00000157 - 158
16 Exhibit 57  E-mail string Bates labeled BAMS    254
17        00000464 - 468
18 Exhibit 64  Bank of America Merchant Services    154
19        Coaching Form for Eric Slawin,
20        dated 9/25/17, Bates labeled BAMS
21        00001368 - 1370
22
23        (Original exhibits attached to the Original
24 transcript.)
25

Page 8

VIRTUAL VIDEOTAPED DEPOSITION OF
ERIC SLAWIN
Tuesday, July 19, 2022
4        THE VIDEOGRAPHER:  We are on the record.
5 My name is Mike Brown representing Veritext
6 Legal Solutions.  The date is July 19th, 2022.
7 The time on the video monitor is 9:31 a.m.
8        Caption of the case is Eric Slawin versus
9 Banc of America Merchant Services, LLC, et al.
10 The name of the witness, Eric Slawin.
11        Counsel, please state your name for the
12 record and whom you represent.
13        MR. GALANEK:  Chris Galanek.
14        MR. MARX:  Sorry.
15        MR. GALANEK:  Chris Galanek.  I'll be
16 taking the deposition.  I represent the
17 Defendant Bank of America Merchant Services.
18        MR. MARX:  Robert Marx of Marx & Marx for
19 the Plaintiff Eric Slawin.
20        MS. McPHERSON:  Aiten McPherson.  I
21 represent the Defendant as well.
22        THE VIDEOGRAPHER:  Our court reporter,
23 Robin Ferrill.
24        Will the court reporter please swear in the
25 witness.

Page 9

1 ERIC SLAWIN,
2        called as a witness, having been duly sworn
3 by a Notary Public, was examined and testified as
4 follows:
5 EXAMINATION
6 BY MR. GALANEK:
7        Q.  Good morning, Mr. Swalin.
8        A.  It's Slawin.  It's Slawin.
9        And who is Sheila?  She didn't introduce
10 herself.  Who are you?
11        Q.  Sheila Lafferty is a client rep of BAMS.
12        A.  A client rep?  I don't know what that
13 means.  What does that mean?
14        MS. LAFFERTY:  I work in the Legal
15 Department of Fiserv and we are representing
16 BAMS in this matter.
17        MR. MARX:  I'm sorry, what was that last
18 name?  The last name?
19        MS. LAFFERTY:  Lafferty.
20        MR. MARX:  Lafferty.  Thank you very much.
21        THE WITNESS:  You work for Fiserv and you
22 get to attend the deposition?  I don't
23 understand that.
24        MR. GALANEK:  She is the corporate
25 representative representing BAMS.

3 (Pages 6 - 9)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 26

1    A.  Sixty-three.
2    Q.  During what period of time did you hold a
3 Series 7?
4    A.  From the, I would say, mid-to-late nineties
5 until 2012 or '13.
6    Q.  Was there a particular brokerage house that
7 held that license for you?
8    A.  Yes.
9    Q.  Who?
10    A.  It was SunTrust Securities.
11    Q.  During what period of time did you hold the
12 Series 24?
13    A.  During the same amount of time.
14    Q.  Was that also held by SunTrust?
15    A.  Yes.
16    Q.  And the Series 63, during what period of
17 time did you hold Series 63?
18    A.  The same amount of time.
19    Q.  Was that also maintained with SunTrust?
20    A.  Yes.
21    Q.  Any other professional license that you now
22 hold or have ever held?
23    A.  No.
24    Q.  Any other certifications that you currently
25 hold or that you have ever held?

Page 27

1    A.  No.
2    Q.  Any other education that you have received
3 that you have not already described to me?
4    A.  No, not -- in high school.
5    Q.  Do you have any legal training?
6    A.  What do you mean by "legal training"?
7    Q.  Just that.  Have you ever taken any course,
8 any training whatsoever with respect to any legal
9 issue?
10    A.  I, at one point, took some classes to take
11 the LSAT.
12    Q.  Did you actually take the LSAT?
13    A.  No.
14    Q.  When did you take those classes?
15    A.  I don't remember.  I mean, approximately
16 2010.
17    Q.  Do you have any particularized legal -- or
18 particular training dealing with compliance with
19 Sarbanes-Oxley?
20    A.  Sarbanes-Oxley.  No.  No, not really.
21    Q.  Do you have any training dealing with
22 compliance with regulations and the requirements of
23 the CFPA?
24    A.  I don't know who the CFPA is.
25    Q.  They were financial -- or, excuse me,

Page 28

1 Consumer Financial Protection Act.
2    A.  No.
3    Q.  Do you have any training with respect to
4 compliance with the terms of Dodd-Frank?
5    A.  No.
6    Q.  Any other professional education or
7 training that you have undertaken since leaving
8 college that we have not discussed?
9    A.  I did take a few classes at the New York
10 Institute of Finance.
11    Q.  When was that?
12    A.  Maybe beginning of 2000s.
13    Q.  What type of coursework?
14    A.  It was related to broker-dealer compliance.
15    Q.  And did you receive any sort of degree or
16 certification as a result of taking those courses?
17    A.  No.
18    Q.  Were those courses taken with the intent of
19 receiving some sort of certification or degree?
20    A.  No.
21    Q.  Any other professional education or
22 training since you left college that we have not
23 discussed?
24    A.  No.
25    Q.  Are you currently employed?

Page 29

1    A.  Yes.
2    Q.  Where are you currently employed?
3    A.  That I have some apprehension about.  You
4 know, I think we talked about that in the
5 Interrogatories.  I -- you know, I don't want to be
6 retaliated against or anything like that.
7    Q.  Sir, where are you currently employed?
8    A.  USAA.
9    Q.  What role do you play at USAA?
10    A.  I am a lead.
11    Q.  Functionally, what duties do you perform
12 for USAA?
13    A.  I handle escalated matters.
14    Q.  What type of escalated matters?
15    A.  What type?  Various.
16    Q.  Give me an example.
17    A.  I write controls.
18    Q.  What types of controls do you write?
19    A.  What type of controls?  Business-related
20 purposes.
21    Q.  For what business units of USAA?
22    A.  Claims.
23    Q.  For which line of insurance?
24    A.  Auto.
25    Q.  Do you work from a USAA office or do you

8 (Pages 26 - 29)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 38

1    A.   No.
2    Q.   Prior to Citibank where did you work?
3    A.   Wells Fargo.
4    Q.   During what period of time did you work at
5 Wells Fargo?
6    A.   From December 2018 or -- yes, December 2018
7 to June 2019.
8    Q.   June 2019 or 2018?  I'm sorry, December of
9 '18 to June '19?
10   A.   Correct.
11   Q.   All right.  You indicated -- and perhaps I
12 took it down wrong -- you indicated that you worked
13 at Citibank from August of 2018 through April of
14 2019.  Are those dates wrong or did you work at both
15 at the same time?
16   A.   I apologize.  So I was at Wells from
17 December 2018 to June 2019.  I was at Citi from
18 approximately August 2019 to April 2020 and then from
19 USAA 2020 on.  I apologize.
20   Q.   What was your title at Wells Fargo?
21   A.   Operational Risk Consultant.
22   Q.   Who did you report to?
23   A.   Sheana Smith.
24   Q.   Did you work from a physical location?
25   A.   Yes.

Page 39

1    Q.   What was that physical location?
2    A.   Charlotte, North Carolina.
3    Q.   Is there actually an address in Charlotte,
4 North Carolina?
5    A.   I believe it was on Tryon Street.  I
6 don't -- I don't know any more details about that
7 address.
8    Q.   During your work with Wells Fargo, did
9 anyone report to you?
10   A.   No.
11   Q.   How did you obtain the job at Wells Fargo?
12   A.   By applying on their online site.
13   Q.   And who interviewed you for that position?
14   A.   Sheana Smith and two other people.
15   Q.   And what compensation did you receive in
16 the Wells Fargo position?
17   A.   Approximately 125,000.
18   Q.   That, again, was base salary?
19   A.   Yes.
20   Q.   Annualized based salary?
21   A.   Yes.
22   Q.   Was there a variable component that was
23 also available to you?
24   A.   There was.
25   Q.   And what was that variable component?

Page 40

1    A.   A discretionary bonus.
2    Q.   Up to what amount?
3    A.   I do not know.
4    Q.   Was there a targeted amount?
5    A.   I do not remember.
6    Q.   Did you receive any health benefits at
7 Wells Fargo?
8    A.   Yes.
9    Q.   It was provided entirely by Wells Fargo or
10 did you have to pay for a portion of those?
11   A.   I paid for a portion.
12   Q.   And do you know what the plan or program
13 was?  Aetna?  Blue Shield?
14   A.   Oh, I believe it was Aetna.
15   Q.   Did you have an opportunity for any
16 retirement savings through your position at Wells
17 Fargo?
18   A.   Yes.
19   Q.   What type of retirement benefits did Wells
20 Fargo provide?
21   A.   I recall a 401(k) plan.
22   Q.   Was that a matching plan?
23   A.   Yes, it was.
24   Q.   Up to what level?
25   A.   I do not remember the exact level.

Page 41

1    Q.   I apologize, I forgot to ask you with
2 respect to Citibank.
3        With respect to Citibank, did you receive
4 health insurance?
5    A.   Yes.
6    Q.   Was that fully provided by the company or
7 did you have to pay a portion?
8    A.   I had to pay a portion.
9    Q.   What portion?
10   A.   I do not know the percentages.  It just
11 came out of my paycheck.
12   Q.   You also have potential retirement benefits
13 through Citibank?
14   A.   Yes, I recall a 401(k) option.
15   Q.   Do you recall whether that was a matching
16 option or not?
17   A.   I believe it was.
18   Q.   So to this point, I just want to make sure
19 I understand, USAA is your current employer.  You
20 have been there two and a half years.  Prior to that,
21 you were at Citibank.  You were at Citibank for a
22 period of time from April of 2019 through -- excuse
23 me, August 2019 through April 2020.  You left the
24 position at Citibank voluntarily to take the position
25 at USAA; is that correct?

11 (Pages 38 - 41)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 42

1    A.   That's correct.
2    Q.   Prior of that you were employed at Wells
3  Fargo.  There appears to be a two-month gap in your
4  employment between the end of your employment at
5  Wells Fargo and the beginning of your employment at
6  Citibank; is that correct?
7    A.   Yes, correct.
8    Q.   Have any employment during that two-month
9  gap?
10   A.   No.
11   Q.   Did you receive or generate any income from
12  any source during that two-month gap?
13   A.   No.
14   Q.   So you were not issued a W-2 or a 1099 with
15  respect to any earned income during that two-month
16  gap; is that correct?
17   A.   That's correct.
18   Q.   Functionally, what was your role at Wells
19  Fargo?
20   A.   We handled operational risk matters for
21  securities trading.
22   Q.   Did you voluntarily end your employment
23  with Wells Fargo?
24   A.   No.
25   Q.   You were terminated at Wells Fargo?

Page 43

1    A.   Correct.
2    Q.   Why were you terminated?
3    A.   Policy violation.
4    Q.   That policy violation was related to your
5  becoming intoxicated at a company event; is that
6  correct?
7    A.   It wasn't explained in that detail.  They
8  just said policy violation.
9    Q.   Were you terminated after becoming
10  intoxicated at a company event?
11   A.   Yes.
12   Q.   And while intoxicated at that company
13  event, you were verbally abusive; is that correct?
14   A.   I don't recall that night at all.
15   Q.   Were you told by the investigators at Wells
16  Fargo that you had become verbally abusive while
17  drunk at a company event?
18   A.   No.
19   Q.   Did anyone ever tell you that you had
20  become verbally abusive while at a company event?
21   A.   No.
22   Q.   Anyone tell you that you had made
23  inappropriate sexual advances while at a company
24  event?
25   A.   No.

Page 44

1    Q.   Did anyone tell you that you had made
2  threatening comments about killing other employees of
3  Wells Fargo or third parties while intoxicated at a
4  company event?
5    A.   No.
6    Q.   As a result of your conduct at that company
7  event, were you referred to Wells Fargo's EAP?
8    A.   Yes.
9    Q.   Did you actually see any psychiatrist or
10  psychiatrist as a result of that referral?
11   A.   Yes.
12   Q.   Who did you see?
13   A.   I believe her name was Lindsey Carpenter.
14   Q.   Ms. Carpenter a psychologist or a
15  psychiatrist?
16   A.   I do not know her absolute designation.
17   Q.   How many times did you meet with
18  Dr. Carpenter?
19   A.   Three or four.
20   Q.   Were those in-person visits?
21   A.   Yes.
22   Q.   Were you truthful in your visits with
23  Dr. Carpenter?
24   A.   Yes.
25   Q.   Over what period of time did you see

Page 45

1  Dr. Carpenter?
2    A.   March 2019 through April or so.  Yes,
3  that's right.
4    Q.   And you indicated the termination of your
5  employment from Wells Fargo was June of 2019; is that
6  correct?
7    A.   Yes.
8    Q.   Was there a period of time that you were
9  placed on administrative leave?
10   A.   Yes.
11   Q.   During what period of time were you placed
12  on administrative leave?
13   A.   March 2019 through my termination date.
14   Q.   So from March 2019 through June of 2019,
15  you continued to be employed and compensated by Wells
16  Fargo but performing no services?
17   A.   Yes.
18   Q.   At any point in time were you brought back
19  from administrative leave to perform services for
20  Wells Fargo?
21   A.   No.
22   Q.   At the time of your termination, did Wells
23  Fargo inform you that you were designated for no
24  rehire by Wells Fargo?
25   A.   I'm sorry, can you repeat the question?

12 (Pages 42 - 45)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 50

1      MR. GALANEK:  Of course.  We will take ten
2  minutes.
3      THE VIDEOGRAPHER:  Going off the record.
4  The time, 10:41.
5      (WHEREUPON, a recess was taken.)
6      THE VIDEOGRAPHER:  We are back on the
7  record.  The time, 10:52.
8      Q.  (By Mr. Galanek) During the period of time
9  that you were on administrative leave from Wells
10  Fargo, did you have any other source of income?
11      A.  No.
12      Q.  You understand that Wells Fargo conducted
13  an investigation into your conduct during the period
14  of time that you were placed on administrative leave?
15      A.  Yes.
16      Q.  Did you participate in that investigation?
17      A.  Yes.
18      Q.  What was your participation in that
19  investigation?
20      A.  I answered questions when asked.
21      Q.  Was a formal interview conducted of you?
22      A.  Yes, I guess.
23      Q.  Do you know whether or not the interview
24  was recorded?
25      A.  No.

Page 51

1      Q.  Do you know whether or not that interview
2  of you was transcribed?
3      A.  No.
4      Q.  Do you know who else was interviewed as
5  part of that investigation?
6      A.  No.
7      Q.  We were talking about your employment with
8  UPS that you voluntarily resigned after November of
9  2018.  So how long did you actually work at UPS?
10      A.  Approximately -- well, three to four weeks.
11      Q.  Where did you work prior to UPS?
12      A.  Prior to UPS?  BAMS.  Can I refer to BAMS
13  also?
14      Q.  Yes, please.
15      A.  Okay.
16      Q.  And your employment with BAMS ended in
17  December of 2017; is that correct?
18      A.  Yes.
19      Q.  How soon after you terminated your
20  employment with UPS did you begin your employment
21  with Wells Fargo?
22      A.  A week.
23      Q.  So you had a period of unemployment that
24  ran from approximately the first week in December of
25  2017 until November of 2018; is that correct?

Page 52

1      A.  Yes.
2      Q.  During that period of time, did you
3  generate any taxable income?
4      A.  Based on what?  I mean, that's -- income
5  can be defined many ways.  Did you say taxable
6  income?
7      Q.  Yes.  Let's focus on the income that you
8  have to report to the IRS.
9      A.  Okay.
10      Q.  Did you have any reportable income to the
11  IRS during 2018 other than income generated from
12  employment with UPS and Wells Fargo?
13      A.  Yes.
14      Q.  And what was the source of that income?
15      A.  My IRA.
16      Q.  And how much income did your IRA generate
17  during that period of time?
18      A.  It didn't generate income.  I had to take
19  money from it to support my family.  So when I did
20  that, since it was an early withdrawal, I had to
21  report it as income on my taxes and take a tax --
22      Q.  And how much did you withdraw?
23      A.  I would have to look at my tax return.  I
24  don't know the exact number, but all of it.
25      Q.  During your employment at Wells Fargo, what

Page 53

1  were your hours that you were expected to work?
2      A.  Well, it was salary, so as many as we need
3  to get the job done.
4      Q.  Were there particular office hours that you
5  were supposed to maintain when you were to be
6  available?
7      A.  Yes.  The nine to five, eight to five.
8      Q.  And with your job at Citibank, were there
9  particular hours that you were supposed to be
10  available to work?
11      A.  Yes.
12      Q.  What were those hours?
13      A.  Eight to five.
14      Q.  When you worked with BAMS, where there
15  particular hours you were supposed to be available?
16      A.  Yes.
17      Q.  What were those hours?
18      A.  Eight to five.
19      Q.  And in your current employment with USAA,
20  are there hours that you are to be available?
21      A.  Yes.
22      Q.  What are those hours?
23      A.  Eight to five.
24      Q.  I'm assuming in all of those roles, the
25  eight to five hours were weekday and not weekend

14 (Pages 50 - 53)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 58

1  accounts for purposes of trading stocks?
2      A.  2018?  No.  Well, I had -- one was --
3  Fidelity, I believe, was an open account but not
4  active.
5      Q.  What do you mean by "not active"?
6      A.  I -- I don't recall making -- conducting
7  transactions in it.
8      Q.  Do you recall conducting transactions with
9  respect to the Vanguard account in 2016?
10     A.  '16?  Yes.
11     Q.  And do you recall conducting transactions
12  with respect to the Fidelity account in 2016?
13     A.  No.
14     Q.  Do you recall conducting transactions with
15  the Vanguard account in 2017?
16     A.  You said Vanguard?
17     Q.  Yes.
18     A.  Yes.
19     Q.  What about with the Fidelity account in
20  2017?
21     A.  No.
22     Q.  With respect to your Vanguard account for
23  each of the years '16, '17 and '18, you would have
24  received at year end a statement of all of the
25  transactions, both purchases and sales, of any

Page 59

1  securities over the course of the year from that
2  entity; is that correct?
3      A.  I -- yes.  Yes.
4      Q.  And the same with Fidelity?
5      A.  Yes.
6      Q.  And to the extent income was earned as a
7  result of any trades on the Fidelity or the Vanguard
8  account in 2016 through 2018, you would have received
9  tax documentation reflecting the income received,
10  correct?
11     A.  No.
12     Q.  Did you receive any tax documentation from
13  Vanguard in 2016?
14     A.  No.
15     Q.  From Fidelity in 2016?
16     A.  Yes.
17     Q.  From Vanguard in 2017?
18     A.  Yes.
19     Q.  From Fidelity in 2017?
20     A.  This is tax documentation?  I'm sorry.  I
21  lost you.
22     Q.  Yes.  Yes.
23     A.  Yes.
24     Q.  From Fidelity in 2018?
25     A.  Yes.

