# EXHIBIT 34

Page 1

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF GEORGIA
3                ATLANTA DIVISION
4    _____
5    ERIC SLAWIN,
6           Plaintiff,
7        v.                                Civil Action
8    BANC OF AMERICA MERCHANT                File No.
9    SERVICES, LLC, s/h/a BANK OF            1:19-cv-04129-
10   AMERICA MERCHANT SERVICES,              AT
11          Defendant.
12   _____
13            VIDEOTAPED DEPOSITION OF
14                 DAVID ADES
15   DATE:        Monday, July 29, 2024
16   TIME:        10:17 a.m.
17   LOCATION:    Remote Proceeding
18                Mississauga, Ontario L5L 5R1
19   REPORTED BY: Tabatha Richards
20   JOB NO.:     6777053
21
22
23
24
25

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 3 of 9

David Ades
July 29, 2024
Slawin, Eric Vs. Banc Of America Merchant Services, Et Al.

Page 2

## APPEARANCES

ON BEHALF OF PLAINTIFF ERIC SLAWIN:

ROBERT N. MARX, ESQUIRE (by videoconference)
JEANNIE MARX, ESQUIRE (by videoconference)
Marx & Marx
1050 Crown Pointe Parkway, Suite 500
Atlanta, GA 30338
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com
(404) 261-9559

ON BEHALF OF DAVID ADES AND DEFENDANT BANC OF AMERICA MERCHANT SERVICES, LLC, S/H/A BANK OF AMERICA MERCHANT SERVICES:

BRIAN M. UNDERWOOD, JR., ESQUIRE (by videoconference)
Bryan Cave Leighton Paisner, LLP
1201 West Peachtree Street NW, 14th Floor
Atlanta, GA 30309
brian.underwood@bclplaw.com
(404) 572-6600

Page 3

## APPEARANCES (Cont'd)

ALSO PRESENT:

Ted Yost, Videographer (by videoconference)
Shelley Marx, Paralegal for Marx & Marx (by videoconference)
Sheila Lafferty, Corporate Representative (by videoconference)

Page 4

## INDEX

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Marx | 8 |
| By Mr. Underwood | 92 |
| By Mr. Marx | 105 |

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16 | 6/13/17 E-mail Chain | 29 |
| Exhibit 28 | Self-Identified Audit | 72 |
| Exhibit 64 | Amendment 4 to Master Services Agreement | 65 |
| Exhibit 65 | Addendum No. 2 to Merchant Services Agreement | 45 |
| Exhibit 79 | PCI DSS Quick Reference Guide | 39 |
| Exhibit 82 | PCI DSS Compliance with Visa | 82 |

### QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 15 | 21 |

### DOCUMENTS REQUESTED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Minutes from Monthly Audit Meetings | 78 |

Page 5

PROCEEDINGS

THE VIDEOGRAPHER: Good morning. We are going on the record at 10:17 a.m. on July 29, 2024. Please note this deposition's being conducted virtually. Quality of recording depends on the quality of the camera and the internet connecting our participants. What is seen from the witness and heard on the screen is what will be recorded. Audio and video recording will continue to take place unless all parties agree to go off the record.

All right, Ms. Richards.

THE REPORTER: Good morning. My name is Tabatha Richards. I'm the reporter assigned by Veritext to take the record of this proceeding. We're now on the written record at 10:18 a.m.

This is the deposition of David Ades in the matter of Eric Slawin vs. Bank of America Merchant Services, LLC on July 29, 2024, at Mississauga, Ontario, Canada.

I am a Georgia certified reporter authorized to take acknowledgements and give -- administer oaths. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 4 of 9

David Ades                                              July 29, 2024
Slawin, Eric Vs. Banc Of America Merchant Services, Et Al.

