# EXHIBIT 36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| ERIC SLAWIN,<br><br>     Plaintiff,<br><br>v.<br><br>BANC OF AMERICA MERCHANT<br>SERVICES, LLC, s/h/a BANK OF<br>AMERICA MERCHANT SERVICES,<br><br>     Defendant. | Civil Action File<br>Case No. 1:19-cv-04129-AT |

## DECLARATION OF ALLISON DAVIS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Allison Davis, declare:

1.      I am over the age of twenty-one, and of sound mind, and am fully competent to make this Declaration.

2.      I have personal knowledge of the information set forth in this Declaration.

3.      I worked for Banc of America Merchant Services ("BAMS") from 2010 to 2020, before which I worked in the merchant group at Bank of America 2009.  In my final role at BAMS, and during 2017, I served as Senior Vice President, Risk and Compliance.

4.      At least as of January 2017, BAMS identified potential instances in which BAMS personnel were accessing or transmitting unencrypted full Primary Account Number ("PAN") data through the data loss prevention ("DLP") process

1

managed by Joe Moll ("Moll"). Such findings came about during normal course reviews, which were intended to capture potential data loss and compliance issues.

5.     The accessing or transmitting of unencrypted full PAN data by BAMS personnel would potentially require BAMS to be Payment Card Industry ("PCI") Data Security Standard ("DSS") compliant.

6.     The accessing or transmitting of unencrypted full PAN data was outside of the expectations for BAMS personnel.

7.     Instead, it was expected that BAMS personnel would not access or transmit full PAN data, such that PCI DSS would not be applicable and BAMS would not be required to certify its compliance with the same.

8.     Moll informed me of the DLP findings concerning the use of PAN data by BAMS employees.

9.     I oversaw the Information Security Product Governance Group in the Risk Department.

10.    I informed BAMS's Chief Risk Officer Tom Fontana ("Fontana") of the issues identified by Moll concerning the use of PAN data by BAMS employees.

11.    The population of BAMS employees attempting to transmit full PAN data included members of David Ades's ("Ades") team.

2

12.   In June 2017, Moll and I had a call with Ades to discuss issues related to members of Ades's team with access to process, transmit or store full PAN data.

13.   On the call, I recommended that the accessing, storing or transmitting of unencrypted full PAN data by Ades's team be self-identified as an audit issue.

14.   A self-identified audit issue ("SIAI") is a potential issue identified by the owner of the activity and investigated internally by BAMS for assessing the scope of the issue, identifying and implementing appropriate remediation, and ultimately reporting to external or third-party auditors or regulators during an audit or similar evaluation. Every SIAI was decisioned and either accepted or rejected as a formally tracked and managed issue. It was not uncommon for SIAIs to be treated as confidential until the issue was fully assessed and appropriate remediation was determined such that it could be disseminated more broadly within BAMS.

15.   BAMS personnel were encouraged to self-identify issues as part of their job, and annual performance goals of a number of BAMS employees, including me, included a ratio for the number of self-identified audit issues raised by the employee versus issues raised by other internal and external auditors. BAMS personnel were never punished for self-identifying issues.

3

16.     One possible form of remediation of the issue of BAMS employees accessing, storing or transmitting full PAN data included allowing the use and transmission of full PAN data to continue, in which case BAMS would potentially be required to become PCI compliant, which in turn would be costly and time-consuming.

17.     Another possible form of remediation of the issue of BAMS employees accessing, storing or transmitting full PAN data was to revise internal processes such that BAMS employees would no longer use or transmit full PAN data, in which case BAMS would not need to become PCI compliant.  A revision of internal processes may have resulted in the need to reduce the employment of a number of BAMS employees on certain teams given the job tasks using full PAN data would be need to be performed outside of BAMS.

18.     It was decided that members of Ades's team would work with me to initiate the SIAI to ensure Ades's team developed new requirements around the handling of PAN data so as not to require PCI compliance, specifically by bringing the processes of Ades's team within their initially designed scope.  The SIAI itself was to be prepared by Eric Slawin.

19.     Plaintiff Eric Slawin failed to finalize the draft SIAI by the time of his termination.

4

20. The SIAI related to the use of PAN data by Ades's team continued after Slawin's termination.

21. An initial draft of the SIAI related to the use of PAN data by Ades's team was prepared by Mark Kendall on December 15, 2017.

22. The issue identified by the SIAI was accepted on January 26, 2018. The action plan identified by the SIAI was accepted on February 28, 2018. The SIAI for Ades's group was closed on December 19, 2018.

23. At the same time as the SIAI for Ades's group, other SIAIs for other groups within BAMS were opened regarding the handling of PAN data by BAMS employees. For example, there was an SIAI for the processing of PAN data by BAMS contact centers. In addition, there was an SIAI for the processing of PAN data by the BAMS settlement exceptions team.

24. I am unaware of anyone working on any of the PAN data SIAIs being terminated from BAMS due to their work on the same; moreover, aside from Slawin, I am unaware of any such individuals (i.e., individuals working on the PAN data SIAIs) being terminated from BAMS for any reason. For example, I was not terminated, and neither was Moll.

25. PCI DSS are set forth by the PCI Security Standards Council and governed by the card brand networks (Visa and MasterCard), not government

requirements. Instead, entities operating in the payment industry agree to comply with PCI DSS through various contractual agreements.

26.    A person working within the payment processing or financial industries could not reasonably believe PCI DSS are government requirements.

27.    A person working within the payment processing or financial industries could not reasonably believe that the failure to be compliant with PCI DSS is fraud or somehow illegal.

28.    A person working within the payment processing or financial industries could not reasonably believe that the failure to disclose any noncompliance with PCI DSS is fraud or somehow illegal; instead, such a person would instead understand that any disclosure obligation would be governed by a contractual relationship, and that the failure to meet that obligation is a breach of said contract.

29.    Slawin did not express any concerns to me that he believed BAMS was engaged in fraudulent conduct; that BAMS was defrauding its customers; that BAMS was engaged in conduct that violated Sarbanes-Oxley, the Consumer Financial Protection Act, or the Dodd-Frank Act; or that Slawin was being placed in an inappropriate position by his managers.

30.    I did not have any role in the termination of Slawin's employment at BAMS.

31.    I did not make or recommend the decision to terminate Slawin's employment at BAMS.

FURTHER Declarant sayeth not,

I declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Executed this ___ day of January , 2025.

_____
Allison Davis