# EXHIBIT 37

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| ERIC SLAWIN,<br><br>    Plaintiff,<br><br>v.<br><br>BANC OF AMERICA MERCHANT SERVICES, LLC, s/h/a BANK OF AMERICA MERCHANT SERVICES,<br><br>    Defendant. | Civil Action File<br>Case No. 1:19-cv-04129-AT |

**DECLARATION OF NATASHA COLLINS IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Natasha Collins, declare:

1. I am over the age of twenty-one, and of sound mind, and am fully competent to make this Declaration.

2. I worked for Banc of America Merchant Services ("BAMS") from October 2010 to June 2020.

3. I was one of the managers of Plaintiff Eric Slawin ("Slawin") during his employment at BAMS. Slawin's job title while at BAMS was Vice President, Operations Control Officer. Slawin's job and position required that he appropriately handle proprietary, confidential, and/or sensitive information.

4. On June 13, 2017, David Ades sent an email to Brian Glynn, Monica Kennedy, and me regarding a discussion he had with Ali Davis and her team regarding the use of full primary account number ("PAN") data by Ades's team. His email discusses potential options for remediating the issue. A true and correct copy of this June 13, 2017 email was introduced during my deposition as Plaintiff's Exhibit 16.

5. One possible form of remediation included allowing the use and transmission of full PAN data to continue, in which case BAMS would potentially be required to become PCI compliant, which in turn would be costly and time-consuming.

6. Another possible form of remediation was to revise internal processes such that BAMS employees would no longer use or transmit full PAN data, in which case BAMS would not need to become PCI compliant.

7. A revision of internal processes may have resulted in the need to terminate the employment of a number of BAMS employees on certain teams. As a result, it was important to keep the SIAI confidential to the team discussing and investigating the issue so as not to raise unwarranted concerns within the workforce prior to any final decisions on direction being made.

8. It was decided that members of Ades's team would work with Davis to initiate a self-identified audit issue ("SIAI") to ensure Ades's team developed new requirements around the handling of PAN data so as not to require a new level of

9. On June 13, 2017, I tasked Slawin with initiating the SIAI.

10. Slawin did not timely initiate the SIAI related to the use of PAN data by Ades's team.

11. Slawin's delay in initiating the SIAI caused a corresponding delay in BAMS's ability to fully assess and remediate issues related to the use of PAN data by Ades's team.

12. In fact, as of September 2017, there were four issues from the start of 2017 or earlier that Slawin had failed to timely resolve and that remained open.

13. On September 26, 2017, I provided a coaching form to Slawin.

14. The coaching form was provided to Slawin due to his failure to timely complete tasks and meet deadlines.

15. The coaching form noted Slawin's failure to timely develop and submit audit and remediation plans, his failure to adequately follow up to ensure the remediation plan was being implemented in a timely fashion, and his failure to provide reporting on status or to escalate challenges unless requested to do so.

16. Slawin failed to finalize the draft SIAI by the time of his termination.

17. I am unaware of anyone working on any of the PAN data SIAIs being terminated from BAMS due to their work on the same; moreover, aside from Slawin, I am unaware of any such individuals being terminated from BAMS for any reason.

18. In the course of this litigation, I provided a verification for certain interrogatory responses from BAMS. I am unaware of providing any other "verification" in connection with this litigation.

19. I did not have any role in the termination of Slawin's employment at BAMS.

20. I did not make or recommend the decision to terminate Slawin's employment at BAMs.

21. Merchants occasionally submitted questionnaires regarding data security, including PCI compliance, to BAMS pursuant to their contractual agreements.

22. Slawin had a role in responding to client questionnaires regarding PCI compliance.

23. Slawin's role with to merchant questionnaires was to define a process for handling those requests, respond to questions where he was able, and to work with others to answer any remaining questions so that the completed questionnaire could be returned to the clients.

24. First Data Merchant Services ("FDMS") was the intended service provider responsible for processing merchant transactions and thus maintained PCI compliance for itself, its systems (on which BAMS conducted business), and its services.

25. In response to merchant questionnaires, BAMS disclosed FDMS's role as the service provider and providing information concerning FDMS's PCI compliance, including the then-current attestation of compliance for FDMS. Slawin, in his role regarding responding to merchant questionnaires, was familiar with BAMS responding to merchant questionnaires in this manner.

26. I am unaware of any instance in which BAMS responded to a merchant questionnaire by affirmatively representing that it maintained an independent certification of its own PCI compliance.

FURTHER Declarant sayeth not,

I declare pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct.

Executed this 8th day of January, 2025.

*Natasha Collins*
Natasha Collins

5