# EXHIBIT 44

**BANK OF AMERICA MERCHANT SERVICES**
**MERCHANT PROCESSING AGREEMENT**
**(GOVERNMENT)**

**STATE OF DELAWARE, OFFICE OF THE STATE TREASURER**

| | |
|---|---|
| CUSTOMER's Legal Name | Doing Business As |

| | | | |
|---|---|---|---|
| **820 SILVER LAKE BLVD, SUITE 100** | **DOVER** | **DE** | **19904** |
| Street Address | City | State | Zip Code |

| | | | |
|---|---|---|---|
| **N/A** | **DE** | | **516000279** |
| CUSTOMER's business organization type (corporation, LLC, partnership, non-profit or other entity) | State of Organization | | Taxpayer Identification Number |

| | |
|---|---|
| **Office of the State Treasurer, Banking Services Manager** | **(302) 739-5635** |
| Recipient/Title For Notices | Facsimile Number |

This MERCHANT PROCESSING AGREEMENT ("Agreement") is entered into by and among the undersigned customer ("CUSTOMER"), and on behalf of Agencies (defined below) as further described below, BANK OF AMERICA, NA ("BANK") and BANC OF AMERICA MERCHANT SERVICES, LLC ("BAMS") and, together with BANK and any other third party providers who enter into Supplements to this Agreement in order to perform services hereunder, (collectively "SERVICERS") for the Services described herein. Unless otherwise specified in this Agreement, (a) each SERVICER'S obligations under this Agreement shall be joint, but not several, and (b) each SERVICER shall have separate but equal rights against the CUSTOMER.

This Agreement governs processing services regarding credit, debit and certain other Card transactions and other services, as those services are further described in this Agreement, the Fee Schedule attached hereto as Schedule A (including any additions and changes thereto, the "Fee Schedule"), any and all concurrent and subsequent addenda, supplements or schedules to this Agreement (each, including the Fee Schedule, as amended from time to time, a "Supplement"), and the Card Organization Rules, all as elected by CUSTOMER and approved by SERVICERS (for the purposes of this Agreement, collectively, the "Services"). Unless otherwise expressly provided in this Agreement or any Supplement, (i) references to each Supplement shall be deemed to include this Agreement and (ii) references to this Agreement shall be deemed to include each Supplement. To the extent the terms of a Supplement directly conflict with the terms of this Agreement, the terms of that Supplement shall control.

The intent of this Agreement is to provide one set of standardized general terms and conditions to be utilized by (i) CUSTOMER, (ii) CUSTOMER on behalf of Agencies, and (iii) each Non-Agency (defined below) that executes a Participation Agreement as further described below, with respect to each such entity's receipt of the Services. CUSTOMER represents and warrants to SERVICERS that it has the necessary power and authority under the laws of the State of Delaware to enter into this Agreement on behalf of Agencies as described herein. CUSTOMER acknowledges and agrees that SERVICERS may provide a copy of this Agreement to Agencies and Non-Agencies.

All Agencies as defined herein and as determined from time to time by the CUSTOMER are part of the State of Delaware and, are not separate legal entities for the limited purpose of this Agreement, and as such will not be required to enter into Participation Agreements; provided that CUSTOMER is responsible and liable to SERVICERS for each Agency's compliance with the terms and conditions of this Agreement (including payment obligations). CUSTOMER is solely responsible for providing a copy of this Agreement and related materials to participating Agencies, and for communicating with participating Agencies with regard to the terms and conditions of this Agreement. SERVICERS may terminate any individual Agency's receipt of Services under this Agreement for the same reasons that SERVICERS may terminate this Agreement in its entirety.

A Non-Agency, which is defined herein and as determined from time to time by the CUSTOMER, may not receive Services under this Agreement unless and until it has entered into a Participation Agreement substantially in the form attached hereto as Exhibit A, and Non-Agency and SERVICERS have executed such Participation Agreement. Upon complete execution of a Participation Agreement, the Non-Agency that is a party thereto will have all the same rights and obligations that CUSTOMER has under this Agreement as if that Non-Agency had separately entered into this Agreement; provided, however, that (i) SERVICERS may terminate any Participation Agreement for the same reasons as it has to terminate this Agreement and (ii) any amendments to this Agreement will constitute simultaneous and identical amendments to each Participation Agreement. Each Non-Agency will be liable to SERVICERS only with respect to its own receipt of Services under this Agreement; neither CUSTOMER nor any individual Non-Agency will be liable to SERVICERS under this Agreement for any other Non-Agency.

BANK's obligations hereunder shall be limited to the sponsorship and settlement of certain Card transactions submitted in accordance with the terms and conditions of this Agreement and the Card Organization Rules, and BANK shall not have any obligation or liability of any nature in connection with any services of any kind provided by BAMS or BAMS' Affiliates hereunder

PLAINTIFF 000612

or pursuant hereto. In performing this Agreement, without diminishing SERVICERS' obligations to CUSTOMER, SERVICERS may use the services of third parties, including, without limitation, their respective Affiliates.

In consideration of the mutual covenants and agreements set forth herein and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, SERVICERS and CUSTOMER agree as follows:

1. **Definitions.** As used in this Agreement, capitalized terms will have the meaning set forth in Annex 1, the Operating Guide or Card Organization Rules, as applicable.

2. **Services.**
   2.1 During the term of this Agreement, CUSTOMER shall use SERVICERS as its exclusive provider of all Services for CUSTOMER, and CUSTOMER will not, directly or indirectly, offer or promote any other Services.
   2.2 Subject to Card Organization Rules, Services may be performed by BAMS or BANK subject to the agreements between them as the same may be modified from time to time. In addition to SERVICERS, one or more Affiliates of BAMS may assist in providing Terminals or other equipment and local support functions in connection with this Agreement.
   2.3 SERVICERS will make the Services operational and available to CUSTOMER through a mutually agreed upon implementation plan. CUSTOMER agrees to at all times cooperate with SERVICERS and provide SERVICERS with all necessary information and assistance required by SERVICERS to provide the Services in accordance with the Card Organization Rules and Applicable Law, including, without limitation, making changes to Merchant Equipment as SERVICERS require. CUSTOMER will provide SERVICERS with information regarding Agencies and Non-Agencies that SERVICERS may reasonably request from time to time and that CUSTOMER reasonably can obtain, taking into account that CUSTOMER is not responsible for any Non-Agency or Non-Agencies' transactions. CUSTOMER will be responsible for (i) use of the Services by CUSTOMER, Agency, and each Agency's and each Agency's employees and agents and Merchant Providers, (ii) CUSTOMER's and each Agency's failure to properly access the Services in the manner prescribed by SERVICERS, and (iii) CUSTOMER's failure to supply accurate information regarding the Services. SERVICERS will provide the Services in accordance with the Service Level Agreement attached hereto as Exhibit 1.

3. **Election of Cards, Duty to Honor Cards and Use of Marks.**
   3.1 <u>Card Election</u>. CUSTOMER has elected and SERVICERS have approved CUSTOMER to accept those Card types and Services designated in this Agreement or the Supplements. CUSTOMER may change CUSTOMER's election of Card types and Services from time to time upon at least sixty (60) days' advance notice to SERVICERS; SERVICERS will use their reasonable efforts to accommodate CUSTOMER's requests in less than sixty (60) days but SERVICERS will not be obligated to do so. Upon SERVICERS' approval of such new Card type or Service, the parties will execute a Supplement therefor. CUSTOMER will not seek Authorization for or submit a transaction of a new Card type until the parties have entered into a Supplement for it. Unless otherwise directed by SERVICERS, CUSTOMER will not seek Authorization for or submit a Card transaction of a Card type CUSTOMER desires to discontinue accepting later than the effective date of the notice to SERVICERS. With respect to inadvertent or unintentional acceptance of a transaction other than the type or service anticipated for CUSTOMER's account (including, without limitation, a different Card type), CUSTOMER will also be subject to payment to SERVICERS in the amount of their then-current transaction fee(s) with respect to such Card, transaction and/or service and be liable, obligated and responsible under this Agreement to pay for any inadvertent or unintentional acceptance of an unanticipated transaction or service to the same extent as CUSTOMER's obligation to pay for an anticipated Card type or service.

   3.2 <u>Honoring Cards Generally</u>. CUSTOMER will honor a Card by accepting it for payment. CUSTOMER will not engage in any acceptance practice or procedure that discriminates against, or discourages the use of, any particular Card type elected by CUSTOMER and approved by SERVICERS, in favor of any competing Card brand also elected and approved.

   3.3 <u>Cards Issued by US Card Issuers</u>. For all Cards issued by U.S. Issuers, CUSTOMER will honor all Cards within the Card types elected and approved in accordance with this Agreement. For example, if CUSTOMER elects and is approved to accept Visa credit Cards, CUSTOMER will submit payments from Visa-branded credit Card Cardholders without regard to whether the credit Card is a Visa-branded rewards credit Card or Visa-branded business purpose credit Card.

   3.4 <u>Cards Issued by Non-US Card Issuers</u>. CUSTOMER will honor all Cards issued by non-U.S. Issuers. For example, even if CUSTOMER elects to limit CUSTOMER's acceptance of MasterCard Cards to MasterCard credit Cards, CUSTOMER will accept for processing a MasterCard debit Card issued by a non-U.S. Card Issuer.

   3.5 <u>Marks Generally</u>. CUSTOMER and SERVICERS acknowledge that no party will acquire any right, title or interest in or to the Marks of any other party or of any Card Organization or SERVICERS' agents by virtue of this Agreement, without prior written consent. CUSTOMER will not assign to any third party any of the rights to use the Marks of SERVICERS, SERVICERS' agents or Card Organizations.

PLAINTIFF 000613

Except as otherwise provided herein, no party will use any other party's Marks, or use language from which the connection of such Marks may be inferred, in any advertising, written sales promotion, press releases or other publicity matters relating to this Agreement without such party's prior written consent.

**3.6 Special Provisions Regarding Discover Network Processed Cards.** Services provided for transactions made with Discover branded Cards or DNP Card Types (as hereinafter defined) are processed by BAMS and not by BANK. DNP Card Types are Cards branded by Diners Club International®, JCB, China UnionPay, Korea Bank and Credit® or any other Card Organizations subsequently designated by Discover, and each of those Card Organizations is referred to as a "DNP Card Organization". The Services provided, transactions processed and other matters contemplated under this Agreement for Discover Cards and DNP Card Types and DNP Card Organizations are subject to the rest of this Agreement; provided, however, that BANK is not a party to this Agreement insofar as it relates to Services for transactions made with Discover Cards or DNP Card Types, and BANK is not liable to CUSTOMER in any way with respect to such Services.

4. **General Requirements and Restrictions for Card Transactions.**

**4.1 Accuracy of Data Submitted.** CUSTOMER will be responsible for the quality and accuracy of all data provided to SERVICERS. SERVICERS may, at SERVICERS' option, return to CUSTOMER for correction before processing any data submitted by CUSTOMER which is incorrect, illegible or otherwise not in proper form. If CUSTOMER does not provide data in accordance with SERVICERS' specified format and schedule, as such format and schedule are communicated by SERVICERS, SERVICERS will use reasonable efforts to reschedule and process the data as promptly as possible, but related expenses incurred by SERVICERS will be charged to CUSTOMER.

**4.2 Prohibitions on Increasing Price of Goods or Services.** CUSTOMER will not increase the price of goods or services for a Card transaction or impose any fee for the service of accepting a Card except as allowed by the Card Organization Rules and Applicable Law. CUSTOMER may charge a surcharge, convenience fee or service fee for a Card transaction only as permitted by the Card Organization Rules and Applicable Law. If clearly disclosed to the Cardholder, CUSTOMER may offer a discount from the standard price for payments by cash.

**4.3 Payments from Cardholders.** CUSTOMER agrees that CUSTOMER will not accept or process, any funds representing a Cardholder's payment to an Issuer.

**4.4 Prohibition on Aggregating and Factoring and Employee Transactions.** CUSTOMER is prohibited from submitting or presenting, and agrees not to submit or to present, any Authorization requests for transactions and Sales Drafts arising from transactions between (i) CUSTOMER and Cardholders who are CUSTOMER's owners, partners, guarantors, officers or employees, other than genuine purchases, leases or rentals of goods or services from CUSTOMER or other payments to CUSTOMER, all in the ordinary course of CUSTOMER's business, and (ii) Cardholders and third parties for their goods or services or other payments to them.

**4.5 Draft Requirements.** All Sales Drafts and Credit Drafts must include all information required under and in accordance with the Operating Guide, Card Organization Rules and Applicable Law:

**4.6 U.S. Dollars.** Unless otherwise agreed in advance and writing by SERVICERS, CUSTOMER must submit all Card transactions in U.S. dollars.

5. **Operating Guide; Card Organization Rules and Compliance; Order of Precedence.**

CUSTOMER acknowledges that it has received the Operating Guide, the terms of which are incorporated into this Agreement (and attached as Exhibit B); any reference to this Agreement includes the Operating Guide. CUSTOMER agrees to comply with the terms of the Operating Guide, as amended or modified by SERVICERS from time to time. Notwithstanding any provision to the contrary contained in this Agreement, the parties hereto acknowledge and agree that the Operating Guide provides the principals of a sound Card program and contains the relevant subset of the Card Organization Rules. However, the Operating Guide is not a complete set of all Card Organization Rules. If CUSTOMER loses or otherwise misplaces the Operating Guide or notices of changes thereto, CUSTOMER shall be responsible for contacting SERVICERS to obtain replacement copies. From time to time, SERVICERS may change the Operating Guide, in whole or in part, and other operating procedures, by providing CUSTOMER with at least thirty (30) days' prior written notice of the change. However, in the event of changes in the Card Organization Rules or due to security reasons, certain changes in Card procedures may become effective on shorter notice. If there is any conflict between the terms of this Agreement and the Operating Guide, the terms of this Agreement will govern, unless the conflict is directly related to a change in the Operating Guide which specifically addresses a procedure or requirement detailed in this Agreement.

CUSTOMER must comply with the Card Organization Rules and Applicable Law, however, with regard to Card Organization Rules; CUSTOMER need only comply with those applicable to Cards. CUSTOMER will review the Card Organization Rules and Applicable Law from time to time for changes, and is responsible for staying apprised of all applicable changes to the Card Organization Rules and maintaining compliance with the Card Organization Rules. Card Organization Rules are available on web

PLAINTIFF 000614

sites, such as http://www.usa.visa.com/merchants/operations/op_regulations.html, and http://www.mastercardmerchant.com, as those links may be changed from time to time.

If CUSTOMER accepts DNP Card Types, CUSTOMER acknowledges and agrees that transactions made using Cards of DNP Card Organizations will be processed under and subject to Discover Card Organization Rules and the terms of this Agreement applicable to Discover Card acceptance and transactions.

In the event there is a conflict between Applicable Law, the Card Organization Rules, this Agreement and/or the Operating Guide, such documents shall govern in the following order of precedence: 1) Applicable Law; 2) Card Organization Rules; 3) this Agreement; and 4) the Operating Guide, to the extent the conflicting provision in the Operating Guide is not related to a Card Organization Rule.

6.  **Authorization.**
    6.1   CUSTOMER agrees to submit only Card transactions for which CUSTOMER has received an Authorization. Obtaining an Authorization will not ensure payment to CUSTOMER for a Sales Draft. The fact that an Authorization is obtained by CUSTOMER will not affect SERVICERS' rights thereafter to revoke Authorization of a Card transaction or to charge back the transaction to CUSTOMER. In no event will the fact that an Authorization is obtained by CUSTOMER be deemed to be SERVICERS' representation or warranty, either express or implied, that the particular Card transaction is in fact a valid, authorized or undisputed transaction entered into by the Cardholder.
    6.2   The Authorization number provided by SERVICERS shall be noted by CUSTOMER in the appropriate place on the Sales Draft. If Authorization is declined, CUSTOMER shall not complete the Card transaction.
    6.3   CUSTOMER shall comply with any special Authorization procedures contained in the Card Organization Rules and any other sections or parts of this Agreement.
    6.4   CUSTOMER acknowledges that Authorization, (i) indicates only the availability of credit at the time of Authorization; (ii) does not warrant that the person presenting the Card is the rightful Cardholder; and (iii) is not an unconditional promise or guarantee by SERVICERS that any Card transaction will not be subject to Chargeback.
    6.5   If CUSTOMER obtains an Authorization by telephone, CUSTOMER shall record the approval number on the Sales Draft.

7.  **Electronic Commerce Transactions.**
    CUSTOMER acknowledges and agrees that this Section 7 pertains only to ECTs that arise from transactions effected in U. S. dollars. All of CUSTOMER's ECTs must be in U.S. dollars and will be settled in U.S. dollars. Under the Card Organization Rules, ECTs are considered non face-to-face Card transactions. In addition, CUSTOMER must properly identify each ECT in the Sales Draft.

    CUSTOMER agrees to develop and maintain a point of presence on the Internet at CUSTOMER's expense. CUSTOMER must post CUSTOMER's consumer data privacy policy and method of transaction security on CUSTOMER's web site(s) in accordance with the Card Organization Rules and Applicable Law. CUSTOMER will, in accordance with the Card Organization Rules and Applicable Law: (i) install and maintain a working firewall to protect data accessible via the Internet; (ii) keep security patches up to date; (iii) encrypt stored data; (iv) encrypt data sent across networks; (v) use and regularly update anti-virus software; (vi) restrict access to data on a "need to know" basis; (vii) assign a unique ID to each person with computer access to data; (viii) not use vendor-supplied defaults for system passwords and other security parameters; (ix) track access to data by unique ID; (x) regularly test security systems and processes; (xi) maintain a policy that addresses information security for employees and contractors; and (xii) restrict physical access to Cardholder data.

    CUSTOMER's internet web site(s) must contain (a) a complete description of the goods or services offered, (b) CUSTOMER's returned merchandise and refund policy, (c) CUSTOMER's customer service contact information, including e-mail address and/or telephone number, (d) transaction currency, (e) export or legal restrictions (if known), (f) CUSTOMER's delivery policy and (g) CUSTOMER's country of domicile immediately prior to the Cardholder's accessing of payment instructions. In addition, CUSTOMER must disclose, at all points of Cardholder interaction (including any of CUSTOMER's supplier or subcontractor internet web sites and any of CUSTOMER's promotional materials and invoices), to the Cardholder that CUSTOMER, and not any of any CUSTOMER's suppliers of goods or subcontractors for services, is the merchant of record and responsible for any Card transaction. CUSTOMER must also notify the Cardholder that CUSTOMER is responsible for (i) payment transactions, (ii) products and services, (iii) direct customer service, (iv) dispute resolution, and (v) all terms and conditions of the transaction. CUSTOMER must display on CUSTOMER's internet web site(s) the Card Organization Marks, wherever CUSTOMER display payment options, in accordance with the Operating Guide and Subsection 3.5 of this Agreement.

    CUSTOMER will be responsible for all costs of connectivity and communication between CUSTOMER, the Internet and SERVICERS. CUSTOMER agrees to utilize SSL (Secure Sockets Layer) or other secure compatible encryption method acceptable to SERVICERS in providing CUSTOMER's ECTs to SERVICERS for Authorization, processing and settlement.

    CUSTOMER will verify identification of the Cardholder and the validity of the Card information for ECT. CUSTOMER agrees that each Authorization request will include a request for address verification and a positive response for it. CUSTOMER agrees to identify separately any high-risk transactions CUSTOMER submits. The high-risk transactions include, but are not

PLAINTIFF 000615

limited to, any under Merchant Category Code 5967 – Direct Marketing – Inbound Telemarketing Merchants.

8. **Multiple Sales Drafts and Partial Consideration.**
   8.1 Except as shall be specifically set forth in the Operating Guide or the Card Organization Rules, CUSTOMER shall list all items of goods and services purchased during each Card transaction and the total amount thereof on a single Sales Draft.
   8.2 CUSTOMER shall comply with all special procedures and conditions applicable under the Operating Guide and the Card Organization Rules with respect to any partial payment, installment payment, delayed delivery or advance deposit situation and any delayed or amended charges for a travel and entertainment transaction. CUSTOMER shall not use more than one Sales Draft to represent a single Card transaction to avoid the need for Authorization.

9. **Pre-Authorized Orders.**
   9.1 A Pre-Authorized Order may include the payment of recurring charges such as insurance premiums, subscriptions, membership fees, tuition or utility charges and may also include preauthorized health care payments (subject to a Supplement).
   9.2 If CUSTOMER is authorized to accept Pre-Authorized Orders, Authorization for each such Card transaction, regardless of the amount, must be obtained, and CUSTOMER must write "Recurring Transaction" (for Visa and other non-MasterCard Card transactions) or "PO" (for MasterCard Card transactions) as applicable, on the Sales Draft in lieu of the Cardholder's signature.
   9.3 Except for preauthorized health care payments for the incremental costs not covered by insurance, advance deposits and installment payments, all made in compliance with this Agreement, a Pre-Authorized Order may not include partial payments made to CUSTOMER for goods or services purchased in a single transaction. In no event may any finance charges be imposed on any periodic payments in connection with a Pre-Authorized Order.
   9.4 CUSTOMER may not accept a Pre-Authorized Order from a Cardholder for the purchase of goods or services which are delivered or performed periodically unless the Cardholder completes and delivers to CUSTOMER a written request (and, when applicable, a written renewal request) identifying (i) the goods or services to be charged to the Cardholder's account, (ii) the amount of the preauthorized or recurring charges (unless such charges are for variable amounts), (iii) the frequency of the preauthorized or recurring charges and (iv) the duration of time for which the Cardholder's permission is granted. If CUSTOMER accepts any Pre-Authorized Orders for variable amounts, CUSTOMER must comply with the supplemental provisions set forth in the applicable Supplements.
   9.5 The Cardholder's written request (including any written renewal request) must be: (a) retained for the duration of the preauthorized or recurring charges; (b) provided in response to an Issuer's request for original documentation; and (c) used no longer after receiving notice of cancellation.

