IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ERIC SLAWIN,<br><br>                    Plaintiff,<br><br>v.<br><br>BANC OF AMERICA MERCHANT SERVICES, LLC, s/h/a BANK OF AMERICA MERCHANT SERVICES,<br><br>                    Defendant. | Civil Action File No. 1:19-cv-04129-AT |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO BAMS MOTION FOR SUMMARY JUDGMENT

### Statement of the Facts

**1. BAMS Was Required to PCI Compliant, Was Not, and Would Not Become PCI Compliant**

At all times during 2017, BAMS was aware that it was required to be PCI compliant but that it was not.  (SDMF 14, 15, 19, 22 -27; Davis Dep. 47:1-3, 52:20-53:13; Exs. 1, 3, 4, 6, 8-10, 17, 19). Under the Payment Card Industry Data Security Standards (PCI DSS) BAMS was required to be PCI compliant because it was receiving and transmitting full PAN data (cardholders' full account numbers). (SDMF 11-13, 15, 25-27, Ex. 79; Moll Dep. 10:14-11:3; Davis Dep. 32:10-22;

1

Slawin Dec. ¶¶ 14-16). From January 2017 through mid-2018, BAMS was <u>actually,</u> not "potentially", PCI non-compliant (SDMF 22-27; Ades Dep. 31:17-32:9, 52:3-6, 53:9-17, 74:12-75:13; Davis Dep. 30:22-31:3; 52:20-53:13; Exs. 1, 3, 4, 6, 8-10, 17, 19). Ali Davis, Sr. VP, admitted that "new layer of PCI compliance" referred to a strategy so that BAMS would not need to become PCI compliant, so that there was no "new layer".  (SDMF 21; Ex. 11; Davis Dep. 98:8-11).

On January 25, 2017, Ali Davis, emailed Thomas Fontana, BAMS Chief Risk Officer, stating that BAMS employees were accessing or using full PAN data, in a non-PCI compliant way, which was confirmed by Joe Moll, VP Corporate In Information Security Officer, Risk and Compliance (SDMF 15; Ex. 1; Davis Dep. 10:16-11:6, 16:3-18, 17:25-18:6; 26:20-27:23, 78:15-79:1). Ms. Davis stated that validating that BAMS was PCI compliant would "cost an absolute fortune." (SDMF 17; Ex. 1; Davis Dep. 38:2-23).

BAMS did not know the full scope of its PCI non-compliance and whether employees had been sending full PAN data in an unencrypted fashion. (SDMF 32; Davis Dep. 85:17-87:6; Kendall Dep. 162:8-163:6). On July 11, 2017, Moll identified 2,925 violations during the prior 12 months, but noted this did not include other instances of full PAN being stored, processed, or transmitted inappropriately by BAMS employees. (SDMF 33; Ex. 8; Moll Dep. 30:1-31:7) The non-PCI compliance issue involved BAMS employees handling debit suspense

items and chargebacks wherein they sent or received full PAN data. (SDMF 34; Exs. 9, 14; Davis Dep. 93:1-95:5, 100:16-20). BAMS not being PCI compliant was firm wide. (SDMF 34; Ex 14; Davis Dep. 100: 22-101:21).

In June 2017, Ali Davis told David Ades, Exec. VP, GM, and Head of Sales North America, that his team was sending full PAN data unencrypted, which was not PCI compliant. (SDMF 24, Ades Dep. 25:22-26:6; SDMF 180, Ex 3; Ades Dep. 28:5-8, 31:8-32:9; Davis Dep. 34:19-23). Ades understood that this violated PCI DSS standards and meant that BAMS was not PCI compliant.  (SDMF 25; Ex. 79; Ades Dep. 37:6-38:8; 41:11-25; Davis Dep. 32:10-22; Moll Dep. 10:14-11:3). On June 13, 2017, Mr. Ades wrote an email stating "We – BAMS don't want to go the route of PCI compliance as it would be a very costly and time consuming exercise." (SDMF 28; Exs. 3, 16; Ades Dep. 30:9-31:24, 33:10 – 34:7), and suggested setting up a Self-Identified Audit Issue (SIAI). (SDMF 28; Davis Dep. 79:17-24; 81:2-4). Brian Glynn, who reported to Ades, responded that "making BAMS PCI compliant is not something we want to consider." (SDMF 29, 31, 42; Ex. 3). The only two solutions for BAMS PCI noncompliance were to transfer all the processing of PAN data to First Data or for BAMS to become PCI compliant, both of which options Ades and other senior management took off the table. (SDMF 51, Slawin Decl.¶32).