Page 60

1      Q.  Do you currently maintain any brokerage
2  accounts for the purposes of trading securities?
3      A.  Yes, but I don't trade securities.
4      Q.  In 2016, did you suffer any losses as a
5  result of your stock trading activities on either the
6  Vanguard or Fidelity accounts?
7          MR. MARX:  Object to the form.
8      A.  I honestly don't recall.
9      Q.  (By Mr. Galanek) What about in 2017?
10         MR. MARX:  Object to the form.
11     Q.  (By Mr. Galanek) Any losses -- let me
12  finish the question before you --
13         MR. MARX:  I'm sorry.
14     Q.  (By Mr. Galanek) In 2017?
15         MR. MARX:  Object to the form.
16     Q.  (By Mr. Galanek) In 2017, did you suffer
17  any losses from the sale of any stock on either the
18  Vanguard or the Fidelity accounts?
19         MR. MARX:  Object to form.
20     A.  I don't recall.
21     Q.  (By Mr. Galanek) Did you suffer any losses
22  in 2018 as a result of the sale or purchase of any
23  stock?
24         MR. MARX:  Object to form.
25     A.  2018?  Yes.

Page 61

1      Q.  (By Mr. Galanek) And what were the losses
2  that you suffered in 2018?
3      A.  Approximately $200,000.
4      Q.  Is that associated with a single trade or
5  multiple trades?
6      A.  I would say multiple trades.
7      Q.  At any point during 2017, did you make any
8  stock trades during normal business hours?
9      A.  Yes.
10     Q.  How frequently?
11     A.  I don't know the exact number.
12     Q.  Are there any days on which you made
13  multiple trades of stock during 2017?
14     A.  I don't know for sure.
15     Q.  Certainly information regarding trades made
16  during 2017 would be reflected in documents from the
17  Vanguard or Fidelity, correct?
18     A.  Yes.
19     Q.  And the stock markets on which you traded,
20  did you trade on markets other than NASDAQ or
21  New York Stock Exchange?
22     A.  No.
23     Q.  And the hours that those exchanges are open
24  are approximately the same hours as your business
25  hours; is that correct?  For work?

16 (Pages 58 - 61)

Eric Slawin                                      July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 62

1    A.   Well, there's after hours trading, so it
2 was on the hours that you worked.
3    Q.   Did you make trades during business hours
4 during 2017?
5    A.   Yes.
6    Q.   During 2016?
7    A.   Yes.
8    Q.   I'm assuming trades were being made, not on
9 days on which you were taking vacation, but on days
10 that you were actually performing services for BAMS?
11    A.   It's quite possible I made trades on
12 vacation days too.
13    Q.   But you also made trades during business
14 hours that you were working for BAMS, correct?
15    A.   Yes.
16    Q.   Did you generate any income in 2017 from
17 the trades that you made in securities during
18 business hours at BAMS?
19    A.   The income, I mean, as disclosed on my tax
20 returns?  I don't know.
21    Q.   Well, I'm assuming you disclosed all of the
22 income that you earned from trades on your tax
23 returns; is that correct?
24    A.   Yes, as required.  Uh-huh.
25    Q.   So how much income did you disclose to the

Page 63

1 IRS from stock trades in 2017?
2    A.   I don't think any.
3    Q.   How about in 2016?
4    A.   Again, I'd have -- I don't think any.
5 Well, I say that, though, is it's how you disclose it
6 on your tax return.  I mean, the transactions were
7 made in, you know, IRA accounts.
8    Q.   At any point in time did you ever disclose
9 to anyone at BAMS that you were involved in day
10 trading while also employed at BAMS?
11    A.   Yes.
12    Q.   To who?
13    A.   Mark Kendall.
14    Q.   Were you telling Mr. Kendall the truth?
15    A.   About what?
16    Q.   About your day trading activities.
17    A.   Yes.
18    Q.   You were never employed by Bank of America;
19 is that correct?
20    A.   I don't know.
21    Q.   Are you aware of having ever been employed
22 by Bank of America?
23    A.   It's possible I was a dual employee.  I
24 just don't know.
25    Q.   Then you have no awareness of being

Page 64

1 employed by Bank of America, correct?
2        MR. MARX:  Object to the form.
3        You can answer.
4    A.   I don't know for sure.
5    Q.   (By Mr. Galanek) Did you ever receive a
6 paycheck from Bank of America?
7    A.   No.
8    Q.   Were you ever employed by First Data?
9    A.   I don't know.
10    Q.   Did you ever receive a paycheck from First
11 Data?
12    A.   No.
13    Q.   Were you ever employed by Fiserv?
14    A.   No.
15    Q.   At any point in time have you ever declared
16 personal bankruptcy?
17    A.   No.
18    Q.   Past your prior arrest when you were a
19 teenager for possession of marijuana have you been
20 arrested at any other point in time?
21    A.   No.
22    Q.   Have you ever filed for divorce?
23    A.   No.
24    Q.   Have there ever been periods in which you
25 have been legally separated from your spouse?

Page 65

1    A.   I don't know how to define legal
2 separation.
3    Q.   Well, has there ever been a period where,
4 on your income tax filings, you indicated that you
5 were separated from your spouse?
6    A.   No.
7    Q.   Under any definition of the word have you
8 ever been separated from your spouse?
9    A.   Can you define it, please?  Define
10 "separation" how you define it?
11    Q.   I'm basically saying however you choose to
12 define it.
13        MR. MARX:  Object to the form.
14        You can answer.
15    A.   Yes.
16    Q.   (By Mr. Galanek) During what period of
17 time?
18    A.   I would say large portion of 2002.
19    Q.   Why did that separation occur?
20    A.   Because I was wrongfully terminated and
21 retaliated against by BAMS.
22    Q.   And what would your wife say was the reason
23 for the terminate -- or the separation -- of your
24 separation during 2018?
25    A.   I don't know.

17 (Pages 62 - 65)

Eric Slawin                                                              July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 122

1    A.  Approximately $250,000.
2    Q.  Are there any other components of your
3  damages calculation that you are seeking other than
4  back pay?
5    A.  Mental anguish.
6    Q.  What amount are you seeking for mental
7  anguish?
8    A.  I haven't determined that amount, frankly.
9    Q.  And what is the factual basis of your claim
10  for mental anguish?
11    A.  Factual basis?  I don't understand that
12  question.
13    Q.  What are the facts upon which you are
14  basing your claim for mental anguish?
15    A.  The fact that I was retaliated against and
16  also terminated from BAMS.
17    Q.  And your claim is that you were retaliated
18  against by the termination of your employment?
19    A.  When you say "by," I mean "via."  I don't
20  know if that's the same thing.
21    Q.  I'm just asking, was there any other form
22  of retaliation that you are claiming other than the
23  termination of your employment?
24    A.  Yes.  I feel the performance review I was
25  put on during my employment with BAMS was

Page 123

1  retaliation.
2    Q.  And anything other than your termination
3  and the performance review?
4    A.  For mental anguish?
5    Q.  Is the basis for your retal -- you said
6  your mental anguish is based upon retaliation.
7    A.  You are echoing.
8    Q.  Yeah.  I don't think I am.  I think
9  somebody else has got -- needs to mute their speaker.
10    A.  Okay.
11    Q.  You indicated that your mental anguish
12  claim is based upon retaliation.  Okay.  So let's
13  step back.
14        Is your mental anguish claim based upon
15  anything other than the alleged retaliation?
16    A.  Yes.  The subsequent depression and things
17  I went through as a result of that retaliation,
18  wrongful termination.
19    Q.  BAMS' only conduct that you claim caused
20  you mental anguish is the retaliation, correct?
21    A.  Well, during my employment, when I -- you
22  know, I felt that I was being put in the middle of --
23  hang on just a second.  I'm sorry, my computer
24  blanked out.
25        Can you hear me?

Page 124

1    Q.  We can hear you.
2    A.  Can you repeat the question, please?
3    Q.  Sure.
4        MR. GALANEK:  Robin, can you please read
5    the question back?
6        (WHEREUPON, the record was read back by the
7    reporter as follows:)
8        "QUESTION:  BAMS' only conduct that you
9    claim caused your mental anguish is the
10    retaliation, correct?"
11    A.  No.
12    Q.  (By Mr. Galanek) What other conduct do you
13  claim forms a basis for your mental anguish?
14    A.  Well, I felt I was in the middle of a
15  fraud, being set up as the fall guy.  And every time
16  I protested to my management, it was met with total
17  indifference.  And that was very hard to deal with.
18    Q.  Prior to the termination of your employment
19  was your salary reduced in any way?
20    A.  At BAMS?
21    Q.  Correct.
22    A.  No.
23    Q.  Was your other compensation reduced in any
24  way at BAMS prior to the termination of your
25  employment?

Page 125

1    A.  I don't know the answer to that.
2    Q.  Were any of your benefits taken away by
3  BAMS prior to the termination of your employment?
4    A.  No.
5    Q.  Was your title taken away from you prior to
6  the termination of your employment at BAMS?
7    A.  No.
8    Q.  Were your duties or responsibilities
9  curtailed in any way?
10    A.  No.
11    Q.  Was the office that you sat in changed in
12  any way?
13    A.  No.
14    Q.  Okay.  Did your reporting change in any way
15  prior to the termination of your employment?  Did you
16  report to the same people?
17    A.  No.
18    Q.  How did your reporting change?
19    A.  I reported to -- well, can you give me a
20  time period, please?
21    Q.  Sure.
22        In 2017, from April until the termination
23  of your employment, did your reporting structure
24  change?
25    A.  Yes.

32 (Pages 122 - 125)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 126

1    Q.   Okay.  How did it change?
2    A.   I reported to different managers.
3    Q.   Which managers did you report to?
4    A.   Natasha Collins, Brian Rubin and Mark
5  Kendall.
6    Q.   And did those direct reports change as
7  punishment to you or because those individuals
8  received promotions?
9    A.   I -- I would say they their job duties
10  changed.  I don't know that any of them were
11  promoted.
12    Q.   Their job duties changed.  And as a result
13  of the changes in their job duties, those people to
14  whom you reported changed; is that fair?
15    A.   Yes.  However, I -- thinking now, I believe
16  Natasha Collins was promoted.
17    Q.   Okay.  Is there anything else upon which
18  you are basing your claim of mental anguish?
19    A.   Yes.  The long year of 2018 was very
20  difficult.  And what happened to me at Wells I feel
21  strongly was -- I feel strongly the way I was treated
22  at BAMS and when I was wrongfully terminated was a
23  catalyst to that happening.
24        My -- my marriage is bad.  And I've lost
25  years of my children.  My house is in disrepair

Page 127

1  because I -- you know, I still am trying to recover
2  financially.  I lost my retirement.  Frankly, I
3  attempted suicide.  Yes, a lot of stuff.
4    Q.   The conduct that we are talking about, not
5  the impact, and I understand.  If you need a moment
6  at any point in time, you just tell me.  I understand
7  you just discussed what you believe the impact to be
8  that resulted in your mental anguish that you are
9  claiming.
10        My question goes to the conduct.  Is there
11  any other conduct of BAMS other than terminating your
12  employment upon which you base your mental anguish
13  claim?
14    A.   The indifference by management when I
15  routinely opposed participating in their fraud and
16  how I was positioned by them.
17    Q.   At any point in time prior to the
18  termination of your employment, did you make any
19  complaint to the Human Resources Department at BAMS
20  about any treatment by any other employee of BAMS?
21    A.   No.
22    Q.   Any point in time prior to your termination
23  did you call the Human Resources hotline to make a
24  complaint about the conduct of any other employee of
25  BAMS?

Page 128

1    A.   No.
2    Q.   And you understand that that Human
3  Resources line or hotline allows for anonymous
4  complaints, correct?
5    A.   I don't recall a hotline being available.
6    Q.   We will take a look at -- take a look at
7  that now.
8        MR. GALANEK:  George, if you will please
9  pull up Exhibit 4 for me.
10        (Defendant's Exhibit 4, Bank of America
11  Merchant Services onboarding information, Bates
12  labeled PLAINTIFF 000141 - 149, marked for
13  identification.)
14        THE WITNESS:  I'm sorry.  Can I just have a
15  couple minutes off the record, please?
16        MR. GALANEK:  That's fine.
17        Before you go off the record, because of
18  your attorney's complaints before, is now a good
19  time for us to take a lunch break, Mr. Slawin?
20        THE WITNESS:  Yeah.  That would be great.
21        MR. GALANEK:  Why don't we do that.  Why
22  don't we take -- it's 1:30.  Why don't we
23  reconvene at -- we will try to be quick.  How
24  about ten minutes after two?
25        THE WITNESS:  Okay.

Page 129

1        MR. GALANEK:  Great.  Let's take a break
2  until a couple minutes after two.
3        THE VIDEOGRAPHER:  Off the record, 1:32.
4        (WHEREUPON, a luncheon recess was taken,
5  1:32 p.m. - 2:12 p.m.)
6        THE VIDEOGRAPHER:  Back on the record.  The
7  time is 2:12.
8    Q.   (By Mr. Galanek) All right.  Mr. Slawin,
9  let me just follow up on a couple of questions and
10  then we will get to that exhibit.
11        When you -- your employment was terminated
12  with Wells Fargo, did you sign any sort of Separation
13  Agreement?
14    A.   Not to my knowledge, no.
15    Q.   Were you provided any severance?
16    A.   No.
17    Q.   Were you provided the option to take COBRA
18  coverage for healthcare matters?
19    A.   Yes.
20    Q.   Sorry?
21    A.   Yes.
22    Q.   And did you take COBRA coverage?
23    A.   Yes.
24    Q.   So there was no gap in healthcare coverage
25  for you or your family from the beginning of your

33 (Pages 126 - 129)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 130

1  employment with Wells Fargo to date, was there?
2      A.  Oh, God.  Correct.
3      Q.  Sorry.  Correct?
4      A.  Yes.  Yes.  Yes, you are correct.
5      Q.  Pardon me.
6          You indicated before lunch that you
7  attempted suicide.  When was that?
8      A.  I'm sorry.  Just give me a second.
9      Q.  Sure.
10     A.  It was after I was terminated -- well, it
11 was after I was put on, you know, leave from Wells.
12     Q.  So this was during your employment with
13 Wells Fargo, correct?
14     A.  Correct.
15     Q.  It was after the conduct you engaged in for
16 which you were put on administrative leave?
17     A.  Yes.
18     Q.  And that conduct involved alcohol, correct?
19     A.  Yes.
20     Q.  And, in fact, you drank so much that, at
21 least based on your earlier testimony, you don't seem
22 to remember the conduct you engaged in; is that fair?
23     A.  That's fair.
24     Q.  And I believe you told me earlier that you
25 began drinking daily, about a quarter of a bottle of

Page 131

1  alcohol a day, sometime in July of 2017, right?
2      A.  That's correct.
3      Q.  And how soon after you were put on
4  administrative leave did you attempt suicide?
5      A.  Within a week.
6      Q.  And in what manner did you attempt suicide?
7      A.  I took as much as I could of the medication
8  that Dr. Carpenter had prescribed.
9      Q.  All right.  And did you seek treatment
10 after your unsuccessful suicide attempt?
11     A.  No.
12     Q.  You didn't seek to see or you didn't seek
13 any medical attention?
14     A.  No.
15     Q.  So you didn't go to the Emergency Room, no
16 stomach pump, nothing along those lines?
17     A.  No.
18     Q.  Did anyone find you and resuscitate you or
19 did you just wake up?
20     A.  I just woke up.
21     Q.  All right.
22         MR. GALANEK:  George, if you don't mind
23 pulling up Exhibit 4, please.  Again, this is
24 Plaintiff's document out of Plaintiff's
25 production, Bates Number 141 to 149.

Page 132

1      Q.  (By Mr. Galanek) Mr. Slawin, as before,
2  feel free to tell George to direct you up and through
3  the document.  This is out of your production,
4  meaning that you have possession of this.  Your
5  lawyers have provided it to us in the litigation.
6  The only question that I'm going to have about this
7  document after you review it is as whether or not, in
8  fact, on -- I believe it's Page 3, but I'll tell you
9  exactly -- whether or not you were provided with
10 contact information for the HR hotline.
11         Actually, it can be a bit more than Page 3.
12 It's actually Plaintiff's 149.  So why don't we go to
13 Plaintiff's 149.
14         You can certainly go back to and review
15 whatever you want to.  But let's just go to that page
16 first so I can show you what I want to ask you a
17 question about.  Right there.
18         MR. GALANEK:  Go down and show him the
19 Bates number, George.  Plaintiff's 149.
20     Q.  (By Mr. Galanek) So that means that it's
21 out of the production of documents that you have
22 possession of.
23         You understand that, Mr. Slawin?
24     A.  I do.
25     Q.  Okay.

Page 133

1          MR. GALANEK:  And if you don't mind,
2  George, just go up so we can all see the first
3  row on that page.
4      Q.  (By Mr. Galanek) The first row reads "Alpha
5  Staff Contact Numbers."
6          Do you see that row, Mr. Slawin?
7      A.  I do.
8      Q.  And is this a document that you received at
9  the beginning of your employment with -- let's see.
10 This is the beginning of your employment with BAMS;
11 is that correct?
12         THE WITNESS:  George, can you go down
13 further, please?
14         MR. GALANEK:  And actually, George, you may
15 want him to go to the beginning of the document.
16 And I apologize, Mr. Slawin, you can have him go
17 wherever, but I think you probably wanted him to
18 go up and get the first page.
19         THE WITNESS:  Yes.  Thank you.
20         Okay.  Can you go down further, George,
21 please?
22         Okay.  Please go down further.
23         Further, please.
24         And further -- can you just go to the end,
25 please?