Page 6

1  and the witness understand and agree that any
2  certified transcript produced from the recording of
3  this proceeding:
4          - is intended for all uses permitted
5          under applicable procedural and
6          evidentiary rules and laws in the same
7          manner as a deposition recorded by
8          stenographic means; and
9          - shall constitute written stipulation
10         of such.
11         This proceeding will be recorded via
12 video technology by Ted Yost.  At this time, will
13 everyone in attendance please identify yourself for
14 the record.
15         MR. MARX:  For the plaintiff, Robert
16 Marx of Marx & Marx.  My co-counsel is here, Jeannie
17 Marx.  We also have present but not on the video our
18 paralegal, Shelley Marx.
19         MR. UNDERWOOD:  My name is Brian
20 Underwood of BCLP here on behalf of defendant, BAMS,
21 as well as the witness.
22         Additionally, Sheila, I'll let you
23 introduce yourself.
24         Sheila, we can't hear your audio.
25         MS. LAFFERTY:  I had my mic up.  Can

Page 7

1  you hear me now?
2          MR. UNDERWOOD:  Yes.
3          MS. LAFFERTY:  Yes.  Sheila Lafferty,
4  corporate representative for the defendant.
5          THE REPORTER:  Thank you.  Hearing
6  no --
7          MR. UNDERWOOD:  David Ades, witness.
8          THE REPORTER:  I'm sorry.
9          MR. ADES:  That's okay.  David Ades,
10 witness.
11         THE REPORTER:  Thank you.  Hearing no
12 objection, I will now swear in the witness.
13         Please raise your right hand and state
14 and spell your first and last name.
15         MR. ADES:  David, D-A-V-I-D.  Last name
16 Ades, A-D-E-S.
17 WHEREUPON,
18            DAVID ADES,
19 called as a witness and having been first duly sworn
20 to tell the truth, the whole truth, and nothing but
21 the truth, was examined and testified as follows:
22         THE REPORTER:  Thank you, Mr. Ades.
23         Mr. Marx, you may proceed when ready.
24         MR. MARX:  Thank you.
25 //

Page 8

1              EXAMINATION
2  BY MR. MARX:
3     Q   Mr. Ades, my name is Robert Marx.  I'm an
4  attorney as you heard with Marx & Marx.  We represent
5  Eric Slawin, the plaintiff in this case.  First of
6  all, I want to thank you for agreeing to participate
7  via remote Zoom deposition.
8          My purpose here today is to ask some
9  questions, see what the answers are.  My purpose here
10 today is not to trick you or trap you.  If you don't
11 understand a question at any time, I'll be happy to
12 rephrase it.  If you do answer a question, I will
13 assume that you understood it.  Do you understand
14 that?
15    A   Yes, sir.
16    Q   And are you okay with that?
17    A   Yes, sir.
18    Q   Okay.  Is there any medical or physical
19 reason why you cannot give testimony today?
20    A   No, sir.
21    Q   Are you taking any prescription or over-the-
22 counter medications that might affect your ability to
23 listen to and understand my questions and give answers
24 to them?
25    A   No, sir.

Page 9

1     Q   Thank you.  Can I get your address for the
2  record, please?
3     A   1976 Lapad Court, Mississauga, Ontario,
4  Postal Code L5L 5R1.
5     Q   And you have a telephone number there?
6     A   Yeah.  (416) 725-1008.
7     Q   Are you today represented by counsel?
8     A   Yes.
9     Q   Okay.  Is that Mr. Underwood?
10    A   Yes.
11    Q   Thank you.  Can I get your e-mail?
12    A   Yep.  David Ades, the number 500, at
13 gmail.com.
14    Q   Thank you.  When did you first -- to your
15 understanding, when were you first represented by
16 Mr. Underwood?  I'm not interested in any
17 conversations you might have had.  That's privileged.
18 I just would like to know when to your understanding
19 that representation began?
20    A   With Mr. Underwood specifically?
21    Q   With Mr. Underwood's firm, which I
22 understand to be Bryan Cave.
23    A   I've only met Mr. Underwood or spoken to
24 Mr. Underwood in the last couple weeks.  But I did
25 have a conversation with the firm, I guess, a few

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 5 of 9

David Ades                                July 29, 2024
Slawin, Eric  Vs. Banc Of America Merchant Services, Et Al.