10. **CUSTOMER Responsibilities for Persons Used by CUSTOMER.**
   10.1 Use of Persons. CUSTOMER's use of the services, equipment, Software, systems, materials, supplies or resources of Persons regarding CUSTOMER's Card transactions processing, including, without limitation, Merchant Providers and any third party lessors and licensors, will not affect CUSTOMER's obligations under this Agreement to SERVICERS which will apply to the same extent as if CUSTOMER had not used them. SERVICERS have no liability or responsibility to CUSTOMER or others regarding these Persons, even if SERVICERS referred them to CUSTOMER. These third parties are CUSTOMER's agents, and CUSTOMER is solely responsible for (i) determining whether they can meet CUSTOMER's needs and standards, (ii) their actions, inactions and compliance with the terms of this Agreement and Applicable Law and (iii) any and all fees, costs, expenses and other obligations owed to them by CUSTOMER or owed by them to SERVICERS or to the Card Organizations.

   10.2 Merchant Providers. Before CUSTOMER engages any Merchant Provider, CUSTOMER must provide to SERVICERS in writing (a) the Merchant Provider's legal name, (b) contact information, and (c) intended function. CUSTOMER covenants with SERVICERS that CUSTOMER will not use, allow the use of, or provide to any Merchant Provider access to any Cardholder data, BAMS Systems, BAMS Software or Services until CUSTOMER receives SERVICERS' approval and, if required, confirmation of SERVICERS' registration of that Merchant Provider with applicable Card Organizations. CUSTOMER must ensure that CUSTOMER and Merchant Providers: (i) comply with the registration process which can involve site inspections, background investigations, provision of financial statements, and any other information required by a Card Organization; (ii) comply with the periodic and other reporting required by a Card Organization; and (iii) comply with this Agreement and Applicable Law, including without limitation, those provisions requiring security of Cardholder data. CUSTOMER may allow Merchant Providers access to Cardholder data only for purposes authorized under and in conformance with the Card Organization Rules and Applicable Law. CUSTOMER is responsible for all of SERVICERS' costs and expenses associated with SERVICERS' review, approval, certification (and recertification as may required by the Card Organization Rules) and registration of any Merchant Providers.

   Upon request and reasonable notice, CUSTOMER will provide, and will ensure that Merchant Providers provide, to SERVICERS and SERVICERS' respective representatives prompt access to CUSTOMER's and their facilities and records for

PLAINTIFF 000616

the purposes of performing any inspection and copying books or records pertaining to the transactions contemplated under this Agreement. CUSTOMER must have written agreements with Merchant Providers requiring such access.

11. **Cardholder Refunds and Credits.**

   11.1 If a Cardholder returns goods or cancels services purchased from CUSTOMER with a Card, or CUSTOMER allows any other price adjustment after a sale has been completed and a refund or adjustment is due to the Cardholder (other than any involuntary refund required by applicable airline or other tariff or by Applicable Law), CUSTOMER will not return cash to the Cardholder but will instead prepare a Credit Draft and process each such refund or adjustment, as specified in the Operating Guide and Card Organization Rules. CUSTOMER will give the Cardholder a copy of the completed Credit Draft.

   11.2 If CUSTOMER establishes a policy limiting refunds or acceptance of returned merchandise (e.g., no refund, exchange only, in-store credit only, or special conditions), CUSTOMER must follow the procedures set forth in the Operating Guide regarding refunds and returned merchandise.

12. **Presentment of Card Transactions.**

   12.1 **Locations.** CUSTOMER will provide SERVICERS with a complete list of all CUSTOMER's Locations in the United States and its territories where CUSTOMER desires to accept Cards, with current information for each Location, including, physical address and telephone number(s), mailing address and, if available, fax number(s) and email address(es). CUSTOMER will provide an updated list as changes to any of CUSTOMER's Locations or their related information occur.

   12.2 CUSTOMER shall electronically (or physically, when authorized by SERVICERS) deliver to SERVICERS Sales Drafts and Credit Drafts for all Card transactions to be processed and settled under this Agreement. The deadlines for submitting Sales Drafts and Credit Drafts are set forth in the Operating Guide and Card Organization Rules corresponding to the applicable Card types and desired rates. In no event shall such deadlines be later than the fifth calendar day or third banking day (whichever is earlier) after completing Card transactions (unless CUSTOMER is entitled to any special extension of these deadlines). CUSTOMER acknowledges that the times specified in the preceding sentence are the maximum deadlines and that faster time frames are required to qualify for incentive programs.

   12.3 CUSTOMER will not submit any Sales Draft that was not created in conjunction with a Card transaction between CUSTOMER and the applicable Cardholder. Under no circumstances will CUSTOMER submit any Sales Draft that has been previously charged back by the Cardholder and subsequently returned to CUSTOMER.

13. **Settlement of Card Transactions.**

   13.1 Settlement of Sales Drafts. SERVICERS will settle with CUSTOMER for each Sales Draft acquired and accepted by SERVICERS under this Agreement after SERVICERS receive payment for that Sales Draft from the related Card Organization, subject to the terms of this Agreement. Unless SERVICERS agree in writing otherwise, SERVICERS will only acquire Sales Drafts for Visa, MasterCard and Discover Network Card types (including those of other Card Organizations processed under Visa, MasterCard or Discover Network Card Organization Rules); provided, however, that, if CUSTOMER has been classified by Discover Network as having a Discover Direct Strategic Relationship with Discover Network, SERVICERS will not acquire CUSTOMER's Discover Network transactions and they will be subject to CUSTOMER's agreement with Discover Network. CUSTOMER acknowledges and agrees that if SERVICERS have not agreed to or do not acquire transactions for any Card type (i) SERVICERS have no liability or responsibility whatsoever for the settlement of or disputes regarding those transactions and (ii) CUSTOMER will pursue directly with the related Card Organization all claims and disputes regarding those transactions. CUSTOMER agrees to pay SERVICERS for per item processing, Authorization and other fees in the Fee Schedule for any non-acquired transaction services CUSTOMER receives from SERVICERS.

   13.2 Settlement Account and Its Operation. CUSTOMER will designate, in writing, and maintain, the Settlement Account for the purposes of settling transactions under this Agreement. If the Settlement Account is with BANK, in the absence of any other written agreement with BANK, the terms and conditions that apply to BANK's deposit accounts of the same type will apply. As amounts become payable to CUSTOMER or to SERVICERS under this Agreement, SERVICERS may, unless otherwise agreed, make payments to or receive payments from CUSTOMER by crediting or debiting the Settlement Account without prior notice as provided herein. If CUSTOMER does not maintain a Settlement Account with BANK, payments between CUSTOMER and SERVICERS must be made in a manner satisfactory to SERVICERS. If CUSTOMER does not maintain sufficient balances in the Settlement Account to cover amounts owing under this Agreement, CUSTOMER must immediately pay all such amounts directly to SERVICERS, and if CUSTOMER does not do so, at SERVICERS' discretion SERVICERS may cease processing additional Card transactions until the amounts due are paid.

PLAINTIFF 000617

CUSTOMER acknowledges and agrees that transfers to or from the Settlement Account will be made on the basis of account number and bank routing number only. SERVICERS are not responsible for detecting errors in any Settlement Account information CUSTOMER provides, including the account numbers and routing numbers associated with the Settlement Account, even if any of those numbers do not correspond to the account or bank identified by name. CUSTOMER's obligations and SERVICERS' rights regarding any settlement transfers SERVICERS make in reliance on the account number(s) and bank routing number(s) for the Settlement Account are not excused in those circumstances, even if CUSTOMER provides SERVICERS erroneous information.

SERVICERS will initiate a transfer of settlement funds to CUSTOMER as set forth in Section 13.3. SERVICERS will not be liable for any delays in receipt of settlement funds or errors in credits or debits to the Settlement Account that are caused by Persons, including but not limited to, delays or errors of any Card Organization or any financial institution other than BANK.

SERVICERS may debit the Settlement Account for the following purposes: (a) to correct accounting or other settlement errors, (b) for the amount of Credit Drafts, adjustments or Chargebacks, (c) fees and fines imposed upon SERVICERS by a Card Organization or Issuer as a result of CUSTOMER's actions or omissions and (d) as required under the Card Organization Rules.

13.3 Settlement Amounts and Time for Settlement. All settlements to CUSTOMER for Sales Drafts will occur on Business Days and be based upon gross sales minus Credit Drafts, adjustments, and Chargebacks. SERVICERS will collect all other amounts, including Card Organization Based Fees, Third Party Based Fees (defined below), Servicers Fees (defined below, and including Discount Rate and transaction fees), and other fees set forth on the Fee Schedule due from CUSTOMER to SERVICERS, on a monthly basis, via net settlement or separate debit to the Settlement Account. All credits to CUSTOMER's Settlement Account or other payments to CUSTOMER are provisional and are subject to (i) SERVICERS' final audit and confirmation, (ii) fees and fines imposed upon SERVICERS by a Card Organization or Issuer as a result of CUSTOMER's actions or omissions and (iii) any other obligations owed by CUSTOMER to SERVICERS.

Except as otherwise set forth in this Agreement, if SERVICERS receive CUSTOMER's Sales Drafts by the applicable cut off time established by SERVICERS, SERVICERS will initiate a transfer of applicable settlement funds, after receipt thereof from the Card Organizations, via ACH (or other payment system available from SERVICERS for these types of transfers) to CUSTOMER's Settlement Account. SERVICERS will generally initiate this transfer by the following Business Day after SERVICERS process the applicable transactions. Generally, the Settlement Account will be credited within two Business Days after SERVICERS' initiation of the transfer.

13.4 Settlement Amounts Subject to Adjustments. This Agreement is a contract whereby SERVICERS are extending financial accommodations to CUSTOMER within the meaning of Section 365(c) of the Bankruptcy Code. CUSTOMER's right to receive any amounts due or to become due from SERVICERS or SERVICERS' respective Affiliates, whether or not those amounts are related to this Agreement, is expressly subject and subordinate to Chargeback, setoff, lien, security interest and SERVICERS' rights to withhold settlement funds under this Agreement, without regard to whether such Chargeback, setoff, lien, security interest and the withholding of settlement funds rights are being applied to claims that are liquidated, unliquidated, fixed, contingent, matured or unmatured.

13.5 Suspension/Change in Payment Terms. In addition to any other remedies available to SERVICERS under this Agreement, CUSTOMER agrees that should any CUSTOMER Event of Default (see Section 22) occur, SERVICERS may, with notice, change processing or payment terms and/or suspend credits or other payments of any and all funds, money and amounts now due or hereafter become due to CUSTOMER pursuant to the terms of this Agreement, until SERVICERS have had reasonable opportunity to investigate such event.

14. Fees; Adjustments; Collection of Amounts Due; Reconcilement.

14.1    Fees and Card Organization Charges. CUSTOMER will pay SERVICERS, within the times specified by SERVICERS, all the fees and charges for the Services calculated pursuant to the Fee Schedule, which includes fees that are in whole or in part based on (i) fees set by Card Organizations, including, without limitation, interchange fees ("Card Organization Based Fees"), (ii) fees set by Persons related to the Services (together with Card Organization Based Fees, "Third Party Based Fees"), and (iii) fees that SERVICERS set. Fees will be charged for all Authorization requests, whether or not approved, all Sales Drafts submitted for processing, all Credit Drafts and all Chargebacks. If a Card transaction does not qualify for the lowest interchange rate for which it is eligible, then that Card transaction will be downgraded and processed at a more costly interchange rate for which it qualifies. CUSTOMER will pay retroactive increased interchange fees for any Card transactions that a Card Organization determines did not qualify for the rates originally used.

CUSTOMER acknowledges that the fees stated herein are based upon the qualification of CUSTOMER's Card transactions for certain interchange fees as set by the applicable Card Organizations. If a transaction fails to qualify for CUSTOMER's anticipated interchange levels or CUSTOMER inadvertently or intentionally accepts a Card transaction other than the type

PLAINTIFF 000618

anticipated for its account (including a different Card type), then, as applicable to the pricing set forth in the Fee Schedule, CUSTOMER will be charged a higher interchange, Discount Rate or non-qualified interchange fee, as well any applicable surcharge for that transaction, all as set forth in the Fee Schedule.

14.2    **Card Organization Fines, Assessments and Penalties.**  The fees for Services set forth in the Fee Schedule may be adjusted to reflect increases, or new fees imposed by Card Organizations, including without limitation, interchange, assessments and other Card Organization fees, or to pass through increases or new fees charged to SERVICERS by other Persons related to the Services. All such adjustments shall be CUSTOMER's responsibility to pay and shall become effective upon the date any such change or addition is implemented by the applicable Card Organization or other Person as specified in SERVICERS' notice, which notice SERVICERS will provide to CUSTOMER in accordance with its usual and customary practices for SERVICERS' clients. In addition, CUSTOMER will pay to SERVICERS all fines, fees, assessments, penalties, and other amounts assessed by a Card Organization , including, but not limited to, any of the foregoing related to CUSTOMER's non-compliance with data security requirements or otherwise based on any CUSTOMER action or failure to act.

14.3    **Payment of Fees, Charges and Other Amounts.**  SERVICERS may debit the Settlement Account for, or withhold from funds SERVICERS owe CUSTOMER under this Agreement, all amounts CUSTOMER owes SERVICERS under this Agreement. If the Settlement Account has insufficient funds, SERVICERS may, without advance notice, withdraw the funds CUSTOMER owes SERVICERS from any Reserve Account CUSTOMER maintains with SERVICERS (or their respective Affiliates) or to which CUSTOMER has granted SERVICERS access. If sufficient funds are not available from those sources, CUSTOMER must pay the amount of any deficiency immediately upon demand.

14.4    **Third Party Based Fee Changes.**  SERVICERS will provide CUSTOMER with at least thirty (30) days' advance notice of any increased or new Third Party Based Fees. However, SERVICERS' ability to provide such notice depends on SERVICERS' receipt of timely notice from the applicable Persons and in those instances, SERVICERS may not be able to provide CUSTOMER with thirty (30) days notice. In any event, any increased or new Third Party Based Fees will become effective and CUSTOMER shall be responsible for paying them as of the date specified in the notice.

14.5    **Fees for Supplies and Other Services.**  In addition to the other fees specified in this Agreement, CUSTOMER agrees to pay SERVICERS for any other fees and charges applicable to any other services CUSTOMER requests or requires which are not covered in this Agreement and which CUSTOMER and SERVICERS mutually agree to in writing.

14.6    **ACH Credits or Debits.**  To the extent the Automated Clearing House ("ACH") settlement process is used to effect debits or credits to CUSTOMER's Settlement Account, CUSTOMER agrees to be bound by the terms of the operating rules of the National Automated Clearing House Association ("NACHA"), as in effect from time to time. CUSTOMER hereby authorizes SERVICERS to initiate credit and debit entries and adjustments as permitted under this Agreement to CUSTOMER's account through the ACH network and/or through direct institutions to the financial institution where CUSTOMER's Settlement Account is maintained for amounts due under this Agreement and under any agreements with SERVICERS or SERVICERS' respective Affiliates for any related services, as well as for any credit entries in error. CUSTOMER hereby authorizes the financial institution where CUSTOMER's Settlement Account is maintained to effect all such credits and debits to CUSTOMER's account. This authority will remain in full force and effect until SERVICERS have given written notice to the financial institution where CUSTOMER's Settlement Account is maintained that all monies due under this Agreement and any other agreements with SERVICERS or SERVICERS' Affiliates for any related services have been paid in full.

14.7    **Intentionally Omitted.**

14.8    **Duty to Review Statements.**  CUSTOMER must carefully review, statements and reports provided or made available to CUSTOMER (physically, electronically or otherwise) reflecting Card transaction activity, including, activity in the Settlement Account , whether provided by SERVICERS or Persons, within fifteen (15) Business Days of receipt.

14.9    **Duty to Notify SERVICERS of Discrepancies or Adjustments.**  If CUSTOMER believes any discrepancies exist or adjustments are needed with respect to any debits or credits effected by SERVICERS with respect to CUSTOMER's Settlement Account  or for any amounts due to or due from CUSTOMER, or if CUSTOMER has any other questions or concerns regarding CUSTOMER's Card transactions that are processed and settled by SERVICERS or regarding any statement or report provided or made available by SERVICERS (physically, electronically or otherwise), CUSTOMER must notify BAMS in writing (i) within sixty (60) days after such debit or credit is effected, such transaction is processed and settled, or such statement or report is provided. If CUSTOMER fails to notify BAMS within such time frame: (a) SERVICERS will not be required to investigate the matter or effect any related adjustment, absent any willful misconduct by SERVICERS; and (b) SERVICERS may, in SERVICERS' discretion and at CUSTOMER's cost, investigate the matter addressed in CUSTOMER's notice, but SERVICERS will not have any liability to effect any related adjustment absent any willful misconduct by SERVICERS. Any voluntary efforts by SERVICERS to assist CUSTOMER in investigating such matters will not create any obligation to continue such investigation or any future investigation.

PLAINTIFF 000619

**14.10  Electronic Statements.**  If CUSTOMER elects to receive statements via electronic mail or online via the Internet, then (a) CUSTOMER authorizes SERVICERS to deliver statements and reports, Card Organization and regulatory information and notices of change in terms that SERVICERS would typically include with paper statements and notifications to review them (collectively, "Electronic Statements") at a web-accessible location on SERVICERS' computer servers, to CUSTOMER electronically, (b) SERVICERS are not required to provide CUSTOMER with a paper copy of statements but SERVICERS may, in SERVICERS' sole discretion, do so at any time, (c) CUSTOMER may request a paper copy of CUSTOMER'S merchant account statement(s) from SERVICERS; however, a fee may apply for such request, and (d) Electronic Statements are part of the Services provided under this Agreement.

If CUSTOMER elects to receive Electronic Statements for its merchant account(s) via electronic mail ("e-mail"), CUSTOMER represents and warrants to, and covenants with, SERVICERS and agrees that: (i) CUSTOMER will add "@cedardoc.com" (the specific addressee portion will vary due to automation) (and such other e-mail address or domain that we may specify from time to time or from which CUSTOMER otherwise receives and Electronic Statement from SERVICERS) as a safe e-mail address or domain with respect to the e-mail account CUSTOMER designates for SERVICERS to send Electronic Statements, and will take such other steps as are necessary to ensure that delivery of emails to CUSTOMER are not prevented; (ii) CUSTOMER is responsible for the accuracy and validity of all e-mail addresses provided by CUSTOMER and/or its agents; (iii) CUSTOMER will ensure that the e-mail account(s) designated for SERVICERS to send CUSTOMER Electronic Statements are under CUSTOMER's ownership or control and will be regularly accessible and actively monitored by CUSTOMER's authorized representatives; (iv) CUSTOMER will not share or permit to be known by any Person not authorized to view Electronic Statements on CUSTOMER's behalf, or store as an "autofill" field on a web browser, any password or encryption key; (v) CUSTOMER will notify SERVICERS promptly if CUSTOMER has not received an Electronic Statement from SERVICERS in the time frame that CUSTOMER normally receives Electronic Statements from SERVICERS, but in no event later than five (5) Business Days after the close of the statement cycle; (vi) CUSTOMER will notify SERVICERS prior to any change of e-mail address(es) designated for receipt of Electronic Statements; (vii) Electronic Statements are subject to the reconciliation time frames described in Section 14.9 of the Agreement; and (viii) immediately after being transmitted from SERVICERS'S e-mail server, CUSTOMER will be solely responsible for preventing the disclosure, interception and viewing of Electronic Statements by any unauthorized Person or Person that is otherwise not in compliance with applicable law.

SERVICERS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING CUSTOMER'S ACTUAL RECEIPT OF E-MAILED ELECTRONIC STATEMENTS THAT SERVICERS ATTEMPTS TO DELIVER TO CUSTOMER.

**14.11  Duty Regarding Merchant Systems.**  CUSTOMER will be responsible for auditing, balancing, verifying and reconciling any out-of-balance condition within the Merchant Systems, and for notifying SERVICERS of any errors in the foregoing after receipt of the applicable report from SERVICERS.  CUSTOMER will notify SERVICERS of all incorrect reports or output within two (2) Business Days after receipt of such reports or output.  Within one (1) Business Day of the original transaction, CUSTOMER must balance each Location to the BAMS system for each business day that each Location is open.  If CUSTOMER determines that transaction(s) have been processed in error, CUSTOMER will initiate the appropriate transaction for adjustment to correct the transaction in question.  CUSTOMER is responsible for all applicable adjustment fees per applicable Card Organization Rules.