## 2.  BAMS Decided not to become PCI Compliant but to Conceal that Fact from the Merchants

BAMS decided to conceal from the merchants that BAMS was not PCI compliant by responding to direct questions regarding <u>BAMS PCI compliance,</u> that First Data was PCI compliant. (SDMF 56-61; Slawin Decl. ¶¶38-41,43-44; Ex. 63; Collins Dep. 68:9-19). First Data being PCI compliant did not resolve the fact that BAMS was not PCI compliant. (SDMF 60; Slawin Decl. ¶43). From January 2017 through mid-2018, BAMS had no plan to tell the merchants that it was not PCI compliant, and never did so. (SDMF 22, 36; Davis Dep. 52:20-53:13, 54:15-20, 114:8-15).

### 3. The SIAI and Slawin's "Mission Impossible."

Slawin was tasked with working on the SIAI. (SDMF 50; Ex. 3; Slawin Decl. ¶31). There was an internal debate within BAMS regarding which business line would own the SIAI, because it was toxic since the way to fix the problem had been taken off the table, and everyone had thought that BAMS was PCI compliant. (SDMF 52; Slawin Decl. ¶33; Kendall Dep. 161:11-163:6, 164:6-11, 168:24-171:13). There was reluctance to be the owner of the SIAI. (*Id*.) "Completing" the SIAI was effectively impossible. (SDMF 68; Slawin Decl. ¶51).

After firing Slawin, Kendall "completed" the SIAI, which did not resolve the PCI noncompliance problem of BAMS employees sending and receiving unencrypted full PAN data. (SDMF 197-198; Ex. 28). The proposed "Remediation Plan" was to: 1) Validate current situation and identify PAN data gaps; 2) Explore

solutions to address, and select best solution; 3) Create project plan to implement solution; 4) Implement solution; 5) Test solution; 6) Implement ongoing controls (if applicable). (*Id.*) Kendall acknowledged that there was <u>no remediation plan</u> in the December 2017 SIAI. (SDMF 198; Kendall Dep. 99:11-15).

### 4. Slawin's Prior Experience Investigating Fraud in the Banking and Securities Sectors

Prior to starting at BAMS, Slawin had almost 25 years in the Securities and Banking Regulatory and Compliance field, starting in that area in 1991, and he had held numerous regulatory and compliance positions both for governmental regulatory agencies as well as for other banks and broker dealers. (SDMF 2; Slawin Decl.¶ 3). Slawin had worked on Wall Street on the trading floor, as a go-to person to answer questions from the syndicate desk and the investment bankers regarding disclosures in offering documents. (SDMF 3; Slawin Decl.¶37). Slawin's experience prior to BAMS also included investigating securities fraud for the State of Florida and NASDAQ, which became FINRA. (*Id.*). Through his prior experiences, Slawin became aware that in many cases the fraud is one of omission. (*Id.*).

After being tasked with the SIAI in June and July 2017, Slawin researched the issue of what BAMS was telling its merchants. (SDMF 44, 45, 54;  Slawin Decl.¶¶20-21, 35; Slawin Dep. 178:12-179:4). He downloaded blank Merchant Service Agreements (MSA's) from the internet from which he saw that BAMS

represented itself to be PCI compliant in its MSA's.  (SDMF 44, 45;  Slawin Decl.¶¶20-21). He also obtained from the internet a copy of the Merchant Processing Agreement (MPA) with the State of Delaware, which also represented that BAMS was PCI compliant. (SDMF 45; Slawin Decl. ¶21; Slawin Dep. 173:19-175:2).

BAMS' response to the PCI non-compliance problem was to deflect that fact, by trying to get its parent, First Data, to answer customer questionnaires regarding data security, to camouflage that BAMS, which received, retained and transmitted its customers' PAN data, was not PCI compliant. (SDMF 56-61; Slawin Decl. ¶¶38-41, 43-44; Ex. 63; Collins Dep. 68:9-19). Mr. Slawin's task was to deflect questions from merchants as to whether BAMS was PCI compliant to First Data, and thereby conceal by fraudulent omission that BAMS was not PCI compliant. (SDMF 57; Slawin Decl. ¶39). Slawin was uncomfortable being positioned to misrepresent the facts. (SDMF 58; Slawin Dep. 204:11-18; Slawin Decl.¶40).

## 5.  Slawin Objects to BAMS' Fraudulent Scheme

Slawin believed that "management across the board. . .engaged in wrongful conduct [which was] not disclosing . . .[the PCI non-compliance] problem. I mean it's omission. It's fraud. And I felt that the implications of this . . could ultimately affect shareholders of various companies." (SDMF 66, 200; Slawin Dep. 183:5-15).

Slawin came to this conclusion "roughly July 2017". (SDMF 66; Slawin Dep. 183:16-18). He complained repeatedly for months, culminating in his 12/11/17 email, that BAMS' conduct in withholding its PCI non-compliance from merchants was fraudulent, illegal and could affect shareholders and stock prices. (SDMF 62-65, 74-77, 79, 83, 88, 91, 162-164, 201, 202; Slawin Dep. 124:14-17, 138:20-25; 197:23-198:7; 203-17-205:6; 206:9-18; 216:9-217:11; 218:11-220:10; 221:25-222:9; Kendall Dep. 92:25-94:5; Slawin Decl. ¶¶45-48, 58-60, 62, 66, 71, 75, 96).