34 (Pages 130 - 133)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 134

1      Is that the bottom, George?
2          THE CONCIERGE:  This is the last page.
3          THE WITNESS:  Okay.  Okay.
4      Q.  (By Mr. Galanek) All right.  Mr. Slawin,
5  this is a document that you received on beginning
6  your employment with BAMS; is that correct?
7      A.  I do not recall receiving this.
8      Q.  You certainly had possession of it in this
9  case to produce it back to BAMS, correct?
10     A.  Correct.
11     Q.  Okay.  And in this document there are
12 certain key resources and contacts that are listed in
13 case you need them, correct?
14     A.  Correct.
15     Q.  Including a number of HR numbers, one for
16 HR Service Center Associates Line, the EAP and the
17 Discrimination and Harassment Hotline; is that
18 correct?
19     A.  Yes.  I do see those numbers there.
20     Q.  And BAMS also had a Code of Conduct; is
21 that correct?
22     A.  I'm not -- I'm not aware of that.
23     Q.  Are you aware that -- I'm sorry.  Were you
24 in a compliance role at BAMS?
25     A.  No, it was a Risk Management role.

Page 135

1      Q.  Okay.  So you had no compliance problem
2  that you weren't looking at, any processes or
3  operations of BAMS to make sure that there was --
4  they were complying with their own policies,
5  procedures?
6      A.  No, I don't recall performing that role.
7      Q.  All right.  And so as an employee of BAMS,
8  you never reviewed the Code of Conduct?
9      A.  I don't remember reviewing it.
10     Q.  At any point in time did you raise any
11 concern to anyone here in Human Resources that you
12 felt that you were being placed in an inappropriate
13 position by your managers while at BAMS?
14     A.  No.
15     Q.  At any point in time did you contact the
16 Legal Department at BAMS to indicate that you felt
17 that you were being placed in an inappropriate
18 position by any of your managers?
19     A.  No.
20     Q.  At any point did you contact anyone in the
21 Legal Department at BAMS to express concerns about
22 any conduct of any of your managers with respect to
23 the treatment of PCI compliance data -- or the
24 failure to meet PCI DSS, or data security standards
25 with respect to the handling of PAN data?

Page 136

1      A.  That was a long question.  Can you --
2      Q.  Sure.
3      A.  Did you say -- I just need to know who you
4  asked me I contacted.
5      Q.  Let me back up.
6          At any point in time -- how about this.  At
7  any point in time did you contact anyone in the Legal
8  Department at BAMS to express any concern about any
9  issue prior to the termination of your employment?
10     A.  Probably as part of my job duties.  When
11 you say concern, it's -- I would reach out to General
12 Counsel if I needed, you know, an answer or an
13 approval to do something.
14     Q.  Great.  So you certainly knew who to
15 contact within the General Counsel's Office as part
16 of your job, correct?
17     A.  Correct.
18     Q.  And, in fact, you had e-mail correspondence
19 frequently with members of the General Counsel's
20 Office, correct?
21     A.  Yes, I did send them e-mails.
22     Q.  At any point in time did you reach out to
23 anyone in the Office of the General Counsel to
24 express concern about the way that you were being
25 treated by management?

Page 137

1      A.  No.
2      Q.  Did you reach out to anyone in the General
3  Counsel's Office to express concern that you felt
4  that you were being placed in an inappropriate
5  position based on decisions being made by your
6  managers with respect to the handling of primary
7  account numbers by BAMS?
8      A.  Did you -- did I reach out to -- I'm sorry.
9  I'm not trying to be evasive.  Did you say -- are you
10 asking if I reached out to General Counsel about
11 that?
12     Q.  Yes.
13         MR. GALANEK:  Robin, please read the
14 question back.
15         (WHEREUPON, the record was read back by the
16 reporter as follows:)
17         "QUESTION:  Did you reach out to anyone at
18 General Counsel's Office to express concern that
19 you felt that you were being placed in an
20 inappropriate position based on decisions being
21 made by your managers with respect to the
22 handling of primary account numbers by BAMS?"
23         THE WITNESS:  Robin, did you say
24 "inappropriate position"?  I thought you said
25 "decisions" twice.

35 (Pages 134 - 137)

Eric Slawin                                                    July 19, 2022

Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 138

1      THE COURT REPORTER: I did say "decisions"
2  twice it should be "positions."  Sorry.
3      THE WITNESS:  Okay.
4  A.  The answer is no.
5  Q.  (By Mr. Galanek) All right.
6      MR. GALANEK:  George, you can take that one
7  down, please.
8  Q.  (By Mr. Galanek) All right.  Now, we were
9  talking about the damages that you are claiming in
10  this case, Mr. Slawin.  You indicated that you were
11  seeking back pay.  We have discussed that.  You
12  indicated that you were seeking mental anguish
13  damages.  You could not articulate an amount you were
14  seeking.  I asked you what that was based upon and
15  you explained how you felt emotionally.
16      I believe you said, when I asked you about
17  the conduct that you claim gave rise to that mental
18  anguish, it was the termination and also being placed
19  on a Performance Plan; is that correct?
20  A.  Well, I would add in just the sheer
21  indifference that I experienced when I would complain
22  or oppose what was going on, you know, with this
23  fraud.  And that was just the -- a lingering thing
24  that was very difficult to deal with.  Nobody seemed
25  interested.

Page 139

1  Q.  Now, with respect to the Performance Plan,
2  you were given a written coaching form in September
3  of 2017, correct?
4  A.  Correct.
5  Q.  After receiving that written coaching form,
6  did you communicate to anyone in HR that you felt
7  that being placed or being provided that written
8  coaching form was somehow in retaliation for any
9  conduct that you had engaged in?
10  A.  No.
11  Q.  Did you communicate to anyone at that time
12  in HR, in Legal, anyone within the company that you
13  felt that you were being provided that written
14  coaching form as a result of any activity that you
15  had engaged in?
16  A.  "Any activity" is pretty broad.  Can you
17  define it a little better, please?
18  Q.  No, because I'm basically asking you a very
19  broad question.  Did you contact anyone and tell them
20  that you felt that you were being given that written
21  coaching form as a result of any, you know, activity
22  or conduct that you had engaged in that you thought
23  was proper?
24  A.  No.
25  Q.  In fact, that written coaching form

Page 140

1  reiterated concerns that had previously been provided
2  to you in an oral fashion by Ms. Collins in June of
3  2017, correct?
4      MR. MARX:  Object to the form.
5      You can answer.
6  A.  I don't -- I don't really -- I don't
7  recollect her complaining about my -- what I was
8  doing.
9  Q.  (By Mr. Galanek) I'm sorry.  You didn't --
10  you don't recall being coached orally about poor job
11  performance by Ms. Collins in June of 2017?
12  A.  Not specifically.  We talked about a lot of
13  things.  I mean, there were things I was behind on,
14  but I wouldn't call it coaching.  I was just a matter
15  of trying to work through deadlines.
16  Q.  She, in fact, required you to begin having
17  one-on-one meetings with her beginning in June of
18  2017 to ensure that you were, in fact, following up
19  on your job responsibilities, correct?
20      MR. MARX:  Object to the form.
21      You can answer.
22  A.  I don't recollect that was the reason for
23  the meetings.  I thought it was just to talk about
24  the deadlines and what I'm getting done.
25  Q.  (By Mr. Galanek) Well, it wasn't what you

Page 141

1  were getting done, it was what you were not getting
2  done, correct?
3      MR. MARX:  Object to the form.
4      You can answer.
5  A.  It was what tasks I had completed and what
6  tasks I had not completed.
7  Q.  (By Mr. Galanek) In your discussions with
8  Ms. Collins in June of 2017, she expressed concerns
9  over the lack of the amount of work that you had, in
10  fact, completed in a timely fashion, did she not?
11      MR. MARX:  Object to the form.
12      You can answer.
13  A.  I don't -- I don't recall that overall, no.
14  Q.  (By Mr. Galanek) All right.  Are there any
15  other components of the damages that you are seeking
16  in this case?
17  A.  Well, it certainly has affected my
18  reputation.  You know, I was totally humiliated.  I
19  really feel like my career trajectory was thrown off
20  kilter.  It was -- it was stymied, at a minimum.
21  Q.  You didn't disclose that you were
22  terminated for a policy violation by BAMS to anyone,
23  did you?
24      MR. MARX:  Object to the form.
25      You can answer.

36 (Pages 138 - 141)

Eric Slawin                                                  July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 146

1    Q.  Functionally on a day-to-day basis --
2  functionally on a day-to-day basis what were you
3  doing in that role?
4    A.  Handling operational risk matters for the
5  large clients.  You got the universe of large clients
6  for -- that BAMS had.
7    Q.  And what did you tell Ms. Collins about
8  your past experience that would qualify you for that
9  position?
10    A.  It was a long time ago, but I'm sure I
11  would have spoke to my resume and my past experience
12  with risk management and operational risk management.
13    Q.  How soon after you interviewed with
14  Ms. Collins were you offered a position?
15    A.  Approximately a week.
16    MR. GALANEK:  George, if you don't mind,
17  let's pull up Exhibit Number 5, please.
18    MR. MARX:  What number is this?
19    MR. GALANEK:  Exhibit 5.  Oh, I'm sorry.
20  It's Bates Number 150 to 152 out of your
21  production.
22    MR. MARX:  Plaintiff's -- okay.  All right.
23  Thank you.  Plaintiff's.
24    MR. GALANEK:  Everything is out of your
25  production unless I say otherwise.

Page 147

1    MR. MARX:  Okay.  That's good.
2  What number was it?  I'm sorry.
3    MR. GALANEK:  It's Exhibit 5, 150 to 152.
4    MR. MARX:  Thank you.
5    (Defendant's Exhibit 5, Offer Letter from
6  Brian Dieckhoff to Eric Slawin, dated 11/5/2015,
7  Bates labeled PLAINTIFF 000150 - 152, marked for
8  identification.)
9    MR. GALANEK:  Mr. Slawin, as before, please
10  feel free to direct George up and down
11  throughout the document.
12    THE WITNESS:  George, please go down.
13  Okay.  Thank you.
14  Can you stop for just a moment?
15  Okay.  Please go down.
16  Okay.  Please go down.
17  Please go down.
18  You can go further.
19  You can probably go to the bottom, please.
20  Okay.  Thank you.
21    Q.  (By Mr. Galanek) Mr. Slawin, is that your
22  signature on the last page of this document?
23    A.  Yes, it appears to be.
24    Q.  And what is this document?
25    A.  It looks like the offer letter that I

Page 148

1  received from BAMS.
2    Q.  As part of the offer from BAMS, you
3  understood that you were also agreeing to certain
4  nondisclosure obligations?
5    A.  I can't say that I understood that at the
6  time.
7    Q.  I'm assuming at the time that you signed
8  this letter you could read, correct?
9    A.  Yes, I could read.
10    Q.  Okay.
11    MR. GALANEK:  George, let's pull up Exhibit
12  6, please.  That's Plaintiff's document 155 to
13  156.
14    (Defendant's Exhibit 6, Proprietary Rights
15  and Information Agreement, Bates labeled
16  PLAINTIFF 000155 - 156, marked for
17  identification.)
18    MR. GALANEK:  Mr. Slawin, again, please
19  feel free to direct George through this
20  document, make sure you're comfortable before I
21  start asking you questions.
22    THE WITNESS:  Okay.
23  Please go down further, George.
24  Stop, please.
25  Okay.  Please go down.

Page 149

1  Okay.  Please go down.
2  Okay.  Please go down.
3  Okay.  Thank you.
4    Q.  (By Mr. Galanek) Mr. Slawin, is that your
5  signature on this document?
6    A.  Yes, it appears to be.
7    Q.  And you signed this document at the
8  beginning of your employment with BAMS; is that
9  correct?
10    A.  Based on the date there, I would say yes.
11    MR. GALANEK:  Thank you, George.  You can
12  take that down.
13    Q.  (By Mr. Galanek) After you were hired,
14  Mr. Slawin, who were you reporting to?
15    A.  Natasha Collins.
16    Q.  How long did you report to Ms. Collins?
17    A.  From the date of my hire to September 2017.
18    Q.  Okay.  So from November of 2015 to
19  September of 2017?
20    A.  Did you say -- excuse me, September 2017?
21    Q.  Yes, from November of 2015 through
22  September of 2017.
23    A.  That sounds correct, yes.
24    Q.  Now, during that period of time did you
25  have anyone who reported to you?

38 (Pages 146 - 149)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 150

1    A. No.
2    Q. During that period of time was Mr. Kendall,
3 a peer of yours, also reporting to Ms. Collins?
4    A. Yes.
5    Q. Now, at some point in time after September
6 '17, did you begin reporting to someone else?
7    A. Did you say after September '17?
8    Q. Yes.
9    A. Okay. Yes.
10    Q. Who did you begin reporting to after
11 September of 2017?
12    A. Mark Kendall.
13    Q. How long did you report to Mr. Kendall?
14    A. Until the date of my termination.
15    Q. Were the only two people that you reported
16 to during the course of your employment Ms. Collins
17 and Mr. Kendall?
18    A. No.
19    Q. Who else did you report to?
20    A. Brian Rubin.
21    Q. When did you report to Mr. Rubin?
22    A. Approximately April or May of 2017 to
23 probably September 2017.
24    Q. Were you reporting to Mr. Rubin at the same
25 time that you were reporting to Ms. Collins?

Page 151

1    A. Yes.
2    Q. They both had responsibility for
3 supervising your activities?
4    A. That was my understanding, yes.
5    Q. And was there a distinction between their
6 obligations that they were managing?
7    A. I would say Brian was day-to-day with me.
8 Our interactions were daily. And Natasha Collins was
9 more weekly, biweekly interactions.
10    Q. Did you complain about Brian's personality
11 to Mark Kendall?
12    A. Yes.
13    Q. Did you complain about Natasha's
14 personality to Mark Kendall?
15    A. I don't specifically recall that.
16    Q. Did you complain about Ms. Collins'
17 management style to Mr. Kendall?
18    A. I don't recall that.
19    Q. Do you recall telling Mr. Kendall that you
20 were making more money day trading during 2017 than
21 doing your job?
22    A. I recall telling him I was day trading. I
23 don't recall saying I was making more money.
24    Q. And if that's his recollection he would not
25 be telling the truth?

Page 152

1    A. I'm sorry?
2    Q. That's what he remembers you telling him.
3 He would be lying?
4    A. I'm not going to say someone else is lying.
5 I -- I'm telling you I don't recall saying I was
6 making more money doing that.
7    Q. Did you ever tell Mr. Kendall that you
8 disliked your job?
9    A. Yes.
10    Q. Did you ever criticize your managers to
11 Mr. Kendall?
12    A. I don't recall specifically doing that.
13    Q. Did you ever tell Mr. Kendall you were
14 interviewing for other positions while at BAMS?
15    A. Yes.
16    Q. Were you interviewing for other positions
17 during 2017?
18    A. Yes.
19    Q. And where were you interviewing?
20    A. SunTrust. I was speaking with them again.
21 And it was a broker-dealer. I don't remember the
22 name of the broker-dealer in the midwest.
23    Q. And when were these interviews taking
24 place?
25    A. Roughly between, I guess -- let's see,

Page 153

1 August and October. Oh, and there's another one,
2 Worldcom, I believe, who I think is local here in
3 Atlanta.
4    Q. As part of the written coaching that you
5 were -- sorry. Anyone else?
6    A. No.
7    Q. As part of the written coaching that you
8 received in September of 2017 from Ms. Collins, were
9 you informed that if your employment -- if your
10 performance did not improve you could be disciplined
11 up to and including the termination of your
12 employment?
13    A. I don't remember verbally being told that.
14 I would have to look at the performance review to see
15 if that's what it said.
16    Q. All right.
17    MR. GALANEK: Let's pull up Exhibit
18 Number 64. And this is actually out of the BAMS
19 production.
20    Mr. Marx, this is Exhibit 1360 -- or
21 document 1368 and 1369.
22    MR. MARX: Thank you.
23    MR. GALANEK: Mr. Slawin, again, feel free
24 to tell George how you would like to view this
25 document.

39 (Pages 150 - 153)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 154

1    (Defendant's Exhibit 64, Bank of America
2    Merchant Services Coaching Form for Eric Slawin,
3    dated 9/25/17, Bates labeled BAMS 00001368 -
4    1370, marked for identification.)
5    THE WITNESS: Okay.
6    Okay. Please scroll down for me.
7    Okay. Please go down further.
8    Okay. Please go down further.
9    Okay.
10   George, can you go down further, please.
11   Okay.
12   Q.  (By Mr. Galanek) Do you recognize this
13   document?
14   A.  I do, yes.
15   Q.  And is this the coaching form that was
16   delivered to you by Ms. Collins in September of 2017?
17   THE WITNESS: Can you please go down
18   further, George?
19   Oh, can you go up, please?
20   A.  I don't believe she sent it to me.
21   Q.  (By Mr. Galanek) It was delivered to you,
22   correct?
23   A.  Yes.
24   Q.  Okay.  Did she hand it to you?  Did she
25   e-mail it to you?  How did you receive this document?

Page 155

1    A.  What I recall is I thought it was sent to
2    me by HR.
3    Q.  And when Ms. Collins and Mr. Kendall state
4    in the coaching form on the first page that you had
5    missed multiple deadlines across the organization and
6    that it was unclear what you had accomplished in the
7    last year, was that false?
8    A.  I think that's overstatement of the facts.
9    I don't agree with that assessment.
10   Q.  Had you missed a deadline?
11   A.  I was -- yes, I was behind on some task.
12   It was natural.  There was so much to do.
13   Q.  Were you behind on more than one task?
14   A.  I don't specifically remember if I was
15   behind on more than one task.
16   Q.  Is it accurate that during the course of
17   2017, the responsibility for risk and control
18   self-assessments had been removed from you and had
19   been taken up by the Enterprise Risk Management
20   Center of Excellence?
21   A.  I do recall going to training for that,
22   that the Enterprise put on.  And then -- and I think
23   that's the role, if that's what you are alluding to,
24   that they became -- or they wanted it done their way,
25   and so they trained us on it.  But I always thought I

Page 156

1    had to -- you know, that would be part of my job
2    duties ongoing.
3    Q.  So you are saying you disagree --
4    MR. GALANEK:  Let's go back up, George.
5    Let's go to the first page, please.
6    Q.  (By Mr. Galanek) And in the first paragraph
7    after the bullet point, the first sentence it states
8    "The biggest part of the BCO job is Risk & Control
9    Self Assessments and that responsibility was assumed
10   by the Enterprise Risk Management Center of
11   Excellence this year."
12   Do you disagree with that statement?
13   A.  I -- I understand when they say the
14   responsibility was theirs but I still was -- I
15   thought I had to carry out those tasks.
16   Q.  Do you disagree with the statement two
17   sentences down that "Coaching has been provided on
18   required structured, status reporting to allow
19   management to help you get organized, manage
20   priorities and ensure" that your deadlines were met?
21   A.  I don't recall that occurred.
22   Q.  Do you disagree with the statement that
23   "Eric has not done that reporting with any
24   regularity"?
25   A.  Yes.