Page 26

1  Q  And then how long were you in that position?
2  A  I -- I don't know exactly.  I joined BAMS in
3  May of 2014.  And through that period -- in May of
4  2014, and I -- I've received some promotions in the
5  six years that I was there.  And I -- I can't tell you
6  exactly when I had that last position.
7  Q  Okay.  All right.  Now, do you have an
8  understanding of the joint venture relationship among
9  BAMS, Bank of America, and First Data Corporation?
10 A  Yes.
11 Q  And what is that understanding
12 A  First Data/Fiserv had 51 percent majority
13 ownership, and the bank had 49 percent.
14 Q  When you say "the bank," which bank are you
15 referring to?
16 A  Bank -- Bank of America.
17 Q  Okay.  And what is the basis of that
18 understanding?
19 A  What is the basis of that -- of that
20 understanding?
21 Q  Or how did you come to that understanding?
22 Someone tell you that?  Did you see any documents?
23 A  I was both told and I saw documents.
24 Q  Who told you?
25 A  Our chief legal officer.

Page 27

1  Q  Okay.  And what documents did you see?
2  A  I think I -- I believe it was a shareholder
3  agreement.
4  Q  Okay.  Were you at all involved in the idea
5  to create the joint venture?
6  A  No.
7  Q  Okay.  Do you have an understanding as to
8  whether there was an operational relationship between
9  First Data, Bank of America Corporation, and BAMS?
10     MR. UNDERWOOD:  Object to form.
11 A  Yes.
12 Q  And what's that understanding?
13 A  So First Data provided services to BAMS.
14 Q  Okay.  And what services did First Data
15 provide to BAMS?
16 A  A whole variety of services.  Card
17 processing, chargebacks, fraud prevention, platforms,
18 technology, client service.
19 Q  And to your understanding, did Bank of
20 America have any operational role in the joint
21 venture?
22 A  Bank of America did not have any operational
23 role.
24 Q  Now, did BAMS ever do any chargebacks?
25 A  BAMS did not do chargebacks.

Page 28

1  Q  Was BAMS ever involved in processing any
2  chargebacks?
3  A  BAMS was not involved in processing
4  chargebacks.
5  Q  Okay.  Now, you described your job title as
6  executive vice president, general manager, and head of
7  sales North America.  Is that right?
8  A  That is correct.
9  Q  Okay.  Is that three different job titles or
10 is --
11 A  That was the job title.
12 Q  Okay.  What were the job functions?
13 A  Head of sales, general management.
14 Q  What did you do as general management?
15 A  I managed the -- our -- our account
16 management team.
17     MR. MARX:  Shelley, I'm going to send
18 it to you.
19 BY MR. MARX:
20 Q  Okay.  Before we do that, now, Mr. Ades, you
21 said you looked at some e-mails in preparation for
22 today's deposition.  Is that right?
23 A  That's what I said.  Yes.
24 Q  Okay.  And was one of those an e-mail that
25 you sent in or about June of 2017?

Page 29

1  A  Yes.
2  Q  Okay.  Now, we're going to be you an exhibit
3  or sharing it, I guess.  We're doing the shared
4  screen.
5     Yeah, so the procedure is as follows.  When
6  we put an exhibit up on the share screen, you'll tell
7  our paralegal, Shelley, to move it around as you like.
8     And I'm going to sit here waiting until you
9  actually say "I'm ready to answer questions" so
10 there's no confusion as to you're ready.  And some
11 cases if you're done with a page, I misunderstand, and
12 I start jumping in.
13     So we're going to show you what we've marked
14 as Exhibit 16, put it on the share screen.
15     (Exhibit 16 was marked for
16     identification.)
17     And then let me know when you're ready to
18 answer questions.
19 A  Okay.  We can go to the next.  Yep.
20    Okay.  I'm ready.
21 Q  Thank you.  And for the record, Exhibit 16
22 is a two-page document produced by Defendant bearing
23 Bates numbers 1820 through 1821.
24    Now, is this an e-mail chain that you were
25 involved in, Mr. Ades?

8 (Pages 26 - 29)

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 6 of 9

David Ades                                            July 29, 2024
Slawin, Eric  Vs. Banc Of America Merchant Services, Et Al.