**15.  Chargebacks.**
**15.1 Chargebacks Payable Immediately.**  CUSTOMER will pay SERVICERS the amount of each Card transaction that CUSTOMER submitted to SERVICERS for processing that is charged back to SERVICERS for any reason permitted by the Card Organization Rules.  Each Chargeback to CUSTOMER is immediately due and payable by CUSTOMER.

**15.2 Disputing Chargebacks.**  CUSTOMER may dispute a Chargeback as provided in the Card Organization Rules, including any requirements for timely submission.  SERVICERS' obligation to CUSTOMER respecting Chargeback disputes is limited to permissible presentment of CUSTOMER's dispute to the appropriate Card Organization.  SERVICERS will not engage in direct collection efforts against Cardholders on CUSTOMER's behalf.

**15.3 Chargeback Fees.**  CUSTOMER will pay SERVICERS the fees associated with processing Chargebacks as provided in the Fee Schedule, without regard to whether the Chargeback is settled in CUSTOMER's favor or the Cardholder's favor.  In addition, in the event the percentage of Chargebacks to CUSTOMER's merchant account meets or exceeds the percentage considered excessive by the Card Organizations, CUSTOMER will pay SERVICERS the Excess Chargeback Fee stated in the Fee Schedule (in addition to any fees imposed on SERVICERS by the Card Organizations).  The rate and the method of calculation for what each Card Organization considers excessive may be found in its Card Organization Rules.  All fees related to processing Chargebacks, including any Excess Chargeback fees, are immediately due and payable to SERVICERS upon assessment.

PLAINTIFF 000620

**16. Representations; Warranties and Covenants.**

16.1 Without limiting any other warranties hereunder, CUSTOMER represents, warrants and covenants with SERVICERS and with the submission of each Sales Draft reaffirms, the following representations, warranties and/covenants:

(i)  each Card transaction is genuine and arises from a bona fide transaction, permissible under the Card Organization Rules and Applicable Law, by the Cardholder directly with CUSTOMER;

(ii)  each Card transaction represents a valid obligation for the amount shown on the Sales Draft, Preauthorized Order, or Credit Draft, and does not involve the use of a Card for any other purpose;

(iii)  each Card transaction represents an obligation of the related Cardholder for the amount of the Card transaction;

(iv)  intentionally deleted;

(v)  each Card transaction amount is only for respective merchandise or services (including taxes, but without any surcharge except as permitted under Card Organization Rules) sold, leased or rented or other payments to CUSTOMER and, except for any delayed delivery or advance deposit Card transactions expressly authorized by this Agreement, that merchandise or service was actually delivered to or performed for the Cardholder entering into that Card transaction simultaneously upon CUSTOMER accepting and submitting that Card transaction for processing;

(vi)  with respect to each Card transaction, CUSTOMER has no knowledge or notice of any fact, circumstance or defense which would indicate that such Card transaction is fraudulent or not authorized by the related Cardholder or which would otherwise impair the validity or collectability of that Cardholder's obligation arising from that Card transaction or relieve that Cardholder from liability with respect thereto;

(vii)  each Card transaction is made in accordance with the terms of this Agreement and Applicable Law;

(viii)  each Sales Draft is free of any alternation not authorized by the related Cardholder;

(ix)  CUSTOMER has completed one Card transaction per sale; or one Card transaction per shipment of goods for which the Cardholder has agreed to partial shipments;

(x)  CUSTOMER is validly existing, in good standing and free to enter into this Agreement;

(xi)  all information provided to SERVICERS in support of this Agreement is true and correct;

(xii)  CUSTOMER is not doing business under a name or style not previously disclosed to SERVICERS;

(xiii)  CUSTOMER has not changed the nature of CUSTOMER's business, Card acceptance practices, delivery methods, return policies, or types of products or services sold requiring a different merchant category code under Card Organization Rules, in a way not previously disclosed to SERVICERS;

(xiv)  CUSTOMER will use the Services only for CUSTOMER's own proper business purposes and will not resell, directly or indirectly, any part of the Services to any Person;

(xv)  CUSTOMER has not filed a bankruptcy petition not previously disclosed to SERVICERS;

(xvi)  CUSTOMER owns and controls the Settlement Account, and no security interest or lien of any type in favor of a Person exists regarding the Settlement Account or any Card transaction;

(xvii)  CUSTOMER will not at any time during the term of this Agreement, or until all amounts due under this Agreement have been paid in full, grant or pledge any security interest or lien in the Settlement Account or transaction proceeds to any Person, without SERVICERS consent; and

(xviii)  CUSTOMER will use best efforts to seek appropriations, including any special appropriations, in order to fulfill its obligations for amounts due and owing to SERVICERS under this Agreement.

16.2 SERVICERS represent and warrant to CUSTOMER that:

(i)  SERVICERS will perform their obligations pursuant to this Agreement in accordance with the Applicable Law and the Card Organization Rules.

(ii)  SERVICERS are validly existing, in good standing and free to enter into this Agreement;

**17. Retention of Records.**

17.1 Unless prohibited by the Card Organization Rules, CUSTOMER will retain, for a period of at least eighteen (18) months from the date of the Card transaction or such other longer period as may be required by the Card Organization Rules, legible copies or images (electronically or otherwise) of CUSTOMER's Sales Drafts, Cardholder consents for Pre-Authorized Orders and Credit Drafts. CUSTOMER's obligation to retain records does not provide authority for CUSTOMER to retain Card magnetic stripe data.

17.2 CUSTOMER will submit to SERVICERS a legible copy or image of a Sales Draft, Cardholder consent for a Pre-Authorized Order or Credit Draft if any Issuer requests one. CUSTOMER's deadline for providing to SERVICERS a legible copy or image of the requested Sales Draft, Cardholder consent for a Pre-Authorized Order or Credit Draft is ten (10) days after the date of the Issuer's retrieval request, or as specified in the notice from SERVICERS. CUSTOMER acknowledges that CUSTOMER's failure to properly and timely respond to any retrieval request may result in a Chargeback.

**18. System Testing and System Enhancements.**

18.1 SERVICERS reserve the right to conduct testing of the Merchant Systems for a period of time reasonably necessary for them to meet SERVICERS', the Merchant Equipment manufacturers', any third party integrators' and the Card

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

10 of 48

PLAINTIFF 000621

Organizations' then-current applicable requirements. Throughout the term of this Agreement, if CUSTOMER changes or modifies the Merchant Systems for any reason, including but not limited to modifications to accommodate changes in Card Organization Rules or Applicable Law, CUSTOMER will immediately notify SERVICERS of such changes or modifications, and SERVICERS will have a reasonable amount of time to conduct certification testing of the Merchant Systems to verify that it meets SERVICERS', any third party integrator's and the Card Organizations' then-current applicable requirements. The first such standard re-certification will be performed by SERVICERS at no cost to CUSTOMER; however, subsequent re-certifications will be billed to CUSTOMER at SERVICERS' then-current hourly rate. Notwithstanding anything to the contrary, by conducting implementation or certification testing, SERVICERS do not guarantee that CUSTOMER's transactions will qualify at the lowest possible interchange level. CUSTOMER shall notify SERVICERS of the changes or modifications or CUSTOMER's refusal to allow SERVICERS to conduct the implementation or certification testing.

18.2 If, after the effective date of this Agreement, CUSTOMER requests SERVICERS to perform or provide any system enhancements, custom reports, special files, terminal applications, related service enhancements or new services (collectively, "System Enhancements"), and SERVICERS agree to do so, these System Enhancements will be made in accordance with terms and conditions, including pricing, agreed to by the parties in writing.

19. **Confidentiality.**

19.1    To the extent permissible under the Delaware Freedom of Information Act, 29 Del.C. Ch. 100, CUSTOMER will treat this Agreement and any information supplied or otherwise made accessible by SERVICERS or SERVICERS' agents as confidential and will not disclose the same to any third parties except as provided herein, including without limitation: (i) information about the products, services, operations, procedures, customers, suppliers, sales, pricing, business plans and marketing strategies of SERVICERS, their Affiliates and the customers, clients and suppliers of any of them; (ii) any scientific or technical information, design, process, procedure, formula, or improvement that is commercially valuable and secret in the sense that its confidentiality affords either SERVICER a competitive advantage over its competitors; (iii) user IDs, security codes, passwords, personal identification numbers, and other security devices and procedures for the Services or related thereto; and (iv) all confidential or proprietary concepts, documentation, reports, data, specifications, computer software, source code, object code, flow charts, databases, inventions, know-how, show-how and trade secrets, whether or not patentable or copyrightable.

19.2    SERVICERS' confidential information shall be used by CUSTOMER only to exercise CUSTOMER's rights and to perform CUSTOMER's obligations hereunder. To the extent permissible under 29 Del.C. Ch. 100, CUSTOMER shall not disclose the confidential information to any Person, except as may be agreed upon in writing by SERVICERS. CUSTOMER shall safeguard all of SERVICERS' confidential information using a reasonable degree of care, but not less than that degree of care used by it in safeguarding its own similar information or material. Upon request by SERVICERS or upon termination of this Agreement, CUSTOMER shall return to SERVICERS or destroy all of SERVICERS' confidential information in its possession or control.

19.3    SERVICERS will keep confidential, in accordance with Applicable Law and the Card Organization Rules, any information received by SERVICERS from CUSTOMER or CUSTOMER's agents regarding CUSTOMER's use of the Services, including any relationship and transaction information; provided that SERVICERS may disclose such information (i) to Persons to the extent necessary to provide the Services, (ii) SERVICERS' respective auditors and attorneys (internal and external) and regulators, (iii) as required or permitted by Applicable Law and (iv) to SERVICERS' respective Affiliates as SERVICERS deem appropriate. CUSTOMER acknowledges and agrees that any information obtained by SERVICERS may be shared with SERVICERS' respective Affiliates, who have a need-to-know, in connection with the provision of the Services, as long as such Affiliates are under obligation to treat such information with the same degree of care as required of SERVICERS.

19.4    In addition to the information security provisions elsewhere in this Agreement, neither CUSTOMER nor SERVICERS will use, store, disclose, sell or disseminate any Cardholder data obtained in connection with a Card transaction (including the names, addresses and Card account numbers of Cardholders), except in accordance with the Card Organization Rules and Applicable Law (e.g., for purposes of authorizing, completing and settling Card transactions and resolving any Chargebacks, retrieval requests or similar issues involving Card transactions). The foregoing will not apply in the instance of a court or governmental request, subpoena or order. SERVICERS may use any Cardholder data for purposes associated with BANK's role as an Issuer if such Cardholder data is derived from a Card transaction in which the Card used was Issued by BANK. Further, in accordance with the Operating Guide, Card Organization Rules and Applicable Law, SERVICERS may participate in sharing Cardholder data among SERVICERS' Affiliates, other financial institutions, regulatory authorities, law enforcement agencies and any other Persons authorized by the Card Organization Rules and Applicable Law. In addition, SERVICERS may participate in sharing Cardholder data with any Card Organization or its designee at the request of that Card Organization.

19.5    CUSTOMER acknowledges that it will not obtain ownership rights in any information relating to and derived from Card transactions. Cardholder account numbers, personal information and other Card transaction information, including any databases containing such information, may not be sold or disclosed to a Person as an asset upon a bankruptcy, insolvency or failure of CUSTOMER's business. Upon a bankruptcy, insolvency or failure of CUSTOMER's business, all Card transaction information must be returned to SERVICERS or acceptable proof of the destruction of all Card transaction information must be provided to SERVICERS.

PLAINTIFF 000622

19.6    The obligations of confidentiality and restrictions on use in this Section shall not apply to any confidential information that: (i) was in the public domain prior to the date of this Agreement or subsequently came into the public domain through no fault of the party that received such confidential information; (ii) was received from a Person free of any obligation of confidence of the disclosing party and which Person, to the receiving party's knowledge, was not under an obligation to keep the information confidential; (iii) was already in the receiving party's possession prior to receipt from the disclosing party; (iv) is required to be disclosed by law, regulation or court order after giving the disclosing party as much advance notice as practical of the possibility of disclosure; or (v) is subsequently and independently developed by the receiving party's employees, consultants or agents without use of or reference to the disclosing party's confidential information.

19.7    Each party acknowledges that breach of the restrictions on use or disclosure of the other party's confidential information could result in immediate and irreparable harm to the other party, and money damages could be inadequate to compensate for that harm. Each party shall be entitled to seek equitable relief, in addition to all other available remedies, to redress any breach by the other party of this Section 19.

19.8    Except as specifically provided for herein, this Section does not confer any right, license, interest or title in, to or under SERVICERS' confidential information to CUSTOMER. Except as specifically provided for herein, no license is hereby granted to CUSTOMER under any patent, trademark, copyright, trade secret or other proprietary rights of SERVICERS, and CUSTOMER shall not assign to any Person the rights to use the Marks of SERVICER or it agents. All right, title, and interest in and to all intellectual property related to the Services (including, without limitation, the content of any materials, web screens, layouts, processing techniques, procedures, algorithms, and methods), owned, developed or licensed by SERVICERS prior to, during the term of, or after the Agreement, or employed by SERVICERS in connection with the Services and any updates, changes, alterations or modifications to or derivative works from such intellectual property, shall be and remain, as among the parties, SERVICERS' exclusive property.

19.9    CUSTOMER agrees that SERVICERS may obtain relevant information from any applicable telecommunications provider utilized by CUSTOMER, as necessary to investigate any allegation of fraud, suspected fraud or other actual or alleged wrongful act by CUSTOMER in connection with the Services.

19.10   Notwithstanding any contrary provisions in the controlling documents for any other accounts CUSTOMER has with BANK, BANK may share and exchange with BAMS and its respective Affiliates and agents information about CUSTOMER and those accounts in connection with the Services, and any services provided by TeleCheck Services, Inc., First Data Merchant Services LLC, or any other SERVICERS of Services under this Agreement.

19.11   Notwithstanding the foregoing, SERVICERS acknowledge that CUSTOMER may be subject to the provisions of applicable state "open records" laws ("Open Records Law") and that under certain circumstances, CUSTOMER may be required to release a copy of this Agreement to a third party under the Open Records Law. In the event that CUSTOMER receives a request for confidential information from any third party under the Open Records Law, CUSTOMER shall immediately (but not later than the next Business Day) notify SERVICERS of such request. Such notification shall include a copy of the written request received by CUSTOMER. As soon as is reasonably possible following such notice, CUSTOMER will provide SERVICERS, at SERVICERS' expense, with copies of any documents and/or other materials that CUSTOMER believes to be responsive to such request. CUSTOMER shall respond to such request by either (x) rejecting such request or (y) acknowledging receipt of such request and advising the requesting party that a subsequent response will be forthcoming. SERVICERS may take whatever action (legal or otherwise) SERVICERS deem necessary to prevent CUSTOMER's disclosure of such confidential information, and CUSTOMER shall provide SERVICERS with reasonable assistance. However, with respect to Cardholder account numbers, personal information and other Card transaction information, CUSTOMER will not disclose such information to any such requesting party, and may only disclose such information as otherwise required or permitted under Applicable Law or the Card Organization Rules.

## 20.  Examinations, Audits and Corrective Action.

20.1 SERVICERS' Rights.  SERVICERS or their respective designees will have the right, during the term of this Agreement and for one (1) year thereafter, upon reasonable advance written notice and during CUSTOMER's normal business hours and without disruption to CUSTOMER's daily operations, to conduct a review of the books, records, operations and Merchant Equipment of CUSTOMER, Merchant Providers and CUSTOMER's other third party service providers to determine or to verify CUSTOMER's and their compliance with CUSTOMER's obligations under this Agreement.

20.2 Card Organization and Investigation.  CUSTOMER will, upon reasonable prior written notice from SERVICERS and as directed by any Card Organization but only during CUSTOMER's normal business hours and without disruption to CUSTOMER's daily operations (to the extent permitted by the Card Organizations), permit any Person acceptable to that Card Organization to examine and audit the records, operations and Merchant Systems relevant to such Card Organization.  The scope, standards and frequency of the examinations and audits will be determined by the Card Organization requesting it.  The results, including, but not limited to any written reports of such examinations and audits, must be made available to the Card Organization requesting it and SERVICERS.

20.3 Remediation.  CUSTOMER must promptly take corrective action acceptable to SERVICERS, in SERVICERS' reasonable discretion, and acceptable to the Card Organizations to rectify (i) any failure to comply with this Agreement or any problem

PLAINTIFF 000623

identified in any report, examination or audit that could reasonably be expected to have an adverse impact on SERVICERS, Issuers, Card Organizations or Cardholders and (ii) any control deficiencies identified in such report.

20.4 Regulatory Agencies.  Notwithstanding anything to the contrary in Sections 19 (Confidentiality) and 24 (Information Security) of the Agreement, CUSTOMER agrees to provide reasonable access to Merchant Systems and CUSTOMER's facilities and records and those of Merchant Providers during CUSTOMER's normal business hours and without disruption to CUSTOMER's daily operations (to the extent permitted by the Card Organizations and by state and federal agencies), for examination purposes to any state or federal agencies with jurisdiction over SERVICERS or any Card Organization, upon SERVICERS' prior written request.

21. **Assignment.**

21.1 Any transfer or assignment of this Agreement (or any portion of it) by CUSTOMER without SERVICERS' prior written consent, by operation of law or otherwise, is voidable at either SERVICER's sole discretion.  In the event of such transfer or assignment, the party to whom the Agreement was transferred or assigned shall be bound to the terms and conditions of this Agreement to the same extent as if SERVICERS and such assignee or transferee, as the case may be, entered into an agreement identical to this Agreement on the effective date of such transfer or assignment. Furthermore, CUSTOMER shall be liable to SERVICERS for all liabilities, Chargebacks, expenses, costs, fees and fines arising in connection with such transferee's or assignee's, as the case may be, submission of Card transactions to SERVICERS for processing.  SERVICERS are not required to continue this Agreement after CUSTOMER's merger or reorganization with or into another entity without SERVICERS' prior written consent, which will not be unreasonably conditioned, withheld, or delayed.  CUSTOMER agrees to provide SERVICERS with at least 30 days' prior written notice of CUSTOMER's intention to take any of those types of actions.

21.2 Upon notice to CUSTOMER, another Visa and MasterCard acquirer  may be substituted for BANK under whose sponsorship this Agreement is performed.  Upon substitution, such other Visa and MasterCard acquirer shall be responsible for all obligations required of BANK, including without limitation, as may be expressly required by applicable Card Organization Rules.  Furthermore, subject to Card Organization Rules, any SERVICER may assign or transfer this Agreement and its respective rights and obligations hereunder and may delegate its respective duties hereunder, in whole or in part, to any Person, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without the notice to or consent of CUSTOMER.

21.3 Except as provided in the following sentence, this Agreement shall be binding upon permitted successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns.  No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Agreement.

22. **Term; Termination; Events of Default.**

22.1 This Agreement and the applicable Supplements will become effective on the Effective Date.  The term of this Agreement shall commence on the date that CUSTOMER submits its first live transaction to SERVICERS for processing, as such date is mutually agreed to in writing or via email by CUSTOMER and SERVICERS.  CUSTOMER acknowledges and agrees that to the extent this Agreement does not represent a renewal or extension of a current agreement between the parties for the Services contemplated hereunder, CUSTOMER shall not process a "live", non-test Card transaction under this Agreement until such time as CUSTOMER has been approved by BAMS' credit department and BAMS and BANK have executed this Agreement.

22.2 Upon expiration of the Initial three (3) year term of this Agreement ("Initial Term"), the parties mutually may agree in writing to extend this Agreement for two (2) option terms (each a "Renewal Term" and, collectively with the Initial Term, the "Term") of one (1) year each (each an "Option" and collectively the "Options").  CUSTOMER will provide SERVICERS written notice of CUSTOMER'S election to exercise an Option no later than one hundred twenty (120) days prior to the end of the then-existing term.  This Agreement shall terminate at the end of the Initial Term or a Renewal Term if an Option is not timely exercised; provided, however that this Agreement shall automatically shall renew for one thirty (30) day period if Customer continues to use the Services after the end of the Initial Term or Renewal Term (as applicable) so long as termination of this Agreement did not result from a CUSTOMER Event of Default.