<u>Mark Kendall</u>

Beginning in July 2017, Slawin complained to Mark Kendall repeatedly that BAMS conduct in not disclosing to the merchants that it was not PCI compliant was fraud and illegal. (SDMF 62, 63; Slawin Dep. 187:15-19, 187:21-22, 187:15-188:17, 189:2-11, 191:21-194:23, 193:3-6, 194:5-11, 205:3-6, 221:25-222:9; Slawin Dec.¶45, 46).

> Q. And you indicated that you also told Mark Kendall that you believed BAMS was engaging in fraud. When did you tell this to Kendall?
>
> A. It was routinely. I spoke to Mark virtually daily. And I started saying that July 2017....When I spoke with Kendall, it was always clear that this was going to be an omission. And I know omission is -- is part of the definition of fraud. And the fact that once I saw what was being said by senior management that this wasn't going to be fixed or disclosed, that's --that's the conclusion I reached.. . .

Slawin Dep. 191:21-192:16. Kendall agreed with Slawin that nondisclosure was

fraud. (SDMF 62, 201; Slawin Dep. 194:5-14).

Slawin complained to Kendall after Kendall was Slawin's supervisor, telling Kendall that BAMS was acting fraudulently and misleading its customers, and that he (Slawin) was not comfortable being part of BAMS' conspiracy to mislead its clients. (SDMF 62, 63; Slawin Dep. 221:25-222:9)

During these conversations, which became monthly, Slawin stated that BAMS' fraud was bad for the clients, and bad for BAMS and its parent companies since the deception could expose the whole organization to massive financial exposure if BAMS PCI noncompliance became public. (SDMF 62, 63; Slawin Decl. ¶¶45, 46) PCI non-compliance violations can incur huge fines, and a potential data security breach posed significant potential costs. (SDMF 63; Ades Dep. 85:21-86:10; Slawin Dep. 197:23-198:7, 22:24-223:10; Slawin Decl. ¶46). Slawin believed BAMS' failure to disclose or correct its non-PCI compliance was a massive fraud on the merchants, and the shareholders of Bank of America which shared name association with BAMS, which he told Kendall.  (SDMF 62, 63) Slawin objected to BAMS' misleading its clients by misdirecting them to First Data. (SDMF 63). Kendall does not dispute that Slawin made these complaints to him. (SDMF 202; Kendall Dep. 93:25-94:5) and testified that the whole issue was traumatic for him as well. (SDMF 203; Kendall Dep. 175:7-16).

Kendall agreed with Slawin that it was a problem that BAMS was receiving PAN data and was not PCI compliant Kendall told Slawin that it would be problematic if it got out that BAMS was not PCI compliant, telling Slawin after he became Slawin's supervisor,  "[t]hat's why we need to keep it confidential and not tell anyone." (SDMF 72; Slawin Dep. 220:14-221:17; Slawin Decl.¶56).

<u>Natasha Collins</u>

In his biweekly meetings with Natasha Collins from August through September 2017, Slawin repeatedly advised her about his concerns regarding BAMS' non-PCI compliance, specifically that he was not uncomfortable being asked to represent to BAMS' clients and to internal BAMS' teammates that BAMS was PCI compliant when he knew that it was not. (SDFM 65; Slawin Dep. 203:16-217:11, 204:6-205:2, 218:11-219:17, 218:11-219:17; Slawin Decl. ¶48).

<u>Sherra Grissom</u>

On at least two occasions Slawin specifically told Sherra Grissom that BAMS was engaged in fraud. (SDMF 77; Slawin Dep. 188:2-20, 189:2-11). Ms. Grissom was Enterprise Risk Management. "I had a dotted line to her. So she was another reporting…line for me"; thus Mr. Slawin's superior. (*Id*.). In November 2017 Slawin told Grissom "I felt that the fact that this isn't being disclosed to clients is omission and it's fraud" (*Id*.)

<u>Brian Rubin and Walt Zimmerman</u>

Slawin expressed his concerns about BAMS non disclosure of its PCI noncompliance to Brian Rubin, Slawin's manager until approximately September 2017 (Undisputed Fact No. 256), and to Walt Zimmerman, a BAMS Sr. Sales executive for the Home Depot account. (SDFM 75,79, 91; Slawin Dep. 216:9-217:11; Slawin Decl. ¶59, 62, 75).  Slawin was aware that Home Depot was very concerned about PCI compliance since Home Depot's own auditors had been brought in to evaluate the handling of PAN data. (SDMF 81; Slawin Decl. ¶64). Part of Slawin's job was to answer customers' inquiries, like those from Home Depot, about whether BAMS was PCI compliant, and Slawin told his superiors that he would not answer that BAMS was PCI compliant when it was not. (SDMF 82, 9; Slawin Dep. 216:9-217:11; Slawin Decl. ¶¶12, 65). Slawin knew that other BAMS' employees handling Home Depot, actively mislead Home Depot, and other similar BAMS' merchants and municipal customers, into believing that BAMS was PCI compliant by diverting the response to First Data. (SDMF 84; Slawin Decl. ¶67). Since the communications between the merchants and BAMS regarding the PCI issue, their questionnaires, and BAMS responses were sent by email over the internet, Slawin believed that these fraudulent email communications were wire fraud. (SDMF 69, 70; Exs. 57, 59, 63, 92; Slawin Decl. ¶52, 53).