Page 157

1    Q.  And did you, after receiving this coaching
2    form, if you disagreed with portions of it, is there
3    a reason that you did not submit a statement setting
4    forth your disagreement?
5    A.  I was advised by Human Resources I didn't
6    have a choice, that it was put in place.  I didn't
7    know that I had the option to disagree with it in
8    writing.  And it was -- it was a done deal.  So here
9    you go.
10   Q.  And you weren't under a Contract of
11   Employment; is that correct?
12   A.  When you say "contract," I don't know what
13   you --
14   Q.  Sure.
15   You could have left BAMS at any point in
16   time, correct?
17   A.  Yes.
18   Q.  So if you disagreed with the coaching that
19   you were receiving, you could have left BAMS, right?
20   A.  Given I had the opportunity to, yes.
21   Q.  And you were already interviewing for other
22   jobs before you even received this coaching, correct?
23   A.  Correct.
24   Q.  And you acknowledged receipt of this by
25   signing -- electronically signing your name and

40 (Pages 154 - 157)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 158

1 dating it electronically October 2nd, 2017, correct?
2    A.   Correct.
3    Q.   And the statement immediately above your
4 signature alerted you to the fact that your failure
5 to meet and sustain the performance objectives
6 outlined in the coaching form could lead to
7 disciplinary action up to and including your
8 termination, correct?
9        THE WITNESS:  George, can you go down
10    further, please, to the bottom?
11    A.   Yes, I do see that statement.
12    Q.   (By Mr. Galanek) Did you express to anyone
13 in Human Resources Department that you felt that the
14 coaching was unfair or inappropriate?
15    A.   Yes.
16    Q.   To whom?
17    A.   I believe her name is Lori Ascio -- or I
18 don't remember her exact last name.
19    Q.   What did you tell her?
20    A.   That I didn't think this was fair, there's
21 too much to do in the job, and I'm surprised I
22 received it.
23    Q.   So your complaint was you didn't think it
24 was fair because there was too much to do in the job,
25 not that what was recited was inaccurate?

Page 159

1    A.   I don't recall disputing the accuracy.  I
2 would say I would dispute the veracity.
3    Q.   Explain what you mean by that.
4    A.   I mean I think the tone is very aggressive
5 and intimidating.
6    Q.   What do you understand the word "veracity"
7 to mean?
8    A.   A harsh way to say things.
9    Q.   Okay.  You understand that is not the
10 definition of veracity, right?
11    A.   Okay.  I guess I do now.
12    Q.   Okay.
13    A.   That's what I meant.
14    Q.   Veracity means truthfulness.
15    A.   Oh, okay.
16    Q.   You felt that the language was too harsh;
17 is that fair?
18    A.   Yes.  I felt it was, I would say,
19 aggressive and intimidating.
20        MR. GALANEK:  All right, George.  That's
21 all for that document.
22    Q.   (By Mr. Galanek) Now, at some point in time
23 you began sending internal BAMS communications to
24 your personal Gmail account; is that correct?
25    A.   That's correct.

Page 160

1    Q.   Why did you do that?
2    A.   I felt it was the only way I could
3 demonstrate, should the fraud become known broadly,
4 that I didn't make the decision to perpetuate the
5 fraud and keep it going or participate in it.
6    Q.   So you were fine remaining employed and
7 being paid by a company that you felt was engaged in
8 fraud, you just didn't want to be blamed for the
9 fraud?
10    A.   I needed to make a living for my family.
11 So I was doing the best I could to make ends meet.  I
12 didn't have a choice.
13    Q.   Well, of course you had a choice.  You
14 could have complained to the SEC before sending any
15 e-mails to your personal e-mail account, couldn't
16 you?
17    A.   I didn't know that at the time.
18    Q.   Well, what did you do to research it?
19    A.   At that time?
20    Q.   At any time.  How did you learn you could
21 complain to the SEC?
22    A.   Subsequent to my termination.  I started
23 Googling.
24    Q.   Okay.  So at no point prior to your
25 termination were you aware that the conduct that you

Page 161

1 felt that BAMS was engaging in would be problematic
2 from the SEC perspective, correct?
3    A.   I had an opinion about that.
4    Q.   Okay.  Well, what informed that opinion?
5    A.   My past background at working with capital
6 markets.
7    Q.   Okay.  So your past work in capital markets
8 informed an opinion that this would be something that
9 the SEC was interested in but you chose not to inform
10 the SEC, correct, before the termination of your
11 employment?
12    A.   I felt it could be something the SEC would
13 be interested in, yes.
14    Q.   Okay.  When did you have that epiphany?
15        MR. MARX:  Object to the form.
16        You can answer.
17    A.   Well, what's -- what's "epiphany" mean?
18 Can you define it?
19    Q.   (By Mr. Galanek) Sure.
20        When did you come to that understanding?
21 When did that opinion formulate itself?
22    A.   Let's say roughly probably July of that
23 year, 2017.
24    Q.   Okay.  And in July of 2017, you did not go
25 to the SEC to complain about any conduct that you

41 (Pages 158 - 161)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 162

1  felt was problematic that was occurring at BAMS; is
2  that correct?
3      A.  That's correct.
4      Q.  Did you go to the CF -- CF -- I can't do it
5  either -- CFPB in July of 2017 to express concern
6  about any conduct by BAMS?
7      A.  No.
8      Q.  Did you alert anyone external to the
9  company at any government regulator that you felt
10 that any conduct that was occurring at BAMS was
11 inappropriate?
12     A.  No.
13     Q.  And did you attempt to make an anonymous
14 tip at that point in time to any government
15 regulator?
16     A.  No.
17     Q.  And at what point in time did you learn or
18 did you come to believe that any of the conduct
19 occurring at BAMS violated any provision of the
20 Consumer Financial Protection Act?
21     A.  That was after my termination.
22     Q.  And at what point in -- at what point in
23 time did you come to understand that any conduct that
24 was occurring at BAMS somehow violated the Dodd-Frank
25 Act?

Page 163

1      A.  After my termination.
2      Q.  Sometime in July of 2017 you began sending
3  internal correspondence with BAMS employees to your
4  personal Gmail account; is that correct?
5      A.  Did you say July 2017?
6      Q.  Yes.
7      A.  Yes.
8      Q.  Now, setting aside for the moment the
9  purpose or belief with which you did it, you would
10 agree with me that sending e-mails to an external
11 personal e-mail account without the consent of the
12 company was a violation of BAMS' policies, correct?
13     A.  I would not agree --
14         MR. MARX:  Object to the form.
15     Q.  (By Mr. Galanek) Sorry.
16     A.  I would not agree.  I would -- I would not
17 agree to that.
18     Q.  Okay.  So sending an e-mail external to the
19 company to a personal e-mail account of company
20 confidential information, regardless of what it was,
21 would not violate any BAMS policy?
22     A.  I do not know what specific policy it would
23 violate.
24     Q.  Okay.  Are you telling me you are not, in
25 your role with BAMS, you are not familiar with the

Page 164

1  global information securities policy?
2      A.  I would tell you I didn't receive it.
3      Q.  Are you telling me that -- that sending
4  e-mails external, to an external e-mail address
5  containing BAMS' confidential information without the
6  consent of the company would not violate the
7  provision set forth in your Employment Agreement or
8  your employment letter?
9          MR. MARX:  Object to the form.
10         You can answer.
11     A.  I do not know that to be the case, no.  I
12 would say no.
13     Q.  (By Mr. Galanek) Your employment letter set
14 forth certain nondisclosure obligations, correct?
15     A.  I would have to pull it back up and see.
16     Q.  Did you have anyone's consent to send any
17 BAMS information to your personal e-mail account?
18     A.  No.
19     Q.  Prior to the company coming to you to tell
20 you that the company believed this was a violation of
21 its policies, did you inform anyone at the company
22 that you were doing this?
23     A.  No.
24     Q.  And you sent BAMS information to your
25 personal e-mail account for five months before anyone

Page 165

1  approached you to tell you that they have become
2  aware of it and that they viewed it as problematic;
3  is that correct?
4      A.  So I -- I think yes, that sounds accurate.
5      Q.  And when you were approached and told that
6  this was a violation of company policy and that you
7  would need to delete the e-mails, you refused,
8  correct?
9      A.  I don't recall verbally saying that.
10     Q.  Are you telling me you told someone you
11 would delete the e-mails?
12     A.  I do not remember that ever coming up in a
13 conversation about deleting the e-mails.
14     Q.  Sir, it was communicated to you that you
15 were in violation of company policy, correct?
16         MR. MARX:  Object to the form.
17         You can answer.
18     A.  No, I -- I wouldn't -- I don't recall
19 verbally being told it was in violation of the
20 company policy.
21     Q.  (By Mr. Galanek) Sir, I didn't say anything
22 about verbal.  Were you or were you not -- was it or
23 was it not communicated to you that you were in
24 violation of company policy by sending e-mails to a
25 personal e-mail address?

42 (Pages 162 - 165)

Eric Slawin    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 170

1    Q.  Did you have the consent of any of the
2  authors or other recipients of those e-mails to
3  e-mail those documents external to the company?
4    A.  No.
5    Q.  Upon the termination of your employment did
6  you return all of those e-mails to the company?
7    A.  No.
8    Q.  Now, you didn't just send BAMS
9  communications to your personal e-mail account, you
10 also retained copies of agreements with BAMS' client,
11 did you not?
12   A.  I don't recall doing that.  So I don't
13 recall doing that.
14      THE WITNESS:  May I take a three-minute
15 bathroom break?
16      MR. GALANEK:  Of course.
17      THE VIDEOGRAPHER:  Off the record, 3:12.
18      (WHEREUPON, a recess was taken.)
19      THE VIDEOGRAPHER:  Back on the record.  The
20 time, 3:15.
21      MR. GALANEK:  George, pull up Exhibit
22 Number 7 for me out of Plaintiff's production
23 157 to 158.
24      MR. MARX:  Thank you.
25      (Defendant's Exhibit 7, City of Deland,

Page 171

1  Florida Request for Commission Action, dated
2  10/7/2013, Bates labeled PLAINTIFF 000157 - 158,
3  marked for identification.).
4      MR. MARX:  Sorry, what were the numbers?
5      MR. GALANEK:  157 to 158.
6      MR. MARX:  Oh, I'm sorry.  My mistake.  I'm
7  sorry.  My bad.
8      MR. GALANEK:  George, sorry if you didn't
9  hear me.  If you could pull up Exhibit 7.
10      THE CONCIERGE:  Oh, 7.  Okay.  Yes, I
11 didn't hear you.
12   Q.  (By Mr. Galanek) Mr. Slawin, the first
13 thing that I'll point out --
14      MR. GALANEK:  Just go to the bottom of this
15 page, if you don't mind, George.
16   Q.  (By Mr. Galanek) Mr. Slawin, this, like
17 every other document that I have used unless I say
18 otherwise, there's a Plaintiff's page number, meaning
19 that it was produced to BAMS by your counsel.  I'm
20 assuming your counsel received it from you.
21      MR. GALANEK:  Let's go back up, George.
22   Q.  (By Mr. Galanek) This document is --
23 purports to be a cover page reflecting action by the
24 City of Deland, Florida on a contract with BAMS.
25      Was this in your possession upon the

Page 172

1  termination of your employment?
2    A.  I do not recall that being in my
3  possession.
4    Q.  Do you know how your attorney would have
5  gotten it if it wasn't in your possession?
6    A.  No.
7    Q.  Did you return this document to BAMS upon
8  the termination of your employment?
9    A.  I would have to check -- I still can't tell
10 you I have that.  So --
11   Q.  Sir, did you return any documents -- did
12 you package up any documents whatsoever and return
13 them to BAMS following the termination of your
14 employment?
15   A.  Yes, I think I -- along with my laptop and
16 things like that, I did return blank copies of their
17 cease and desist letter and whatever else they sent
18 me that day.
19   Q.  Did you retain copies of any BAMS
20 information?
21   A.  I retained the e-mails we have been talking
22 about.
23   Q.  And unless there's some explanation for how
24 your client or your attorney has this, do you have
25 any reason to believe that this was not something you

Page 173

1  provided to your attorney, which meant you kept a
2  copy of it?
3    A.  I don't have -- I'm sorry.  Can you ask the
4  question again?
5    Q.  Do you have an explanation as to how your
6  attorney would have had this document if you didn't
7  retain a copy following the termination of your
8  employment?
9    A.  No.
10   Q.  All right.
11      MR. GALANEK:  George, pull up Exhibit
12 Number 34 for me, please.
13      And this is -- Mr. Marx, this is Page 1 of
14 an agreement, a BAMS agreement inside of your
15 production.  It begins at Page 612.  The
16 agreement continues on, but we are just pulling
17 up Page 612.
18      MR. MARX:  612.  Thank you.
19      (Defendant's Exhibit 34, Bank of America
20 Merchant Services Merchant Processing Agreement
21 (Government), Bates labeled PLAINTIFF 000612,
22 marked for identification.)
23      MR. GALANEK:  George, if you don't mind, go
24 down to the bottom of this page.  And Mr. Slawin
25 can see that this is, again, a document that was

44 (Pages 170 - 173)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 174

1   provided by his counsel to BAMS.
2       Go back to the top of the page.
3   Q.  (By Mr. Galanek) Mr. Slawin, do you
4   recognize that this is, in fact, a BAMS Merchant
5   Processing Agreement?
6   A.  It appears to be one page of it, yes.
7   Q.  Yes.  And do you have an explanation as to
8   how your attorney would have come to possess this
9   document if it was not something that you retained
10  and failed to return upon the termination of your
11  employment?
12  A.  This document in particular is available on
13  the Internet.
14  Q.  Did you pull this document from the
15  Internet?
16  A.  Yes.
17  Q.  When?
18  A.  During, I'm going to say, maybe the last --
19  if I remember correctly, the last few months of my
20  employment with BAMS.
21  Q.  So you pulled it from the Internet during
22  your employment with BAMS.  Why?
23  A.  I, in the context of the fraud that was
24  going on, I was curious what was being represented to
25  clients.  Because every time I complained, I said "We

Page 175

1   needed to disclose this problem" and nobody wanted to
2   do it.
3   Q.  And so when you pulled up this document and
4   determined fraud was being committed, did you
5   immediately resign your employment so as not to
6   participate in such fraud?
7   A.  No.
8   Q.  Did you immediately contact the SEC?
9   A.  When -- no.
10  Q.  Did you immediately contact the Consumer
11  Financial Protection Bureau for -- or, excuse me,
12  Consumer Financial Protection Agency to alert them to
13  the fraud that you had discovered by pulling this
14  document up?
15  A.  No.
16  Q.  Did you contact any state or Federal agency
17  to alert them that BAMS was somehow engaged in fraud
18  that you had discovered as soon as you pulled this
19  document up during the last three months of your
20  employment with BAMS?
21  A.  No.
22  Q.  All right.
23      MR. GALANEK:  You can take that one down,
24  George.
25  Q.  (By Mr. Galanek) Now, the fraud that you

Page 176

1   claimed that BAMS was engaged in, tell me what that
2   fraud was.
3   A.  It was omission, I think, a twofold
4   omission that the firm needs to be PCI compliant and
5   that, you know, when you look at these documents,
6   it's being represented to clients that the firm's PCI
7   compliant.
8   Q.  At any point in time prior to the
9   termination of your employment did you communicate to
10  any client of BAMS that you felt that false
11  representations were being made to them?
12  A.  No.
13  Q.  Did you call any client and make an
14  anonymous representation that they should look into
15  this issue because you were concerned that they were
16  being defrauded?
17  A.  No.
18  Q.  Did you contact anyone in the General
19  Counsel's Office of BAMS to express to them your
20  concern that you believed that BAMS was defrauding
21  customers?
22  A.  No.
23  Q.  Now, you certainly understood that BAMS was
24  an entity that was owned both by Bank of America and
25  First Data, correct?

Page 177

1   A.  Yes.
2   Q.  At any point in time prior to the
3   termination of your employment did you contact anyone
4   at Bank of America to express concern that management
5   at BAMS was engaged in fraudulent conduct?
6   A.  No.
7   Q.  Did you contact anyone at First Data to
8   express concern that management at BAMS was engaged
9   in fraudulent conduct?
10  A.  No.
11  Q.  Now, you sent e-mails to your personal
12  e-mail account that contained BAMS information that
13  had nothing to do with PCI, didn't you?
14  A.  Possibly.  I'm not entirely sure.
15  Q.  Why did you send e-mails to your personal
16  e-mail account that had nothing to do with PCI
17  compliance?
18  A.  I was -- what I recall is maybe -- I
19  believe I was working on spreadsheets and I would
20  work on the spreadsheet at home.  And so I was just
21  forwarding those e-mails or those spreadsheets to my
22  e-mail address is what I recall in those instances.
23  Q.  Did you return all those spreadsheets on
24  the termination of your employment?
25  A.  No.