Page 30

1  A  Yes.
2  Q  Okay. And so like most e-mail chains, the
3  prior in time e-mail would be the one starting on the
4  bottom of 1820. Is that right?
5  A  That would be correct.
6  Q  Okay. And that goes onto the next page,
7  1821. Correct?
8  A  Correct.
9  Q  Okay. And that's an e-mail that you sent.
10 Right?
11 A  That is correct.
12 Q  And you sent that in the normal course of
13 business. Right?
14 A  That is correct.
15 Q  Okay. And so is that an e-mail that you
16 sent on, as it stated, June 13, 2017?
17 A  That's what it says.
18 Q  Okay. At the second page, your name is
19 typed. You didn't actually sign, but that is the
20 electronic version of your signature. Correct?
21 A  That's correct.
22 Q  Okay. Why did you send this?
23 A  Beg your pardon?
24 Q  Why did you send this e-mail?
25 A  Why did I send this e-mail?

Page 31

1  Q  Yes.
2  A  Because I had had a meeting with Ali Davis
3  for some information that was related to me. And then
4  that information that was related to me caused me to
5  send this e-mail to my staff or to three of my leaders
6  to get to the root cause of the problem that was
7  identified to me.
8  Q  And what was that information that was
9  related to you by Ms. Davis?
10 A  That our client services team were sending
11 PAN data, which is personal account number data, in
12 the clear, unencrypted to clients to help them manage
13 their chargebacks.
14 Q  Is PAN data also known as primary account
15 number?
16 A  Primary account number. That's correct.
17 Q  All right. And the second paragraph of your
18 e-mail, the second sentence you wrote "We - BAMS don't
19 want to go the route of PCI compliance as it would be
20 a very costly and time-consuming exercise." You see
21 that?
22 A  Yes.
23 Q  And you wrote that. Right?
24 A  I did.
25 Q  Okay. So at the time that you wrote that,

Page 32

1  BAMS was not PCI compliant. Correct?
2      MR. UNDERWOOD: Object to form.
3  A  BAMS -- BAMS was not PCI compliant as it was
4  made -- as I was made aware of by Ali Davis. Correct.
5  Q  Okay. So we're clear, as of June 13, 2017,
6  your understanding was that BAMS was not PCI
7  compliant. Correct?
8      MR. UNDERWOOD: Object to form.
9  A  Correct.
10 Q  All right. I'd like to see if we can flesh
11 out. This last sentence on that first paragraph, you
12 wrote "Merchant calls in and request info on a
13 chargeback et cetera, and our client support team
14 sends the merch" -- I guess that's merchant -- "full
15 PAN data and not always via secure e-mail."
16     Describe for me that process as you
17 understood it when you wrote this.
18 A  It was brought to my knowledge that if one
19 of our merchants called into our client service
20 centers, spoke to one of our team members, and asked
21 about a particular chargeback that they were -- had
22 inquiries about, that our client service team member
23 was providing the actual primary account number
24 unencrypted and sometimes e-mailed it to them
25 unencrypted.

Page 33

1  Q  Okay. So to that extent, would it be
2  correct to say that BAMS was involved in chargebacks?
3      MR. UNDERWOOD: Object to form.
4  A  No.
5  Q  No. Okay. Now, the transmission of full
6  PAN data by BAMS unencrypted, that was in response to
7  an inquiry about a chargeback. Is that right?
8      MR. UNDERWOOD: Object to form.
9  A  From my understanding.
10 Q  Okay. Now, you sent this e-mail to Natasha
11 Collins, Brian Glynn, and Monica Kennedy?
12 A  Correct.
13 Q  What was Natasha Collins's job title at the
14 time?
15 A  She was vice president of sales operations,
16 I believe.
17 Q  Okay. Did she report to you?
18 A  She did.
19 Q  Okay. And Brian Glynn, what was his job
20 title?
21 A  I believe he was senior vice president of
22 account management.
23 Q  Did he report to you?
24 A  He did.
25 Q  And Monica Kennedy, what was her job title?

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 7 of 9

David Ades                                    July 29, 2024
Slawin, Eric  Vs. Banc Of America Merchant Services, Et Al.