22.3 (a) If any of the following events shall occur (each a "**CUSTOMER Event of Default**"):

(i) a material adverse change in the financial condition, business procedures, products or services of CUSTOMER; or

(ii) irregular Card sales by CUSTOMER, excessive Chargebacks or any other circumstances which, in SERVICERS' sole discretion, may increase SERVICERS' exposure for CUSTOMER's Chargebacks or otherwise presents a financial or security risk to SERVICERS; or

PLAINTIFF 000624

(iii) any representation, warranty or covenant of CUSTOMER in this Agreement is breached in any material respect or was or is incorrect in any material respect when made or deemed to be made; or

(iv) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement, including, without limitation, (a) the Information Security requirements as detailed in Section 24 or (b) CUSTOMER's failure to pay SERVICERS for any amounts due and owing under this Agreement; or

(v) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any respective Affiliate of SERVICERS, including, but not limited to, any agreement governing check guarantee or check verification services; or

(vi) CUSTOMER shall default in the payment when due, whether upon maturity or otherwise, of any material indebtedness for borrowed money or any material trade payable; or

(vii) CUSTOMER shall: commence a voluntary case under the Bankruptcy Code; file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or entry into a composition agreement or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; generally become unable to pay its debts or trade obligations as they become due; make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

(viii) a case or other proceeding shall be commenced against CUSTOMER, in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator or the like of CUSTOMER, or of all or any substantial part of the assets, domestic or foreign, of CUSTOMER, and such case or proceeding shall continue undismissed or unstayed for a period of sixty (60) consecutive days, or an order granting the relief requested in such case or proceeding against CUSTOMER (including, but not limited to, an order for relief under the Bankruptcy Code) shall be entered; or

(ix) the independent certified accountants retained by CUSTOMER shall refuse to deliver an unqualified opinion with respect to the annual financial statements of CUSTOMER;

then, upon the occurrence of (1) a CUSTOMER Event of Default specified in subparagraphs (ii), (iv), (vii) or (viii) above, SERVICERS may consider this Agreement to be terminated immediately, without notice, and all amounts payable hereunder by CUSTOMER to SERVICERS shall be due and payable in full upon demand, and (2) any other CUSTOMER Event of Default, this Agreement may be terminated by SERVICERS by giving not less than ten (10) days' notice to CUSTOMER, and upon such notice all amounts payable hereunder by CUSTOMER to SERVICERS shall be due and payable on demand.

(b) If any of the following events shall occur (each a "SERVICERS Event of Default"):

(i) any representation, warranty or covenant of SERVICERS in this Agreement is breached in any material respect or was or is incorrect in any material respect when made or deemed to be made; or

(ii) SERVICERS shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement;

(iii) SERVICERS fail, due to causes within SERVICERS' sole and exclusive control, to make any settlement payment when due and payable pursuant to this Agreement and such settlement payment is not paid within three (3) Business Days following notice of such failure to pay; or

(iv) SERVICERS shall: commence a voluntary case under the Bankruptcy Code; file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or entry into a composition agreement or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; generally become unable to pay its debts or trade obligations as they become due; make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

(v) a case or other proceeding shall be commenced against SERVICERS, in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator or the like of SERVICERS, or of all or any substantial part of the assets, domestic or foreign, of SERVICERS, and such case or proceeding shall continue undismissed or unstayed for a period of sixty (60) consecutive days, or an order granting the relief requested in such case or proceeding against SERVICERS(including, but not limited to, an order for relief under the Bankruptcy Code) shall be entered;

then, upon the occurrence of (1) a SERVICERS Event of Default specified in subparagraphs (b) (iii) (iv) or (v) above, CUSTOMER may consider this Agreement to be terminated immediately, without notice, and all amounts payable

PLAINTIFF 000625

hereunder by SERVICERS shall be due and payable in full, without demand or other notice of any kind, all of which are expressly waived by SERVICERS, and (2) any other SERVICERS Event of Default, this Agreement may be terminated by CUSTOMER by giving not less than thirty (30) days' notice to SERVICERS. The parties hereto acknowledge and agree that SERVICERS' obligations to pay CUSTOMER all amounts due and owing CUSTOMER as contemplated in this paragraph shall continue to be subject to (A) SERVICERS' receipt of such funds from the applicable Card Organization and (B) the provisions of Sections 13 through 15 of this Agreement.

22.4    Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable and such provisions shall survive the expiration or termination of this Agreement.

22.5    Upon the occurrence of any CUSTOMER Event of Default, whether or not it is cured, SERVICERS may, in their sole discretion, exercise all of their rights and remedies under this Agreement and Applicable Law, including, without limitation, exercising their rights under Section 23.

22.6    This Agreement also may be terminated by SERVICERS without notice or penalty, if in their sole discretion, such termination is necessary for SERVICERS to comply with their obligations under any Applicable Law, rule or regulation including, but not limited to, the Office of Foreign Assets Control ("**OFAC**") Regulations and Card Organization Rules. SERVICERS' termination of this Agreement pursuant to this Subsection 22.6 shall not be deemed a breach of contract by SERVICERS.

22.7    If this Agreement is terminated for cause, CUSTOMER acknowledges that SERVICERS may be required to report CUSTOMER's business name and the names and other identification of its principals to the  terminated merchant files maintained by the Card Organizations. CUSTOMER expressly agrees and consents to such reporting in the event CUSTOMER is terminated as a result of the occurrence of a CUSTOMER Event of Default or for any reason specified as cause by a Card Organization.

22.8    In addition to the provisions of the Agreement that survive termination, the terms and provisions governing CUSTOMER's obligations and liabilities and SERVICERS' rights regarding the following matters will survive termination until all these matters are resolved or settled and all amounts owed to SERVICERS regarding these matters are fully and irrevocably paid: (i) processing and settlement of Card transactions, Sales Drafts and Credit Drafts, (ii) adjustments, (iii) all amounts due to SERVICERS under this Agreement, (iv) the resolution of any Chargebacks, disputes or other issues involving Card transactions, (v) Compromised Data Events and (vi) all SERVICERS' rights regarding CUSTOMER's breach of any of its agreements, representations, warranties, covenants or other obligations under this Agreement. In addition to the above and any terms and provisions which by their terms or nature survive termination, the terms and provisions of Sections 9, 14 through 21, inclusive, 23 through 31, inclusive, Subsection 22.6 and this Subsection 22.8 shall survive any termination of this Agreement. Upon termination of this Agreement, CUSTOMER agrees to immediately send SERVICERS all the data relating to Card transactions made up to the date of termination.

22.9    After termination of this Agreement for any reason whatsoever, CUSTOMER shall continue to bear total responsibility for all Chargebacks, fees, credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due to SERVICERS under this Agreement or which may be due to SERVICERS before or after such termination to either SERVICERS or any of SERVICERS' respective Affiliates for any related equipment or related services.

22.10   In the event CUSTOMER files for protection under the U.S. bankruptcy code or any other laws relating to bankruptcy, insolvency assignment for the benefit of creditors or similar laws, and CUSTOMER continues to use the Services, it is CUSTOMER's responsibility to open new accounts to distinguish pre and post filing obligations. CUSTOMER acknowledges that as long as it utilizes accounts established prior to such filing, SERVICERS will not be able to systematically segregate CUSTOMER'S post-filing transactions or prevent set-off of the pre-existing obligations. In that event, CUSTOMER will be responsible for submitting an accounting supporting any adjustments that CUSTOMER may claim.

22.11   CUSTOMER may terminate this Agreement if the Delaware General Assembly fails to appropriate funds to pay for Services. CUSTOMER shall provide written notice to SERVICERS of nonappropriation no later than fifteen (15) calendar days after the enactment of a law that fails to appropriate funds necessary to pay for Services. Notwithstanding the foregoing: (a) this right to terminate is effective only if the withdrawal of funding applies not only to SERVICERS but also to any other Person that is capable of providing services the same as or similar to the Services for which funding has been withdrawn; and (b) CUSTOMER shall pay SERVICERS all charges, fees, fines, penalties, assessments, and other amounts arising in connection with Services that SERVICERS have provided to CUSTOMER, subject to any limitations of Applicable Law.

PLAINTIFF 000626

23. **Reserve Account; Security Interest; Set-Off.**

23.1  To the extent permitted under Applicable Law, CUSTOMER expressly authorizes SERVICERS to establish an account (the "Reserve Account") pursuant to the terms and conditions set forth in this Section 23. The initial amount of such Reserve Account shall be set by SERVICERS, in their sole discretion, based upon CUSTOMER processing history and the anticipated risk of loss to SERVICERS.

23.2  The Reserve Account shall be fully funded upon five days' notice to CUSTOMER, or in instances of fraud or an CUSTOMER Event of Default, Reserve Account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to CUSTOMER's Settlement Account or any other accounts held by BANK or any of its Affiliates; (ii) one or more deductions or off sets to any payments otherwise due to CUSTOMER; (iii) CUSTOMER's delivery to SERVICERS of a letter of credit; or (iv) if SERVICERS so agree, CUSTOMER's pledge to SERVICERS of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to SERVICERS and shall be in a form satisfactory to SERVICERS. In the event of termination of this Agreement by either CUSTOMER or SERVICERS, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by BANK for the greater of ten (10) months after termination of this Agreement or for such longer period of time as is consistent with BANK's liability for Card transactions in accordance with Card Organization Rules. CUSTOMER's funds held in a reserve account may be held in a commingled Reserve Account for the reserve funds of BANK's customers, without involvement by an independent escrow agent. SERVICERS will hold funds pursuant to this Section 23 in master account(s) with your funds allocated to separate sub accounts. CUSTOMER will not at any time during the term of this Agreement, or until all amounts due under this Agreement have been paid in full, grant or pledge any security interest or lien in the Reserve Account to any Person without SERVICERS' consent. CUSTOMER acknowledges and agrees that Section 14.8 (Duty to Review Statements) and Section 14.9 (Duty to Notify Servicers of Discrepancies or Adjustments) shall apply with respect to the Reserve Account.

23.3  If CUSTOMER's funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from CUSTOMER, or if the funds in the Reserve Account have been released, CUSTOMER agrees to promptly pay SERVICERS such sums upon request. In the event of a failure by CUSTOMER to fund the Reserve Account, SERVICERS may fund such Reserve Account in the manner set forth in Subsection 23.2 above. CUSTOMER acknowledges and agrees that its failure to establish or maintain funds in the Reserve Account as required by SERVICERS hereunder shall be a material default of CUSTOMER under this Agreement pursuant to Section 22.3(iv).

23.4  To secure CUSTOMER's performance of CUSTOMER's obligations under this Agreement, and any other agreement for the provision of related equipment or related service CUSTOMER grants SERVICERS security interests in each transaction and its proceeds, the Settlement Account, the Reserve Account (if any) and any other depository, reserve or bank account held by CUSTOMER with SERVICERS, the Settlement Account at any other financial institution, whether now existing or established in the future, and in the balances and proceeds of all those accounts, any funds due CUSTOMER from SERVICERS and any of CUSTOMER's property held by SERVICERS and SERVICERS' respective Affiliates. SERVICERS may enforce these security interests without notice or demand to the extent permitted by the Card Organization Rules and Applicable Law. The security interests granted under this Agreement will survive the termination of this Agreement until all CUSTOMER's obligations are irrevocably paid and performed in full.

23.5  In addition to any rights now or hereafter granted under Applicable Law and not by way of limitation of any such rights, SERVICERS are hereby authorized by CUSTOMER at any time and from time to time, without notice or demand to CUSTOMER or to any other Person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of CUSTOMER's obligations to SERVICERS and their respective Affiliates under this Agreement and any other agreement with SERVICERS or any of SERVICERS' respective Affiliates for any related equipment or related services (including any check guarantee and check verification services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured.

24. **Information Security.**

24.1  <u>Data Protection</u>. CUSTOMER must, and must ensure that Merchant Providers, have proper security measures in place for the protection of Cardholder data, and comply with the Data Security Standards adopted by the PCI Security Standards Council, LLC.(as amended, the "**PCI DSS**"), which may be reflected in the Visa Cardholder Information Security Program ("**CISP**"), the MasterCard Site Data Protection Program ("**SDP**") and Discover Network's Information and Security Compliance ("**DISC**"). Additional information regarding the CISP, SDP programs and DISC is available at the Visa web site, www.visa.com/cisp, the MasterCard web site, www.mastercard.com/banksdp/, Discover Network's web site, www.DiscoverNetwork.com/fraudsecurity/disc.html, and at the PCI DSS web site: http://www.PCISecurityStandards.Org, as

PLAINTIFF 000627

updated from time to time. CUSTOMER will use only services and Merchant Equipment that have been certified as PCI DSS compliant by the Card Organizations when available.

24.2    Costs. In addition to CUSTOMER's obligations as set forth in Sections 27 (Responsibility of the Parties) and 14 (Fees; Adjustments; Collection of Amounts Due; Reconcilement) of this Agreement, if CUSTOMER or a Merchant Provider (or other Person used by CUSTOMER) is determined by any Card Organization, regardless of any forensic analysis or report, to be the source of any loss, disclosure, theft or compromise of Cardholder data or Card transaction information (together, "Compromised Data Event") and regardless of CUSTOMER's belief that CUSTOMER has complied with the Card Organization Rules, Applicable Law or any other security precautions and is not responsible for the Compromised Data Event, CUSTOMER must promptly pay SERVICERS for all related expenses, claims, assessments, fines, losses, costs, and penalties and issuer reimbursements imposed by the Card Organizations against SERVICERS (together, "Data Compromise Losses").

24.3    Compromised Data Event Appeals. If SERVICERS are allowed under the applicable Card Organization Rules to contest or appeal any amount assessed by a Card Organization against SERVICERS, or any claim of an Issuer, which CUSTOMER is obligated to pay under this Section 24, CUSTOMER will be given the opportunity to advise whether CUSTOMER wishes SERVICERS to contest or appeal the claim, assessment, penalty or fine. If CUSTOMER asks SERVICERS to contest or appeal, all related costs will be paid by CUSTOMER. Any amount returned to SERVICERS as a result of the contest or appeal will be promptly refunded to CUSTOMER.

24.4    Notice of Data Breach. CUSTOMER will (i) immediately notify SERVICERS of any suspected, alleged or confirmed Compromised Data Event and (ii) engage, at CUSTOMER's expense, a certified PCI Forensic Investigator (PFI) no later than the time required by a Card Organization, which may be no longer than 24 hours following CUSTOMER's suspected or actual discovery of that Compromised Data Event. CUSTOMER must cooperate with the PFI so that it may immediately conduct an examination of Merchant Equipment, Merchant Systems, and CUSTOMER's and Merchant Providers' procedures and records and issue a written report of its findings. CUSTOMER agrees that upon CUSTOMER's suspected or actual discovery of a Compromised Data Event, CUSTOMER will not alter or destroy any related records and will maintain complete and accurate documentation regarding any modifications made to the records. CUSTOMER will share with SERVICERS information related to CUSTOMER's or any Card Organization's investigation related to any actual or suspected Compromised Data Event (including, but not limited to, forensic reports and systems audits), and SERVICERS may share that information with Card Organizations. SERVICERS may, in their sole discretion, suspend or terminate Services under this Agreement for any Compromised Data Event.

24.5    System Scans. As requested by any Card Organization or required by any Card Organization Rule, CUSTOMER shall conduct, or shall have conducted by an Approved Scanning Vendor that CUSTOMER has the right to hire, electronic scans of Merchant Systems, similar to those conducted under the PCI DSS, to confirm compliance with the requirements of the PCI DSS and similar requirements of the Card Organizations. CUSTOMER shall provide SERVICERS and SERVICERS' respective representatives copies of those scans to confirm compliance with PCI DSS and similar requirements of the Card Organizations.

24.6    Intentionally Omitted.

24.7    SERVICER Requirements. SERVICERS must comply with all applicable Card Organization Rules, including without limitation, those that are related to PCI DSS and that apply to SERVICERS, which may be available from the following website, as amended or changed from time to time: https://www.pcisecuritystandards.org/document_library and must also comply with the IT Addendum attached hereto and incorporated herein. If a SERVICERS Data Security Event occurs: (a) as between CUSTOMER and SERVICERS, SERVICERS shall be responsible for investigating and responding to such SERVICERS Data Security Event in accordance with Card Organization Rules and Applicable Law; (b) to the extent required by Card Organization Rules, or as otherwise imposed by Card Organizations, SERVICERS will be responsible to the Card Organizations for all amounts resulting from such SERVICERS Data Security Event; and (c) SERVICERS shall pay the cost of providing twelve (12) months of credit monitoring to affected Cardholders that have suffered actual fraud as a result of the SERVICERS Data Security Event, provided such payment and costs shall be subject to, and aggregated towards, the Special Cap (defined below in Section 28.3).

25.    Compliance with Applicable Law. In performing its obligations under this Agreement, the parties agree to comply with all Applicable Law. To the extent that CUSTOMER'S obligations under this Agreement would cause CUSTOMER to violate any Applicable Law, CUSTOMER's obligation to comply with such Applicable Law will prevail. CUSTOMER shall be solely responsible for (i) determining which laws and regulations apply to their activities under this Agreement and (ii) maintaining compliance with all Applicable Law. CUSTOMER further agrees to cooperate with, and to provide information requested by, any SERVICER as such SERVICER deems necessary to facilitate its compliance with all Applicable Law. CUSTOMER must not use the Services for transactions prohibited by Applicable Law or the Card Organization Rules, such as those prohibited for alcoholic beverages, tobacco products, gambling, Internet gambling (for example, those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq., as may be amended from time to time), drugs, weapons, adult-content material, or adult web sites, services or entertainment.

PLAINTIFF 000628

**26. Financial and Other Information.**

To the extent CUSTOMER's financial statements are not publicly available, CUSTOMER agrees to provide SERVICERS with such annual financial statements of CUSTOMER which CUSTOMER prepares in the ordinary course of business and in accordance with applicable state law. CUSTOMER will provide such statements to SERVICERS within one hundred twenty (120) days after the end of each fiscal year, in the case of annual financial statements. Such financial statements shall be prepared in accordance with U.S. generally accepted accounting principles applicable to government entities. CUSTOMER also shall provide such other financial statements and other information concerning CUSTOMER's business and CUSTOMER's compliance with the terms and provisions of this Agreement as SERVICERS may reasonably request. CUSTOMER authorizes SERVICERS to obtain from third parties financial and credit information relating to CUSTOMER, as authorized under this Agreement. Such information will be used by SERVICERS in connection with their determination whether to accept this Agreement and their continuing evaluation of the financial and credit status of CUSTOMER. Pursuant to Applicable Law, including the USA PATRIOT Act, SERVICERS are obtaining information and will take necessary action to verify CUSTOMER's identity. Upon request, CUSTOMER shall provide to SERVICERS or their representatives or regulators reasonable access to CUSTOMER's facilities and records for the purpose of performing any inspection and/or copying of CUSTOMER's books and/or records deemed appropriate by SERVICERS.

**27. Responsibility of the Parties.**

27.1 CUSTOMER agrees to reimburse each SERVICER, and its Affiliates, agents, subcontractors, employees directors and officers, for all Claims brought against such SERVICER, and all related Losses, to the extent such Claims result from: (a) any breach of any warranty, covenant or obligation of CUSTOMER under this Agreement; (b) any misrepresentation by CUSTOMER under this Agreement; (c) any gross negligence or willful misconduct of CUSTOMER, to include by its employees or agents, in connection with CUSTOMER's Card transactions; (d) CUSTOMER's provision of goods and services to Cardholders; or (e) any Excluded Claims. Notwithstanding the foregoing, the reimbursement obligations set forth in this Section 27.1 shall not exceed $500,000 and shall apply only to Losses which are: (x) assessed, imposed, or required by any governmental authority or pursuant to applicable law; (y) part of a final judgment, ruling, opinion, decree, or other order of a judge, court, judicial authority, or tribunal; or (z) agreed upon as part of a settlement.

27.2 SERVICERS agree to defend, indemnify and hold harmless CUSTOMER from and against all Claims brought against CUSTOMER, and all related Losses, to the extent such Claims result from: (a) any breach of any warranty, covenant or obligation of SERVICERS under this Agreement; (b) any gross negligence, fraud or willful misconduct by SERVICERS under this Agreement; (c) any misrepresentation by SERVICERS under this Agreement; or (d) any infringement or misappropriation of any patent, copyright, trademark, service mark, trade secret or other proprietary right (collectively, "Intellectual Property Rights") of a third party by the BAMS Systems or the Services; provided that the foregoing shall not apply to that portion (and only that portion) of any such Claim that is caused by, results from or arises out of (i) CUSTOMER's failure to use the BAMS Systems or the Services as required under this Agreement, (ii) CUSTOMER's configuration, modification or use of the BAMS Systems or the Services in combination with other products or services (including software, equipment or systems) that are not provided by SERVICERS, and that combination creates a process or method that is the causation for the infringement or misappropriation, (iii) SERVICERS' use of any designs, artwork, concepts, specifications or other materials provided by or on behalf of CUSTOMER in connection with this Agreement or (iv) SERVICERS' custom development of the BAMS Systems or the Services, or other actions taken by SERVICERS with respect to the BAMS Systems or the Services, at CUSTOMER's request (the Claims (or portions of Claims) referred to in the foregoing clauses (i), (ii), (iii) and (iv) are herein referred to collectively as the "Excluded Claims"). Furthermore, if SERVICERS determine that any portion of the BAMS Systems or the Services likely infringes or misappropriates a third party's Intellectual Property Rights, or that it is otherwise in SERVICERS' best interests to reduce or avoid the risk of an actual or potential infringement or misappropriation of a third party's Intellectual Property Rights, then SERVICERS, at their option and expense, may either: (A) obtain the right for CUSTOMER to continue using the infringing or misappropriating portion of the BAMS Systems or the Services; (B) modify the infringing or misappropriating portion of the BAMS Systems or the Services to make it non-infringing or non-misappropriating; (C) replace the infringing or misappropriating portion of the BAMS Systems or the Services with a non-infringing or non-misappropriating equivalent; or (D) terminate either the applicable Addendum or the Agreement in its entirety upon written notice to CUSTOMER, and without further liability to CUSTOMER. The obligations of SERVICERS set forth in this Section 27.2(d) are CUSTOMER's sole and exclusive remedies with respect to any and all Claims made by a third party against CUSTOMER relating to the infringement or misappropriation of such third party's Intellectual Property Rights by the BAMS Systems or the Services.