**6. Slawin Downloads Emails to his Personal Email Account**

For his own protection, in the summer of 2017, Slawin began downloading emails regarding BAMS' PCI noncompliance to his personal email account because he felt he " . . . was positioned in the middle of a fraud to be a fall guy" and wanted it clear that he had not been a willing participant in BAMS' fraudulent scheme. (SDMF 97; Slawin Dep. 159:22-160:5, 203:17-205:2, 206:9-18).

**7. BAMS Directs Slawin to Destroy the Downloaded Emails, Slawin Responds that He will not Comply because He does not want to be Implicated in BAMS' Fraudulent Scheme, and is Fired the Next Day.**

On December 8, 2017, BAMS sent an email to Slawin directing him to destroy the downloaded emails and to sign a Declaration confirming that he had done that. (Slawin Decl. ¶ 92). On December 11, 2107, Slawin sent an email to Mr. Solan explaining why he would not sign the requested declaration:

> . . . .
> Should I acknowledge the statements in the declaration by writing my signature on the document I could make it appear that I as a declarant agree with the actions taken by other parties to withhold information possibly demonstrated by and referenced as "BAMS' confidential business information" in the declaration statement. I have not at any time taken nor will I ever agree with any actions taken by parties either individually or acting as joint tortfeasors which implies, demonstrates, or creates a belief that information should be withheld that could damage the counter-parties of Bank of America Merchant Services, Inc.
>
> . . . .

11

(SDMF 162; Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).  Slawin

testified:

> The e-mails's clear. . . when you look at holistically. . . it's
> clear, okay, that those e-mails, I wasn't going to delete
> those e-mails because I was in the middle of a fraud. And
> I'm not going to be pulled into that. And I'm not going to
> be -- I'm not going to be set up so I -- you know, my
> contention is I told them that and they terminated me. And
> they retaliated against me.

(SDMF 162.a; Slawin Dep. 206:9-18).  He was fired the next day. (SDMF 156-165;

Ex. 45; [December 12, 2017 Termination letter] [Doc. 175-27].

ARGUMENT

POINT I
SLAWIN WAS NOT REQUIRED TO MENTION SOX
OR THE CFPA TO ENGAGE IN PROTECTED ACTIVITY

In *Ronnie v. Office Depot, LLC*, 81 F.4th 1345, 1351 (11th Cir. 2023) , the

Court of Appeals held that a SOX plaintiff <u>need</u> <u>not</u> cite a specific statute to engage

in protected activity, provided he specifically identifies the illegal <u>conduct</u> in his

complaint:

> To make a showing of protected activity. . . . does not
> require the complainant to articulate the *specific*
> *provision* of §1514A he alleges his employer's conduct
> violates. [citation omitted]. . . . a complainant will not be
> penalized for failing to identify the specific SOX
> provision at issue.

*Ronnie*, 81 F.4th at 1351 (Emphasis in original).

12

This aligns with case law in other circuits.  Under SOX "[a] plaintiff need not . . . cite a particular statute that he believed was being violated." *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011), *citing*, *Mahony v. KeySpan Corp.,* 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007). "An employee need not 'cite a code section he believes was violated' in his communications to his employer, but the employee's communications must identify the specific conduct that the employee believes to be illegal." *Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008), cited with approval in *Gale v. U.S. Department of Labor*, 384 Fed. App'x 928, 929 (11th Cir. 2010). In *Van Elswyk v. RBS Sec., Inc.*, 2017 WL 3431395 (D. Conn. 2017), the court found protected activity where the plaintiff alleged fraud without citing to specific statutes:

> . . . Van Elswyk unequivocally stated . . . that the decision . . . could be "illegal" . . . . . he "truly believed that the trading desk was making a conscious decision to use an inappropriate accounting method," . . . in which case, if RBS employees "sign[ed] a financial statement knowing that [they were] mismarking [their] position, depending upon the facts and circumstances, it could be fraud ...

*Van Elswyk*, at *10 (D. Conn. Aug. 9, 2017).  The court noted that, "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers," (*Id*., *citing*, *Sharkey* 805 F. Supp. 2d at 55).  On similar facts as here, the Court in *Van Elsywk* denied summary judgment on the plaintiff's SOX

claim where the plaintiff had complained about fraud and illegal conduct, and the
employer's articulation was that the plaintiff had improperly downloaded emails.