45 (Pages 174 - 177)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 178

1    Q.  Did you communicate with anyone at BAMS
2  that you were sending BAMS material external to the
3  company for any purpose?
4    A.  No.
5    Q.  Did you seek consent of your manager that
6  you send BAMS information external to the company?
7    A.  No.
8    Q.  Did you talk to someone in BAMS' IT
9  Department to make sure that you had permission to
10  send BAMS information external to the company?
11    A.  No.
12    Q.  What precisely is it that you claim made
13  BAMS not PCI compliant?
14    A.  I believe they never registered or never
15  went through the process to become PCI compliant.
16    Q.  Do you even know what that process
17  requires?
18    A.  My understanding is an independent audit of
19  their systems so that you can determine that there's
20  data -- I'm generally speaking -- much strength
21  there, data integrity.
22    Q.  What is that understanding based on?
23    A.  Research I did.
24    Q.  What research?
25    A.  Literally get on the Internet when this

Page 179

1  situation was presented.  I wanted to understand, you
2  know, what the ramifications of it were and
3  understand what was needed and what the requirements
4  were.
5    Q.  And what does PCI stand for?
6    A.  Payment card industry.
7    Q.  And the payment card industry data security
8  standards, those are voluntary standards adopted by
9  the payment industry; is that correct?
10    A.  I don't know if they're voluntary.  I guess
11  if you want to do business in certain ways you have
12  to have it.  So I wouldn't necessarily call it -- I
13  would call it a requirement, not voluntary.
14    Q.  It's not a government requirement, correct?
15    A.  Not to my knowledge.
16    Q.  And, in fact, organizations all the time
17  self-certify compliance with BAMS, don't they --
18  excuse me, compliance with PCI DDS, correct -- or
19  DSS, correct?
20    A.  Yes.  I believe their merchants were
21  required to do that pursuant to their agreements.
22    Q.  And so your testimony is that the only
23  reason you believe BAMS was not PCI compliant was
24  because they had not had an auditor come in and say
25  that they were PCI compliant?

Page 180

1    A.  Well, I would add that they were receiving
2  PAN data and that that made them, pursuant to those
3  standards, have to become PCI compliant.
4    Q.  Well, you don't have to be PCI compliant if
5  you are not actually using PAN data, do you?
6    A.  I don't know all the requirements.  I don't
7  know if there are other ones that require you to be
8  PCI compliant.  But, I mean, I'm focused on primary
9  account numbers.
10    Q.  Okay.  But if you are a company and you
11  eliminate a process that would use primary account
12  numbers, just eliminate the process in its entirety
13  so the process doesn't exist, and that it doesn't
14  exist, there's no requirement to be PCI compliant, is
15  there?
16    A.  I can't say that absolutely because I --
17  you know, there could be other things that require
18  you to be PCI compliant that I'm not aware of.
19    Q.  Because you just don't know and you didn't
20  ask anyone, correct?
21    A.  When you say I don't know or didn't ask
22  anyone, I don't understand the question.
23    Q.  Yes.
24       With respect to the use of PAN data at
25  BAMS, the concern about the access to such data, who

Page 181

1  raised that concern?
2    A.  I first heard about it from Joe Moll and I
3  think her name is Ali Davis, the Compliance Officers.
4    Q.  So this is an issue that was identified by
5  you, correct?
6    A.  Correct.
7    Q.  Others within the organization identified
8  the potential issue, correct?
9    A.  Yes.
10    Q.  And others within the organization
11  indicated that it should be self-identified as an
12  audit issue so the company could determine how to
13  deal with the issue, correct?
14    A.  Yes, that was the -- I guess you would say
15  the wrapper category I think they wanted the issue
16  treated as.
17    Q.  All right.  And one of the ways that was
18  discussed addressing any concern over the use of
19  personal -- or, excuse me, primary account numbers
20  was merely to remove any process from BAMS that would
21  require the use of such numbers.  Outsource that to
22  another party, correct?
23    A.  I believe that was one of the strategies
24  proposed, yes.
25    Q.  And the outsourcing of that task would

46 (Pages 178 - 181)

Eric Slawin                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 182

1 ultimately result in the termination of current BAMS
2 employees who were performing that task, correct?
3    A.  I didn't know that to be the absolute
4 result of that.
5    Q.  Well, you knew that if somebody had a job
6 that was performing a task in which PAN data would be
7 used and if that task was eliminated, those jobs
8 could be eliminated, didn't you?
9    A.  I remember David Ades making that comment
10 or raising that possibility, but I didn't know that
11 that was going to be the absolute result.  If the
12 task was removed by -- I would -- well, I wouldn't be
13 surprised if those individuals are doing other tasks
14 too.  So I don't know if that was going to be the
15 result of --
16    Q.  Mr. Ades raised that issue at the same time
17 that he expressed concern, the discussions about
18 remediation efforts you maintained as confidential,
19 since it could potentially affect other people's
20 jobs, correct?
21    A.  I don't recall to that detail.
22    Q.  So it didn't happen or you just don't
23 recall it?
24    A.  I just don't recall to that detail, that
25 that --

Page 183

1    Q.  Who is it you contend engaged in wrongful
2 conduct at BAMS?
3    A.  When you say "wrongful conduct," what do
4 you mean?
5    Q.  I mean, you are complaining about wrongful
6 conduct of BAMS.  I want to know what your definition
7 is and who you are saying engaged in wrongful
8 conduct.
9    A.  Well, overall, as a whole, it's management
10 across the board.  I mean, the wrongful conduct is
11 not disclosing this -- this problem.  I mean, it's
12 omission.  It's fraud.  And I felt that the
13 implications of this, to your point with the SEC and
14 things, could ultimately affect shareholders of
15 various companies.
16    Q.  And when did you come to that conclusion?
17    A.  Like I previously answered, roughly July
18 2017.
19    Q.  And when you came to that conclusion you
20 did nothing to alert the SEC to this potential fraud?
21    A.  I did not alert the SEC to that.
22    Q.  You did nothing to alert the General
23 Counsel's Office of BAMS to this potential fraud?
24    A.  Correct.
25    Q.  You did nothing to alert Bank of America to

Page 184

1 this potential fraud?
2    A.  Correct.
3    Q.  You did nothing to alert First Data to this
4 potential fraud?
5    A.  Correct.
6    Q.  You did not seek to terminate your own
7 employment to remove yourself from the participation
8 in such fraud?
9    A.  I did my best to find other opportunities
10 but they didn't pan out.
11    Q.  So the answer is you did not remove
12 yourself from the company to make sure that you
13 weren't somehow participating or perpetrating fraud,
14 correct?
15    A.  I was unable to remove myself from the
16 company.
17    Q.  Are you saying you were physically unable
18 to remove yourself, they somehow locked you in an
19 office, didn't let you leave?
20    A.  No.
21    Q.  Okay.
22       Now, you claim in this case that you were
23 retaliated against.  Who do you claim engaged in
24 retaliation against you?
25    A.  Whoever made the determination to terminate

Page 185

1 me.
2    Q.  Okay.  Who do you claim made the
3 determination to terminate you?
4    A.  Well, I think what's clear is Mark Kendall.
5 I'm sure that Natasha Collins had a hand in that, HR,
6 General Counsel.
7    Q.  What's the factual basis for claiming that
8 the General Counsel of BAMS had anything to do with
9 the decision to terminate your employment?
10    A.  They -- they were the authors of the cease
11 and desist letter and the affidavit that was sent to
12 me.
13    Q.  Anything else?
14    A.  No, not that I can recall.
15    Q.  And I believe you have already told me
16 repeatedly you never told anyone in the Office of
17 General Counsel that you were concerned that the
18 company was somehow engaged in fraudulent conduct;
19 isn't that correct?
20    A.  Correct.
21    Q.  Did you ever tell anyone in HR that the
22 company was engaged in fraudulent conduct?
23    A.  HR?  No.
24    Q.  At any point prior to the termination of
25 your employment did you tell anyone in HR or the

47 (Pages 182 - 185)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 186

1  General Counsel Office that you felt that any conduct
2  they engaged in at BAMS violated Sarbanes-Oxley?
3      A.  You said HR and, I'm sorry, who else?
4      Q.  In the General Counsel's Office.
5      A.  No.
6      Q.  At any point in time prior to the
7  termination of your employment did you tell anyone in
8  HR or the General Counsel's Office that you felt the
9  conduct of BAMS violated the Consumer Financial
10  Protection Act?
11      A.  No.
12      Q.  Did you tell anyone in either HR or the
13  General Counsel's Office that you felt conduct being
14  engaged in at BAMS violated the Dodd-Frank Act?
15      A.  No.
16      Q.  Did you tell anyone in HR or the General
17  Counsel's Office that you felt BAMS was defrauding
18  its customers?
19      A.  No.
20      Q.  Did you tell anybody at BAMS prior to the
21  termination of your employment that you felt that the
22  conduct that BAMS was engaging in violated the
23  Dodd-Frank Act?
24      A.  No.
25      Q.  Did you tell anyone at BAMS prior to

Page 187

1  terminating -- the termination of your employment
2  that you felt that any conduct at BAMS violated
3  Sarbanes-Oxley?
4      A.  No.
5      Q.  Did you tell anyone at BAMS that you felt
6  the conduct that was being engaged in violated the
7  Consumer Financial Protection Act?
8      A.  No.
9      Q.  Did you tell anyone at BAMS at any time
10  prior to the termination of your employment that you
11  felt that the conduct that BAMS was engaging in with
12  respect to PCI data was a violation of any law?
13      A.  I'm sorry.  Can you repeat the question,
14  please?
15      Q.  Prior to the termination of your employment
16  did you tell anyone, any employee of BAMS that you
17  felt the conduct that BAMS was engaging in with
18  respect to PAN data was a violation of any law?
19      A.  Yes.
20      Q.  Who?
21      A.  I told Mark Kendall that I thought it was
22  fraud.  I discussed it with Treicia Brooks.  And I
23  told --
24      Q.  Who?
25      A.  Her name -- Treicia Brooks.

Page 188

1      Q.  Okay.
2      A.  And I told Sherra Grissom.
3      Q.  What was the name, Sherrie Grissom?
4      A.  Yes.  G-r-i-s-s-o-m, I believe.
5      Q.  And what was Ms. Grissom's role in the
6  company?
7      A.  She was Enterprise Risk Management and I
8  had a dotted line to her.  So she was another
9  reporting, I guess, line for me.
10      Q.  She was your superior or she was your peer?
11      A.  She was a superior.
12      Q.  And what precisely did you tell her?
13      A.  That I felt that the fact that this isn't
14  being disclosed to clients is omission and it's
15  fraud.
16      Q.  When did you tell her this?
17      A.  November 2017.
18      Q.  Did you tell her orally or did you put it
19  in writing?
20      A.  Orally.
21      Q.  Did you ever express this concern that you
22  had regarding misrepresentations to clients or fraud
23  on clients, did you ever put that in writing and
24  provide it to anyone at BAMS?
25      A.  No.

Page 189

1      Q.  All right.
2          Was this a single conversation with
3  Ms. Grissom?
4      A.  I said it on two different occasions.  We
5  had biweekly meetings where I'd report to her my
6  activities.
7      Q.  And you told her that you thought that BAMS
8  was engaged in fraud?
9      A.  Yes.
10      Q.  And that's the word you used?
11      A.  Yes.
12      Q.  What did she say?
13      A.  She said -- she listened and she said she
14  was going to raise it to her superior.
15      Q.  Did she say anything else?
16      A.  Not -- not that I recall.  There was, you
17  know, again listening and, I mean, that was the
18  closest thing to no indifference that I experienced.
19      Q.  Sitting here today, you have no idea
20  whether she ever discussed that with anyone else, do
21  you?
22      A.  That's correct.  I don't know if she told
23  her superior.
24      Q.  And you don't contend that Ms. Grissom
25  played any role in the decision to terminate your

48 (Pages 186 - 189)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 190

1  employment, do you?
2      A.  I don't know that.  I don't know.  To be
3  honest, I don't know what feedback she may have given
4  about me.
5      Q.  You don't have any factual basis that you
6  could point to to say that she somehow participated
7  in the decision to terminate your employment,
8  correct?
9      A.  At this moment, no.
10     Q.  Ms. Brooks.  What -- who was Ms. Brooks?
11 What role did she play in the company?
12     A.  She had the same role as me.  But she
13 performed those duties over, I believe, the marketing
14 team.
15     Q.  She was a peer, then?
16     A.  Yes.
17     Q.  You don't contend that Ms. Brooks played
18 any role in the decision to terminate your
19 employment, do you?
20     A.  I do -- I don't know that to be a fact.
21     Q.  You don't have any evidence to suggest that
22 she actually participated in the decision to
23 terminate you, correct?
24     A.  Correct.
25     Q.  Okay.  What did you tell Ms. Brooks?

Page 191

1      A.  Well, I had numerous conversations with her
2  and just talked about how -- what a mess this was and
3  can't believe it's going on.  And every time I say
4  something to somebody about it no one's doing
5  anything.
6      Q.  And when did you have these conversations
7  with Ms. Brooks.
8      A.  During the month of October, November-ish.
9  They were ongoing.
10     Q.  Of 2017?
11     A.  Yes.
12     Q.  At what point did you form the opinion that
13 BAMS was misrepresenting to customers that it either
14 was PCI compliant or did not have to be PCI
15 compliant?
16     A.  Misrepresenting -- I would say August,
17 September, around that time.
18     Q.  You didn't put anything in writing to
19 Ms. Brooks expressing these concerns, did you?
20     A.  No.
21     Q.  And you indicated that you also told Mark
22 Kendall that you believed BAMS was engaging in fraud.
23 When did you tell this to Mr. Kendall?
24     A.  It was routinely.  I spoke to Mark
25 virtually daily.  And I started saying that July

Page 192

1  2017.
2      Q.  Okay.  Can you explain to me how you
3  started telling Mr. Kendall in July of 2017 that
4  you felt that BAMS was committing fraud when less than
5  five minutes ago, you testified that you did not have
6  the opinion that BAMS was committing fraud until
7  August or September of 2017?
8      A.  Well, I think you misstated.  I understood
9  your question for that was representation of, you
10 know, PCI compliance.  When I spoke with Mr. Kendall,
11 it was always clear that this was going to be an
12 omission.  And I know omission is -- is part of the
13 definition of fraud.  And the fact that once I saw
14 what was being said by senior management that this
15 wasn't going to be fixed or disclosed, that's --
16 that's the conclusion I reached.
17     Q.  I'm sorry.  Would you like to restate that,
18 when you reached that conclusion?
19     A.  Well, you asked me about the agreements and
20 representing to clients about PCI compliance.  Okay.
21 To me, that's different, the agreements that say
22 that.  I came to that conclusion.
23     Q.  That's not what I asked you.  I asked you
24 who within the company you expressed concerns that
25 BAMS was engaged in some sort of illegal conduct

Page 193

1  And you said "Well, I told Mark Kendall, Ms. Brooks
2  and Ms. Grissom that I felt this was fraud."  All we
3  have ever been talking about.  So when did you tell
4  Mr. Kendall that you felt that BAMS was somehow
5  engaged in illegal conduct?
6      A.  July 2017.
7      Q.  Okay.
8      A.  I'm just making a distinction, based on the
9  definition of fraud.
10     Q.  Where do you obtain your definition of
11 fraud?
12     A.  My past experience in investigating it.
13     Q.  And what past experience do you have in
14 investigating fraud?
15     A.  I investigated stock manipulations,
16 misrepresentations to clients for the State of
17 Florida and for NASDAQ, which is now FINRA.
18     Q.  And brokers owe a fiduciary obligation to
19 their clients; is that correct?
20     A.  Yes.
21     Q.  Do contracting parties in the payment space
22 owe fiduciary obligations to one another?
23     A.  Do contract -- can you repeat that, please?
24     Q.  Do contracting parties or a payment
25 processing contract owe fiduciary obligations to one

49 (Pages 190 - 193)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 194

1 another, in your opinion, since you are espousing
2 your understanding of legal fraud?
3    A.   To the extent the contracts lay that out,
4 yes, in my opinion.
5    Q.   Tell me precisely what you told Mr. Kendall
6 in July of 2017.
7    A.   I can't remember absolutely, precisely, but
8 it was that we discussed next steps, what a large
9 mess this was.  And I routinely told him that this
10 needs to be disclosed, that it's omission.  It's a
11 fraud.
12    Q.   And how did Mr. Kendall respond?
13    A.   He agreed.  And said we got to keep it
14 confidential, don't tell anybody.
15    Q.   Did he tell you why he thought it should be
16 confidential?
17    A.   Not specifically.  We were discussing in
18 the context of how big of an issue it could become if
19 it got out.
20    Q.   And these discussions were taking place in
21 July of 2017?
22    A.   Yes.  It was around when we started with,
23 you know, talking about the issue.  So yes.
24    Q.   And the issue wasn't identified by you.  It
25 was identified by others within the business,

Page 195

1 correct?
2    A.   Others was in the company, so to my
3 knowledge, it was identified by the Chief Information
4 Security Officer, Joe Moll.  And the Chief Compliance
5 Officer, Ali Davis.
6    Q.   And they identified it as an issue that
7 needed to be subject to audit by the company,
8 correct?
9    A.   I don't -- when you say "audit," my
10 understanding is somebody comes in and looks at
11 things as an auditor.  I don't think there was --
12 could be identified that way.
13    Q.   You were assigned or they both indicated
14 that this needed to be subject to a self-identified
15 audit issue, correct?
16    A.   Yes.
17    Q.   And you were involved because you were
18 informed that based on the concerns expressed by
19 these two individuals, that you needed to actually
20 write up the self-identification audit issue so the
21 company could determine how to both investigate it
22 and resolve the issue, correct?
23    A.   Yes.  Or more specifically, come up with a
24 project plan, which I believe is what the
25 self-identified audit issues are.

Page 196

1    Q.   And you never actually completed a project
2 plan, did you?
3    A.   I didn't write the project plans as part of
4 my job.
5    Q.   You also didn't write the self-identified
6 audit issue document, did you?
7    A.   For this matter?
8    Q.   Yes.
9    A.   I don't recall me putting that in writing,
10 no.
11    Q.   There's actually a template to do that; is
12 that correct?
13    A.   I guess I would call it a form.  I don't
14 know if it's a template.
15    Q.   And this was a task that was assigned to
16 you, correct?
17    A.   Yes.  I was put on point for that by I
18 believe Natasha.
19    Q.   And you had the ability to write in that
20 form the same concerns that you are expressing now,
21 correct?
22    A.   No, I wouldn't go that far.
23    Q.   Well, you certainly didn't write in that
24 form the same concerns that you are expressing now,
25 did you?

Page 197

1    A.   I did not write those down, no.
2    Q.   Okay.
3    A.   I was being told -- I was being told
4 routinely to keep it confidential, so --
5    Q.   Yes.
6         The conversation that you were having with
7 Mark Kendall in July of 2017, he was your peer at
8 that point in time, correct?
9    A.   Yes.
10    Q.   He wasn't your manager at that time,
11 correct?
12    A.   Not in July.
13    Q.   So when Mr. Kendall was telling you in July
14 of 2017 to keep this confidential, he didn't have any
15 ability to hire or fire you, did he?
16    A.   No.
17    Q.   At any point in time prior to the
18 termination of your employment did you inform anyone
19 at BAMS that you felt that consumers could be injured
20 as a result of BAMS' treatment of PAN data?
21    A.   Consumers?
22    Q.   Yes.
23    A.   I -- I know we discussed a data breach that
24 could happen if the data isn't secure, which it
25 wasn't.  So I guess in that way, no.