Page 90

1  somebody had sent you or that you might have sent
2  somebody else, how would you go about doing that?
3      A   I guess I would have to go to my IT
4  department.
5      Q   Okay.  Do you know who was the head of the
6  IT department?
7      A   Well, we didn't have a head of it 'cause the
8  IT was provided by First Data.
9      Q   And do you know if the IMs were kept on a
10 server?
11     A   I mean, I'm -- I can only assume that they
12 would be.
13     Q   Do you know whether BAMS used Skype as the
14 program for sending or receiving IMs?
15     A   We did not use Skype.
16     Q   Okay.  Do you know who you did use or BAMS
17 did use?
18     A   I don't recall.
19     Q   Okay.  And why would you assume that the IMs
20 would be kept on a server?
21         MR. UNDERWOOD:  Objection.  Form.
22     A   General -- general practice, e-mails and IMs
23 are -- are stored on servers.
24         MR. MARX:  Can we take five minutes,
25 please?

Page 91

1          THE WITNESS:  Yep.
2          MR. UNDERWOOD:  Sure.
3          THE VIDEOGRAPHER:  We're off the record
4  at 1:41 p.m.
5          (Off the record.)
6          THE VIDEOGRAPHER:  Going back on the
7  record at 1:44 p.m.
8          MR. MARX:  Okay.  Mr. Underwood --
9  What is it?
10         Okay.  On this -- and we'll be happy to
11 talk about it after the break.  I just want this on
12 the record.  Pursuant to the witness's testimony today
13 regarding Exhibit 65, which is the -- oh, sorry, 64,
14 which is the Chevron MSA, where he testified that he
15 did sign as an original signature for page 25, I'd
16 like to have a discussion with you.
17         After we can explore to see if we can
18 find where that is because we didn't -- we got one
19 that was unsigned as you see.  We are going to -- and
20 I don't expect you to agree with it.  I just want to
21 make our position clear.  We're going to leave this
22 deposition open subject to the direction at the
23 earlier part of this deposition and the open issue of
24 the redactions.
25         I have no further questions at this

Page 92

1  time.
2          MR. UNDERWOOD:  And, Robert, certainly
3  happy to discuss those issues with you after the
4  deposition.  I don't believe the witness represented
5  whether a signed copy of that particular page exists
6  or not, but we're certainly happy to look at it.
7          MR. MARX:  Okay.  I appreciate that.
8          MR. UNDERWOOD:  I do have a few
9  questions.
10         MR. MARX:  Sorry.
11         MR. UNDERWOOD:  No.  No problem at all.
12 I do have a few follow-up questions for the witness.
13              EXAMINATION
14 BY MR. UNDERWOOD:
15     Q   First, Mr. Ades, you talked a little bit
16 about -- with Mr. Marx about IMs.  Do you recall
17 BAMS's retention schedule for instant messaging?
18     A   I do not.
19     Q   So if you were to be asked whether the
20 retention schedule was 30 days or 3 years, you
21 wouldn't know one way or the other?
22     A   No clue.
23         MR. UNDERWOOD:  Robert, can I impose on
24 you all since it was your exhibit to put back 16 on
25 the screen?  I've got a few questions to follow up

Page 93

1  with the witness about that.
2          MR. MARX:  All right.  All right.  All
3  right.  Shelley will do it.
4          MR. UNDERWOOD:  Thank you.  I
5  appreciate the courtesy.
6          MR. MARX:  Sure.
7          MR. UNDERWOOD:  Shelley, please scroll
8  down to Mr. Ades's e-mail at the end if you don't
9  mind.  Thank you so much.
10 BY MR. UNDERWOOD:
11     Q   Now, Mr. Ades, I know we've talked about
12 this e-mail a lot today, and I know you've probably
13 answered this question already.  But can you remind me
14 what does SIAI mean in the subject line?
15     A   Self-identified audit issue.
16     Q   Were you familiar with the general process
17 for handling self-identified audit issues at BAMS?
18     A   Yes.
19     Q   Were you familiar with the reasons BAMS had
20 a process for self-identified audit issues?
21     A   Yep.  It was part of our audit culture of
22 accountability.
23     Q   Talk to me a little bit about that culture.
24     A   We had a --
25         MR. MARX:  Object to the form of the

24 (Pages 90 - 93)

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 8 of 9

David Ades
July 29, 2024
Slawin, Eric Vs. Banc Of America Merchant Services, Et Al.