27.3 In the event of any legal action or claim with any third parties concerning any transaction or event in which a claim for reimbursement or indemnification against a party may be made under this Agreement, the party to be reimbursed or indemnified hereunder (the "reimbursed party") agrees to: (a) promptly notify the reimbursing party hereunder (the "reimbursing party") of the legal action or claim, (b) reasonably cooperate with the reimbursing party in the making of claims or defenses, and (c) provide information, assist in the resolution of the legal action or claim and make available at least one employee or agent who can testify regarding said claim or defenses. To the extent applicable, the reimbursing party shall, upon written notice from the reimbursed party, immediately undertake the defense of any said legal action or claim with counsel reasonably satisfactory to the reimbursed party. In any event the reimbursing party shall be

PLAINTIFF 000629

entitled to direct the defense and settlement thereof with counsel reasonably satisfactory to the reimbursed party; provided, however, that the reimbursing party shall not compromise or settle any claim or action affecting the reimbursed party to the extent that it involves more than the payment of money by the reimbursing party hereunder without the reimbursed party's written consent.

27.4 Insurance.  SERVICERS shall maintain insurance as required by Applicable Law.  SERVICERS shall procure or add to an existing policy or policies or otherwise maintain general liability insurance for the Services in the minimum amount of $1,000,000 per occurrence, $3,000,000 in the aggregate, as well as Errors and Omissions/Data Security Liability coverage in the minimum amount of $10,000,000 per occurrence and $10,000,000 in the aggregate.  BAMS shall provide CUSTOMER with the certificate(s) of insurance and/or copies of the insurance policies referencing the Agreement prior to the execution of this Agreement.  In no event shall CUSTOMER or any Agency be named as an additional insured on any policy required under this Agreement.

28.  **Warranties; Limitation on Liability; Exclusion of Consequential Damages.**

28.1 **Disclaimer of Warranties.  THIS AGREEMENT IS AN AGREEMENT FOR THE SERVICES AND EXCEPT AS EXPRESSLY PROVIDED HEREIN, SERVICERS AND THEIR RESPECTIVE AFFILIATES DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, MADE TO CUSTOMER OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, NONINFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE (REGARDLESS OF ANY COURSE OF DEALING, CUSTOM OR USAGE OF TRADE) OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT.**

28.2 **Limitation of Liability.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, SERVICERS' CUMULATIVE LIABILITY, IN THE AGGREGATE (INCLUSIVE OF ANY INDEMNIFICATION OBLIGATION UNDER THIS AGREEMENT, WHETHER SUCH CLAIMS ARE RELATED OR UNRELATED TO ONE ANOTHER) FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES, OR DAMAGES FOR ANY CAUSE WHATSOEVER AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED $500,000 ("LIABILITY CAP"); PROVIDED, SUCH LIMITATION WILL NOT APPLY TO LOSSES ARISING FROM SERVICERS': (A) FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; (B) OBLIGATION TO SETTLE ALL TRANSACTION PROCEEDS VALIDLY DUE TO CUSTOMER; (C) OBLIGATION TO INDEMNIFY CUSTOMER FOR INTELLECTUAL PROPERTY INFRINGEMENT PURSUANT TO SECTION 27.2(d) OF THIS AGREEMENT; OR (D) THE WRONGFUL DEATH AND/OR PERSONAL INJURY OF ANY OF CUSTOMER'S EMPLOYEES, OFFICERS, OR AGENTS (EXCLUDING ANY LOSSES RESULTING FROM SOFTWARE OR EQUIPMENT THAT SERVICERS PROVIDE TO CUSTOMER PURSUANT TO THIS AGREEMENT).**

28.3 **Special Cap; Credit Monitoring Costs.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, SERVICERS' CUMULATIVE LIABILITY, IN THE AGGREGATE, FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES, OR DAMAGES RELATED TO SERVICERS' OBLIGATION TO PROVIDE CREDIT MONITORING SERVICES IN ACCORDANCE WITH SECTION 24.7(C) OF THIS AGREEMENT, REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY, SHALL NOT EXCEED $750,000 ("SPECIAL CAP").  FOR THE AVOIDANCE OF DOUBT, COSTS OF PROVIDING CREDIT MONITORING SERVICES SHALL NOT BE DEEMED TO BE CONSEQUENTIAL DAMAGES UNDER THIS AGREEMENT.**

28.4 **Interaction of Liability Caps.  FOR CLARITY, THE LIABILITY CAP AND THE SPECIAL CAP ARE SEPARATE CAPS, AND ONLY THE APPLICABLE CAP (BASED UPON THE TYPE OF LOSSES AT ISSUE, AS DESCRIBED IN SECTIONS 28.2 AND 28.3 ABOVE) MAY BE DEDUCTED FOR ANY LOSSES THAT ARISE UNDER THIS AGREEMENT.  FURTHERMORE, ANY AMOUNT DEDUCTED AGAINST ONE SUCH CAP WILL NOT COUNT AGAINST THE OTHER CAP.**

28.5 **Exclusion of Consequential Damages.  NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN NO EVENT SHALL CUSTOMER OR SERVICER OR ITS AFFILIATES BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

28.6 **Exception to Exclusion of Consequential Damages.  THE EXCLUSION OF CONSEQUENTIAL DAMAGES DESCRIBED IN SECTION 28.3 WILL NOT APPLY TO DAMAGES ARISING FROM CUSTOMER'S OR SERVICERS' FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  FOR THE AVOIDANCE OF DOUBT, THESE DAMAGES ARE SUBJECT TO THE LIABILITY CAPS DESCRIBED ABOVE IN SECTIONS 27.1 AND 28.2.**

29.  **Independent Contractor; Subcontractors; Third Party Beneficiaries.**  The parties are independent contractors.  No party shall have any authority to bind any other party.  SERVICERS may engage, subcontract with or use its Affiliates and/or other Persons (as hereinafter defined) to provide Services and perform any of its obligations under this Agreement.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to confer upon any Person, any rights or remedies, and the parties do not intend for any Persons to be third-party beneficiaries of this Agreement.

30.  **Publicity.**  Neither party will initiate publicity relating to this Agreement without the prior written approval of the other, except that either party may make disclosures required by legal, accounting or regulatory requirements.

31.  **Force Majeure.**  No party hereto shall be held responsible for any delays in or failure or suspension of service caused, directly or indirectly, by mechanical or power failure, computer malfunctions (including, without limitation, software, hardware and firmware malfunctions), failure, delay or error in clearing or processing a transaction through the ACH Network or Federal Reserve system, if applicable, the nonperformance, delay or error by a third party or in any other third party system (other than

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

PLAINTIFF 000630

any Merchant Provider or Merchant Provider system) for any similar cause beyond the reasonable control of such party, including without limitation, failures or fluctuations in telecommunications, transmission links or other equipment; any outbreak or escalation of hostilities, war, riots, terrorism or civil disorders in any country; strikes, labor difficulties, fire, inability to operate or obtain service for its equipment, unusual delays in transportation, earthquake, fire, flood, elements of nature or other acts of God, any act or omission of the other party or any government authority, or other causes reasonably beyond the control of such party. The foregoing shall not apply with respect to CUSTOMER's obligation to make any payment due to SERVICERS pursuant to this Agreement.

32. **Choice of Law and Venue.** This Agreement will be governed by the laws respecting national banks and, to the extent not so covered, by the laws of the State of Delaware without regard to conflicts of law provisions. If any part of this Agreement is not enforceable, the remaining provisions still remain valid and enforceable. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the courts of the State of Delaware, and each party submits to the jurisdiction of those courts in connection with such actions or claims. CUSTOMER will not raise sovereign immunity as a defense to any claim of a party to enforce the terms of this Agreement; and SERVICERS may file any breach of contract claims related to this Agreement directly in the state courts of the State of Delaware.

33. **Intentionally Omitted.**

34. **Intentionally Omitted.**

35. **Notices.** Except as otherwise specifically provided, all notices and other communications required or permitted hereunder (other than those involving normal operational matters relating to the Services) shall be in writing, and shall be sent by mail, if to CUSTOMER at the address appearing on the first page of this Agreement, if to BAMS, at the following address: Banc of America Merchant Services, LLC, 1307 Walt Whitman Road, Melville, New York 11747, Attention: Executive Vice President Operations, with a copy to Attention: General Counsel's Office, 150 N. College Street; Mail Code: NC1-028-15-01; Charlotte, NC 28213, and if to BANK, 1231 Durrett Lane, Louisville, KY 40213, Attention: Operations Manager, with a copy to BANK's Legal Department-Merchant Services Group, at Bank of America, N.A., Bank of America Plaza, 101 South Tryon Street, Mail Code: NC1-002-29-01, Charlotte, North Carolina, 28255-0001. Any such notices shall be deemed to have been given when received.

36. **IRS Reporting Information.** Pursuant to Section 6050W of the Internal Revenue Code, merchant acquiring entities (like BANK) and third party settlement organizations are required to file an information return reflecting all payment card transactions and third party network transactions occurring in a calendar year. This requirement applies to returns for calendar years after December 31, 2010. Accordingly, CUSTOMER will receive a form 1099-k reporting CUSTOMER's gross transaction amounts for each prior calendar year, beginning with transactions processed in calendar year 2011.

37. **Severability.** The parties intend every provision of this Agreement to be severable. If any part of this Agreement is not enforceable, the remaining provisions shall remain valid and enforceable. In such case, the parties will in good faith modify or substitute a provision consistent with their original intent. If any remedy fails of its essential purpose, then all other provisions, including the limitations on liability and exclusion of damages, will remain fully effective.

38. **Entire Agreement; Waiver.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter, supersedes any previous agreements and understandings and, except as provided in other Sections of this Agreement, can be changed only by a written agreement signed by all parties. Throughout this Agreement, where appropriate, singular terms include the plural and the plural includes the singular and the words "will" and "shall" are used interchangeably and have the same meaning. Headings are for convenience and reference only, and shall not in any way affect the meaning or construction of any provision of this Agreement. Purchase orders, requests for production, pre-printed terms or other CUSTOMER-generated documents that SERVICERS may receive are for administrative convenience only and do not modify this Agreement and are expressly rejected by SERVICERS.

A waiver by any of the parties of any of the covenants, conditions, or agreements to be performed by the other or any breach thereof will not be construed to be a waiver of any succeeding breach or of any other covenant, condition or agreement contained in this Agreement. No waiver will be effective unless made in writing by the party against whom it is being enforced.

39. **Survival.** This Section 39, Sections 14-21 (inclusive), Section 22.8, Sections 23-30 (inclusive), and Sections 32-39 (inclusive) will survive termination of this Agreement.

40. **Counterparts; Electronic Originals.** This Agreement and any Supplements hereto may be executed in any number of counterparts and all such counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement or any Supplement, by facsimile or other electronic means, shall be effective as delivery of a manually executed counterpart of this Agreement or any Supplement.

PLAINTIFF 000631

41. **Card Organization Disclosure**

Member Bank Information: Bank of America, NA
The BANK's mailing address is 1231 Durrett Lane, Louisville, KY 40213 and its phone number is 800-430-7161.

Important Member Bank Responsibilities

(a) The BANK is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant
(b) The BANK must be a principal (signer) to this Agreement.
(c) The BANK is responsible for educating Merchants on pertinent Card Organization Rules with which Merchants must comply; but this information may be provided to CUSTOMER by BANK.
(d) The BANK is responsible for and must provide settlement funds to the CUSTOMER in accordance with the terms of this Agreement.
(e) The BANK is responsible for all funds held in reserve that are derived from settlement.

Important Merchant Responsibilities

(a) Ensure compliance with Cardholder data security and storage requirements.
(b) Maintain fraud and Chargebacks below Card Organization thresholds.
(c) Review and understand the terms of the Agreement.
(d) Comply with Card Organization Rules.

[Signature Page Follows]

PLAINTIFF 000632

The parties hereto have caused this Agreement to be executed by their duly authorized officers. **THIS AGREEMENT IS NOT BINDING UPON SERVICERS UNTIL SIGNED BY SERVICERS.**

STATE OF DELAWARE, OFFICE OF THE STATE TREASURER
("CUSTOMER")
Original On File

By: _____ Ori

Name: _Kenneth A Simpler_
(Please Print or Type)

Title: _State Treasurer_

Date: _1/31/17_

BANC OF AMERICA MERCHANT SERVICES, LLC
("BAMS")
Original On File

By: _____

Name: _Ed Sykes_
(Please Print or Type)

Title: _SVP_

Date: _2/1/17_

BANK OF AMERICA, N.A.
("BANK")

By: BANC OF AMERICA MERCHANT SERVICES, LLC,
PURSUANT TO A LIMITED POWER OF ATTORNEY

Original On File

Name: _Ed Sykes_
(Please Print or Type)

Title: _SVP_

Date: _2/1/17_

PLAINTIFF 000633

ANNEX 1

The following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"**Acquirer**" means Bank, in the case of MasterCard, Visa and certain debit Card transactions, and Processor, in the case of Discover Card and DNP Card Types transactions.

"**Affiliate**" means a Person that, directly or indirectly, (i) owns or controls a party to this Agreement or (ii) is under common ownership or control with a party to this Agreement.

"**Agency**" means an agency, bureau, commission, commissioner, department, division, office or other entity of the State of Delaware, performing a governmental or public purpose or function of the State of Delaware, as determined from time to time by the CUSTOMER for the sole purpose for this Agreement. .

"**Agreement**" means, collectively, this Agreement (including the Supplements) and the Operating Guide, as each may be amended from time to time.

"**Applicable Law**" means the Delaware Constitution and all federal, state, and local statutes, ordinances, laws, regulations and executive, administrative and judicial orders applicable to this Agreement, the transactions or other matters contemplated under this Agreement (including, without limitation, the rules and regulations promulgated by the Office of Foreign Assets Control of the U.S. Department of the Treasury), and all amendments thereto.

"**Approved Scanning Vendor**" means an organization with a set of security services and tools to conduct external vulnerability scanning services to validate adherence with the external scanning requirements of PCI DSS.

"**Authorization**" means an approval by, or on behalf of, the Issuer to validate a Card transaction. An Authorization indicates only the availability of the Cardholder's credit limit or funds at the time the Authorization is requested.

"**BAMS Software**" means Software licensed to CUSTOMER by BAMS, including any third party Software BAMS sublicensed to CUSTOMER.

"**BAMS Systems**" means any and all Card-related information reporting, operating and processing systems used by BAMS or Persons on BAMS' behalf, including, without limitation, hardware, BAMS Software, related documentation, technical formats and specifications, technical and business information related to inventions, present and future products and product lines, intellectual property, know-how, and any other information that is identified as BAMS' systems, whether owned by BAMS or Persons used by BAMS.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time.

"**Business Day**" means Monday through Friday, excluding Bank holidays.

"**Card**" - See either Credit Card or Debit Card.

"**Cardholder**" means a Person whose name is embossed on the Card (or Debit Card, as applicable) and any authorized user of such Card.

"**Card Organization**" means any entity formed to administer and promote Cards, including without limitation Visa U.S.A., Inc. ("Visa"), MasterCard International Incorporated ("MasterCard") and DFS Services LLC ("Discover"), and any applicable Debit Networks

"**Card Organization Rules**" means the rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Card Organization and related authorities, including without limitation, those of the PCI Security Standards Council, LLC and the National Automated Clearing House Association (including, with respect to EBT, the Quest Operating Rules and with respect to PIN debit Cards, the rules, regulations, policies and procedures of the applicable Debit Network).

"**Card Validation Codes**" means a three-digit value printed in the signature panel of most Cards and a four-digit value printed on the front of an American Express Card. Visa's Card Validation Code is known as CVV2; MasterCard's Card Validation Code is known as CVC2; Discover's Card Validation Code is known as a CID. Card Validation Codes are used to deter fraudulent use of an account number in a non face-to-face environment (e.g., mail orders, telephone orders and Internet orders).

"**Chargeback**" means a Card transaction (or disputed portion thereof) that is returned to SERVICERS by the Issuer, the liability of which is the CUSTOMER's responsibility.

"**Claim**" means any third party claim, demand, suit, action, cause of action or proceeding of any form, kind or nature (including contract claims and negligence and other tort claims).

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

PLAINTIFF 000634

"Credit Card" means a valid device bearing the Marks of Visa, MasterCard, Discover or a DNP Card Organization and authorizing the Cardholder to buy goods or services on credit and, to the extent the Supplements so provide, a valid device authorizing the Cardholder to buy goods or services on credit and issued by any other Card Organization specified on such Supplements.

"Credit Draft" means a document evidencing the return of merchandise by a Cardholder to CUSTOMER, or other refund or price adjustment made by the CUSTOMER to the Cardholder, whether electronic, paper or some other form, all of which must conform to Card Organization Rules and Applicable Law.

"Debit Card" - See either PIN Debit Card or Non-PIN Debit Card.

"Debit Network" means the telecommunications and processing system of a shared electronic funds transfer network.

"Discount Rate" means a percentage rate and/or amount charged a merchant for processing its qualifying daily Credit Card and Non-PIN Debit Card transactions, as further described in Subsection 14.1 of this Agreement and in the Fee Schedule. Transactions that fail to meet applicable interchange requirements will be charged additional amounts as set forth in Subsection 14.1 of this Agreement and the Fee Schedule.

"Electronic Benefits Transfer" ("EBT") means the electronic transfer of government benefit funds to individuals through the use of Card technology with point of sale terminals, as further described in the applicable Addenda.

"EBT Network" means a shared electronic funds transfer network that is used by its members to assist government agencies in the distribution of benefits to eligible Recipients, whether such benefits are for the delivery of services or the transfer of funds or information.

"Electronic Commerce Transaction" ("ECT") means a Card transaction that occurs on the Internet, as further described in Section 7.

"Fee Schedule" means the fee schedules provided with this Agreement, including, without limitation, Schedule A and any attachments thereto, and all additions or changes SERVICERS make to them, whether contained in updated versions or in separate communications.

"Imprinter" means a manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on Sales Drafts.

"Issuer" means the Card Organization or its financial institution member that has provided a Card presented to CUSTOMER by a Cardholder for a Card transaction.

"Location" means a physical location, internet address, division, processing method or business activity for which (i) CUSTOMER has requested and SERVICERS have approved the assignment of a unique merchant account number or (ii) SERVICERS have otherwise determined a unique merchant account number is required and have assigned it.

"Losses" means any liability, obligation, loss, damage, judgment, settlement, cost or expense of any kind or nature (including attorneys' fees, expert witness fees and collection costs), regardless of whether suit is brought, and any assessment, fee or fine imposed by any Card Organization.

"Magnetic Stripe" means a stripe of magnetic information affixed to the back of a plastic Credit or Debit Card. The Magnetic Stripe contains essential Cardholder and account information.

"Marks" means names, logos, emblems, brands, service marks, trademarks, trade names, tag lines or other proprietary designations.

"Merchant Equipment" means any and all equipment CUSTOMER uses in connection with Card Authorization, clearing, completing, settling, transmitting or other related processing, including, without limitation, all telecommunication lines and wireless connections and Software (excluding BAMS Software), Purchased Equipment and Merchant Systems, Terminals, card readers, merchandise and card scanners, printers, PIN pad devices and other hardware, whether owned by CUSTOMER, Merchant Providers or other Persons used by CUSTOMER.

"Merchant Provider" means any Person engaged by CUSTOMER to provide services to CUSTOMER involving or relating to (i) access to Cardholder data, transaction data or information related to either Cardholder data or transaction data or (ii) PIN encryption, including without limitation, Encryption Service Organizations (ESOs). "Merchant Provider" also includes any

PLAINTIFF 000635

corporate entity or franchisor that provides or controls a centralized or hosted network environment irrespective of whether Cardholder data is being stored, transmitted or processed through it.

"**Merchant Systems**" means any and all Card acceptance and processing systems used by CUSTOMER (except BAMS Systems), including, without limitation, Software (except BAMS Software), related documentation, technical formats and specifications, technical and business information related to inventions and present and future products and product lines, intellectual property, know-how, and any other information that is identified as CUSTOMER's systems, whether owned by CUSTOMER or Merchant Providers or other Persons used by CUSTOMER.

"**Non-Agency**" means any government entity, municipality or political subdivision (other than an Agency) located in the State of Delaware, such as a city, county, public university or other agency with separate statutory authority, or delegated authority from the State of Delaware, to procure services for itself, as determined from time to time by the CUSTOMER for the sole purpose of this Agreement and includes but is not limited to Delaware Solid Waste Authority, Delaware State Housing Authority, Diamond State Port Authority, Delaware Technical and Community College and its bookstore, and the University of Delaware and its bookstore.

"**Non-PIN Debit Card**" means a device with a Visa, MasterCard, Discover or other Card Organization Mark that is tied to a Cardholder's bank account or a prepaid account and which is processed without the use of a PIN.