POINT II
SLAWIN COMPLAINED  OF AND OBJECTED TO
PARTICIPATING IN SPECIFIC FRAUDULENT CONDUCT
THAT IS COVERED UNDER SOX AND THE CFPA

BAMS reliance on reliance *Cruzan v. Hewlett Packard Enterprise Company*,
2020 WL 10574160 (N.D. Ga, 2020) and *Veard v. F&M Bank*, 704 Fed. Appx. 469,
474  (6th Cir. 2017) is misplaced because in both cases the plaintiff  had merely
asked questions, and did not as Slawin did here, complain about or oppose
engaging in specific conduct they believed to be unlawful or fraudulent.

Here, Slawin complained repeatedly to his supervisors from July 2017
continuing until his December 11, 2017 email, that BAMS was engaging in illegal
and fraudulent conduct by withholding from merchants the information that it was
not PCI compliant. He objected to being positioned to misrepresent to merchants
by redirecting their questions to First Data, when they specifically were inquiring
about BAMS' PCI compliance. BAMS' assertion (Br. p. 8) that BAMS never
represented that it was PCI compliant misses the point that it was striving to
conceal its PCI noncompliance by requiring Slawin to redirect merchants'
questions about BAMS' PCI compliance to First Data.  Since the MSA's required
BAMS to be PCI compliant, its failure to acknowledge that it was not, amounted to

fraud by omission, and Slawin objected to participating in the fraudulent scheme. *See*, Undisputed Facts Nos. 238-240.

BAMS misleadingly states that saying "illegal" is insufficient to amount to protected activity (Def. Br. 16), but that statement in *Cruzan*, was in the context of the plaintiff merely asking questions about whether conduct was illegal, as was made clear in the immediately following citation and parenthetical in that case.

Slawin complained about BAMS conduct as fraud and illegal to Trecia Brooks, Sherra Grissom (2x) and repeatedly to Kendall, even after Kendall became his supervisor, which Kendall does not deny. (SDMF 62-65, 74-77, 79, 83, 88, 91, 162-164, 201, 202; Slawin Dep, 220:14-222:9; Kendall Dep.93:25-94:5). While he did not specifically use the words "fraud" or "illegal" when complaining, to Natasha Collins, Brian Rubin (both of whom had been his supervisors before Kendall), Leonard Ebel, and Walt Zimmerman who was BAMS relationship manager for the Home Depot account, he expressed his concerns routinely about being positioned to misrepresent facts around BAMS' PCI noncompliance. (SDMF 58-59, 62-66, 68, 74-77, 79-83, 87-88, 91, 162, 162.a., 163). BAMS admits that, "Slawin further contends he told Kendall and Grissom 'it could become an issue with it getting out that data wasn't secure at merchants and that could affect their bottom line. And ultimately, the bottom line leads to earnings per share/shareholders,' referring to the shareholders of merchants." (SUMF 248).

Slawin discussed with Kendall his concern that BAMS conduct could affect shareholders of BOA and merchants. (Slawin Decl. ¶45). *See*, (SUMF 254-261).

Slawin's knowledge that BAMS employees were using email to mislead merchants like Home Depot, and that use of email amounted to wire fraud, put his complaints clearly within the ambit of SOX. (SDMF 69, 70; Slawin Dec. ¶¶52, 53). *United States v. Phillips*, 647 F. App'x 917, 918 (11th Cir. 2016) (emails sent in furtherance of fraud, or contemplated to be sent, support wire fraud under 18 U.S.C. § 1343).

Slawin's objections to BAMS' fraudulent concealment of BAMS PCI noncompliance, was protected action under the CFPA. Ali Davis admitted that merchants serviced by BAMS had customers who were consumers purchasing goods and services for their personal use. (SDMF 204; Davis Dep. 103:3-22, 104:24-105:4, 105:23-106:19). Slawin's complaints thus regarded conduct that was subject to enforcement by the CFPB.

PCI DSS standards are payment card industry *standards* to regulate credit card and debit card processing, under the CFPB's clear jurisdiction. Thus 12 U.S.C. §5567(a) precludes termination by a <u>covered person</u> or <u>service provider</u> of any <u>covered employee</u> who "objected to, refused to participate in, any activity, policy, practice or assigned task that the employee . . .reasonably believed to be in violation of any law, rule order, <u>standard</u> or prohibition subject to the jurisdiction

of enforceable by, the <u>Bureau</u>." 12 U.S.C. §5567(a)(4). (Emphasis added). Also, the CFPB enforces activities regarding credit card processing since its definitions section, defines "financial product or service" to include "providing financial data processing products or services by any technological means, including processing, storing, aggregating, or transmitting financial or banking data . . ." 12 C.F.R. §§1001.1, 1001.2.  Under *Ronnie*, it is immaterial that Slawin did not specifically say that the conduct he was complaining about was illegal under the CFPA, since he objected to fraudulent conduct enforceable by the CFPB under the CFPA.