50 (Pages 194 - 197)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 198

1    Q.   Who did you discuss the data breaches with?
2    A.   Mark Kendall.  Joe Moll told us that.  It's
3 his -- in his role.  And I can't think of the
4 gentleman's name.  He was -- he was like me, but over
5 the team, the sales support team that was in receipt
6 of the PAN data at the moment.  I just can't remember
7 his name.  Darien Newman.
8    Q.   So Mr. Moll informed all of you that he
9 would have concerns that the failure to properly
10 handle PAN data could lead to a data breach, correct?
11   A.   Yes.
12   Q.   And from that, did you then tell anyone
13 within BAMS that you had a concern that consumers
14 could be injured as a result of the manner in which
15 BAMS was handling PAN data?
16   A.   I can't remember specifically saying that.
17   Q.   All right.
18        You indicated that you expressed concerns
19 about BAMS' conduct to Mark Kendall, Treicia Brooks
20 and Ms. Grissom.  Anyone else?
21   A.   Can you repeat the question, please?
22   Q.   Sure.
23        I asked you earlier to whom did you express
24 concerns that BAMS was somehow engaged in illegal
25 activity.  You said Mark Grissom, Ms. Brooks --

Page 199

1 excuse me, Mark Kendall, Ms. Brooks and Ms. Grissom.
2 And that what you expressed to them was that the
3 conduct that BAMS was engaging in was fraud.
4        Is there anyone else that you haven't told
5 me about to whom you directly disclosed any concern
6 that BAMS was engaged in illegal conduct or fraud?
7    A.   No.
8    Q.   At any point in time prior to the
9 termination of your employment did you put your
10 concerns in writing and provide them to anyone within
11 the company?
12   A.   No.
13   Q.   And you were having, on a routine basis,
14 e-mail communication with various employees within
15 BAMS regarding how the company was dealing with the
16 PAN data issue, correct?
17   A.   On a routine basis?  I don't -- can you ask
18 the question again, please?
19   Q.   You sent out a number of e-mails dealing
20 with the PAN data issue, right?
21   A.   To whoever was in the group that knew about
22 it and had agreed, as a group, or like I was told to
23 keep it confidential or who I could communicate with.
24   Q.   And a lot of those are the e-mails that you
25 sent to yourself to your personal e-mail address,

Page 200

1 right?
2    A.   Those are -- it's some of the ones.
3    Q.   And this working group that you are talking
4 about, you never put in writing to anyone in that
5 working group that you felt that the conduct that was
6 being engaged in at BAMS was somehow illegal or
7 fraudulent, did you?
8    A.   No.
9    Q.   Now, when I asked you earlier about who had
10 input on the decision to terminate your employment,
11 you said "I'm sure Natasha Collins had input."  What
12 is the basis for that statement?
13   A.   I would say it's probably more of an
14 assumption.
15   Q.   So nobody told you that she was involved in
16 the decision; is that fair?
17   A.   Well, I thought I recalled seeing our --
18 there's, like -- there's a document or something that
19 you guys produced which talks about her involvement.
20   Q.   Listen to my question.  My question was,
21 did anyone tell you that she was involved?
22   A.   At the time, no.
23   Q.   Since the time of your termination, has
24 someone told you that Ms. Collins was involved in any
25 determination of your continued employment with the

Page 201

1 company?
2    A.   Tell me -- no one's told me that.
3    Q.   Okay.  And what document is -- what
4 document exists that you say somehow indicates that
5 she was involved?
6    A.   I don't have the specifics.
7    Q.   Well, give me the generalities.
8    A.   I thought it was some type of verification
9 or something to -- questions or something.
10   Q.   And what evidence do you have that Mark
11 Kendall was involved in the determination regarding
12 the termination of your employment?
13   A.   He was at the meeting where they terminated
14 me.
15   Q.   He was present for the meeting.  That's
16 the -- that's the evidence that you have?
17   A.   Yes, it was -- yes.
18   Q.   Has anyone ever told you that Mr. Kendall
19 was a decision-maker related to the decision to
20 terminate your employment?
21   A.   I'm trying to think.  I -- at the meeting
22 when they terminated me, I remember asking "Are you
23 in agreement with this, Mark?"
24   Q.   And what did he say?
25   A.   He just said yes.

51 (Pages 198 - 201)

Eric Slawin                                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 202

1    Q.  And what were you told the reason was for
2  the termination of your employment?
3    A.  It wasn't specific.  It was after an
4  investigation, they have made a determination to
5  terminate me.  And that's it.  I mean, that was it.
6    Q.  So nobody told you what the investigation
7  was about?
8    A.  They did tell me what the investigation was
9  about.
10   Q.  And what did they tell you the
11 investigation was about?
12   A.  Me downloading the e-mails.
13   Q.  You sending e-mails outside of the company
14 to a personal e-mail account?
15   A.  Well, I think that's one and the same.  So
16 I just remember downloading e-mails.
17   Q.  They told you that's what the investigation
18 was about.  Did they also request that you delete
19 those e-mails?
20   A.  I don't -- you keep asking me the same
21 question.  I don't -- I will tell you I don't
22 remember verbally being told to delete the e-mails.
23   Q.  Was it ever communicated to you that you
24 needed to delete the e-mails?
25   A.  It -- well, needed, I mean, it was --

Page 203

1  that's what they wanted, the -- I believe the cease
2  and desist order, or however you call it, and the
3  affidavit.
4    Q.  You certainly read the cease and desist
5  letter when you received it, didn't you?
6    A.  Yes.
7    Q.  And the cease and desist letter took place
8  before the termination meeting, correct?
9    A.  It was sent to me prior to the termination
10 meeting, yes.
11   Q.  The cease and desist letter indicated that
12 you needed to delete BAMS information that you had
13 sent to your personal e-mail account, correct?
14   A.  To be absolutely certain, I would like you
15 to put the document in front of me so I can read it
16 again.  I haven't looked at it.
17   Q.  What's the factual basis for your
18 contention that your termination was not based on
19 your sending e-mails containing BAMS information to a
20 personal e-mail account and, instead, was based on
21 some expression that you made that BAMS' conduct with
22 respect to PAN data and PCI compliance was
23 inappropriate?
24   A.  It was the reaction that I didn't -- I
25 didn't know I was going to be terminated.  And then I

Page 204

1  put that in writing and I was terminated.
2    Q.  You put that in writing in an e-mail back
3  to the company in which you refused to delete the
4  e-mail, correct?
5    A.  Along with the reasons as to why.
6    Q.  So basically after they have sent you a
7  letter saying "You must delete this information,"
8  then you put in writing "I'm not going to delete it"
9  and then you were terminated.  Is that the basis for
10 your retaliation claim?
11   A.  No.  The basis is that I -- after months of
12 telling people that I oppose this fraud, management,
13 along with -- not just fraud but also talking with
14 Natasha Collins, Brian Rubin, talking about many
15 other things about these questionnaires, they -- I
16 was positioned to being forced to represent that the
17 company was PCI compliant.  I was totally
18 uncomfortable with that.
19        But in the end, my e-mail was clear as to
20 why I was not going to delete those e-mails.  I was
21 not -- I was positioned -- I felt I was positioned in
22 the middle of a fraud to be a fall guy.  And I was
23 clear in that e-mail, and if anybody reads that -- I
24 know you have a different opinion -- but if anybody
25 reads that in an e-mail, they will come to that same

Page 205

1  conclusion.  It was clear what my -- what -- where I
2  stood.  And that's it.  Well, that's it.
3    Q.  Was it clear where you stood when you spoke
4  with Mr. Kendall in July of 2017?
5    A.  It was clear, I thought, that this was
6  fraud going on because it was an omission.
7    Q.  And your employment was not terminated in
8  July of 2017; is that correct?
9    A.  That's correct.
10   Q.  And it wasn't -- your employment wasn't
11 terminated in August, September, October or November
12 of 2017, correct?
13   A.  Correct.
14   Q.  And when you expressed these concerns to
15 Ms. Brooks in October of 2017, your employment was
16 not terminated; is that correct?
17   A.  Correct.
18   Q.  And you indicated that Ms. Grissom was a
19 superior to yours and when you expressed these
20 concerns to Ms. Grissom in November of 2017, your
21 employment was not terminated, was it?
22   A.  It was not.
23   Q.  So the basis for your claim that you were
24 retaliated against for engaging in what you have
25 characterized in the lawsuit as protected activity

52 (Pages 202 - 205)

Eric Slawin                                               July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 206

1 was because you were terminated after you sent an
2 e-mail back to the HR representative in December of
3 2017 indicating that you would not delete BAMS
4 information that you had e-mailed to yourself; is
5 that correct?
6     A.  I think that's parsed to your benefit.
7     Q.  I'm sorry.  I don't understand that
8 response.  Explain --
9     A.  The e-mails's clear.  I mean, I think you
10 are being selective for the benefit of your client.
11 The e-mail, when you look at holistically -- when you
12 look at it holistically, it's clear, okay, that those
13 e-mails, I wasn't going to delete those e-mails
14 because I was in the middle of a fraud.  And I'm not
15 going to be pulled into that.  And I'm not going to
16 be -- I'm not going to be set up so I -- you know, my
17 contention is I told them that and they terminated
18 me.  And they retaliated against me.
19     Q.  You told them that in the e-mail you sent
20 after they said delete the e-mails, correct?
21     A.  Yes.
22     Q.  Okay.  That's all I'm trying to understand.
23 You are basically saying the trigger for your
24 termination was you telling them in an e-mail "I am
25 not going to delete those e-mails and this is why I'm

Page 207

1 not going to delete them."  And you say that's why
2 you were terminated, correct?
3     A.  I believe that e-mail, me sending that is
4 protected activity.
5     Q.  And you sent that e-mail after the concerns
6 had been raised to you about the fact that you had
7 sent e-mails in violation of company policy to a
8 personal e-mail account, correct?
9     A.  After the meeting, yeah --yes.
10    Q.  All right.
11        MR. GALANEK:  George, if you don't mind
12 pulling up Exhibit Number 43.
13        (Defendant's Exhibit 43, Letter from Meg
14 Troughton to Eric Slawin, dated 12/8/2017, Bates
15 labeled PLAINTIFF 000713, marked for
16 identification.)
17        MR. GALANEK:  Which is the -- which is
18 Plaintiff 713.
19        And once again, Mr. Slawin, please take
20 your time to direct George around however you
21 would like for him to be directed around so you
22 can review this document.
23        THE WITNESS:  Okay.
24        Please go down.
25    Q.  (By Mr. Galanek) Okay.  Did you receive

Page 208

1 this letter, sir?
2     A.  Yes.
3     Q.  Did you receive this letter on or about
4 December the 8th, 2017?  Is that correct?
5     A.  I will not dispute the date on it.  I don't
6 know if I exactly received it on the 8th.
7     Q.  After receiving this letter, or when you
8 received this letter, the letter informs you that
9 BAMS believed that you had violated company policy by
10 e-mailing documents to your personal e-mail account;
11 is that correct?
12        THE WITNESS:  George, can you go down for
13 me, please?
14        Stop, please.
15     A.  I don't believe it's saying I violated the
16 policy.
17     Q.  (By Mr. Galanek) You don't read this
18 letter, quote, "holistically," to use your term, as
19 informing you that the company believes that you are
20 in violation of the company's policy?
21     A.  I -- no, I read it differently.
22     Q.  Great.  You certainly understand that the
23 company has informed you, quote, "In conformance with
24 your legal obligations, you are to destroy all"
25 copies -- excuse me, "all originals and copies of

Page 209

1 confidential documents and information of BAMS, that
2 you sent to your personal email," correct?
3     A.  I do see that paragraph, yes.
4     Q.  In response to this letter, did you, in
5 fact, destroy all BAMS information that you had sent
6 to your personal e-mail account?
7     A.  No.
8        THE COURT REPORTER:  Can we take a break
9 real quick?
10        MR. GALANEK:  Of course.
11        THE VIDEOGRAPHER:  Off the record, 4:17.
12        (WHEREUPON, a recess was taken.)
13        THE VIDEOGRAPHER:  Back on the record.  The
14 time is 4:25.
15        MR. GALANEK:  George, can you please pull
16 up Exhibit 42 for me.  This is Plaintiff's 711
17 through 712.
18        (Defendant's Exhibit 42, Letter from
19 Michael Solan to Eric Slawin, dated 12/12/2017,
20 Bates labeled PLAINTIFF 000711 - 712, marked for
21 identification.)
22        MR. MARX:  711 through 12.  Thank you.
23        MR. GALANEK:  Mr. Slawin, please feel free
24 to ask George to move around the document.  Tell
25 me after you've had a chance to review it.

53 (Pages 206 - 209)

Eric Slawin                                                        July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 210

1    THE WITNESS: Okay.
2    Okay. George, can you go down further,
3 please?
4    George, can you go down just a little bit
5 further, please?
6    Okay. Thank you.
7    Okay. I have read the letter.
8    Q. (By Mr. Galanek) Do you recognize this
9 document?
10   A. Yes.
11   Q. The letter that you received?
12   A. Yes.
13   Q. You received this letter on or about
14 December 12th, 2017?
15   A. Yes.
16   Q. You understand that this letter effected a
17 termination of your employment?
18   A. Yes.
19   Q. Do you know when the decision to terminate
20 your employment was actually made?
21   A. I would say it was the 12th.
22   Q. I didn't ask what you would say. Do you
23 actually have facts to support an understanding of
24 when the decision to terminate your employment was
25 actually made?

Page 211

1    A. I knew I was terminated on the 12th. So I
2 don't -- I mean, that's my answer.
3    Q. And so the letter communicates to you the
4 decision to terminate your employment. Do you have
5 any independent information beyond this letter to
6 point to as to when the decision to terminate your
7 employment was made, whether on the 12th or at some
8 earlier date?
9    A. I found out I was terminated on the 12th.
10   Q. Okay. So the answer is all that you have
11 is this letter; is that fair?
12   A. Relative to what?
13   Q. When the decision to terminate your
14 employment was actually made.
15   A. Yes. I mean, this letter told me I was
16 terminated.
17   Q. You, of course, understand that a decision
18 to terminate your employment could have occurred at
19 any point in time prior to this letter, but
20 obviously, it didn't occur after this letter; is that
21 fair?
22   A. I don't -- I don't know how you say --
23 well, I don't understand that part. I know I was
24 terminated on the 12th. So I -- I don't know. I
25 don't quite get what you are saying.

Page 212

1    MR. GALANEK: George, let's pull up
2 Exhibit 8, please.
3    MR. MARX: Sorry, what is that number?
4    MR. GALANEK: I'm -- yeah, I'm sorry,
5 Robert. Exhibit 8 is actually Plaintiff's 1 and
6 2.
7    MR. MARX: Thank you.
8    (Defendant's Exhibit 8, E-mail from Mike
9 Solan to Eric Slain, dated 12/8/2017, Subject:
10 Action Required - Legal Affidavit & Cease and
11 Desist Letter - Information Security Violation,
12 Bates labeled PLAINTIFF 000001 - 2, marked for
13 identification.)
14   MR. MARX: 1 and 2.
15   THE WITNESS: George, can you go up,
16 please?
17   A. Okay.
18   Q. (By Mr. Galanek) All right. Do you
19 recognize Exhibit 8 as a document or as an e-mail
20 that you received from Mike Solan?
21   A. Yes.
22   Q. And that was the e-mail that you received
23 from Mr. Solan on or about 4:19 on December 8th,
24 2017; is that correct?
25   A. Yes. Yes, according to the data -- the

Page 213

1 date and time of the e-mail.
2    Q. And in the e-mail, Mr. Solan indicates to
3 you that you should read and sign and return the
4 Legal Affidavit that is attached, you know, if
5 they -- if the affidavit is true to the best of your
6 knowledge. And that if any part of the affidavit is
7 not true, you should contact him to discuss next
8 steps, correct?
9    A. Yes.
10   Q. Did you contact Mr. Solan to tell him that
11 any parts of the affidavit were not true?
12   A. No.
13   Q. And, in fact, you didn't contact Mr. Solan
14 at all before receiving the letter that we just
15 looked at on the 12th; is that correct?
16   A. No, there were -- the letter on the 12th,
17 there were e-mails with him and I on the 11th.
18   Q. I apologize. You're right. You're right.
19 We'll get there.
20   MR. GALANEK: All right. George, if you
21 could pull up Exhibit Number 9, please.
22   And this is Plaintiff's document 16 and 17.
23   (Defendant's Exhibit 9, Letter from Meg
24 Troughton to Eric Slawin, dated 12/8/2017 with
25 attachment, Bates labeled PLAINTIFF 000016 - 17,

54 (Pages 210 - 213)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 214

1    marked for identification.)
2         MR. MARX:  Thank you.
3    Q.  (By Mr. Galanek) Now, this is the letter
4    Mr. Slawin, that we have already seen, but the other
5    letter did not have the attachment.
6         MR. GALANEK:  So, George, if you could go
7    to the next page, which, for him, is the
8    proposed Declaration.  Let me know after you
9    have had a chance to review this, Mr. Slawin.
10        THE WITNESS:  Okay.
11        Please go down further, George.
12   A.  Okay.
13   Q.  (By Mr. Galanek) All right.  This is the
14   Declaration that was -- that was sent to you by
15   Mr. -- actually, it was sent to you by the Office of
16   General Counsel.  This is the affidavit that is
17   referenced in the e-mail that we just looked at from
18   Mr. Solan, correct?
19   A.  Yes, it was sent to me.
20   Q.  And the Declaration that you are being
21   asked to sign merely states that you are affirming
22   that on the signing of this document, you would have
23   permanently deleted all copies of BAMS confidential
24   information in your possession, custody or control
25   and you would further be affirming that you had not