Page 94

1  question.
2          You can answer.
3          THE WITNESS: We -- we had a culture
4  of -- of accountability specifically --
5          MR. UNDERWOOD: I believe we have lost
6  the witness.
7          THE WITNESS: I'm back.
8  BY MR. UNDERWOOD:
9     Q   Okay.
10    A   We had culture of accountability. We
11 cover -- we carried the Bank of America name, so we
12 were held to a pretty high standard by the bank. We
13 had our own internal audit processes. We had the
14 bank's audit processes. And we had First Data's audit
15 processes. And so it was an environment in which, you
16 know, accountability and ensuring strong business
17 practices was highly encouraged.
18    Q   Did BAMS encourage its employees to self-
19 identify issues?
20         MR. MARX: Object to the form of the
21 question.
22    A   Yes. Yes.
23    Q   Why did BAMS encourage employees to self-
24 identify issues?
25         MR. MARX: Object to form of the

Page 95

1  question
2     A   Because the -- you know, the executive team
3  felt it was important that the -- not just the
4  leadership but the team members would be --
5  would -- would look for opportunities to improve
6  any -- any business processes that we had in place.
7     Q   Are you aware of any instances in which a
8  BAMS -- excuse me. Let me rephrase that question.
9          Are you aware of any instances in which BAMS
10 punished an employee for self-identifying an issue?
11    A   Never.
12    Q   Now, looking at your e-mail, Mr. Ades, it
13 says "They strongly suggest we should self-identify
14 this issue." Did I read that correctly?
15    A   Yes.
16    Q   And does "they" refer to Ali Davis and her
17 team?
18    A   Yes.
19    Q   Now, when you say "They strongly suggest we
20 should self-identify the issue," what do you mean?
21    A   Well, when -- when what I spoke to Ali Davis
22 about it, at the time it was we've uncovered this. We
23 encourage you to -- to look into this and then self-
24 identify. They could have reported as an audit issue,
25 or we could have through self-identification. And the

Page 96

1  discussion what I had with Ali at the time was that we
2  should do the reporting of the issue, i.e., my team.
3     Q   Did they explain to you why they suggested
4  self-identifying the issue?
5          MR. MARX: Object to the form of the
6  question.
7     A   I don't -- I don't recollect the specific
8  reasons why. But, again, it was -- it was part of our
9  culture and practice.
10    Q   Did you agree with their suggestion to self-
11 identify the issue?
12         MR. MARX: Object to the form of the
13 question.
14    A   Yes. I did.
15    Q   Why did you agree?
16    A   Because I felt it was the right thing to do.
17    Q   Okay. Turning to the next sentence, I think
18 Mr. Marx asked you about this. Says "We, BAMS, don't
19 want to go the route of PCI compliance as it would be
20 a very costly and time-consuming exercise." Did I
21 read that right?
22    A   Yes. You did.
23    Q   What did you mean in that sentence?
24    A   What I meant, it would be a very onerous
25 exercise. It would be time consuming. It -- it would

Page 97

1  require resources and, you know, eventually money
2  spent when we had other options. So that's why I
3  suggested in my options that we don't go the PCI --
4  self PCI route and look to other options, which is
5  using our -- our provider, which happened to be First
6  Data at the time.
7     Q   Sure. And you jumped ahead a little bit,
8  but you mentioned that there are other options to PCI
9  compliance. And I want to make sure I understand
10 that. When you say there are other options to PCI
11 compliance, what do you mean?
12    A   So what I -- what I meant there is we
13 wouldn't continue the practice of having merchants
14 call our teams directly to have access to their
15 chargeback information. So we would have to stop that
16 practice because we didn't want to continue to send
17 PAN data in the open.
18         And so the options would be to have our --
19 our clients, instead of coming into us, into our teams
20 and accessing that data, we would redirect them to
21 First Data, which we knew would be PCI compliant.
22    Q   And I believe with Mr. Marx you said -- you
23 expressed concerns that that wouldn't be a great
24 client experience. Correct?
25    A   Yep. I was concerned about potential

25 (Pages 94 - 97)

Case 1:19-cv-04129-AT   Document 176-5   Filed 01/08/25   Page 9 of 9

David Ades                                                    July 29, 2024
Slawin, Eric Vs. Banc Of America Merchant Services, Et Al.