"**Operating Guide**" means the then-current Operating Procedures Guide prepared by SERVICERS, containing operational procedures, instructions and other directives relating to Card transactions, as amended from time to time.

"**PAN Truncation**" means a procedure that results in only the last four digits of a Cardholder's account number appearing on the copy of a Sales Draft or Credit Draft that the CUSTOMER provides to the Cardholder and, as required by applicable law or Card Organization Rules, the Sales Draft or Credit Draft retained by the CUSTOMER.

"**Person**" means a third party individual or entity, other than the CUSTOMER or SERVICERS.

"**PIN**" means the Personal Identification Number used by a Cardholder to complete a PIN Debit Card transaction.

"**PIN Debit Card**" means a device bearing the Marks of ATM networks (such as NYCE or Star) used at a Location by means of a Cardholder-entered PIN in the merchant PIN Pad.

"**Pre-Authorized Order**" means any Card transaction permitted by this Agreement for which a Cardholder provides CUSTOMER advance permission to charge the Cardholder's Card for recurring sales, delayed delivery orders or other preauthorized orders.

"**Purchased Equipment**" means any and all Merchant Equipment sold to CUSTOMER by BAMS (or its applicable Affiliate) pursuant to this Agreement or any Supplement.

"**Resubmission**" means a transaction that the CUSTOMER originally processed as a Store and Forward transaction but received a soft denial from the respective PIN Debit network or Card Organization. The resubmission transaction allows the merchant to attempt to obtain an approval for the soft denial, in which case CUSTOMER assumes the risk that the transaction fails.

"**Sales Draft**" means evidence of a purchase, rental or lease of goods or services by a Cardholder from, and other payments to, CUSTOMER using a Card, including preauthorized orders and recurring transactions (unless the context requires otherwise); regardless of whether the form of such evidence is in paper or electronic form or otherwise, all of which must conform to Card Organization Rules and Applicable Law.

"**SERVICERS Data Security Event**" means a breach of SERVICERS' data security obligations under Applicable Law, Card Organization Rules, or PCI DSS resulting from SERVICERS' acts or omissions which results in the actual, unauthorized disclosure of personally identifiable consumer information, including but not limited to Cardholder Data that is submitted to SERVICERS by CUSTOMER pursuant to this Agreement.

"**Settlement Account**" means an account or accounts at a financial institution designated by CUSTOMER as the account to be debited and credited by SERVICERS for Card transactions, fees, Chargebacks and other amounts due hereunder or in connection herewith.

"**Software**" means any and all software, computer programs, related documentation, technology, know-how and processes embodied in or provided in connection with Card Authorization, clearing, completing, settling, transmitting or other related processing, whether equipment, PC, server or Internet based.

"**Store and Forward**" means a transaction that has been authorized by a merchant when the merchant cannot obtain Authorization while the customer is present, typically due to a communications failure. The merchant will store the transaction electronically in their host system and retransmit the transaction when communications have been restored.

PLAINTIFF 000636

"Terminal" means a device placed in a Location which is connected to the BAMS Systems via telephone lines and is designed to authorize, record and transmit settlement data by electronic means for all sales Card transactions.

PLAINTIFF 000637

**Exhibit 1**

**Service Level Agreement**

| Global Measurements | Global SLA Goal* | Definitions |
|---|---|---|
| Authorization System Availability | 99.5% | Percentage of availability of authorization networks as defined by the ability for the merchant to successfully complete an authorization. Merchant authorization outages that occur as a result of third party network issuer outages, payment networks and communications carrier outages not included, nor are scheduled outages, or network connection outages with merchants who selected to have a single point of failure connection. |
| ACH Timeliness | 99.5% | Percentage of ACH Files that will be processed and sent out within one (1) business day. |
| Settlement: Timeliness - Visa and MasterCard Interchange | 99.5% | For settlement files completely received by the cutoff point established by cut-off guidelines, percentage of the interchange-out files that will be sent to MasterCard and Visa within the scheduled association windows for each month's cycles. Not liable for delays caused by MasterCard or Visa. |

*SLAs are global, measured across all BAMS clients and are not client-specific. SLAs are measured on a monthly basis.

In the event that CUSTOMER can confirm that SERVICERS failed to meet any of the SLA's in Exhibit 1 (not including scheduled downtime if applicable) for two consecutive months or any three months in a calendar year, due solely to the acts or omissions of SERVICERS (each, an "SLA Failure"), CUSTOMER may terminate this Agreement, without penalty, by providing SERVICERS with written notice within thirty (30) days of the SLA Failure. Should CUSTOMER not exercise its right of termination during such thirty day period, such right shall be automatically rescinded and thereafter null and void until the occurrence of a future SLA Failure. Notwithstanding any provision in this Agreement to the contrary, CUSTOMER expressly acknowledges and agrees that a SLA Failure shall not constitute a SERVICERS Event of Default, nor shall CUSTOMER have a right to bring any claim or action against SERVICERS under this Agreement on the basis of a SLA Failure. CUSTOMER acknowledges and agrees that CUSTOMER's sole and exclusive remedy for a SLA Failure shall be termination of this Agreement, as expressly set forth herein.

PLAINTIFF 000638

**Schedule A to Merchant Processing Agreement**
**Fee Schedule**

| Merchant Name: | | State of Delaware | Average Ticket: | $ Redacted |
| Contract Term (Years see below): | | 3 | Annual Volume: | $ |
| Transmission Method: | | Blend | Fee Collection Frequency | Monthly |
| Pricing Method: | | Interchange Plus | | |

Processing Fees:
*Authorization Fee- Per Authorization Attempt
**Per Item Fee- Per Settled Sale and Credit Transactions
*** The discount rate is charged as a % of total gross dollar volume

| Volume Tiers based on Authorization Volume | | Auth Fee* | Per Item Fee** | Discount Rate*** |
|---|---|---|---|---|
| Tier 1 - Up to 2MM Authorizations | VS/MC/AX/DS | | | |
| Tier 1 - Up to 2MM Authorizations | Pin Debit | | | |
| Tier 2 - +2MM-2.5MM Authorizations | VS/MC/AX/DS | Redacted | | |
| Tier 2 - +2MM-2.5MM Authorizations | Pin Debit | | | |
| Tier 3 - +2.5MM-3MM Authorizations | VS/MC/AX/DS | | | |
| Tier 3 - +2.5MM-3MM Authorizations | Pin Debit | | | |
| Tier 4 - +3MM Authorizations | VS/MC/AX/DS | | | |
| Tier 4 - +3MM Authorizations | Pin Debit | | | |

| TransArmor Fees per TransArmor transaction (based on authorizations): | | | |
|---|---|---|---|
| Tier 1 - Up to 2MM Authorizations | All Card Types | Redacted | |
| Tier 2 - +2MM-2.5MM Authorizations | All Card Types | | |
| Tier 3 - +2.5MM-3MM Authorizations | All Card Types | | |
| Tier 4 - +3MM Authorizations | All Card Types | | |

| Per Occurrence Fees: | Amount | Description |
|---|---|---|
| Chargeback Fee | | Per Chargeback |
| ACH Reject Fee | | Per ACH Returned Item |
| System Enhancements | Redacted | Per Hour |
| ACH Deposit Fee | | Per ACH Deposit |
| Wire Deposit Fee | | Per Wire Deposit |
| Non Qualified Surcharge | | % of Sale for Each Downgraded Transaction |
| Voice Auth/ARU Fee | | Per Voice Auth/ARU Item |

| Additional Product Fees: | | |
|---|---|---|
| Payeezy Additional Transaction Fee | | Per ea Authorization-All Card Types |
| Payeezy Set Up Fee | | Per ea MID Set Up |
| Payeezy Monthly Fee | Redacted | Per Month per ea MID |
| Data File Manager Set Up Fee | | One Time Fee per Message Way User |
| Data File Manager Monthly Fee | | Monthly Fee Per User |
| Data File Manager Run Now File Fee | | Per User |

All telecommunications costs/Third Party Fees will be passed through to CUSTOMER.

| Interchange Schedule and Qualification Attachments (Interchange Schedules) | |
|---|---|
| Visa and MasterCard Interchange | BAMS.MVD.S19.1.IC_Net MSA |
| Discover Interchange | BAMS MVD S19 1 IC_Net MSA |
| PIN Debit Switch and Interchange Fees | 2015 BAMS Debit Network Standard Fees FD |

Capitalized terms not defined above are defined in the Merchant Processing Agreement ("Agreement") to which this Schedule A is attached.

1. Sales plus interchange and assessments will be collected on the frequency specifically set forth in the above fee schedule.

2. The processing fees set forth in Schedule A are based on the average ticket and annual volume set forth in the fee schedule above.

3. CUSTOMER will be priced in accordance with a Pick A Tier pricing method. Therefore, CUSTOMER's applicable pricing tier (as set forth in the Fee Schedule tiers above) will be set based on the total number of transactions processed during the immediately preceding Contract Year, and CUSTOMER will pay the transaction fees corresponding to such tier for all transactions processed under this Agreement during the current Contract Year. Effective as of the date of this Agreement, CUSTOMER will pay the transaction fees corresponding to Tier 1 during the first Contract Year. At the end of each Contract Year, it shall be CUSTOMER's responsibility to notify SERVICERS promptly if CUSTOMER believes it has qualified for a higher pricing tier (i.e., a lower transaction fee) based on the number of transactions processed during the Contract Year just ended. If, following such notice, SERVICERS confirm that CUSTOMER's transaction volume qualifies for the next pricing tier (i.e. lower transaction fee), or if SERVICERS determine, based on their analysis, that CUSTOMER's transaction volume

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

PLAINTIFF 000639

qualifies for a lower pricing tier (i.e., a higher transaction fee), SERVICERS shall adjust the applicable pricing tier beginning the month following SERVICERS' confirmation or determination, as the case may be, and such fees shall be in effect for the remainder of the new Contract Year. SERVICERS shall have no responsibility to adjust pricing for transactions submitted more than thirty (30) days prior to CUSTOMER's notice. For the avoidance of doubt, (i) if CUSTOMER fails to notify SERVICERS of its transaction volume for the Contract Year, SERVICERS shall have no obligation to adjust the applicable pricing tier, (ii) SERVICERS shall have no obligation to adjust CUSTOMER's pricing in the middle of a Contract Year, and (iii) in no event will SERVICERS adjust CUSTOMER's pricing more often than once per Contract Year. For the purposes of this paragraph, "Contract Year" means each twelve (12) month period measured from the effective date of this Agreement.

**Important Information About Your Fees**

**Interchange**
A significant amount of the fees that we charge you for processing your transactions consists of charges that we must pay to issuing banks (or that are otherwise charged to us by the Card Organizations) under the Card Organization Rules. These charges are often referred to as "Interchange fees" or simply "interchange". Interchange fees are set by the Card Organizations based upon a series of Interchange levels that they establish and modify from time to time. Thus, the Interchange fee charged for a given transaction depends on the Interchange level applicable to that transaction; and that Interchange level depends on a number of factors established by the Card Organizations, such as the type of Card transaction presented, specific information contained in the transaction, how and when the transaction is processed, your industry and other factors. For a transaction to qualify at any specific Interchange level, the applicable qualification criteria must be met. Note that the Card Organizations regularly add new Interchange levels, and change the Interchange rates and qualification criteria for existing Interchange levels.

3.    **Equipment Costs**: To assist CUSTOMER with costs associated with purchasing equipment from BAMS for CUSTOMER's use in connection with the Services, BAMS agrees to provide CUSTOMER with up to 50 FD130 or FD130 Duo terminals at no cost to CUSTOMER (each a "Device"). CUSTOMER acknowledges the value of each Device is $499.00. CUSTOMER acknowledges that it shall be billed the cost of the Devices purchased by CUSTOMER and BAMS shall reimburse CUSTOMER for such purchase(s) by issuing the a credit to CUSTOMER's invoice in the amount of the purchase.    In the event the Agreement is terminated by for any reason other than BAMS' breach of a material obligation, CUSTOMER shall re-pay to BAMS a pro rata amount equal to (a) the total dollar value of all Devices ordered by CUSTOMER (that BAMS provided an invoice credit for) , divided by the number of months in the initial term, multiplied by (b)  the number of months, including any partial month, remaining in the initial term as of the effective date of termination of this Agreement.

4    **Card Organization Pass Through Fees:**

In addition to the interchange rates, SERVICERS may pass through to CUSTOMER any fees assessed to SERVICERS by the Card Organizations, including but not limited to, new fees, fines, penalties and assessment imposed by the Card Organizations. These pass through fees include the following:

| Fee/Name | Fee/Description |
|---|---|
| **VISA FEES:** The following fees result from charges assessed to SERVICERS from Visa and are subject to increases, decreases and additional new fees imposed by Visa. | |
| VISA ASSESSMENT – Debit & Prepaid | 0.11% Fee assessed on the gross dollar amount of all Visa signature Debit and prepaid  card transactions.    Fee  will increase  to  0.13%, effective July 1, 2016. |
| VISA ASSESSMENT – Credit | 0.13% Fee assessed on the gross dollar amount of all Visa Credit card transactions. |
| | |
| VISA BASE II SYSTEM FILE TRANSMISSION FEE | $0.0018 Fee assessed on all Visa transactions transmitted through the Visa BASE II settlement system, including sales / purchases, sales returns / refunds, sales reversals, chargebacks, and chargeback reversals. |
| VISA ZERO DOLLAR VERIFICATION FEE | $0.025 Fee assessed on all Account Verification messages, including both approved and declined, AVS, and SMS account verification transactions. Account Verification transactions must be submitted for $0 and are used to validate cardholder account numbers and other |

PLAINTIFF 000640

| | |
|---|---|
| | elements, such as CVV2 and AVS, prior to obtaining an actual Authorization. |
| VISA ZERO FLOOR LIMIT FEE | $0.10 Fee assessed on all clearing transactions that are not authorized based on matching the Transaction ID on the Authorization to the Transaction ID on the Clearing transaction. Fee also applies if the Transaction ID is missing. |
| VISA NETWORK ACQUIRER PROCESSING FEE (NAPF) - Credit | $0.0195 Fee assessed on all Visa Credit card Authorization attempts. Does not apply to $0 Account Verification messages, Real Time Clearing pre-Authorization requests, Authorization reversals, chargeback responses, and other administrative messages. |
| VISA NETWORK ACQUIRER PROCESSING FEE (NAPF) – Debit & Prepaid | $0.0155 Fee assessed on all Visa signature Debit and prepaid card Authorization attempts. Does not apply to $0 Account Verification messages, Real Time Clearing pre-Authorization requests, Authorization reversals, chargeback responses, and other administrative messages. |
| VISA BASE II CREDIT VOUCHER FEE – Credit | $0.0195 Fee assessed on all Visa credit voucher (sales return / refund) transactions for Credit cards. |
| VISA BASE II CREDIT VOUCHER FEE – Debit & Prepaid | $0.0155 Fee assessed on all Visa credit voucher (sales return / refund) transactions for signature Debit and prepaid cards. |
| VISA AUTHORIZATION SYSTEM MISUSE FEE | $0.045 Per Authorization that is not followed by a matching Visa clearing transaction (or is not properly reversed in the case of a cancelled/voided transaction) as shown by a matching transaction ID. Billed on a one month lag. |
| VISA INTERNATIONAL SERVICE FEES - BASE (FOR PURCHASE TRANSACTIONS) | 0.80% of the source amount on U.S. Acquired Original Purchase transactions when the Issuer Country is different from the Merchant Country and the transaction is settled in U.S. dollars. |
| VISA INTERNATIONAL SERVICE FEES – ENHANCED (FOR PURCHASE TRANSACTIONS) | 1.20% of the source amount on U.S. Acquired Original Purchase transactions when the Issuer Country is different from the Merchant Country and the transaction is not settled in U.S. dollars. |
| VISA INTERNATIONAL SERVICE FEES (FOR CASH ADVANCE TRANSACTIONS) | 0.40% of the source amount on U.S. Acquired Cash Disbursement transactions when the Issuer Country is different from the Merchant Country. |
| VISA INTERNATIONAL ACQUIRER FEE (IAF) | 0.45% Assessed on all transactions at a U.S. merchant location with a non-U.S. issued card. Billed with applicable international/interregional interchange fees. |
| VISA INTERNATIONAL ACQUIRER FEE (IAF) – HIGH RISK | 0.45% Fee assessed on all transactions conducted at U.S. merchant locations with a non-U.S. issued card; applicable to high-risk merchants in MCCs 5962 (Direct Marketing – Travel-Related Arrangement Services), 5966 (Direct Marketing – Outbound Telemarketing Merchants), and 5967 (Direct Marketing – Inbound Telemarketing Merchants). |
| VISA US DEBIT INTEGRITY TRANSACTION FEE | $0.10 charged on each signature Debit Card and Non-PIN Debit Card transaction (including Visa Consumer and Business debit cards and Visa |

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

PLAINTIFF 000641

| Fee/Name | Fee/Description |
|---|---|
| | Consumer and Commercial Prepaid Cards) that does not meet the qualification criteria defined under the Visa U.S. Custom Payment Service (CPS) program. |
| VISA FIXED ACQUIRER NETWORK FEE | See Visa Fixed Acquirer Network Fee section of rate schedule for Visa/MasterCard/Discover Interchange referenced in Interchange Schedules section above. Billed on a one month lag. |
| VISA PARTIAL AUTHORIZATION NON PARTICIPATION FEE (PANPF) FOR AFD MERCHANTS | $0.01 Fee assessed on Automated Fuel Dispenser (MCC 5542) transactions that do not support partial Authorization. |

**MasterCard Fees:** The following fees result from charges assessed to SERVICERS from MasterCard and are subject to increases, decreases and additional new fees imposed by MasterCard.

| Fee/Name | Fee/Description |
|---|---|
| MASTERCARD ASSESSMENT FEE | 0.12% Fee assessed on the gross dollar amount of all MasterCard transactions. |
| MASTERCARD ASSESSMENT FEE (>=$1,000) | 0.02% Fee assessed on the gross dollar amount of MasterCard Consumer and Commercial credit transactions that are $1,000 or greater. |
| MASTERCARD KILOBYTE FEE | $0.0035 Fee related to transmission of clearing data. Charged per kilobyte. |
| MASTERCARD CROSS BORDER FEE (U.S.) | 0.60% Fee assessed on all Consumer, Commercial, Credit and Debit transactions that are processed with the country code of the merchant different from the country code of the cardholder, where the transaction is settled in U.S. dollars. |
| MASTERCARD CROSS BORDER FEE (Non U.S.) | 1.00% Fee Assessed on all Consumer, Commercial, Credit and Debit transactions that are processed with the country code of the merchant different from the country code of the cardholder where the transaction is not settled in U.S. dollars. |
| MASTERCARD NETWORK ACCESS AND BRAND USAGE (NABU) FEE | $0.0195 Assessed on all MasterCard Authorization attempts and credit (sales return) transactions that are processed with a U.S. issued card at a U.S. merchant location. Does not apply to Authorization reversals and $0 Account Status Inquiry transactions. |
| MASTERCARD ADDRESS VERIFICATION SERVICE (AVS) CARD NOT PRESENT ACCESS FEE | $0.01 Assessed on all MasterCard Card Not Present Authorizations that use the Address Verification Service (AVS) that are submitted for more than $0. |
| MASTERCARD ADDRESS VERIFICATION SERVICE (AVS) CARD PRESENT ACCESS FEE | $0.01 Assessed on all MasterCard Card Present Authorizations that use the Address Verification Service (AVS) that are submitted for more than $0. |
| MASTERCARD ACCOUNT STATUS INQUIRY FEE – INTERREGIONAL | $0.03 Fee assessed on all Account Status Inquiry Service messages where the country code of the merchant is different from the country code of the cardholder. Account Status Inquiry Service transactions must be submitted for $0 and are used to validate cardholder account numbers and other elements, such as CVC 2 and AVS, prior to obtaining an actual Authorization. |
| MASTERCARD ACCOUNT STATUS INQUIRY FEE – INTRAREGIONAL | $0.025 Fee assessed on all Account Status Inquiry Service messages where the country code of the merchant is the same as the country code of the cardholder. Account Status Inquiry Service transactions must be submitted for $0 |