BAMS' argument (Br. p. 15) that Slawin lacked a subjective belief that any statute was violated is belied by his deposition testimony that he believed "the SEC would be interested in" his complaint that BAMS was engaging in fraud by omission in concealing its PCI noncompliance from merchants, and that he believed that "the implications of this . . could ultimately affect shareholders of various companies." (SDMF 91, 200; Slawin Dep. 183:5-15). He amplified this testimony in his Declaration, stating that he was thinking that BAMS conduct would violate the 1933 and 1934 acts setting up the SEC and its statutory framework. (SDMF 66; Slawin Decl. ¶49). Slawin's prior years of banking, regulatory, and securities experience, including investigating fraud, informed his belief that fraud by omission is fraud. The MSA's and Delaware MPA he obtained online confirmed that BAMS had to be PCI compliant. This is sufficient evidence

17

of Slawin's subjectively genuine belief in violations of pertinent laws covered under SOX. A jury assesses credibility so that BAMS subjective belief argument will have to be made to a jury. *Van Elswyk,* 2017 WL 3431395 at *10. *Gale v. U.S. Dept. of Labor*, 384 Fed. App'x, 926 (11th Cir. 2010) is inapposite since Gale denied at his deposition any belief that illegal or fraudulent conduct had occurred.

The evidence refutes BAMS' "objective belief" argument since BAMS <u>was PCI non-compliant,</u> strived to mislead the merchants about this, and BAMS management testified to the "reputational risk" to BAMS if its PCI non-compliance "got out", or if the merchants found out. (SDMF 37, 172; Ex 42; Collins Dep. 85:11-86:10, 126:10-127:7; Solan Dep. 53:17-55:16, 56:24-59:15; 111:19-25) Solan's 12/7/17 email to Maryann De Castro about Slawin's downloaded emails specifically raised the "severe ramifications" of public disclosure of BAMS PCI non-compliance, including "extensive reputational damage". Ex 63 is BAMS' general counsel's email regarding answering merchants, that BAMS should just refer merchants to First Data. (SDMF 205). Unlike *Ronnie* where there was no evidence to support the plaintiff's complaints, here, BAMS' own documents affirm the objectively reasonable basis for Slawin's complaints and concern about being drawn into BAMS' fraud. "Objective reasonableness is an issue ill-suited" for resolution on summary judgment. *Van Elswyk*, 2017 WL 3431395 at * 12, *citing*, *Allen v. Admin. Rev. Bd*., 514 F.3d 468, 477–78 (5th Cir. 2008) ("If reasonable

minds could disagree on this issue, the objective reasonableness of an employee's belief should not be decided as a matter of law....")(citations omitted)).

*Cruzan* is inapposite because there Hewlett Packard (HPE) terminated a contract with DXC Technology (DXC), which objected to the contract termination but did not file any legal action. BAMS misses the point that in *Cruzan,* DXC was *aware* of HPE's termination of the contract but here, the merchants were *unaware* that BAMS was not PCI compliant, precisely because that information was being concealed from them.  That is why the *Cruzan* Court stated that the plaintiff could not reasonably believe that a breach of contract action could constitute fraud, to DXC's shareholders, or to DXC.  Also, unlike here, the *Cruzan* plaintiff did not make any allegations of fraud but merely raised the question about potential illegality.

BAMS considered that Slawin might have whistleblower protection, and concluded (erroneously) that he did not only because he had not yet gone to the SEC. (DSMF 172; Ex 42, Solan Dep. Solan Dep. 83:22-86:16). Since BAMS implicitly believed that Slawin had engaged in protected activity, so could a jury.

<u>POINT III</u>
<u>BAMS' ADMITS TERMINATING SLAWIN ON DECEMBER 12, 2017</u>
<u>PRECLUDING  ITS ARGUMENT THAT SLAWIN'S</u>
<u>DECEMBER 11, 2017 EMAIL WAS NOT PROTECTED ACTIVITY</u>

Slawin was terminated on December 12, 2017, immediately following his December 11, 2017, email. (SDMF 156-160) It is undisputed that the termination

19

letter is dated December 12, 2017, and that it was emailed to Slawin on that date. (SUMF 132, 135; Solan Dep., Ex. 45 [Termination letter] [Doc. 175-27]; Solan Dep. 132:25-134:2). <u>Mr. Solan admitted at his deposition that Slawin was fired on December 12, 2017.</u> (SDMF 157; Solan Dep. 131:21-132:8).