Page 215

1    sent -- or, excuse me, forwarded or shared such files
2    with other persons, correct?
3    A.  Yes.  I think you paraphrased it somewhat,
4    but yes.
5    Q.  And you chose not to sign this Declaration,
6    correct?
7    A.  That's correct.
8    Q.  Because you chose not to delete the
9    information, correct?
10   A.  Above and beyond that, it was -- I -- after
11   months of protesting with management and opposing
12   their fraud, I -- I -- and looking at what's going
13   on, the e-mails was my -- was the only defense I had
14   after everything to prove I wasn't going to be part
15   of that fraud.  And I was sent this after I told them
16   I wasn't going to participate in this fraud.  So --
17   Q.  You were -- you were sent this document on
18   December the 8th, correct?
19   A.  Oh, you're right.  I stand corrected.
20   Q.  This was sent to you before you told them
21   "By God, I am not going to stand for fraud," correct?
22   A.  Yes.  I believe as part of that e-mail I
23   did.  Uh-huh.
24   Q.  I asked you before who within BAMS you
25   communicated any concern that BAMS was engaged in

Page 216

1    illegal conduct.  And you at that point said "Well, I
2    communicated that BAMS was engaged in fraudulent
3    conduct to Ms. Brooks, Mrs Grissom and Mr. Kendall."
4         Now, in other times, you stated "Oh, well,
5    I have been opposing fraud at management."  You have
6    not identified anyone else.  Is there anyone other
7    than those three people who you expressed that you
8    believe that BAMS was engaged in fraudulent conduct?
9    A.  I expressed to Natasha Collins and Brian
10   Rubin, and I think it was Leonard Ebel and the
11   gentleman that was the Relationship Manager for Home
12   Depot that the questionnaires I was being asked to
13   complete, I was not going to do that because
14   representing that was not appropriate.
15   Q.  Okay.  With respect to any of these
16   individuals that you just mentioned, Ms. Collins,
17   Mr. Rubin, Leonard Ebel or the Home Depot
18   relationship whose name you can't
19   remember, did you indicate to any of them that you
20   felt that BAMS was somehow engaged in fraud?
21   A.  I did not use the word "fraud" with them.
22   Q.  Did you indicate to any of them that you
23   felt that BAMS was engaged in any illegal activity?
24   A.  I thought -- or I think, too, that you
25   know, misrepresenting your piece as compliant on

Page 217

1    those questionnaires is tantamount to fraud and being
2    illegal.  That's how I feel about it.
3    Q.  Sir, I'm not asking about your feelings.
4    I'm asking you what you communicated to these four
5    individuals.  Did you communicate to any of those
6    four individuals that you felt BAMS was engaged in
7    illegal conduct?
8    A.  I do not remember using the word "illegal."
9    I just was expressing my concerns routinely about
10   being positioned to misrepresent the facts, and I
11   deem that to be illegal.
12   Q.  Did you indicate to any of those four
13   individuals that you felt any conduct that BAMS was
14   engaging in violated any state or Federal law or
15   regulation?
16   A.  No, I used the word "fraud" broadly or, you
17   know, inappropriate activity, illegal activity.  I --
18   Q.  You told me you didn't use -- go ahead.
19   A.  No.  Go ahead.  I'm sorry.
20   Q.  Well, you just told me you didn't use the
21   word "fraud" with any of them.  So my question was,
22   because you said I didn't use the word "fraud," I
23   didn't use the word "illegal conduct," so I'm asking
24   you, did you tell any of the four of these that you
25   felt that any of the conduct that BAMS was engaging

55 (Pages 214 - 217)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 218

1 in somehow violated any state or Federal law or
2 regulation?
3    A.  I do not recall being asked specifics
4 relative to state regulations or whatever -- however
5 you put it.
6    Q.  And other than Ms. Collins, do you contend
7 that any of the other four -- any of the other three
8 individuals had any input whatsoever in the decision
9 to terminate your employment?
10    A.  No.
11    Q.  To whom did you express the ramifications
12 that you believed would occur if it became public
13 that BAMS was somehow not PCI compliant?
14    A.  For months, Mark Kendall, Sherra Grissom.
15 I did discuss that with Natasha Collins.  I said
16 "That's going to affect shareholders, or could affect
17 shareholders."  Treicia Brooks.  That's -- that's
18 what I recall.
19    Q.  What were the ramifications that you
20 informed these individuals of?
21    A.  That it could become an issue with it
22 getting out that data wasn't secure at merchants and
23 that could affect their bottom line.  And ultimately,
24 the bottom line leads to earnings per
25 share/shareholders.

Page 219

1    Q.  So you told them that the ramifications
2 that may follow a disclosure that BAMS was not
3 compliant with PCI was that the individual
4 merchants -- it could negatively impact the
5 individual merchants who did business with BAMS,
6 their bottom lines and their share value by the
7 merchants' share value?
8    A.  I said shareholders.  I didn't
9 specifically --
10    Q.  Okay.  I'm sorry.  I'm sorry.  But you were
11 talking about the shareholders of the merchants?
12    A.  Yes.  That's how I felt how big it was and
13 possibly still is.
14    Q.  When did you have those conversations?
15    A.  With Mark Kendall, at least once a month.
16 Natasha, we had biweekly meetings leading up to
17 September.  I told her right around that time.  Brian
18 Rubin --
19    Q.  I'm sorry.  Hold on.
20       I'm sorry.  You told Ms. Collins in
21 September of 2017?
22    A.  Yes, roughly.  Uh-huh.  Yes.
23    Q.  Okay.  And when did you tell this to
24 Mr. Rubin?
25    A.  October-ish because he had -- we had talked

Page 220

1 how his duties had changed, and he was going to --
2 his new role was to redesign processes, and he was
3 reporting in to a gentleman -- I think his name is
4 Dave Darey -- who had a line into Bank of America.
5 But I told Brian that all of this is going on and I'm
6 concerned about what's being represented in
7 questionnaires, what I'm being asked to represent.
8 And this could blow up and affect merchants and their
9 shareholders.  And I was hoping that Brian would
10 communicate that up to his superior.
11    Q.  You have no idea if Mr. Rubin communicated
12 that further, correct?
13    A.  I do not.
14    Q.  What was the reaction of any of these
15 individuals to whom you communicated those
16 ramifications to your statements?
17    A.  Agreement and indifference.
18    Q.  Who agreed?
19    A.  Mark Kendall agreed more than once that it
20 could have big implications like that.  Natasha,
21 her -- Mark Kendall, in particular.
22    Q.  Okay.  And what did they say?  You say they
23 agreed.  How did they voice that agreement?
24    A.  He said "Yes, I agree this has big
25 implications."  That's what I recall.  And "That's

Page 221

1 why we need to keep it confidential and not tell
2 anybody."
3    Q.  Those implications -- and I asked about
4 ramifications, but I'm assuming you are using the
5 word "ramifications" and "implications" as synonyms?
6    A.  Sure.  Yes.
7    Q.  Did you ever put those ramifications in any
8 written document to share with anyone at BAMS?
9    A.  No.  I was -- I didn't want to put anything
10 in writing because since I was told to keep it
11 confidential, and there's -- both -- I was told that
12 written and verbally, I was afraid if I did that
13 was going to be terminated.
14    Q.  You were told that by Mark Kendall, who was
15 a peer, correct?
16    A.  At the time he told me that, I -- if I
17 recall, he was my manager.
18    Q.  So you -- earlier you told me that you told
19 him that you felt it was fraud when he was your peer.
20 And you are saying that later you were concerned that
21 if you put something in writing about ramifications
22 that he would terminate you?  Even though you had
23 previously told him, while he was your peer, that you
24 felt it was fraud?
25    A.  Well, I was telling him it was fraud after

56 (Pages 218 - 221)

Eric Slawin                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 222

1 he was my manager also.
2    Q.  When did you tell Mr. Kendall that it was
3 fraud?
4    A.  I would say monthly.  We talked almost
5 daily.  And I -- remember consistently raising it
6 weekly at least.  Because I was just so afraid of the
7 position I was in.
8    Q.  And you used the word "fraud"?
9    A.  Yes.
10   Q.  Do you have any awareness of any loss that
11 has occurred whatsoever to a payment processor as a
12 result of any PCI DSS violation?
13   A.  I know there's been -- there's been signs
14 from Visa and MasterCard, or at least one of those
15 two payment processors, for PCI compliance problems
16 or --
17   Q.  How do you come about that knowledge?
18   A.  I take that back.  Not necessarily a
19 payment processor, but I know Visa and MasterCard
20 have levied fines for that.
21   Q.  They've levied fines against merchants,
22 correct?
23   A.  Yes, I believe it is merchants.
24   Q.  You are not aware of either Visa or
25 MasterCard ever levying any fine against a payment

Page 223

1 processor for failure to comply with PCI DSS,
2 correct?
3    A.  Payment processor, no.  But I'm clear that
4 if they knew a payment processor should be P -- you
5 know, PCI compliant that they could fine them.
6    Q.  And what is that based on?
7    A.  Based on the way I have read their rules.
8    Q.  Which rules have you read?
9    A.  The rule book when I looked at it in the
10 past.
11   Q.  Which rule book?  That's what I'm asking
12 you.
13   A.  Oh.  Probably would have been either Visa
14 or MasterCard's.  I don't remember which one.
15   Q.  What rule book?
16   A.  I don't remember which one.
17   Q.  Do you recall?
18   A.  I don't know of any other.
19   Q.  In what way did BAMS' noncompliance and
20 your alleged -- or the alleged fraudulent
21 misrepresentation that it was making to its customers
22 regarding how it was handling credit card data
23 violate the Consumer Financial Protection Act?
24   A.  I don't know the answer to that.
25   Q.  In what way did it violate Sarbanes-Oxley?

Page 224

1    A.  Violate Sarbanes-Oxley?  I don't know the
2 answer to that.  I don't know how that would violate
3 Sarbanes-Oxley.
4    Q.  In what way did it violate the Dodd-Frank
5 Act?
6    A.  The Dodd-Frank Act?  The Dodd-Frank Act?  I
7 don't know.
8    Q.  When did you first become aware that BAMS
9 was not, in fact, in your mind, PCI compliant?
10   A.  The date I saw the letter or -- I'm sorry,
11 the e-mail from Dave Ades where it was stated there.
12   Q.  When was that?
13   A.  I believe it was June 2017.
14   Q.  In your Complaint, you say that BAMS'
15 senior management understood the seriousness of the
16 issue and directed all written references to BAMS
17 being noncompliant be deleted.  Who directed you to
18 delete any reference to BAMS being noncompliant with
19 PCI DSS?
20   A.  Mark Kendall.
21   Q.  When did Mr. Kendall do that?
22   A.  After he was my manager.  I don't remember
23 the exact date, but the context was this was going to
24 be reported up in a deck or a PowerPoint presentation
25 to the CEO.  And I asked him if he still wanted a

Page 225

1 reference to BAMS not being PCI compliant in that
2 deck.  And I said -- you know, he told me to take it
3 out -- or actually he said -- I said "Do you want it
4 to be taken out?"  And he said "Yes.  Good catch."
5 That would have -- you know, giving the CEO
6 deniability.
7    Q.  Yes.  That was an e-mail that you sent
8 asking him whether you should take that reference
9 out, correct?
10   A.  Correct.  Following his direction to keep
11 it confidential.
12   Q.  Is there any other, quote, "directive," in
13 any written reference to PCI being noncompliant be
14 deleted that you are referring to in your Complaint?
15   A.  No.
16   Q.  All right.
17      MR. GALANEK:  George, if you can please
18 pull up Exhibit Number 10, please.
19      MR. MARX:  And what number is that?
20      MR. GALANEK:  I'm sorry.  It's Plaintiff's
21 20.
22      MR. MARX:  Thank you.
23      (Defendant's Exhibit 10, E-mail string
24 Bates labeled PLAINTIFF 000020 - 24, marked for
25 identification.).

57 (Pages 222 - 225)

Eric Slawin                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 230

1 basically state that you have been operating under
2 the assumption that BAMS is not PCI compliant and
3 does not have to be. Is that a statement that you
4 wrote on October the 27th of 2017?
5    A. Yes.
6    Q. So up until October 27th, 2017, you were
7 under the impression that BAMS did not need to be PCI
8 compliant, correct?
9    A. No, that's not correct.
10   Q. When did you become aware that BAMS did not
11 need to be -- when did you become aware that BAMS
12 needed to be PCI compliant?
13   A. July 2017.
14   Q. Is there a reason you don't tell
15 Mr. Einhorn that you have been aware since July of
16 2017 that BAMS is not PCI compliant but needed to be?
17   A. Yes, because I was being told by my manager
18 to not speak about it.
19   Q. Yes. Your manager is not on this e-mail;
20 is that correct?
21   A. I didn't see that, no.
22   Q. This is a direct communication between
23 yourself and in-house counsel for BAMS, correct?
24   A. Yes.
25   Q. You take this opportunity to tell in-house

Page 231

1 counsel for BAMS that you have concerns that BAMS is
2 engaging in an illegal activity?
3    A. In this e-mail?
4    Q. Yes.
5    A. I didn't say that in this e-mail.
6    Q. Nor did you say that you believe that BAMS
7 is engaged in fraudulent conduct; isn't that correct?
8    A. In this e-mail?
9    Q. Yes.
10   A. Yes.
11   Q. And, in fact, you state in the last
12 sentence of your e-mail "It's important I understand
13 the situation relative to BAMS' PCI Compliance so I
14 can provide the proper support to our sales team."
15       So is it your position that you fully
16 understood the situation relative to BAMS' PCI
17 compliance when you were writing this e-mail to
18 in-house counsel but you weren't disclosing that to
19 him?
20   A. With this e-mail, I was trying to -- I
21 wanted -- I was trying to verify BAMS' PCI compliance
22 status, as I knew it, as I -- I knew they weren't
23 PCI compliant. But I was in a difficult situation
24 because I was being told not to talk about that.
25       So I sent this e-mail to Aaron and -- to

Page 232

1 see what his understanding was and not -- I mean,
2 follow my manager's directive to not disclose it.
3    Q. If you are not to speak about it, why are
4 you engaging with Mr. Einhorn anyway?
5    A. Well, my understanding was I was -- what I
6 was told not to say is that BAMS is not PCI compliant
7 and in receipt of PAN data.
8    Q. You don't express that in your e-mail to
9 him, do you? You don't express to him that you
10 believe that BAMS is not PCI compliant?
11   A. I say that -- my assumption is that BAMS is
12 not PCI compliant.
13   Q. And your assumption is that they don't have
14 to be PCI compliant. That's what you are
15 communicating to him, correct?
16   A. Obviously, I was following the directive of
17 my manager. I wanted -- I wanted to find out from
18 Aaron what the status was. I thought he knew too.
19 And I didn't know how else to say it without saying
20 it.
21   Q. Are you saying your manager directed you to
22 send this e-mail to Mr. Einhorn?
23   A. No.
24   Q. And you don't copy your manager on this
25 e-mail, correct?

Page 233

1    A. Correct.
2    Q. And, in fact, you affirmatively delete your
3 manager and others who are on the earlier string from
4 the e-mail that you sent to Mr. Einhorn; is that
5 correct?
6    A. Well, I felt if I included every -- you
7 know, more people, I would have been terminated.
8 Because I was told not to do that.
9    Q. Sir, my question was simple. You
10 affirmatively deleted everyone else from this e-mail;
11 is that correct?
12   A. I wouldn't say I did -- I deleted them. I
13 didn't include them in this inquiry. I don't know
14 what you mean by "deleted."
15   Q. You made an inquiry directly to
16 Mr. Einhorn, just you and just him, correct?
17   A. That's what -- that's what the e-mail
18 string shows here, at least for this part of it, yes.
19       MR. GALANEK: George, let's pull up
20 Exhibit 13, please.
21       MR. MARX: What number is that?
22       MR. GALANEK: Plaintiff's 37 and 38.
23       MR. MARX: Thank you.
24       (Defendant's Exhibit 13, E-mail string
25 Bates labeled PLAINTIFF 000037 - 39, marked for

59 (Pages 230 - 233)

Eric Slawin                                          July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 234

1    identification.)
2        MR. GALANEK:  Please take your time to
3    review the document.
4        THE WITNESS:  Okay.
5        George, can you go down, please?
6        Can you go down a little bit more, please?
7        George, can you go down further, please?
8        Okay.  Can you go down, please?
9        Okay.  Thank you.
10       MR. GALANEK:  George, please go back up to
11   Page 37, Plaintiff's 37.
12   Q.  (By Mr. Galanek) Mr. Slawin, is this the
13   e-mail that you referred to earlier that forms the
14   basis for your allegation that management insisted
15   that you delete any and all written references to the
16   PCI issue that appears in your Complaint?
17   A.  Well, when you say "any and all," are you
18   reading from the Complaint?
19   Q.  Just answer my question, sir.  Is this the
20   e-mail that you are referring to -- we asked that --
21   we talked about that earlier.  Is this the e-mail you
22   were referring to?
23   A.  Yes.
24   Q.  Okay.  And your e-mail appears at the
25   bottom of Page 37; is that correct?

Page 235

1        THE WITNESS:  George, can you go down,
2    please?
3    A.  Yes.
4    Q.  (By Mr. Galanek) And you're inquiring as to
5    whether or not you should delete something, correct?
6    A.  At the direction of my manager, yes.
7    Q.  Yet your e-mail precedes the direction of
8    your manager, correct?
9    A.  I'm sorry, what's that?
10   Q.  You sent your e-mail at 2:30 on
11   November 8th, 2017, correct?
12   A.  Uh-huh.
13   Q.  "Yes"?
14   A.  Yes.  That's the date and time stamp on
15   this e-mail, yes.
16   Q.  And at the time of this e-mail, Mr. Kendall
17   was your manager, correct?
18   A.  Yes.
19   Q.  And Mr. Kendall responds to your e-mail.
20   He didn't send you an e-mail before your e-mail.  He
21   responds to yours, correct?
22   A.  Yes.
23   Q.  You didn't report to Sara Saha, correct?
24   A.  Correct.
25   Q.  Now, all of the e-mails that you forwarded

Page 236

1    to yourself at the eslawin16Gmail account, to the
2    extent that you forwarded e-mails to that account
3    that purport to have been written by you or received
4    by you, they were, in fact, written by you or
5    received by you, correct?
6    A.  The e-mails I -- you lost me on that
7    question.  I apologize.
8    Q.  The e-mails that you forwarded to your
9    personal e-mail account, they were all genuine
10   e-mails, correct?  You are not contending that
11   someone created an e-mail in your e-mail account?
12   A.  All those e-mails were forwarded from my
13   work e-mails.  So I guess if that meets the
14   definition of genuine.
15       MR. GALANEK:  George, if you will pull up
16   (Zoom interruption), please.
17       MR. MARX:  Which number, Counsel?
18       MR. GALANEK:  Plaintiff's 47 through 50.
19       MR. MARX:  And what number is that
20   Defendant's number?
21       MR. GALANEK:  No, it's Exhibit 16.  It's
22   Plaintiff's 47 through 50.
23       MR. MARX:  Right.  Defendant's 16, you
24   said?
25       MR. GALANEK:  Exhibit 16.