Page 98

1 quality of service again because they weren't our
2 direct employees.
3    Q   Were there other options to redirecting the
4 service to First Data?
5    A   I mean, the other options --
6         MR. MARX:  Object to the form of the
7 question.
8    A   The other option would be just to not
9 prevent -- not to provide this service to our clients,
10 I guess, would be another option
11    Q   Of the options that were available to
12 addressing the issue, would you have wanted to keep
13 any of those options confidential?
14         MR. MARX:  Object to the form of the
15 question.
16    A   Confidential internally?  Externally?
17 Where -- where do you --
18         MR. MARX:  Object to the form of the
19 question.
20 BY MR. UNDERWOOD:
21    Q   That's a good clarification.  Would you have
22 wanted to keep any of these options confidential among
23 other BAMS employees?
24         MR. MARX:  Object to form of the
25 question.

Page 99

1    A   No.  No.
2    Q   There at the end of your sentence or at the
3 very end of that last paragraph, you asked the
4 question "If we go this route, we can reduce head
5 count to fund, seeing as these requests will lighten
6 the loads on our teams?"  Did I read that correctly?
7    A   Yes.
8    Q   Did you want to -- I'll back up.  In
9 resolving or in choosing these issues, did you want
10 BAMS employees to be aware that reducing headcount was
11 one of the options?
12         MR. MARX:  Object to the form of the
13 question.
14    A   Reducing headcount discussion would've been
15 kept at a -- at a management level.
16    Q   Why is that?
17         MR. MARX:  Object to the form of the
18 question.
19    A   Well, until we had certainty in terms of,
20 you know, any potential ramifications in -- in
21 reducing headcount, we would have to make sure that
22 we're doing it in -- in collaboration with both our HR
23 teams and our legal teams to ensure that we were
24 doing -- you know, handling those discussions
25 properly.

Page 100

1 So you'd have to check all those boxes
2 before you'd have a conversation about, you know, any
3 kind of headcount reduction.
4    Q   During this paragraph at the end of your e-
5 mail, were you suggesting that BAMS should conceal the
6 PCI related issue?
7         MR. MARX:  Object to the form of the
8 question.
9    A   Absolutely not.
10    Q   Were you suggesting that BAM should ignore
11 the issue to save time and cost?
12         MR. MARX:  Objection the form of the
13 question.
14    A   Absolutely not.
15    Q   Were you suggesting that Ali Davis and her
16 team were wrong to suggest self-identifying the issue?
17         MR. MARX:  Object to the form of the
18 question.
19    A   Absolutely not.
20    Q   Okay.
21         MR. UNDERWOOD:  Thank you, Shelley.
22 You can take this one down a few more.
23 BY MR. UNDERWOOD:
24    Q   Just a few more questions, Mr. Ades.  We had
25 some discussions at the beginning of this regarding

Page 101

1 your representation.
2    Q   Do you recall conversations with a former
3 attorney at my firm named Aiten McPherson?
4    A   Sorry.  What was the name again?
5    Q   Aiten McPherson.
6    A   I -- I don't recall that specific name.
7    Q   Do you recall discussions with an attorney
8 or other attorneys at my firm in 2023?
9    A   Yes.
10    Q   And those were conversations when your
11 deposition in this case was originally scheduled.
12 Right?
13         MR. MARX:  Objection the form of the
14 question.
15    A   Correct.  Correct.
16    Q   Sorry.  Let me rephrase it to fix the
17 objection.  When were those conversations?
18    A   Sometime in 2023.
19    Q   What were they related to?
20    A   To this lawsuit.
21    Q   As it pertains -- did it pertain to your
22 role in the lawsuit?
23    A   It did.
24    Q   Was your deposition scheduled at the time?
25    A   I don't believe it was.