PLAINTIFF 000642

| | and are used to validate cardholder account numbers and other elements, such as CVC 2 and AVS, prior to obtaining an actual Authorization. |
|---|---|
| MASTERCARD PROCESSING INTEGRITY FEE | $0.055 Fee assessed on all MasterCard authorized transactions which are not followed by a matching MasterCard clearing transaction (or not reversed in the case of a cancelled transaction). Automated Fuel Dispensers (MCC 5542) are not subject to this fee. Rate includes additional $0.01 reporting cost from MasterCard for each transaction. Billed on a one month lag. |
| MASTERCARD LICENSE VOLUME FEE | 0.0071% of MasterCard volume. Fee based on a good faith effort to recover and allocate among our customers MasterCard's annual fees for licensing and third party processing and calculated by multiplying your settled MasterCard dollar volume by the percentage rate (which rate may be adjusted to reflect changes in those MasterCard fees and/or our allocation). |
| MASTERCARD e-COMMERCE SUSPECT FRAUD INDICATOR REBATE | $0.015 Rebate for every e-Commerce/Card Not Present Authorization reversal that includes the suspect fraud indicator. The suspect fraud indicator is used in the e-Commerce/Card Not Present environment when an Authorization reversal is processed for an approved MasterCard Authorization where the merchant suspects fraud. |
| MASTERCARD ACQUIRER PROGRAM SUPPORT FEE | 0.85% Fee assessed on all U.S. region acquired MasterCard Consumer Credit, Consumer Debit, and Commercial Card transactions for cards issued outside the U.S. region.  Billed with applicable international/interregional Interchange fees. |
| MASTERCARD CARD VALIDATION CODE 2 (CVC 2) FEE | $0.0025 Fee assessed on all Authorizations that include Card Validation Code 2 (CVC 2) validation. CVC 2 is an optional service from MasterCard that was implemented to help reduce the risk of fraud and is part of the screening tools used by merchants to ensure that the person placing the order has the card. Fee does not apply to Account Status Inquiry transactions. |
| MASTERCARD SECURECODE FEE | $0.03 Fee assessed on all MasterCard SecureCode verification requests. MasterCard SecureCode is an optional service for E-Commerce merchants that allows for an additional level of shopping security by requiring cardholders to enter additional log-in credentials that are verified by the issuer when completing an online sale (if the issuer participates in the service). |
| MASTERCARD DIGITAL ENABLEMENT FEE | 0.01% Fee assessed on the gross dollar amount of all MasterCard Card Not Present transactions. |
| MASTERCARD GLOBAL WHOLESALE TRAVEL BUSINESS TO BUSINESS FEE | 1.57% Fee applies to transactions that qualify for the MasterCard Business to Business Global Wholesale Travel Transaction program for virtual card transactions between travel agents and travel suppliers (merchants in MCCs 3000- |

PLAINTIFF 000643

|  | 3999, 4112, 4131, 4411, 4511, 4582, 4722, 5962, 6513, 7011, 7012, 7032, 7033, 7298, 7512, 7513, 7519, 7991, 7997, and 7999). Transactions assessed this fee will not be subject to the MasterCard Network Access and Brand Usage (NABU) fee, the MasterCard Cross Border fee, the Mastercard Acquirer Program Support Fee, and the MasterCard Card Present and Card Not Present Address Verification Service (AVS) fees. |
|---|---|

**Discover Network Fees: The following fees result from charges assessed to SERVICERS from Discover Network and are subject to increases, decreases, and additional new fees imposed by Discover Network. Please note that Discover Network fees apply only to Discover transactions acquired by Bank of America Merchant Services.**

| Fee/Name | Fee/Description |
|---|---|
| DISCOVER NETWORK ASSESSMENT | 0.13% Fee assessed on the gross dollar amount of all Discover, JCB, UnionPay, Diners Club International, and Korea BCcard transactions. |
| DISCOVER NETWORK DATA USAGE FEE | $0.0195 Fee assessed on all Discover, JCB, UnionPay, Diners Club International, and Korea BCcard sales and credit (return) transactions. |
| DISCOVER NETWORK INTERNATIONAL SERVICE FEE | 0.80% Fee assessed on all Discover, Diners Club International, JCB, UnionPay, and Korea BCcard transactions at a U.S. merchant location with a non-U.S. issued card. |
| DISCOVER NETWORK INTERNATIONAL PROCESSING FEE | 0.50% Fee assessed on all Discover, Diners Club International, JCB, UnionPay, and Korea BCcard transactions where the country code of the merchant is different from the country code of the card issuer. Billed with applicable international interchange fees. |
| DISCOVER NETWORK AUTHORIZATION FEE | $0.0025 Fee Assessed on all Discover, JCB, UnionPay, Diners Club International and Korea BCcard Authorizations. |

5.    **General Pricing Information:**

a.    **Interchange Schedules.** The fees and assessments and qualifying criteria set forth above and in the rate schedules referenced in the Interchange Schedules section above which are and annexed hereto by such references thereto, may be changed from time to time as a result of Card Organization changes. References in those rate schedules to the "Program Guide" and "Application" shall mean the Agreement.

b.    **Information Regarding Certain Transaction Fees for the Above Card Types:**
    (i)      Billable transactions include: purchases, returns, declines, reversals, terminal balancing totals and Authorizations.
    (ii)     Authorization fees apply to all attempted Authorizations and approved Authorizations.
    (iii)    Per item fees include data capture and settlement.
    (iv)    The Discount Rate applies to gross processing volume.
    (v)     The fees and charges set forth on this Schedule A are in addition to all other Third Party Based Fees and all fees due and payable to BAMS and/or any applicable Person and will be collected by BAMS as set forth in the Agreement.

c.    Information Regarding Supplies Charges
    (i)      The cost of supplies will not be charged to CUSTOMER, but CUSTOMER must pay shipping and handling charges for supplies.  BAMS retains discretion to determine whether particular items are considered supplies.
    (ii)     CUSTOMER shall be responsible for payment of all shipping costs associated with any equipment purchased, leased or maintained by BAMS under this Agreement.

Other Card Services Supplement to Merchant Processing Agreement and Attachment I

Debit Transactions Supplement to Merchant Processing Agreement and Attachment II

PLAINTIFF 000644

**Other Card Services Supplement to Merchant Processing Agreement and Attachment I to Schedule A**

This Other Card Services Supplement to Merchant Processing Agreement and Attachment I to Schedule A (referred to herein as the "OCS Supplement") supplements the Merchant Processing Agreement (the "Agreement") and Schedule A to which is attached and sets forth the terms applicable to BAMS provision of the specified services for the Card transactions set forth below:

**OTHER CARD SERVICES SUPPLEMENT TO MERCHANT PROCESSING AGREEMENT:**

1.  **GENERAL:**   CUSTOMER understands and acknowledges that BAMS' sole responsibility with respect to Issuer Card transactions shall be to provide the services specified in this OCS Supplement.

In the event CUSTOMER has a separate agreement with an Issuer to accept such Issuer's cards ("Issuer Agreement") respective Issuer, all Chargeback and financial obligations including but not limited to fees and issues related thereto shall be governed by the terms of such Issuer Agreement.  CUSTOMER shall comply with all terms and conditions of the Issuer Agreement and the applicable rules, regulations, interpretations and other requirements of the respective Issuer and shall not seek Authorization for or submit for processing or settlement hereunder any Issuer Card transactions at any time when CUSTOMER does not have in effect a valid Issuer Agreement with such Issuer.  CUSTOMER agrees to notify BAMS immediately upon the termination of any Issuer Agreement to which it is a party.  Upon such termination, BAMS shall have no further obligations hereunder to provide any services to CUSTOMER with respect to any transactions involving such Issuer Cards.

In the event CUSTOMER does not have a separate Issuer Agreement with a respective Issuer, the Issuer Card services to be provided hereunder shall be in accordance with the terms of the Agreement and this OCS Supplement.  Issuer Cards shall be considered "Credit Cards" for purposes of Services provided by SERVICERS or BAMS with respect to them and "Card Organizations" shall be deemed to include any Card Organizations set forth in this OCS Supplement for purposes of such Services.

2. **ISSUER CONSENTS:**

CUSTOMER shall be responsible for obtaining any operational consents required of Issuer to comply with procedures or practices contemplated by both CUSTOMER and BAMS under this OCS Supplement.

3. **AUTHORIZATION SERVICES ONLY:**

In the event BAMS is providing Authorization services only for Issuer Card transactions as specified herein, CUSTOMER shall seek such Authorization through BAMS. In the event that BAMS is not providing processing services for Issuer Card transactions as specified in this OCS Supplement, CUSTOMER shall be responsible for processing and submitting directly to the applicable Issuer for settlement of such Card transactions.

4. **PROCESSING AND SUBMISSION TO ISSUERS:**

In the event BAMS is providing processing services for Issuer Card transactions as specified herein, CUSTOMER shall submit to BAMS for processing all of CUSTOMER's Issuer Card transactions and BAMS shall process such transactions and transmit them electronically to the applicable Issuer with a summary of such Card transactions

BAMS does not warrant or bear responsibility for the performance of any Issuer in any way.

5. **DISCOVER PROCESSING PROVISIONS:**

Acceptance of DNP Card Types:  Except as provided in this OCS, the terms and conditions governing CUSTOMER's acceptance of DNP Card Types are as specified in the Agreement.  CUSTOMER agrees to follow the Agreement concerning CUSTOMER's acceptance of DNP Card Types.

Any provision contained in the Agreement which directs CUSTOMER to contact Discover for customer services or for any other inquiry or purpose is modified hereby to provide that CUSTOMER is to contact BAMS for customer service or in relation to such inquiry or purpose.

PLAINTIFF 000645

## 6.  CARD TYPES

| | | | | |
|---|---|---|---|---|
| American Express* | __X__ | Diners Club*** | _____ | Discover* |
| JCB*** | _____ | Fleet* | _____ | Voyager** |
| Wright Express* | _____ | | | |

*Card processing services for these transaction types may be subject to a separate agreement.

**SERVICERS will settle Voyager transactions directly to merchants.  All other Card types listed in this Attachment shall be settled by the Issuer.

***These are DNP Card Types and will be processed via Discover systems and subject to Discover Card Organization Rules; BAMS will settle transactions for all Discover Cards and DNP Card Types, unless CUSTOMER is classified by Discover Network as a Discover Direct Strategic Relationship as further described in Subsection 13.1 of the Agreement.

## 7.  FEES:  See Schedule A (Fee Schedule) to Agreement

### General Pricing Information:

Billable transactions include: purchases, returns, declines, reversals, Authorizations & Terminal balancing totals.

Unless expressly set forth above, the  Card transaction fee includes Authorization and data capture. Settlement and payment for such Card types will be provided by the applicable Issuer, pursuant to the agreement between CUSTOMER and such Issuer.

The fees and charges set forth above are in addition to all other Third Party Based Fees and all fees due and payable to SERVICERS and/or any applicable Person and will be collected by SERVICERS as set forth in the Agreement.

Original On File

BA_____ES, LLC
(B/

By _____

Title: _SVP_____

Date: _2/1/17_____

STATE OF DELAWARE
CUSTOMER

Original On File

By: _____

Title: _State Treasurer_____

Date: _1/31/17_____

PLAINTIFF 000646

**Debit Transactions Supplement to Merchant Processing Agreement and Attachment II to Schedule A**

This Debit Transactions Supplement to Merchant Processing Agreement ("Debit Supplement") supplements the Merchant Processing Agreement (the "Agreement") and Schedule A thereto, and sets forth the terms applicable to BAMS' provision of the Debit Services described below. BAMS is the service provider for the Debit Services, and BANK is the sponsoring member of the Debit Networks ("Debit Network Bank").

The special provisions outlined in this Debit Supplement apply only to a) those PIN Debit Transactions that are processed by a Cardholder entering a PIN, and b) those PINless Debit Transactions that are processed by a Cardholder, provided that CUSTOMER may only accept PINless Debit Transactions if CUSTOMER has been approved to accept PINless Debit Transactions and such transactions are eligible for acceptance as PINless Debit Transactions. These provisions do not apply to Non-PIN Debit Card transactions which do not involve entry of a PIN. As used in this Debit Supplement, "Debit Services" means BAMS' provision of the specific services for the PIN Debit Transactions and PINless Debit Transactions.

1.1. **PIN Debit Card Acceptance.** Most, but not all, PIN Debit Cards can be accepted at the point of sale at participating Locations. Examine the back of the PIN Debit Card to determine if the Card participates in a Debit Network that CUSTOMER is authorized to accept. Debit Network Marks are usually printed on the back of the Card. If the PIN Debit Card is valid and issued by a financial institution Issuer participating in a Debit Network, CUSTOMER must comply with Applicable Law and Card Organization Rules with respect to PIN Debit Transactions and PINless Debit Transactions submitted by CUSTOMER. In addition, CUSTOMER agrees as follows:

- CUSTOMER must honor all valid PIN Debit Cards when presented that bear authorized Debit Network Marks.
- CUSTOMER must treat transactions by Cardholders from all Issuers in the same manner.
- CUSTOMER may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.
- CUSTOMER may not require additional information, besides the PIN, for the completion of a PIN Debit Transaction unless the circumstances appear suspicious. A signature is not required for PIN Debit Transactions.
- For a PINless Debit Transaction, CUSTOMER may not require any additional information to complete that transaction unless the circumstances appear suspicious. Neither a PIN nor a signature is required for a PINless Debit Transaction.
- CUSTOMER will not disclose transaction related information to any party other than CUSTOMER's agent, a Debit Network, or Issuer and then only for the purpose of settlement or error resolution.
- a. CUSTOMER may not process a Credit Card transaction in order to provide a refund on a PIN Debit Transaction or PINless Debit Transaction.
- b. CUSTOMER must comply with applicable Card Organization Rules regarding any maximum transaction amount (and any other eligibility requirements) for acceptance of PINless Debit Transactions.

1.2. **Transaction Processing.** The following general requirements apply to all PIN Debit Transactions and PINless Debit Transactions, except as otherwise indicated below:

- All PIN Debit Transactions and all PINless Debit Transactions must be authorized and processed electronically. There is no voice authorization or imprinter procedure for PIN Debit Transactions or PINless Debit Transactions.
- CUSTOMER may not complete a PIN Debit Transaction or PINless Debit Transaction that has not been authorized. If CUSTOMER cannot obtain an Authorization at the time of sale, CUSTOMER should request another form of payment from the Cardholder. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined.
- CUSTOMER may not complete a PIN Debit Transaction without entry of the PIN by the Cardholder. The PIN must be entered into the PIN pad only by the Cardholder. CUSTOMER cannot accept the PIN from the Cardholder verbally or in written form.
- The Debit Network used to process a PIN Debit Transaction or PINless Debit Transaction will depend upon, among other things, SERVICERS' business considerations, the availability of the Debit Network at the time of the transaction and whether a particular PIN Debit Card is enabled for a particular Debit Network. The Debit Network utilized to route such transaction may or may not be the lowest cost Debit Network available. CUSTOMER agrees that SERVICERS may, in their sole discretion, (i) utilize any Debit Network available to SERVICERS for a given PIN Debit Transaction or PINless Debit Transaction (including a Debit Network affiliated with SERVICERS) and (ii) add and/or remove Debit Networks available to CUSTOMER based on a variety of factors, including availability, features, functionality and SERVICERS' own business considerations.
- CUSTOMER must issue a receipt to the Cardholder upon successful completion of a PIN Debit Transaction or PINless Debit Transaction and effect PAN Truncation on it.
- CUSTOMER may not manually enter the account number. The account number must be read electronically from the magnetic stripe affixed to the back of a plastic PIN Debit Card. If the magnetic stripe on the card is unreadable, CUSTOMER must request another form of payment from the Cardholder.

PLAINTIFF 000647

- Any applicable tax must be included in the total transaction amount for which Authorization is requested. Tax may not be collected separately in cash.
- CUSTOMER acknowledges that CUSTOMER will not perform or attempt to perform PIN Debit Card return transactions on PIN Debit Transactions or PINless Debit Transactions . CUSTOMER will not prompt Cardholder to enter PIN for return transactions. To the extent CUSTOMER allows refunds or returns on PIN Debit Card sales transactions, CUSTOMER will return/refund such amounts to the Cardholder in cash. **CUSTOMER IS RESPONSIBLE TO SECURE CUSTOMER'S TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING CREDITS AND VOIDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR PIN DEBIT TRANSACTIONS OR PINLESS DEBIT TRANSACTIONS.**

**1.3. Cash Back From Purchase.** CUSTOMER has the option of offering cash back to Cardholders when they make a PIN Debit Transaction or PINless Debit Transaction purchase. CUSTOMER may set a minimum and maximum amount of cash back that CUSTOMER will allow. If CUSTOMER is not now offering this service, CUSTOMER's Terminal may require additional programming to begin offering cash back as long as it is supported by a Debit Network.

**1.4. Settlement.** Within one Business Day of the original PIN Debit Transaction or PINless Debit Transaction, CUSTOMER must balance each Location to the BAMS System for each Business Day that each Location is open.

**1.5. Adjustments.** An adjustment is a transaction that is initiated to correct a PIN Debit Transaction or PINless Debit Transaction that has been processed in error. CUSTOMER will be responsible for all applicable adjustment fees that may be charged by a Debit Network. Some Debit Networks may have established minimum amounts for adjustments.

There are several reasons for adjustments being initiated:

- The Cardholder was charged an incorrect amount, either too little or too much.
- The Cardholder was charged more than once for the same PIN Debit Transaction or PINless Debit Transaction.
- A processing error may have occurred that caused the Cardholder to be charged even though the PIN Debit Transaction or PINless Debit Transaction did not complete normally at the point of sale. All parties involved in processing adjustments are regulated by time frames that are specified in the applicable Debit Network Card Organization Rules or under Applicable Law (such as the Electronic Funds Transfer Act or Regulation E).

**1.6. Change in Sponsorship.** Upon notice to CUSTOMER, another Debit Network member may be substituted for Debit Network Bank under whose sponsorship this Debit Supplement is performed. Upon substitution, such other Debit Network member will be responsible for all obligations required of Debit Network Bank, including the obligations under applicable Card Organization Rules. Subject to Card Organization Rules, BAMS and Debit Network Bank may assign or transfer this Debit Supplement and their rights and obligations hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without advance notice to CUSTOMER.

**1.7. Fees.** CUSTOMER agrees to pay the fees for the Debit Services set forth on Schedule A (Fee Schedule) to the Agreement. The fees set forth in Schedule A are in addition to all other applicable Third Party Based Fees and Servicers Fees, which will be payable by CUSTOMER as set forth in the Agreement.

STATE OF DELAWARE
(c(Original On File

By
Tif
Date: 1/81/17

BANC OF AMERICA MERCHANT SERVICES, LLC
(BAMS)
Original On File

By:
Title:
Date: 2/1/17

BANK OF AMERICA, N.A.
("BANK")

By: BANC OF AMERICA MERCHANT SERVICES, LLC,
PURSOriginal On File
By: File

(Please Print or type)

Title: SVP

Date: 2/1/17

State of Delaware (BAMS) Govt Merch Agmt 01-30-17 BAMS cln.docx

PLAINTIFF 000648

## PAYEEZY℠ SERVICES ADDENDUM TO MERCHANT PROCESSING AGREEMENT

**THIS PAYEEZY SERVICES ADDENDUM TO MERCHANT PROCESSING AGREEMENT ("Payeezy Addendum")** dated ___January 31___, 2017 **("Effective Date")** is among BANC OF AMERICA MERCHANT SERVICES, LLC **("BAMS")** and STATE OF DELAWARE **("Customer")**; and supplements the Merchant Processing Agreement dated ___January 31, 2017___ **("Agreement")** between Customer, BAMS and BANK OF AMERICA, N.A. **("Bank")**.

BAMS AND CUSTOMER AGREE:

1. **Definitions.** Capitalized terms used but not defined in this Payeezy Addendum are defined in the Agreement.

2. **Payeezy Services.**

2.1 **Services.** BAMS will provide Customer with an electronic gateway messenger system (**"Payeezy Services"**) that allows Customer to manage Card transaction information being transmitted when processing Customer's payment transactions, and includes the following functionality: (i) a web-based application programming interface (**"API"**) that allows third-party applications to process transactions through the Payeezy Services system and supports a range of processing functions (e.g., purchase, refund, pre-authorization functions) and further allows Customer to implement custom business logic to manage these functions; (ii) a securely hosted web payment form (a **"Payment Page"**) designed to accept Internet-based eCommerce transactions, redirecting the consumer to a payment form hosted by the gateway that uses a "Checkout" button on Customer's website to submit payment posting requests to a designated URL and displays payment acceptance details and authentication information on the Customer's website, the appearance of which and payment options displayed may be configured by Customer using an online management interface provided by BAMS; and (iii) a real-time payment manager (**"RPM"**) hosted application that is able to turn any Internet connected personal computer with a standard web browser into a point of sale device to process retail and MO/TO payments, allowing Customer's employees to input payment transactions in a MO/TO, call center or back office environment, or to swipe Cards in a retail point of sale environment. Receipts for RPM processed transactions are provided, and can be printed or emailed to the cardholder. RPM is also a centralized administrative tool through which Customer may access its Payeezy Services account (i.e., user administration, gateway reporting, and hosted payment page configurations).

2.2 **Provider.** The Payeezy Services are provided to Customer by BAMS and not Bank. Bank is not liable to Customer in any way with respect to the Payeezy Services. For the purposes of this Payeezy Addendum, the term "Servicers" in the Agreement refers only to BAMS and not the Bank.

2.3 Notwithstanding any term or provision of this Payeezy Addendum to the contrary, BAMS shall not provide the Payeezy Services to Customer unless and until Customer has asked BAMS in writing or via email to commence providing the Payeezy Services.

3. **Payeezy Services Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED IN THIS PAYEEZY ADDENDUM, THE PAYEEZY SERVICES ARE PROVIDED "AS IS" AND BAMS MAKES NO REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) WITH REGARD TO THE PAYEEZY SERVICES, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF ACCURACY, NON-INFRINGEMENT OR THAT THEY WILL FUNCTION UNINTERRUPTED OR ERROR-FREE; AND ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) ARE DISCLAIMED.