BAMS' argument that it decided to terminate Slawin before his December 11, 2017, email must be made to a jury, which can reject Solan's excuse that he could not notify Slawin of his termination until December 12, 2017. Slawin received no phone calls or social media communication from Solan over the weekend of December 9-10, disputing Solan's testimony that he tried to call Slawin to terminate him over that weekend. (SDMF 166; Slawin Decl. ¶100). Solan admitted that he could have emailed the termination letter before December 12th, since at all times he had Slawin's personal email. (SDMF 161; Solan Dep. 131:25-132:5, 132:19-133:24, 134:15-23). A jury reasonably could conclude, as the termination letter states, that BAMS fired Slawin on December 12, 2017.

POINT IV<br>
<u>MARK KENDALL ALONG WITH MIKE SOLAN</u><br>
<u>DECIDED TO TERMINATE SLAWIN</u>

Ex 76, BAMS' verified Supplemental Responses to Plaintiff's First Interrogatories, Response No. 3 states: "Mike Solan. . .<u>and Mark Kendall</u> . . . ultimately decided to terminate Plaintiff's employment with BAMS." Accordingly, this Court must reject Kendall's and Solan's contrary testimony that

Kendall was not a decisionmaker. BAMS argument and citation to *Hitt v. CSX Transp. Inc.*, 116 F. 4th 1309 (11th Cir. 2024) at page 22 of its brief, is inapposite, because there "[n]one of the decision-makers knew about Hitt's protected conduct." *Hitt* at 1317-18. Kendall knew about Slawin's protected conduct from July through December 2017. And, after receiving the December 11, 2017, email from Slawin, Solan – the other decision maker – knew about it too. (SDMF 168).

POINT V
SLAWIN'S PROTECTED ACTIVITY CONTRIBUTED
TO HIS TERMINATION

Under SOX and the CFPA, a "contributing factor" is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Shea v. Kohl's Dept Stores, Inc.* 2019 WL 1452887 (N.D. Ala.) at *7. "[A]n employee's participation in protected activity need only be one factor in the termination decision" to violate SOX or the CFPA, which is a "relatively low bar". *Grove v. EMC Corp.*, 2006–SOX–99, at 26 (ALJ July 2, 2007). "[T] he protected activity need not be 'the primary motivating factor' . . . nor does the plaintiff need to demonstrate that "the employer's articulated reason [for the personnel action] was pretext in order to prevail." *Shea,* 2019 WL 1452887 at *7.

Out of emails that Slawin sent from his work email to his personal email the *only* 10 emails flagged by BAMS DLP all related to what BAMS understood to be the PCI noncompliance issue. (SDMF 178).

21

Ex 42, Solan's 12/7/17 email to Ms. De Castro, posited Slawin as a potential whistleblower, and stated that 1) Slawin was involved in the "organization wide PCI Non-Compliance issue"; 2) the emails Slawin had downloaded, "include our acknowledgement that this issue exists, the scope of the problem, as well as some potentially damaging quotes about not wanting to implement internal compliance because of the cost. . .", and 3) noted the "severe ramifications if [the content of these emails] were to be shared publicly" as well as "extensive reputational damage." BAMS' concern was about "reputational risk" if the merchants were to find out about BAMS' PCI noncompliance. (SDMF 37; Collins Dep. 85:11-86:10, 126:10-127:7; Solan Dep. 53:17-55:16, 56:24-59:15; Ex. 40; Ex. 42).

Kendall provided the information to Solan regarding BAMS' PCI non-compliance issue, and described the problems with disclosure, and reputational damage. (SDMF 111.a; Solan Dep. 45:14-47:7, 48:18-52:12, 53:1-55:16, 56:10-61:2, 69:2-16, 79:6-82:2, 103:22-105:5, 113:23-114:22; Kendall Dep. 45:5-48:3, 66:5-67:2, 128:7-129:19; Ex. 40; Ex. 42; Ex. 49). Solan discussed BAMS' PCI noncompliance with Maryann De Castro, his supervisor, who approved the termination decision. (SDMF 174, Solan Dep. 38:19-40:2, 42:17-44:3, 121:12-123:18, 124:9-125:1).

BAMS' purported "loss of trust" in Slawin was grounded in its fear that Slawin would disclose the emails and BAMS' PCI noncompliance to merchants,

and fired him the day after he refused to destroy the emails because he wanted to make clear that he was not a willing participant in BAMS' fraudulent conduct.

BAMS cannot disentangle Slawin's protected activity from his termination. The close temporal proximity alone, of Slawin's termination a day after his December 11, 2017, email supports the reasonable inference that his protected activity contributed to it. *Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).* BAMS' argument about delay between Slawin's complaints to Kendall in July 2017 and his termination is refuted since Slawin complained for months, culminating in his December 11, 2017, email.

POINT VI
BAMS CANNOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT
IT WOULD HAVE FIRED HIM IN THE ABSENCE OF HIS PROTECTED
ACTIVITY

Disputed material facts preclude BAMS from meeting its "clear and convincing" burden. *Shea*, 2019 WL 1452887 at *9. The only emails BAMS "flagged" and based Slawin's termination on, were emails having to do with BAMS non-PCI compliance, which Solan admitted in EX 42 created substantial risk to BAMS.