Page 237

1        MR. MARX:  Yes, 16.  I didn't know if you
2    said 60.  Thank you.
3        (Defendant's Exhibit 16, E-mail string
4    Bates labeled PLAINTIFF 000047 - 50, marked for
5    identification.)
6        THE WITNESS:  Okay.
7        George, can you go down further?
8        Okay.  Can you go down further, please?
9        Can you go down further, please?
10       Can you go down further, please?
11       I'm sorry, George, can you go up just a
12   little bit, please?  Thank you.
13       Okay.  Can you go down further, please?
14       Go down further.
15       Okay.  Thank you.
16   Q.  (By Mr. Galanek) Mr. Slawin, you became
17   aware of the self-identification or the suggestion of
18   a self-identified audit issue for Mr. Ades on or
19   about June 13, 2017, correct?
20   A.  Correct.
21   Q.  And you were with preparing the
22   self-identified audit issue, correct?
23   A.  We started talking about how to, I guess,
24   come up with a solution or, you know, a strategy on
25   how to deal with it.  I didn't hand write or -- (Zoom

60 (Pages 234 - 237)

Eric Slawin                                July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 238

1  interruption) as an SIA -- SIAI.
2      Q.  You were the person who was charged with
3  preparing the SIAI, correct?
4      A.  Initially, yes.
5      Q.  And you received this e-mail string when
6  Ms. Collins copied you on it on June 13th at 5:18 in
7  the evening, correct?
8      THE WITNESS:  Can you go down further,
9  George?
10     A.  Yes, correct.
11     MR. GALANEK:  Follow me, George.
12     You can take it down.
13     THE CONCIERGE:  Okay.
14     MR. GALANEK:  If you can next pull up
15  Exhibit 17 for me, please.  This is Plaintiff's
16  Bates Number 56 and 57.
17     (Defendant's Exhibit 17, E-mail string
18  Bates labeled PLAINTIFF 000056 - 57, marked for
19  identification.)
20     Q.  (By Mr. Galanek) Mr. Slawin, it this an
21  e-mail that you wrote on or about December 20, 2017?
22     A.  Yes.
23     Q.  And you sent it to Mr. Kendall and
24  Ms. Collins?
25     A.  Yes.  They are part of the e-mail string,

Page 239

1  uh-huh.
2      MR. GALANEK:  Follow me, George.  You can
3  take it down.  That's all we need, George.  You
4  can take it down.
5      George, can you please pull up Exhibit 20?
6      Exhibit 20 is Plaintiff's 74 and 75.
7      (Defendant's Exhibit 20, E-mail from Eric
8  Slawin to Mark Kendall, dated 6/2/2017, Subject:
9  check it out, Bates labeled PLAINTIFF 000074 -
10  75, marked for identification.)
11     Q.  (By Mr. Galanek) Did you write the e-mail
12  that appears at the top of this page?
13     A.  Yes.
14     Q.  And did you attach to that e-mail a
15  internal messaging string that you had written?
16     A.  I don't know.  That appears to be the case
17  here.
18     Q.  I'm sorry?
19     A.  That appears to be the case here.
20     Q.  Thank you.
21     And you sent this e-mail to Mr. Kendall on
22  June 2nd, 2017; is that right?
23     A.  Yes.
24     Q.  And at that time Mr. Kendall was your peer?
25     A.  Yes.

Page 240

1      Q.  And what did you mean by the statement at
2  the end, "nice to know you and you start making some
3  money in the market"?
4      THE WITNESS:  Can you go back up, please,
5  George?
6      A.  I meant that I was going to look for a job
7  and that, you know, hopefully, I can make some money
8  in the stock market.
9      Q.  (By Mr. Galanek) Did you ever tell anyone
10  that you spent 2018 in your underwear in your
11  basement day trading?
12     A.  I didn't remember saying that until I saw
13  what was put in.  I believe that was in the OSHA
14  complaint response.  So I know I talked to Mark about
15  trading in my basement.  But I don't -- I don't -- I
16  didn't -- I don't specifically say in my underwear.
17     MR. GALANEK:  If you would please pull up
18  Exhibit 21, George.
19     This is Plaintiff's 76, Mr. Marx.
20     MR. MARX:  Thank you.
21     What Defendant's number is that?
22     MR. GALANEK:  It's -- it's Exhibit 21.
23     MR. MARX:  Thank you.
24     (Defendant's Exhibit 21, E-mail string
25  Bates labeled PLAINTIFF 000076 - 80, marked for

Page 241

1      identification.)
2      Q.  (By Mr. Galanek) Mr. Slawin, did you write
3  the e-mail -- or, excuse me, did you receive the
4  e-mail from Ms. Collins on June 6th, 2017 that's in
5  the middle of this page?
6      A.  Yes.
7      Q.  And you forwarded it to your personal
8  e-mail account on June 6th, 2017; is that correct?
9      THE WITNESS:  George, can you go up?
10     A.  Yes.
11     Q.  (By Mr. Galanek) And you also forwarded it
12  to an eslawin@comcast.net account that you didn't
13  mention earlier, correct?
14     A.  Correct.
15     Q.  That's yet another personal e-mail account
16  that you maintain?
17     A.  Yes, it is.
18     Q.  And you forwarded this e-mail string that
19  goes on from Page 76 through 80 to those two personal
20  e-mail accounts on June 6th, 2017, correct?
21     A.  Yes.  That would have been what was
22  forwarded, uh-huh.
23     Q.  This is more than a week before any issue
24  of PCI DSS had been identified by anyone at BAMS,
25  correct?

61 (Pages 238 - 241)

Eric Slawin                                                    July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 242

1    A.  Well, I don't know identified by anyone.  I
2  think Joe Moll probably knew about it sooner, but
3  this was before I knew about it.
4    Q.  This e-mail string that you chose to
5  forward outside of the company without the company's
6  consent has nothing to do with PCI compliance,
7  correct?
8       THE WITNESS:  George, can you go down
9    further, please?
10      Further, please.
11      Can you go down further, please?
12   A.  The e-mail itself doesn't.  I don't know if
13  the questionnaire from Verisign.
14      THE CONCIERGE:  Repeat that, please.
15      MR. GALANEK:  You can take that one down,
16    George.
17      Can you tell me how much time we have got
18    left?
19      THE VIDEOGRAPHER:  Yes.  We are at six
20  hours, 25 minutes.
21      MR. GALANEK:  Let's take a five-minute
22    break, please.
23      THE VIDEOGRAPHER:  Off the record.  The
24    time is 5:28.
25      (WHEREUPON, a recess was taken.)

Page 243

1       THE VIDEOGRAPHER:  Back on the record.  The
2    time, 5:35.
3       MR. GALANEK:  George, if you don't mind
4    pulling up Exhibit 36, please.
5       Mark, this is Plaintiff's 665 is the
6    beginning number.
7       MR. MARX:  Thank you.
8       (Defendant's Exhibit 36, U.S. Securities
9    and Exchange Commission TCR Summary, Bates
10    labeled PLAINTIFF 000665 - 671, marked for
11    identification.)
12   Q.  (By Mr. Galanek) Mr. Slawin, my question on
13  this is going to be fairly simple.  This purports to
14  be a redacted copy of a complaint that you filed with
15  the Securities & Exchange Commission.  And I just
16  want you to confirm that this is, in fact, what you
17  filed with the Securities & Exchange Commission and
18  that you filed it following the termination of your
19  employment.
20      THE WITNESS:  George, can you go down,
21    please?
22   A.  Yes, that's correct.
23   Q.  (By Mr. Galanek) And the submission date
24  has been blacked out here.  Do you know why that
25  submission date's been blacked out?

Page 244

1    A.  I do not.
2    Q.  And you submitted this following the
3  termination of your employment; is that correct?
4    A.  That's correct.
5       MR. GALANEK:  George, could you please pull
6    up Exhibit 37 for me.
7       MR. MARX:  Okay.  What number is that?
8       MR. GALANEK:  Sorry.  Plaintiff's 672.
9       (Defendant's Exhibit 37, E-mail string
10    Bates labeled PLAINTIFF 000672 - 673, marked for
11    identification.)
12      MR. MARX:  Thank you.
13   Q.  (By Mr. Galanek) Mr. Slawin, we have marked
14  this as Exhibit Number 37.  Is this an e-mail that
15  you received back from the CFPB regarding your
16  submission of a complaint?
17   A.  Yes.
18   Q.  And you submitted your complaint to the
19  CFPB following the termination of your employment; is
20  that right?
21   A.  I submitted it late that day when I --
22  which is the day I found out I was terminated.
23   Q.  Right.  So after you found out you were
24  terminated you submitted this, correct?
25   A.  Correct.

Page 245

1    Q.  And you received an acknowledgment that
2  your complaint has been submitted, which is the
3  second page of this two-page exhibit, on or about
4  January 1 of 2018; is that correct?
5    A.  Yes.
6       MR. GALANEK:  George, if you don't mind,
7    could you pull up Exhibit Number 34 again.  It's
8    one we have already looked at.
9       This is the exhibit -- or it's Exhibit 34,
10    Mr. Marx.  It's Plaintiff's 612.
11   Q.  (By Mr. Galanek) Mr. Slawin, we looked at
12  this document earlier.  It's the first page from a
13  BAMS Merchant Processing Agreement.  You earlier
14  testified that you pulled this document out while
15  employed with BAMS and you pulled it up from a
16  publicly available website.
17      What website did you pull this document up
18  from?
19   A.  I don't recall.
20   Q.  How did you find the website?
21   A.  A Google search.
22   Q.  And what did you Google search to find this
23  document?
24   A.  I don't recall exactly what I typed.
25   Q.  Did you do that on a BAMS computer?

                                      62 (Pages 242 - 245)

Eric Slawin                                                          July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 246

1   A.   No.
2   Q.   Did it on a personal computer?
3   A.   Yes.
4   Q.   So you did it from home?
5   A.   Yes.
6   Q.   And where is that computer that you used to
7   pull up this document now?
8   A.   In the trash.
9   Q.   You indicated that you had a hard drive
10  crash.  When did that occur?
11  A.   It's happened quite a few times throughout
12  these last few years.
13  Q.   When you say the computer is in the trash,
14  do you still have physical possession of the computer
15  and it is merely not working, or you no longer have
16  physical possession of the computer?
17  A.   I no longer have physical possession of the
18  computer.
19  Q.   And when did you surrender physical
20  possession of that computer?
21  A.   I don't know the exact date.
22  Q.   Before or after this lawsuit was filed?
23  A.   I don't -- I don't remember the exact date.
24  Q.   Do you remember the year?
25  A.   It would still be a guess.

Page 247

1   Q.   What type of computer was it?
2   A.   It's a -- I built it myself.  It was a
3   motherboard and the various components and a hard
4   drive.  It's not a type.
5   Q.   At any point in time did you tell any of
6   the counselors or psychiatrists that you worked with
7   that you owed a significant amount of money to the
8   IRS?
9   A.   Yes.
10  Q.   How much money did you owe to the IRS in
11  2019?
12  A.   In 2019?  I don't know the exact amount.
13  Q.   More than a hundred thousand dollars?
14  A.   No.
15  Q.   More than $50,000?
16  A.   No.
17  Q.   More than $25,000?
18  A.   I believe it was around in the thirties.
19  It was an unexpected expense because I was with -- I
20  was using early withdrawals from my IRA to live on
21  and I didn't anticipate that.  So I was feeling
22  pressure.
23       MR. GALANEK:  George, if you would please
24  pull up Exhibit 49.
25       MR. MARX:  What number is it?

Page 248

1        MR. GALANEK:  I'm sorry.  This is
2   Plaintiff's 739.  It's the first page of it.
3        MR. MARX:  PX739.  Thank you.
4        (Defendant's Exhibit 49, Whistleblower
5   Online Complaint, Bates labeled PLAINTIFF 000739
6   - 743, marked for identification.)
7   Q.   (By Mr. Galanek) Mr. Slawin, we pulled up
8   what is Exhibit Number 49.  Do you recognize this
9   document?
10       THE WITNESS:  George, can you go down
11  further, please?
12       Can you go down further, please, George?
13       Can you go down further, please?
14       Stop, George.
15       Can you go back up, please?
16       Can you go down to the next page?
17       Thank you.
18  Q.   (By Mr. Galanek) Do you recognize this
19  document, sir?
20  A.   That -- that page there reminds me that
21  this is, I believe, the OSHA complaint, my initial
22  submission.
23  Q.   This is an OSHA complaint that you
24  submitted following the termination of your
25  employment?

Page 249

1        THE WITNESS:  Can you go back up, George,
2   please?  I'm just looking for a date, George.
3        Can you go back up, please?
4        Stop, please.
5   A.   Yes.  It would have been subsequent to my
6   termination.
7   Q.   (By Mr. Galanek) Now, your complaint to
8   OSHA, your complaint to the CFPA and your complaint
9   to the SEC all took place following the termination
10  of your employment, on the 12th, within hours
11  following the termination of your employment; is that
12  correct?
13  A.   I remember the CFPB one was dated within
14  hours.  I don't see a time for this one.  I don't
15  remember.  And the SEC, I don't know if that was
16  within hours.
17  Q.   You certainly submitted all three of your
18  complaints within no more than a day or so after the
19  termination of your employment; is that correct?
20  A.   I don't know that for sure.
21  Q.   Within a week of the termination of your
22  employment?
23  A.   Yes, I would say within a month.  I
24  don't -- I just don't know the exact date for all of
25  them.

63 (Pages 246 - 249)

Eric Slawin                                              July 19, 2022
Eric Slawin v. Bank of America Merchant Services, LLC, et al.

Page 250

1    Q.  Certainly, the OSHA complaint that you
2  filed that we're looking at, you purport to have
3  filed it on the 12th, following the termination of
4  your employment; is that right?
5    A.  Where do you see that date?
6    Q.  On the very first page.
7    A.  Oh, okay.  I see that there.  Yes.  Uh-huh.
8    Q.  So certainly within 24 hours of your
9  employment being terminated, you had figured out how
10 to file a complaint with OSHA expressing concerns
11 about BAMS' conduct, correct?
12   A.  I'm sorry.  Can you repeat the question?
13   Q.  Sure.
14       Within 24 hours of the termination of your
15 employment, you had figured out how to make a
16 complaint to OSHA with respect to what you believed
17 to be inappropriate conduct by BAMS, correct?
18   A.  Yes.  Based on this date, that's correct.
19   Q.  All right.
20       MR. GALANEK:  Let's take a look, George, at
21 Exhibit 51.
22       This is actually out of the BAMS
23 production.  This is BAMS 111, Mr. Marx.
24       MR. MARX:  Thank you.
25       (Defendant's Exhibit 51, E-mail chain Bates

Page 251

1  labeled BAMS 00000111 - 112, marked for
2  identification.)
3    Q.  (By Mr. Galanek) Okay.  Mr. Slawin, what
4  I'm interested in talking to you about is the first
5  e-mail on this page from Ms. Collins to a number of
6  individuals and copying you.  The e-mail is dated
7  June 13th of 2017.  This is the e-mail whereby your
8  manager at the time is assigning to you to get the
9  SAIA documented, correct?
10   A.  Yes.
11   Q.  I'm sorry?
12   A.  Yes.
13       MR. GALANEK:  Thank you.  That's all we
14 need for that, George.
15       George, if you pull up Exhibit Number 52,
16 please.
17       (Defendant's Exhibit 52, E-mail chain Bates
18 labeled BAMS 00000129 - 131, marked for
19 identification.)
20       MR. MARX:  What number is that?
21       MR. GALANEK:  I'm sorry, Mr. Marx.  It's
22 BAMS -- it starts BAMS 129.  The question that I
23 have is merely I want Mr. Slawin to let me know
24 if he wrote the e-mail that is at the top of
25 BAMS 130.

Page 252

1        THE WITNESS:  Okay.
2        MR. MARX:  Okay.  129.  I'm sorry, so just
3  to be precise, Defendant's -- we're at 52 is
4  Defendant's document production with Bates
5  numbers 129 through what number?
6        MR. GALANEK:  It's 129 through 131.  And
7  the question that I have of the witness is --
8        MR. MARX:  Yes, I know.  I just wanted to
9  make sure I have the whole document.  I get it.
10       MR. GALANEK:  Yes, of course.  Of course.
11       If you go down, George, to -- on Page 130,
12 it's the top e-mail from Mr. Slawin to Brian
13 Rubin of May 11, 2017 at 9:11.
14   Q.  (By Mr. Galanek) Mr. Slawin, do you see the
15 e-mail of May 11, 2017 at 9:11?
16   A.  May 11 -- you said May 11, 2017 at 9:11?
17   Q.  Yes.
18   A.  Yes.  Uh-huh.
19   Q.  Is that an e-mail that you wrote?
20   A.  Yes.
21   Q.  At this point in time was Mr. Rubin your
22 manager?
23   A.  Yes.
24       MR. GALANEK:  I don't have anything further
25 on that one, George.

Page 253

1        If you would pull up, George, Exhibit
2  Number 53 for me.
3        Mr. Marx, this is from the BAMS production.
4  It's 157 through 158.
5        MR. MARX:  Thank you.
6        (Defendant's Exhibit 53, E-mail string
7  Bates labeled BAMS 00000157 - 158, marked for
8  identification.)
9    Q.  (By Mr. Galanek) Mr. Slawin, I want to ask
10 you if you received the e-mail from Ms. Collins that
11 appears at the middle -- begins at the middle of
12 Page 157.
13       THE WITNESS:  George, can you pan up just a
14 little bit, please?
15   A.  Yes.
16   Q.  (By Mr. Galanek) You did receive this from
17 Ms. Collins; is that correct?
18   A.  That's what that date indicates, yes.
19   Q.  And then you turned around and e-mailed it
20 to your personal e-mail account; is that correct?
21       THE WITNESS:  George, can you go up?
22   A.  Yes.
23   Q.  (By Mr. Galanek) There's no reference to
24 PCI compliance anywhere within the e-mail that
25 Ms. Collins sent you, is there?

64 (Pages 250 - 253)