4. **Fees.** Payment of fees for the Payeezy Services will be as set forth in the Agreement. The fees for processing transactions related to the Payeezy Services are described on <u>Schedule A</u> of the Agreement. In addition to the fees described on <u>Schedule A</u>, Customer will be responsible for all additional costs and expenses as set forth in the Agreement.

5. **Sublicense; Intellectual Property; Representations and Warranties.**

PLAINTIFF 000649

5.1     **Software License; Use Restrictions.** BAMS hereby grants Customer a royalty free, non-exclusive, nontransferable, revocable, limited license to use the software (including Updates, as defined below, "*Software*") and documentation that BAMS, its affiliates or partners involved in provision of the Payeezy Services, provides to Customer during the term of this Payeezy Addendum for the sole and limited purpose of submitting payment transactions to BAMS for processing using the Payeezy Services; all subject to the terms of this Payeezy Addendum and the Agreement.  Customer may only use the Payeezy Services in connection with the processing services Customer receives under the Agreement.  Customer has no right, title or interest in or to the Payeezy Services, any related software, materials, documentation, or derivative works thereof; and nothing in this Payeezy Addendum or the Agreement assigns, transfers or creates any such right, title or interest for Customer (whether express or implied, or by estoppel or otherwise).  Any and all right, title or interests associated with the Payeezy Services that are not expressly granted by BAMS within this Payeezy Addendum are expressly withheld. Customer will not take any action inconsistent with the ownership, title or license rights associated with the Payeezy Services.  Customer will not file any action, in any forum, challenging ownership of the Payeezy Services, any related software, materials, documentation or derivative works thereof.  Breach of this Section constitutes a material breach of this Payeezy Addendum and the Agreement, and BAMS may immediately suspend or terminate Customer's use of the Payeezy Services, this Payeezy Addendum or the Agreement in the event of such breach.

5.2     Customer will not, and will not permit others to: (i) sell, distribute, lease, license, sublicense or otherwise disseminate the Payeezy Services or any portion thereof; (ii) copy, modify, enhance, translate, supplement, create derivative works from, reverse engineer, decompile or otherwise reduce to human-readable form the Payeezy Services or any portion thereof; (iii) use altered versions of the Payeezy Services or portion thereof; (iv) use, operate or combine the Payeezy Services or any related software, materials or documentation, or any derivative works thereof with other products, materials or services in a manner inconsistent with this Payeezy Addendum or the Agreement; or (v), other that intended by its nature, use the Payeezy Services, or any portion thereof, as a standalone or non-integrated program.  Customer will not permit others to access the Payeezy Services, any related software, materials or documentation, or derivative works thereof.  Customer will not remove, alter, modify, relocate or erase any copyright notice or other legend(s) denoting BAMS' or other third parties' proprietary interests in the Payeezy Services.

5.3     BAMS reserves the right to alter, immediately suspend or upon notice terminate the Payeezy Services in the event Customer violates the terms of this Payeezy Addendum, the Agreement or if BAMS terminates any agreement with third parties that are involved in providing the Payeezy Services, or BAMS is otherwise unable to continue to provide the Payeezy Services.

5.4     *Software Updates.*  From time to time BAMS may release updates ("*Updates*") to the Software, which must be installed and integrated with Customer's systems within 60 days of receipt of such Updates, or sooner (but not less than 30 days) for important security updates and for updates needed to ensure compliance with Card Organization Rules.  Customer acknowledges that failure to install Updates in a timely fashion may impair the functionality of the Payeezy Services, and associated Services provided under the Agreement and accessed through the Payeezy Services.  BAMS will have no liability for Customer's failure to properly install the most current version of the Software or any Update, and will have no obligation to provide support or services for outdated versions of the Software.

5.5     Software Return/Destruction. Upon termination or expiration of this Payeezy Addendum, all licenses granted hereunder will immediately terminate and Customer will either return or destroy the Software, certifying such destruction in writing to BAMS.

6.      **Termination.**  In addition to the termination rights set forth in the Agreement, this Payeezy Addendum will automatically terminate upon any termination or expiration of the Agreement.

7.      **Full Force and Effect.**  The terms of the Agreement are integrated within this Payeezy Addendum and the Agreement remains in effect as supplemented hereby.  In the event of any conflict between the terms of this Payeezy Addendum and the Agreement, this Payeezy Addendum will control with respect to the Payeezy Services.  References to the Agreement after the date of this Payeezy Addendum include this Payeezy Addendum.

PLAINTIFF 000650

8.  **Representations and Warranties.** Customer and BAMS each represent and warrant: (i) they have authority to execute this Payeezy Addendum; and (ii) executing this Payeezy Addendum does not constitute a material conflict with, breach or default under any documents, agreements or other instruments which are binding upon the parties.

9.  **Counterparts.** This Payeezy Addendum may be executed in any number of counterparts, each of which is deemed an original and all of which constitute one and the same instrument. Facsimile, electronic or other copies of this executed Payeezy Addendum are effective.

**[Signature Page Follows]**

PLAINTIFF 000651

IN WITNESS WHEREOF, the parties hereto have executed this Payeezy Services Addendum to Merchant Processing Agreement as of the Effective Date.

STATE OF DELAWARE, OFFICE OF THE STATE TREASURER
("CUSTOMER")

By: _Original On File_

_Kenneth A Simpler_
(Please Print or Type)

Title: _State Treasurer_


BANC OF AMERICA MERCHANT SERVICES, LLC
("BAMS")     Original On File

By: _____

Name: _Ed Sykes_
(Please Print or Type)

Title: _SVP_

PLAINTIFF 000652

**TRANSARMOR SERVICES ADDENDUM TO MERCHANT PROCESSING AGREEMENT**

This TransArmor Services Addendum ("*TransArmor Addendum*") dated ___January 31___, 2017 ("*Effective Date*") is among **STATE OF DELAWARE** ("*Customer*"); Banc of America Merchant Services, LLC ("*BAMS*"); and Bank of America, N.A. ("*Bank*") (collectively BAMS and Bank are the "*Servicers*"); and supplements the Merchant Processing Agreement ("*Agreement*") between Customer, BAMS and Bank, dated ___January 31, 2017___.

1. **Definitions.** Capitalized terms used but not defined in this TransArmor Addendum are defined in the Agreement.

2. **TransArmor Services.** BAMS will provide Customer with services ("*TransArmor Services*") that will provide Customer with (a) encryption of point-of-sale data, including, historical transaction data, card number, and track 1 and track 2 magnetic stripe data, related to payments or non-monetary electronic transactions (e.g., loyalty transactions) when such data is uploaded and sent to BAMS for processing; (b) tokenization of the authorization response that BAMS provides to Customer in connection with processing the point-of-sale or non-monetary, electronic transaction data Customer submits by converting and replacing BAMS' authorization response data with a token value (a "*Token*"); and (c) the ability to convert primary account number ("**PAN**") data contained in historical transaction information into Tokens as part of implementation and, conversely, convert Tokens generated during payment processing back into corresponding PAN data as part of a deconversion (conversion of historical PAN data into Tokens, and deconversion of Tokens into corresponding PAN data described in clause (c) is "*Legacy Data Conversion*"). TransArmor Services do not include, and specifically exclude, point-of-sale data or authorization responses processed in connection with electronic check transactions, closed-loop gift card transactions, STAR contactless transactions read in contactless mode, Wright Exprses ("**WEX**") transactions, Voyager transactions, or other Card transaction types that BAMS determines are not capable of being tokenized using the TransArmor Services. The TransArmor Services are incorporated within the term Services in the Agreement. BAMS will provide Customer with an encryption key that must be used to encrypt Card data upon upload for transmission to BAMS in connection with the TransArmor Services. Customer may not use encryption keys that BAMS does not provide to Customer in connection with the TransArmor Services. The TransArmor Services are for Customer's internal business use only and apply only to Card transactions that Customer sends to BAMS for authorization and settlement pursuant to this TransArmor Addendum and the Agreement.

Use of the TransArmor Services does not cause Customer to be compliant with, or eliminate Customer's obligation to comply with, the data security requirements or Card Organization Rules as set forth in the Agreement. Use of the TransArmor Services does not eliminate the risk of, and is not a guaranty against, an unauthorized breach of Customer's Merchant Systems. Customer must implement the TransArmor Services according to the operating instructions, which includes, without limitation, (i) implementing the services throughout Customer's Merchant Systems involved in the Services, (ii) replacing existing Card numbers within Customer's Merchant Systems involved in the Services with Tokens, and (iii) complying with applicable data security standards and reviews set forth in the Agreement and Card Organization Rules. Customer must implement any upgrades to the TransArmor Services within a commercially reasonable period of time after receiving the updates. Customer may not retain Card account numbers following implementation of the TransArmor Services and must use Tokens in lieu of Card account numbers for *all* activities related to the Services provided by BAMS subsequent to receipt of a Token associated with a Card transaction; including, without limitation, settlement, retrieval, chargeback and adjustment processing and transaction reviews. Customer may only use Merchant Systems, gateways or VARs that are certified for use with the TransArmor Services. If Customer submits Card transactions as batch files for processing, Customer must use batch file processing services, truncated report viewing and data extract creation tools provided by BAMS in connection with the TransArmor Services.

In the event this TransArmor Addendum is terminated for any reason, BAMS will deconvert Tokens into their corresponding Card numbers and provide the Card numbers and corresponding information (collectively, "*Legacy Data*") to Customer or, at Customer's written request, to Customer's designated third party, as part of Legacy Data Conversion. Legacy Data constitutes Cardholder data under the Agreement. Customer will be responsible for its, and its designated third party's, compliance with Applicable Law and Card Organization Rules (including PCI-DSS) with respect to use, storage, transmission or handling of Legacy Data that BAMS

PLAINTIFF 000653

provides to it, or its designated third party, in connection with Legacy Data Conversion. BAMS will not be responsible for any claims, losses or liabilities arising from Customer's, or its designated third party's, use, transmission, storage or handling of Legacy Data that BAMS provides in connection with Legacy Data Conversion. Customer agrees that BAMS' provision of Legacy Data to Customer's designated third party in connection with Legacy Data Conversion hereunder is not a breach of the confidentiality provisions of the Agreement. Notwithstanding the foregoing, BAMS will not be required to provide the Legacy Data to any third party that is not authorized to use, transmit, store or handle Legacy Data pursuant to Applicable Law or the Card Organization Rules.

The TransArmor Services are provided to Customer by BAMS and not Bank. Bank is not liable to Customer in any way with respect to the TransArmor Services. For the purposes of this TransArmor Addendum, the words "we", "our" and "us" refer only to BAMS and not the Bank.

3.  **Intentionally Deleted.**

4.  **TransArmor Limited Warranty.** BAMS warrants that the Token returned to Customer as a result of using the TransArmor Service cannot be used to initiate a financial sale transaction by an unauthorized entity/person outside Customer's Merchant Systems involved in BAMS' payment processing (the "**TransArmor Limited Warranty**"). The TransArmor Limited Warranty applies only to authorization responses for which BAMS returns a Token to Customer and the subsequent use of such Token to initiate a financial sale transaction as described in the TransArmor Limited Warranty. To be eligible for the TransArmor Limited Warranty, Customer must obtain authorization and settlement processing services from BAMS and must be in compliance with the material terms of Customer's Agreement and this TransArmor Addendum.

    BAMS will indemnify and hold Customer harmless from direct damages, including third party claims, resulting from BAMS' breach of the TransArmor Limited Warranty; subject to the exclusion of consequential damages and limitations of liability set forth in the Agreement. The TransArmor Limited Warranty is void if Customer (a) fails to comply with the operating instructions we may provide for the tokenization process, the terms of this TransArmor Addendum or the Agreement after Customer is provided with notice of such failure and an opportunity of at least ten (10) days to cure, or (b) is grossly negligent or engage in willful misconduct with respect to the tokenization process or use of a Token.

5.  **Fees.** The fees for the TransArmor Services are described in Schedule A. The TransArmor Service fees are incremental, additional fees charged for each transaction in addition to the applicable processing fees set forth in the Agreement. BAMS will collect fees for the TransArmor Services and Customer will pay fees for the TransArmor Services in the same manner and pursuant to the same terms and conditions that are set forth in the Agreement for the collection and payment of Servicers Fees.

6.  **TransArmor Services Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED IN THIS ADDENDUM, BAMS MAKES NO REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) WITH REGARD TO THE TRANSARMOR SERVICES, INCLUDING, WITHOUT LIMITATION, NON-INFRINGEMENT BY THE TRANSARMOR SERVICES OR THAT THEY WILL FUNCTION UNINTERRUPTED OR ERROR-FREE; AND ANY AND ALL SUCH REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) ARE DISCLAIMED AS SET FORTH IN THIS ADDENDUM AND THE AGREEMENT.

7.  **Intellectual Property.** BAMS grants to Customer a non-transferable, non-assignable, non-exclusive, revocable sub-license during the term of this TransArmor Addendum to use the TransArmor Services, and the associated trademarks or service marks identified in the operating instructions, within the United States and subject to the terms of this TransArmor Addendum and the Agreement. Customer has no right, title or interest in or to the TransArmor Services, any related software, materials, documentation, or derivative works thereof; and nothing in this TransArmor Addendum or the Agreement assigns, transfers or creates any such right, title or interest for Customer (whether express or implied, or by implication, estoppel or otherwise); and any rights associated with the TransArmor Services that are not expressly granted by BAMS within this TransArmor Addendum are withheld. Customer will not take any action inconsistent with the ownership, title or license rights associated with the TransArmor Services. Customer will not file any action, in any forum, challenging ownership of the TransArmor Services, any related software, materials, documentation or derivative works thereof. Breach of this Section constitutes a material breach of this TransArmor Addendum and the

PLAINTIFF 000654

Agreement, and BAMS may immediately suspend or terminate Customer's use of the TransArmor Services, this TransArmor Addendum or the Agreement in the event of such breach.

Customer will not, and will not permit others to: (i) sell, distribute, lease, license, sublicense or otherwise disseminate the TransArmor Services or any portion thereof; (ii) copy, modify, enhance, translate, supplement, create derivative works from, reverse engineer, decompile or otherwise reduce to human-readable form the TransArmor Services or any portion thereof; (iii) use altered versions of the TransArmor Service or portion thereof; (iv) use, operate or combine the TransArmor Service or any related software, materials or documentation, or any derivative works thereof with other products, materials or services in a manner inconsistent with this TransArmor Addendum or the Agreement; or (v) use the TransArmor Services, or any portion thereof, as a standalone or non-integrated program.  Customer will not remove, alter, modify, relocate or erase any copyright notice or other legend(s) denoting BAMS' or other third parties' (if any) proprietary interest in the TransArmor Services.

8. **Full Force and Effect.**  The Agreement remains in effect as amended and supplemented by this TransArmor Addendum.  In the event of any conflict between the terms of this TransArmor Addendum and the Agreement, this TransArmor Addendum will control with respect to the TransArmor Services.  References to the Agreement after the date of this TransArmor Addendum include this TransArmor Addendum.

PLAINTIFF 000655

IN WITNESS WHEREOF, the parties hereto have executed this TransArmor Services Addendum to Merchant Original On File

**STATE OF DELAWARE, OFFICE OF THE STATE TREASURER**
("CUSTOMER")

Name: Kenneth A Simpler
(Please Print or Type)

Title: State Treasurer

**BANC OF AMERICA MERCHANT SERVICES, LLC**
("BAMS Original On File

By:

Name: Ed Sykes
(Please Print or Type)

Title: SVP

PLAINTIFF 000656

## EXHIBIT A TO MERCHANT PROCESSING AGREEMENT

This PARTICIPATION AGREEMENT ("Participation Agreement") is entered into as of _____, 20__ by and among BANK OF AMERICA, N.A. ("Bank"), BANC OF AMERICA MERCHANT SERVICES, LLC ("BAMS" and, together with Bank and any other third party providers who enter into addenda to this Agreement in order to perform services hereunder, collectively, "Servicers"), and _____, a _____ of the State of Delaware ("Non-Agency"). Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement (as defined below).

WHEREAS, Servicers and the State of Delaware, Office of the State Treasurer ("Customer") entered into a Merchant Processing Agreement, effective as of _____, 2017 (together with any and all amendments, addenda and supplements thereto, collectively, the "Agreement"), for the provision of processing services regarding credit, debit and certain other Card transactions and other services as further described therein (collectively, "Services");

WHEREAS, the Agreement provides that the Services will be provided to any government entity, municipality or political subdivision (other than an Agency) located in the State of Delaware, such as a city, county, public university or other agency with separate statutory authority, or delegated authority from the State of Delaware, to procure services for itself, that enters into a Participation Agreement with Servicers and agrees to become a party to the Agreement; and

WHEREAS, Non-Agency desires to be bound by the terms of the Agreement and receive the Services as provided in and subject to the Agreement, as further specified in this Participation Agreement.

1.  Participation Terms and Conditions.

    A.  Non-Agency represents that it has received, reviewed and retained a true and correct copy of the Agreement, which is attached to this Participation Agreement as Exhibit A. Non-Agency agrees to be bound by (i) the terms and conditions of the Agreement to the same extent as Customer (but only for Non-Agency's use of the Services) as provided therein, and (ii) the terms and conditions of this Participation Agreement. For the avoidance of any doubt, Non-Agency is responsible and liable to Servicers for any and all acts, omissions, and breaches of Non-Agency in connection with the Participation Agreement and/or the Agreement. Non-Agency further agrees to abide by any decisions made by Customer on all matters involving the Agreement (including any amendments thereto), and acknowledges that amendments to the Agreement made in accordance with its terms will constitute amendments to this Participation Agreement, and will be binding upon Non-Agency. Non-Agency will be liable to SERVICERS only with respect to its own receipt of Services under this Agreement; neither CUSTOMER nor any other individual Non-Agency will be liable to SERVICERS under this Agreement for any other Non-Agency, including for Non-Agency transactions.

    B.  This Participation Agreement will remain in effect unless and until it is terminated in accordance with its terms or the Agreement is terminated, in which case this Participation Agreement will automatically terminate as of the effective date of termination of the Agreement. Servicers and Non-Agency may terminate this Participation Agreement for the same reasons such parties have to terminate the Agreement.

    C.  Non-Agency agrees to pay in accordance with the terms of the Agreement all fees charged by Servicers under the Agreement for the Services received by Non-Agency. Non-Agency will verify that it has established a Settlement Account separate from the Settlement Accounts of Customer, other Agencies and other Non-Agencies.

    D.  Non-Agency agrees that Servicers may share certain information with Customer, on an as-needed basis in accordance with Applicable Law and the Card Organization Rules, regarding the Services provided to Non-Agency in order for Servicers to carry out the program established by Customer and Servicers with respect to the provision of Services to Non-Agency.

2.  Notices.

    A.  All notices and other communications to Non-Agency required or permitted under this Participation Agreement or the Agreement shall be sent to Non-Agency at the following address in accordance with the notice procedures specified in the Agreement:

        Non-Agency Name:          _____

        Street Address:            _____

        City, State, Zip:          _____

        Recipient/Title for Notices: _____

        Facsimile Number:          _____

        Email Address:             _____

        Taxpayer ID Number:        _____

PLAINTIFF 000657

B. All notices and other communications to any party other than Non-Agency required or permitted under this Participation Agreement or the Agreement shall be sent to such party in accordance with the notice procedures specified in the Agreement.

C. Routine notices given by Servicers to Non-Agency, such as transaction details, changes in terms required by systems updates or Card Organization changes and the like, may be delivered by electronic mail to the address provided by Non-Agency above.

3. <u>General</u>.

A. This Participation Agreement and the Agreement contain the entire understanding of the parties and supersedes any and all previous discussions, proposals or agreements, if any, by and among the parties with respect to the subject matter hereof.

B. This Participation Agreement may be amended for the same reasons and in the same manner as the Agreement; **provided however**, that no amendment to this Participation Agreement may be signed by Non-Agency unless also approved in writing by Customer.

C. This Participation Agreement is binding upon Servicers and Non-Agency and their respective successors and assigns. Non-Agency may not assign or transfer this Participation Agreement, in whole or in part, without the written consent of Servicers and Customer.

D. To the extent the terms of the Agreement directly conflict with the terms of this Participation Agreement, the terms of this Participation Agreement shall control.

IN WITNESS WHEREOF, the parties hereto have caused this Participation Agreement to be duly executed by their authorized officers, as of the date first written above.

| | |
|---|---|
| ("NON-AGENCY") | **BANK OF AMERICA, N.A.** ("BANK") |
| | By Banc of America Merchant Services, LLC pursuant to a limited power of attorney |
| | Original On File |
| By:_____ | By: _____ |
| Name:_____ | Name: Ed Sykes |
| Title:_____ | Title: SVP |
| Date:_____ | Date: 2/1/17 |

**BAN** Original On File
("BA
By:_____
Name: Ed Sykes
Title: SVP
Date: 2/1/17

PLAINTIFF 000658

**EXHIBIT A**

**MERCHANT PROCESSING AGREEMENT**

PLAINTIFF 000659