Slawin did not violate any policy or nondisclosure obligation contained in his offer letter (SDMF 112 -145). His offer letter did not refer to violations of policy for downloading information from his work to personal email account, and the nondisclosure obligation referred to dissemination of BAMS' information

23

outside the company, ". . . to any other person, organization, or entity . . ." (SDMF 114; Slawin Dep. 148:2-6; Slawin Decl. ¶ 99), which Solan admitted Slawin did not do. (SDMF 118; Solan Dep. 161:15-162:1).

The policies do not support any violations by Slawin. (SDMF 113-145). The Proprietary Rights And Information Agreement (Doc. 175-7) prohibits dissemination of information outside the company but BAMS concedes that Slawin did not do that. (SDMF 114 -127; Solan Dep. 161:15-162:1; Slawin Dep. 204:11-22). The policy deals with inventions and refers to conduct immaterial to the termination decision. (SDMF 114-127; Solan Dep. 166:3-7).

Solan admitted there was no evidence that Slawin violated the Associate Handbook. (SDMF 128-133; Solan Dep. 163:7-21, 158:13-159:3, 159:12-24, 171:1-25, 172:1-20, 172:22-173:12). Solan was unable to ". . . recall a specific sentence that was . . . violated . . .", in the Code of Ethics, Slawin had violated it " . . . just in general." (SDMF 134; Solan Dep. 166:17-168:4).

Regarding the Global Information Security Policy, Slawin did not release or publish the emails to anyone outside the company. (SDMF 118; Solan Dep. 158:3-12, 161:15-162:1). Solan admitted that there was no evidence that Slawin had modified, destroyed or damaged the emails, or that he had done anything else with them other than send them to his personal email. (SDMF 139; Solan Dep. 158:13-159:3, 171:1-25, 172:22-173:12). Solan undermined his own assertion that Slawin

had "removed" the emails from BAMS' server by acknowledging that those emails were still on it. (SDMF 140; Solan Dep. 159:12-24). Slawin did not violate that policy's prohibition of using a non-BAMS/FDC device, since he did not save any BAMS emails onto any laptop. (SDMF 141; Slawin Decl. ¶121). BAMS' assertion that Slawin "mishandled" confidential information has no textual support, but is based on Solan's self-serving opinion, which a jury may reject.

POINT VII
MITIGATION OF DAMAGES IS A JURY ISSUE

Failure to mitigate damages is an affirmative defense. *Lathem v. Dep't of Child. & Youth Servs.*, 172 F.3d 786, 794 (11th Cir. 1999). Mitigation does not apply where the employer's conduct precipitated the circumstances preventing Slawin from finding (or keeping) other employment. *Lathem*, 172 F.3d at 794. *Lathem* cited *Maturo v. Nat'l Graphics, Inc.*, 722 F. Supp. 916, 928 (D. Conn. 1989) ("When a plaintiff has taken reasonable measures to obtain employment but is unable to accept or continue the employment because of injuries inflicted by her former employer, she has sustained her duty to mitigate.")

*Richardson v. Tricom Pictures & Productions, Inc*., 334 F. Supp. 2d 1303, 1313 (S.D.Fl. 2004) is inapposite since plaintiff's mitigation and damages were considered <u>after a trial</u>; not on summary judgment.  In *Richardson* the jury's failure to award emotional distress damages demonstrated the absence of evidence that the plaintiff's emotional distress from the defendant caused her to lose a later job.

25

This Court must accept as true, Slawin's testimony about his downward emotional spiral caused by BAMS which led to increasingly excessive drinking, precipitating his termination from Wells Fargo and that he continued to mitigate his damages thereafter.  (SDMF 183, 185, 187-191, 193-196).

## CONCLUSION
**SUMMARY JUDGMENT SHOULD BE DENIED**

This 25th day of February 2025.

 /s/Robert N. Marx
Georgia Bar Number 475280
Jean Simonoff Marx
Georgia Bar Number 475276
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
(404) 261-9559
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

               Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT
SERVICES,

               Defendant.

Civil Action File No.
1:19-cv-04129-AT

<u>Certificate of Service</u>

This is to certify that on February 25, 2025, I electronically filed: **Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment,** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> Christopher P. Galanek, Esq.
> Chris.Galanek@bclplaw.com
> Brian Underwood, Esq.
> Brian.Underwood@bclplaw.com
> Bryan Cave Leighton Paisner
> LLP One Atlantic Center, 14th
> Floor 1201 West Peachtree
> Street, N.W. Atlanta, GA 30309-
> 3471

This 25th day of February 2025.

          /s/Robert N. Marx
          Robert N. Marx, Esq.
          Georgia Bar No. 475280
          Jean Simonoff Marx, Esq.

Georgia Bar No. 475276
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
Tel. (404) 261-9559
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com
*Attorneys for Plaintiff*