IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| ERIC SLAWIN,<br><br>                    Plaintiff,<br><br>v.<br><br>BANC OF AMERICA MERCHANT SERVICES, LLC, s/h/a BANK OF AMERICA MERCHANT SERVICES,<br><br>                    Defendant. | Civil Action File No.<br>1:19-cv-04129-AT |

## <u>PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS</u>

**Slawin's Experience Investigating Banking and Securities Frauds**

1. Slawin was hired by BAMS for the position of VP Operations Control Officer on or about November 5, 2015, and started his employment in that position on or about December 7, 2015. In that position, Slawin was the liaison between BAMS' Independent Risk Management, Compliance and Internal Audit segments. (Slawin Decl. ¶2).

2. At the time he began employment at BAMS in December 2015, Slawin had almost 25 years in the Securities and Banking Regulatory and Compliance field, having started in this area in 1991. Prior to working at BAMS Slawin had held numerous regulatory and compliance positions both for governmental

regulatory agencies as well as for other banks and broker dealers. (Slawin Decl. ¶3).

3. Slawin has investigated securities fraud for the State of Florida and NASDAQ, which became FINRA. Prior to his employment with BAMS, Slawin had over twenty years of experience in the securities industry, including extensive experience on Wall Street on the trading floor, as a go-to person to answer questions from the syndicate desk and the investment bankers regarding disclosures in offering documents. The syndicate desk is the intermediary between the investment bankers underwriting the proposed security and the sales force. Slawin became aware that in many cases the fraud is one of omission. (Slawin Decl. ¶37).

**Mr. Slawin's Supervisors**

4. During his employment, Slawin reported directly to Natasha Collins, Mark Kendall and Brian Rubin. (Slawin Decl. ¶4).

5. Natasha Collins was Senior Vice President, Head of Sales Operations and Planning. Slawin reported to Ms. Collins during the late summer and early fall of 2017 until in or about September 2017. (Slawin Decl. ¶5).

6. Until in or about September 2017, Mark Kendall was Director of Risk and Control and also reported to Ms. Collins. In or about September 2017, Mr. Kendall

was promoted and became Slawin's immediate supervisor instead of Ms. Collins. (Slawin Decl. ¶7).

7. Even after Mark Kendall became Mr. Slawin's immediate supervisor in September 2017, Ms. Collins, as Mr. Kendall's supervisor, remained on a higher supervisory level than Mr. Slawin and within his chain of supervision. (Slawin Decl., ¶117)

8.  Brian Rubin was Mr. Slawin's immediate supervisor into the second quarter of 2017. (Slawin Decl.,¶119).

**BAMS Not PCI Compliant**

9. A credit card or debit card has an account number on it.  That is known as a Primary Account Number or PAN. (Slawin Decl. ¶12)

10.  When an entity transmits or receives data containing a cardholder's complete account number, it is deemed to be transmitting or receiving "full PAN." (Slawin Decl. ¶13).

11. The payment card industry, known as PCI, has a series of data security standards, known as DSS.  This includes, among other things, transmitting or receiving the data in an encrypted format. The payment card industry data security standards are known by the acronym PCI DSS. (Ex. 79 Davis Dep., 32:10-22; Moll Dep. 10:14-11:3, Slawin Decl. ¶14).

12. The Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements promulgated by the Payment Card Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed, or transmitted and require financial institutions and providers of payment processing services such as BAMS to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies. "PCI compliance" refers to adherence to this set of security standards embodied in the Payment Card Industry Data Security Standard (PCI DSS). (Ex. 79 Davis Dep., 32:10-22; Moll Dep. 10:14-11:3, Slawin Decl. ¶15)

13. The PCI DSS requires that entities that transmit or receive PAN data comply with the requirements of the payment card industry data security standards, or PCI DSS. An entity that complies with the PCI DSS is considered to be PCI compliant. An entity that does not comply with the payment card industry data security standards, or PCI DSS is considered to be PCI noncompliant, which is alternatively expressed as not being PCI compliant. (Ex. 79 Davis Dep., 32:10-22; Moll Dep. 10:14-11:3, Slawin Decl. ¶16)

14. BAMS discovered that it was not PCI compliant in January 2017. (Ex. 1).

15. On January 25, 2017, Alison Davis, BAMS Sr. VP, Risk and Compliance, in charge of PCI compliance (Davis Dep. 10:16-11:6) sent an email to Thomas Fontana, BAMS Chief Risk Officer "subject" "Hot Topic: PCI at BAMS" (Davis Dep. 16:3-18; 26:20-27:23), which referred to the fact that BAMS employees were accessing or using full PAN data, in a non-PCI compliant way. (Davis Dep. Ex. 1, 17:25-18:6; 78:15-79:1).

16. Ms. Davis did not label her January 25, 2027, email regarding BAMS using full PAN data and not being PCI compliant confidential. (Ex. 1).

17. Ms. Davis wrote in her January 25, 2017, email that having a Qualified Security Assessor certify or validate that BAMS was PCI compliant would "cost an absolute fortune." (*Id*.; Davis Dep. 38:2-23).

18. The two options to correct this PCI compliance issue were to remove access to BAMS employees to full PAN data so that BAMS would not need to become PCI compliant or for BAMS to go through the QSA process and become PCI compliant. (Davis Dep. 42:1-9).

19. The next day, January 26, 2017, Joe Moll replied to Ms. Davis' January 25, 2017, email with an excel spreadsheet attached noting some instances Mr. Moll confirmed where BAMS employees were using full PAN data. (Ex. 1).

20. Mr. Moll also did not mark his January 26, 2017, email concerning instances of BAMS employees using full PAN data while not being PCI compliant as confidential. (*Id*.; Ex. 88).

21.  When BAMS documentation referred to a "new layer of PCI compliance" that referred to the remediation of issues path so BAMS would not need to become PCI complaint, instead of the alternative path of becoming PCI compliant, which were the two options to deal with BAMS non-PCI compliance. (Ex. 11, Davis Dep. 98:8-11)

22. Ali Davis confirmed that BAMS was not PCI compliant from at least January 2017 until the middle of 2018, and did not tell BAMS customers, i.e. merchants, this. (Davis Dep. 30:22-31:3, 52:20-53:13; Exs. 1, 3, 4, 5, 6, 8, 9, 10, 12, 17, 19).

23. At all relevant times, throughout all of 2017, BAMS was not PCI compliant.  (Ex. 1; Ades Dep. 31:17-32:9, 52:3-6, 53:9-17, 74:12-75:13; Ex. 3; Davis Dep. 30:22-31:3).

24. In June 2017, Ali Davis told Mr. Ades that his client services team was sending full PAN (personal account information data) in an unencrypted fashion which was not PCI compliant. (Ades Dep. 28:5-8, 31:8-32:9; Davis Dep. 34:19-23).

25. Ades understood in June 2017 that BAMS was transmitting full PAN data in derogation of the PCI Security Standards Council standards for transmission of such data. (Ades Dep. 37:6-38:8; 41:11-25, Ex. 79; Davis Dep., 32:10-22; Moll Dep. 10:14-11:3).

26. Under the applicable PCI DSS security standards, PAN data should never be sent via unsecured email. (Ades Dep. 38:13-39:7; Ex. 79; Davis Dep., 32:10-22; Moll Dep. 10:14-11:3).

27. Yet, BAMS was storing or transmitting full PAN data via unsecured email, which Ades knew meant that BAMS was not PCI compliant and violated PCI DSS standards. (Ades Dep. 32:12-15, 39:14-22, 41:11-25, 42:3-7; Ex. 79; Davis Dep., 32:10-22; Moll Dep. 10:14-11:3).

28.  On June 13, 2017, Mr. Ades wrote an email stating "We – BAMS don't want to go the route of PCI compliance as it would be a very costly and time consuming exercise." (Ades Dep. 30:9-31:24; Ex. 16 [Doc. 176-6]; Ex. 3). Mr. Ades sent this email to Natasha Collins, VP of Sales Operations, Brian Glynn Sr. VP of Account Management, and Monica Kennedy, who was either Sr. VP or VP. (Ades Dep. 33:10 – 34:7), and suggested for the first time, setting up a Self-Identified Audit Issue (SIAI). (Davis Dep. 79:17-24, 81:2-4).

29. Ms. Collins, Mr. Glynn and Ms. Kennedy reported to Mr. Ades. (Ades Dep. 33:10 – 34:7).

30. Neither Mr. Ades nor Mr. Glynn or Ms. Collins labelled the various emails in the email chain as confidential. (Ex. 3).

31.  Mr. Glynn responded to Mr. Ades' June 13, 2017, on the same day, stating that "We all agree that the main disadvantage of outsourcing this type of request handling to FD directly is the negative impact it could have on client experience, which you mentioned. That said, we understand that going down the path of making BAMS PCI compliant is not something we want to consider." (Ex 3).

32. BAMS did not know the full scope of its non-PCI compliance, and whether employees were sending full PAN data unencrypted fashion before 2017. (Kendall Dep. 162:8-163:6).

33. Joe Moll sent an email to Ms. Davis on July 11, 2017, setting forth the number of actual violations during the prior 12 months that BAMS handled full PAN data, which was 2,925 violations. (Ex 8; Davis Dep. 85:17-87:6). Mr. Moll noted to Ms. Davis that <u>this number only included instances of BAMS employees sending full PAN data and does not include any other instances of full PAN being stored, processed, or transmitted inappropriately by BAMS employees</u>. (Ex. 8). Neither Ms. Davis nor Mr. Moll marked either email in the email chain as confidential. (*Id.*, Moll Dep. 30:1-31:7).

34. The PCI noncompliance issue implicated debit suspense items as well as chargebacks that BAMS handled. (Ex 9; Davis Dep. 93:1-95:5, 100:16-20). The PAN data issue and not being PCI compliant was firm wide. (Ex 14; Davis Dep. 100: 22-101:21).

35. Cardholders whose PAN data was at issue included businesses, business customers buying a business item for his or her consumption in their business, or consumers who did transactions with merchants buying a good or service for personal or family use, including from merchants serviced by BAMS. (Davis Dep. 103:3-22, 104:24-105:4, 105:23-106:19; Ex. 28).

**Slawin's Protected Conduct**

36. BAMS never told its customers, *i.e* the merchants, that it was not PCI compliant. (Davis Dep. 54:15-20, 114:8-15)

37. BAMS was concerned about reputational risk if its customers/merchants found out that it was not PCI Compliant. (Solan Dep., Ex. 42; Collins Dep. 85:11-86:10, 126:10-127:7; Solan Dep. 53:17-55:16, 56:24-59:15; Ex. 40).

38. BAMS represented itself as a payment acquirer, an entity involved in payment processing to major private merchants such as Home Depot, Target, Amazon, Exon Mobile, Royal Caribbean Lines, MGM and others, as well as to numerous municipalities, to facilitate credit and debit card transactions between those entities and their customers. (Slawin Decl., ¶9).

9

39. At all relevant times, BAMS solicited the business, *i.e.* merchant and municipal customers, and was the "face" of the relationship between its customers, while First Data Corporation ("First Data") handled the payment processing from the back end. (Slawin Decl., ¶10).

40. First Data was sometimes referred to as "FD" or "FDMS" for First Data Merchant Services. (Slawin Decl., ¶118).

41. In this relationship, First Data was in essence the back office so that private merchants' and municipalities' point of contact was BAMS. (Slawin Decl., ¶11.

42. On June 13, 2017 Natasha Collins copied Slawin on an email chain regarding BAMS sending full PAN data and not being PCI compliant. One email in the chain was from David Ades, dated June 13, 2017. Mr. Ades' email stated in pertinent part that BAMS was transmitting and receiving PAN data with respect to chargebacks, which required BAMS to be PCI compliant, but that BAMS was not PCI compliant. Mr. Ades also stated in his email, "We – BAMS don't want to go the route of PCI compliance as it would be a very costly and time consuming exercise. So the options are to have the merchants call directly to FD [First Data] to obtain info they request-might not be a great client experience." This email chain also contained a responding email from Brian Glynn, also dated June 13, 2017 stating, "We all agree that the main disadvantage of outsourcing this type of

request handling to FD directly is the negative impact it could have on client experience, which you mentioned. That said, we understand that going down the path of making BAMS PCI compliant is not something we want to consider." (Slawin Decl., ¶18; Ex. 3).

43. At all relevant times, Slawin was aware that merchants for whom BAMS did credit or debit card processing had to certify that they were PCI compliant. (Slawin Decl., ¶19).

44. In or about July 2017, Slawin became aware that BAMS was required to be PCI compliant under the Merchant Services Agreements (MSA's) that it had entered into, partnered with Bank of America, with merchants to do their credit or debit card processing. Slawin became aware that BAMS had to be PCI compliant because of the June 13, 2017 email from David Ades, and senior management said that BAMS was receiving full PAN data. Slawin looked up agreements available on the internet over the next month following Mr. Ades' June 13, 2017 email and found boiler plate agreements for MSA's. (Slawin Decl., ¶20).

45. In or about July 2017 Slawin also found on the internet the executed Merchant Processing Agreement (MPA) between BAMS and Bank of America and the state of Delaware which indicated that BAMS was PCI compliant. (Slawin Dep. 173:19-175:2, Slawin Decl., ¶21).

46. In addition to the PCI DSS, credit card companies such as VISA and MASTERCARD have rulebooks which set forth rules that apply to merchants and acquiring banks such as BAMS. These rules include the right of companies like VISA and MASTERCARD to fine non-PCI compliant companies like BAMS up to $100,000 a month for each month that the company is not PCI compliant. Slawin knew this during his employment because he had seen such rulebooks online. (Slawin Decl., ¶22).

47. One area in which the issue of BAMS' non-PCI compliance rose was in the context of how BAMS should respond to client questionnaires that raised questions regarding how data was secured by BAMS, and direct inquiries about whether BAMS was PCI compliant. (Slawin Decl., ¶24).

48. BAMS' highest level executives knew that BAMS was required to be PCI compliant and that it was not. (Slawin Decl., ¶25).

49. During May and throughout the summer of 2017, there were email exchanges including among the highest level of BAMS' executives regarding the magnitude of the PCI non-compliance issue given the large volume of PAN data that BAMS handled. (Slawin Decl., ¶26).

50. Slawin was assigned the job task of preparing what is known as a self-identified audit issue, or SIAI, to resolve the issue of BAMS PCI noncompliance. (Ex. 3; Slawin Decl., ¶31).

51.  The problem was that the only two ways of resolving the issue was either for BAMS to become PCI compliant, or to transfer all processing of PAN data to First Data, both of which options had effectively been taken off the table by Mr. Ades and the other high level executives at BAMS who agreed with the substance of his email. (Slawin Decl., ¶32).

52. In addition, there was an internal debate within BAMS regarding which business line or business area would own the SIAI, because it was toxic. It was toxic because the only way to fix the problem had effectively taken off the table. There was reluctance to be the owner of the SIAI. BAMS' employees were surprised because they had assumed that BAMS was PCI compliant. (Kendall Dep. 161:11-163:6, 164:6-11, 168:24-171:13; Slawin Decl., ¶33).

53. The problem was not just that BAMS was not PCI compliant, but that it represented to merchants in its MSA's that it was. Slawin had seen from the internet boilerplate MSA's, and it was common knowledge that BAMS represented to its clients/merchants in its MSA's that it was PCI compliant. Slawin brought blank the agreements that he got from the internet to Mark Kendall on numerous occasions, including after Kendall became Slawin's supervisor, when Slawin discussed with Kendall him Slawin's concern that BAMS was misrepresenting to merchants that it was PCI compliant, when it was not. (Slawin Decl., ¶34).

54. Slawin researched the issue of what BAMS was telling its merchants. He obtained a copy of the MPA with the State of Delaware off the internet. He was aware that Delaware is a municipality, and not a publicly traded merchant, but believed that individuals and businesses in Delaware made credit card transactions, and knew that BAMS and Bank of America had entered into a Merchant Processing Agreement with Delaware representing that BAMS was PCI compliant. (Slawin Dep., 178:12-179:4; Slawin Decl., ¶35).

55.  Slawin discovered that BAMS was required under the MSA's it was entering into with the merchants to be PCI compliant and that it represented that it was in fact was PCI compliant, by reviewing blank agreements online and then discussing them with Mark Kendall, Natahsa Collins, Sherra Grissom and others during the SIAI scoping, so that Slawin knew that BAMS was engaging in acts of fraudulent misrepresentations and/or instances of fraud by omission as to its customers. (Slawin Decl., ¶36).

56. BAMS' response to the PAN data issue and its non-PCI compliance was to deflect its non-PCI compliance by trying to get its parent, First Data, to answer customer questionnaires regarding data security, in order to camouflage that BAMS, which received, retained and transmitted its customers' PAN data, was not PCI compliant. (Ex. 63; Collins Dep. 68:9-19; Slawin Decl., ¶38).

14

57. Slawin's task was to deflect questions from merchants as to whether BAMS was PCI compliant to First Data, and thereby conceal by fraudulent omission that BAMS was not PCI compliant. (Ex. 63; Collins Dep. 68:9-19; Slawin Decl., ¶39).

58. Slawin was uncomfortable being put in a position to misrepresent the facts. (Slawin Dep. 204:11-18; Slawin Decl., ¶40).

59. Slawin tried unsuccessfully for several months to get another job outside of BAMS so that he would not be in this position. Slawin was afraid of being made a scapegoat or fall guy if it got out that BAMS was not PCI compliant. (Slawin Decl., ¶41).

60. First Data being PCI compliant did not resolve the PAN data security issues endemic to BAMS' not being PCI compliant. (Slawin Decl., ¶43).

61. Slawin was expected to go along with BAMS' deflection and information omission strategy. (Slawin Decl., ¶44).

62. Slawin had at least four or five conversations with Mr. Kendall in which Slawin told Mr. Kendall that BAMS was acting fraudulently and misleading its customers, and that Slawin was not comfortable being a part of BAMS' conspiracy to mislead its clients. These conversations were both when Mr. Kendall was Slawin's peer, and after September 2017, when Kendall was Slawin's immediate

supervisor.  Kendall agreed that BAMS nondisclosure of its PCI noncompliance was fraud. Slawin noted his concern that it could affect shareholders, both of the merchants and of Bank of America, particularly because of the Bank of America name association between BOA and BAMS. (Slawin Decl., ¶45; Slawin Dep. 187:15-19, 187:21-22, 187:15-188:17, 189:2-11, 191:21-194:23, 193:3-6, 194:5-114, 205:3-6, 218:11-220:10, 221:25-222:9).

63. During these conversations, Slawin stated that BAMS' fraud was bad for the clients, and bad for BAMS and its parents since the deception could expose the whole organization to massive financial exposure if it got out that BAMS was not PCI compliant. There are huge fines that attach to PCI non-compliance violations, and the potential costs of a data security breach were astronomical. Slawin believed that BAMS' failure to disclose or correct its non-PCI compliance was a massive fraud, including on the shareholders of Bank of America. (Slawin Dep. 197:23-198:7, 222:24-223:10; Ades Dep. 85:21-86:10; Slawin Decl., ¶46).

64. Slawin raised his concern about and objection to BAMS' misleading its clients by misdirecting them to First Data. (Slawin Decl., ¶47).

65. During the period August through September 2017, Slawin had biweekly meetings with Natasha Collins. During these meetings Slawin discussed the creation of a self-identified audit issue and mitigation of BAMS' non-PCI compliance. Slawin repeatedly advised Ms. Collins about his concerns regarding

BAMS' non-PCI compliance. Slawin reiterated several times that he was uncomfortable being asked to represent to BAMS' clients and to internal BAMS' teammates that BAMS was PCI compliant when Slawin knew that it was not. (Slawin Dep. 203:16-217:11, 204:6-205:2, 218:11-219:17; Slawin Decl., ¶48).

66. Slawin knew that omission is part of the definition of fraud. He understood that the core requirement for the SEC is disclosure, that a public entity is required to disclose all information that might affect share price, so that an investor can then make an informed decision as to whether or not the potential investor wants to purchase shares of that company. Slawin came to a belief in or about July 2017 that BAMS was committing fraud by omission by not disclosing the fact that it was not PCI compliant, which could affect the shareholders of public entities that were having their customers' purchases processed by BAMS, especially if there was a data breach. Slawin also believed that the omission could affect shareholders of one of BAMS' parent company, Bank of America. While Slawin did not know the specific provisions or even the existence of Sarbanes-Oxley, Dodd-Frank, the CFPA, or any other federal statute giving jurisdiction to the SEC, or to the CFPB, he believed that the fraudulent omission could constitute bank fraud and securities fraud, at the very least, and possibly other types of fraud made unlawful under federal statutes. Slawin became aware that the conduct in which BAMS was engaging could be investigated by the SEC and be found to

constitute unlawful acts under the statutes enforced by the SEC. In particular,
Slawin was thinking about the 1933 and 1934 acts of the SEC. In his job at
FINRA, he had been involved mostly with the 1934 act from the perspective of the
public, regarding representations for sales of securities, and at J.P. Morgan, in the
private sphere, he had been mostly involved with the 1933 act for underwriting and
disclosures in offering documents for the sales of securities. (Slawin Dep. 160:24-
162:3, 183:5-18, 191:12-193:7; Slawin Decl., ¶49).

67.  At the time that he was tasked with the SIAI Slawin understood that the
option of removing all job tasks involving PAN data and transferring them to First
Data, who was PCI compliant, was undesirable from BAMS' point of view because
it would negatively affect client relations with the merchants. This is what Brian
Glynn had written on June 13, 2017, in the email chain that had been sent to him.
(Slawin Decl., ¶50).

68. Slawin was reluctant to put his name on the SIAI because he did not
want it to look like he had covered up the fact that BAMS was not PCI compliant
and yet was representing that it was. Slawin did not "complete" the SIAI because
he kept seeking a resolution that effectively was impossible. (Slawin Decl., ¶51).

69. Slawin was aware that communications between the merchants and
BAMS regarding the PCI issue, their questionnaires, and BAMS responses were
sent by email over the internet. (Slawin Decl., ¶52).

70.   Slawin believed that fraudulent communications communicated by email over the internet constitutes wire fraud. (Slawin Decl., ¶53).

71. Everybody Slawin spoke to knew that BAMS should become PCI compliant, but they didn't want to do it. Nobody said that BAMS did not need to become PCI compliant. (Slawin Decl., ¶54).

72. Mark Kendall agreed with Slawin that it was a problem that BAMS was receiving PAN data and was not PCI compliant. Kendall told Slawin that it would be problematic if it got out that BAMS was not PCI compliant. (Slawin Dep. 220:14-221:17; Slawin Decl., ¶56).

73. To become PCI complaint would have required an audit by a Qualified Security Assessor (QSA) who, after an audit, would issue an Attestation of Compliance (AOC). However, the QSA inevitably would have discovered that BAMS had been representing that it was PCI compliant during a time when it was not and should have been. (Slawin Decl., ¶57).

74. Throughout the summer and continuing through the fall of 2017 Slawin participated in numerous conversations in which he discussed with his immediate superiors and other senior executives at BAMS the problems surrounding BAMS being PCI noncompliant, and his concerns and objections to BAMS' actions, which it intended to continue, to mislead and defraud its customers into believing that it

was PCI compliant when it was not and had no intention of becoming PCI compliant.  (Slawin Decl., ¶58).

75. Among the numerous individuals whom Slawin spoke to about BAMS' non-PCI compliance and his concerns about fraud and the ramifications if this information were to become public, were Brian Rubin, Sherra Grissom, Mark Kendall, Natasha Collins, and Walt Zimerman, who was a Senior Sales executive at BAMS assigned to the Home Depot relationship. (Slawin Dep. 188:2-20, 189:2-11, 203:17-205:6, 216:9-217:11; Slawin Decl., ¶59).

76. Sherra Grissom was a Senior Vice President, Business Controls Manager of Respondent BAMS who reported to Thomas Fontana. (Slawin Decl., ¶60).

77. On at least two occasions Slawin specifically told Sherra Grissom that BAMS was engaged in fraud. Ms. Grissom was Enterprise Risk Management. "I had a dotted line to her. So she was another reporting…line for me"; thus Mr. Slawin's superior. In November 2017 Slawin told Grissom "that I felt that the fact that this isn't being disclosed to clients is omission and it's fraud"  (Slawin Dep. 188:2-20, 189:2-11).

78. Thomas Fontana was BAMS' Chief Risk Officer and reported to CEO Tim Tynan. (Slawin Decl., ¶61).

79. Slawin had at least one conversation with Walt Zimmerman who was a Senior Sales executive at BAMS assigned to the Home Depot relationship. Slawin

objected to answering Home Depot's question in its questionnaire it sent to BAMS about whether BAMS was PCI compliant in any way that would indicate that BAMS was PCI compliant, when it was not. Slawin was unequivocal that he would not indicate that BAMS was PCI compliant. (Slawin Dep. 216:9-217:11; Slawin Decl., ¶62).

80. Mr. Zimmerman expressed extreme concern about BAMS not being PCI compliant and indicated that he had been led to believe that BAMS was PCI complaint. (Slawin Decl., ¶63).

81. Slawin was aware that Home Depot, one of BAMS' customers, was very concerned about PCI compliance issues since Home Depot's own auditors had been brought in to evaluate the handling of PAN data. (Slawin Decl., ¶64).

82. It was part of Slawin's job to provide answers to customers' inquiries, like those from Home Depot, about whether BAMS was PCI compliant. (Slawin Decl., ¶65).

83. Slawin told his superiors that he was not going to answer that BAMS was PCI compliant when it was not. (Slawin Dep. 216:9-217:11; Slawin Decl., ¶66).

84. Invariably the question was not answered, and other BAMS' employees who handled the Home Depot relationship, actively mislead Home Depot, and other similar BAMS' merchant and municipal customers, into believing that

BAMS was PCI compliant by diverting the response to First Data. (Slawin Decl., ¶67).

85. However, BAMS owned the relationship with Home Depot, and did not want First Data to usurp its primacy in the relationship with Home Depot. (Slawin Decl., ¶68).

86. BAMS' response to Home Depot's concern and direct inquiry about BAMS' PCI compliance was to omit any disclosure that it was not PCI compliant. Such a disclosure would have been cataclysmic for the relationship since BAMS handled all the chargeback issues, not First Data, which meant that all the involved PAN information was being mishandled. (Slawin Decl., ¶69).

87. Slawin was concerned about BAMS' strategy of sidestepping its customers' concerns and inquiries about PAN data security and PCI compliance instead of becoming PCI compliant. (Slawin Decl., ¶70).

88. Slawin repeatedly expressed his concern that BAMS was engaging in fraud by not disclosing its non-PCI compliance, instead misleading its potential and existing customers into believing that it was PCI compliant by having First Data (which was PCI compliant) answer those questions. (Slawin Dep. 124:14-17, 138:20-25, 197:23-198:7, 203-17-205:6, 206:9-18, 216:9-217:11, 218:11-220:10, 221:25-222:9; (Slawin Decl., ¶71).

89. Slawin was expected to keep quiet, and to participate in BAMS' practice of misleading its merchant and municipal customers, to perpetuate their erroneous belief that BAMS was handling their PAN data in a PCI compliant manner. (Slawin Decl., ¶72).

90. Other BAMS' employees who were not aware that BAMS was not PCI compliant could not believe it when Slawin discussed the issue with them. (Slawin Decl., ¶73).

91. While Slawin does not recall using the word "fraud" or "fraudulent" in his discussions with Natasha Collins, Brian Rubin, and Leonard Ebel, as he did when Ihe talked to Mark Kendall and Sherra Grissom,  he communicated that BAMS actions in concealing its PCI non-compliance from its customers was deceptive, and could impact shareholders in various companies. (Slawin Dep. 183:5-15, 216:9-217:11; Slawin Decl., ¶75).

92. Slawin also believed and understood that BAMS conduct violated consumer laws that protected people against data breaches, and he was aware of multimillion dollar losses from large data breaches. (Slawin Decl., ¶76).

93.  While he did not know the exact name of the CFPA, Slawin was aware from his experience in banking and regulation that entities involved in handling personal account information data, including entities involved in payment processing, were regulated under federal laws that protected the data security of

personal account information, including credit card personal account information. (Slawin Decl., ¶77).

94. BAMS' own senior management understood the seriousness of this issue, directing that all written references to BAMS being non-PCI compliant be deleted. (Slawin Decl., ¶78).

95. Mark Kendall, as Slawin's immediate supervisor, directed that discussion of the PAN data and PCI non-compliance issue be kept quiet, and that written references to this issue be deleted. At this time, there was no explicit statement about keeping the matter confidential, but Mark Kendall stated that it would be a problem if BAMS PCI non-compliance got out. (Slawin Decl., ¶79).

96.  In July 2017 Slawin concluded that the SEC would be interested in BAMS' fraudulent misrepresentations and/or fraudulent concealment regarding its noncompliance with the PCI DSS rules, that such unlawful acts could be within the scope of statutes that the SEC enforces, and that he did not want to be the "fall guy." (Slawin Dep. 124:14-17, 183:5-15; Slawin Decl., ¶104).

**The Downloaded Emails**

97. In or about August 2017, Slawin began downloading emails to his personal email regarding the PAN data and BAMS' PCI noncompliance issue. He did this because he was concerned about being drawn into fraudulent and improper data security practices by BAMS, and to demonstrate that he had not willingly

24

participated in a fraudulent scheme to mislead merchants into believing that BAMS was PCI compliant. (Slawin Dep. 159:22-160:5, 203:17-205:2, 206:9-18; Slawin Decl., ¶80).

98. Some of the emails that Slawin downloaded did not related to BAMS PCI noncompliance. (Slawin Decl. ¶83).

99. Not all of the emails Slawin downloaded referred to BAMS' PCI noncompliance. One of the emails was about his Management Form and he downloaded it to work on it from home.  Apparently, one of the downloaded emails referred to BAMS' preparations for Hurricane Irma.  Slawin cannot remember why he downloaded it to his personal email. It may have been to work on the hurricane preparations at home or it may just have been a mistake. Another of the downloaded emails dealt with an entirely different issue, data entered into SalesForce without independent verification. Slawin also cannot remember why he did that or if it was downloaded in error. (Slawin Decl., ¶83).

100. To his understanding and knowledge at the time, downloading the emails did not violate any policy of BAMS. (Slawin Decl., ¶84).

101. Slawin did not ask the Legal Department for a copy of an MSA because he was concerned that if someone in the Legal Department asked why he wanted to see an MSA, it would raise a red flag. (Slawin Decl., ¶85).

102. In or about the last week of October 2017 there was a meeting at which Mark Kendall specifically discussed that the PCI non-compliance issue was "confidential". This meeting occurred after Slawin had received and seen numerous emails about the PCI non-compliance problem that were not marked confidential, which included emails that he had downloaded. (Slawin Decl., ¶86).

103.  While it may not have been uncommon for SIAI's to be treated as confidential until the issue was fully assessed and appropriate remediation was determined such that it could be disseminated more broadly within BAMS, with respect to the SIAI that Slawin was tasked with remediating, it was kept confidential because BAMS wanted to conceal the fact that it was not PCI compliant. (Slawin Decl., ¶102).

104. Mr. Slawin had sent an email to Mr. Kendall on June 2, 2017, which indicated that a copy had been sent to his personal email account.  (Slawin Dep. 239:7-23; Ex. 20 [Doc. 175-11]), Undisputed Facts Nos. 43 – 45.

105. The June 2, 2017, email discussed anti-trust issues. (Slawin Dep., Ex. 20 [Doc. 175-11]).

106. Kendall did not speak to Slawin about sending the June 2, 2017, email to his (Slawin's) personal email account. (Slawin Decl. ¶115)

107. Kendall did not tell Slawin orally or in writing that there was anything objectionable about Slawin having sent a copy of his June 2, 2017, email to his (Slawin's) personal email account. (Slawin Decl. ¶116).

108. BAMS did not care about Mr. Sawin emailing confidential information to his personal email until it was about BAMS not being PCI compliant and not wanting to disclose that fact to merchants. (Slawin Dep., Ex. 20 [Doc. 175-11]).

109.  Mr. Kendall pointed to this exact email as "important" when considering the termination decision in December 2017. (Kendall Dep., Ex. 49, p. 1; Slawin Dep., Ex. 20 [Doc. 175-11].)

110. The June 2, 2017, email was not identified by the Infosec computer search, and is not one of the ten Incident Reports.  (Docs. 175-17 through 175-26).

111. The only way that BAMS was able to refer to the June 2, 2017 email to Mr. Kendall, with a cc to Mr. Slawin's personal email, was precisely because Mr. Kendall had noticed it at the time and remembered it in December 2017. (Kendall Dep., Ex. 49, p. 1; Slawin Dep., Ex. 20 [Doc. 175-11] Docs. 175-17 through 175-26).

111.a Kendall provided the information to Solan regarding BAMS' PCI non-compliance issue, and described the problems with disclosure, and reputational damage. (SDMF 109; Solan Dep. 45:14-47:7, 48:18-52:12, 53:1-55:16, 56:10-

61:2, 69:2-16, 79:6-82:2, 103:22-105:5, 113:23-114:22; Kendall Dep. 45:5-48:3, 66:5-67:2, 128:7-129:19; Ex. 40; Ex. 42; Ex. 49).

**Slawin Did Not Violate Any Policy**

112.  While Mr. Kendall spoke to Mr. Slawin about keeping BAMS' PCI non-compliance quiet because it would be a problem "if it got out" that BAMS was not PCI compliant, the discussion about keeping the matter confidential occurred in or about the last week of October 2017. (Slawin Decl. ¶¶56, 86)

113. The first time that emails about the PCI non-compliance issue first included reference to the issue being confidential was on or about October 26, 2017. (Ex. 19; Slawin Decl., ¶86).

### Proprietary Rights and Information Agreement

114.  Slawin's November 5, 2015, offer letter did not advise him of any specific nondisclosure obligations and specifically did not advise him that it would be a violation of any BAMS policy if he were to download any information from his work email account to his personal email account. (Slawin Dep. 148:2-6. Slawin Decl., ¶99)

115. During his employment by BAMS, Slawin did not disseminate any of BAMS' materials or information outside BAMS, to any other person, organization or entity. (Solan Dep. 161:15-162:1; Slawin Dep. 204:11-22).

116.  Slawin did not violate BAMS' Proprietary Rights and Information Agreement. (Solan Dep. 161:15-162:1; Slawin Dep. 204:11-22)

117. BAMS' Proprietary Rights And Information Agreement (Doc. 175-7) (hereinafter "Proprietary Rights and Information Agreement") does not prohibit BAMS' employees from emailing BAMS' materials or information to their personal emails, as long as those materials or information is not subsequently disseminated outside the company, to another person, organization or entity.

118. BAMS does not assert that Mr. Slawin released or published the emails to anyone outside the company. (Solan Dep. 161:15-162:1).

119.   The Proprietary Rights and Information Agreement has 14 headings, 9 of which (1. Assignment of Inventions, 2. Prior Inventions, 6, Former Employer Information, 7. Third Party Information, 10. Governing Law, 11. Severability, 12. Survival, 13. Waiver, and 14. Entire Agreement), clearly have nothing to do with the factual issues in this case. (Doc. 175-7).

120. Heading Nos. 3 and 4 of the Proprietary Rights and Information Agreement concern employee inventions, not emails. (Doc. 175-7).

121. Heading No. 3 is entitled, Maintenance and Return of Records. It provides in part that, "I will keep and maintain adequate and current written records related to any invention made by me." (*Id*.), (Emphasis added).

122. The rest of the language within Heading No. 3 refers to employee obligations at the time of leaving BAMS, which Mr. Solan admitted was not material to BAMS' decision to terminate Mr. Slawin's employment. (*Id*., Solan Dep. 166:3-7).

123. Heading No. 4 is similarly concerned with Slawin ". . . disclos[ing] all inventions . . ." (Doc. 175-7).

124. Heading No. 5 is entitled Company Information, and requires the BAMS employee to maintain confidential information ". . . in strictest confidence . . ." and not to ". . . release or publish the information to anyone outside the Company . . ." (*Id*.) Again, BAMS does not assert that Mr. Slawin released or published the emails to anyone outside the company. (Solan Dep. 161:15-162:1).

125. Heading No. 8 ("Employment") is just a provision that the employment is at-will. (Doc. 175-7).

126. Heading No. 9 ("Non-limitation of Rights") provides only that the employer is not waiving any rights it might have. (*Id*.)

127. There was therefore no basis for Mr. Solan reasonably believing that Mr. Slawin had violated any provision of the Proprietary Rights And Information Agreement. (*Id*., Solan Dep. 161:15-162:1).

**Associate Handbook**

128. Mr. Solan testified that the relevant provisions of the Associate Handbook referred to the alleged use, access, disclosure, modification, destruction, damage and removal of confidential emails. (Solan Dep. 163:7-21).

129. Mr. Solan admitted that there was no evidence that Mr. Slawin disclosed any of the emails to anyone else, or that he modified, destroyed or damaged them. (Solan Dep. 158:13-159:3, 171:1-25).

130. Mr. Solan admitted that BAMS made the decision to fire Mr. Solan before it had any evidence that Mr. Solan had disclosed any of the emails to anyone outside the company. (Solan Dep. 172:1-20).

131. While Mr. Solan asserted that Mr. Solan had "removed" the emails from BAMS' server, he acknowledged that those emails were still on BAMS' server. (Solan Dep., 159:12-24).

132. Mr. Solan asserted that Mr. Slawin had violated the provision of the Associate Handbook regarding intellectual property because he had not preserved the confidentiality of the emails, but again, admitted that there was no evidence that Mr. Solan had disclosed them or sent them to anyone outside the company, or that he had done anything else with them other than send them to his personal email. (Solan Dep. 172:22-173:12).

31

133. Slawin did not violate the Associate Handbook. (Solan Dep. 158:13-159:3, 159:12-24,163:7-21, 171:1-173:12).

**Code of Ethics**

134. With respect to the Code of Ethics, Mr. Solan asserted that Mr. Slawin had violated the section regarding making sound business decisions but was unable to ". . . recall a specific sentence that was . . . violated . . ." (Solan Dep. 166:17-168:4). Instead, Mr. Solan could only testify to his belief that Mr. Slawin had violated the Code of Ethics " . . . just in general." (*Id*.).

135. Slawin did not violate the Code of Ethics. (Solan Dep. 166:17-168:4).

**Information Security Policy**

136. Mr. Slawin never received the Global Information Security Policy. (Slawin Dep. 163:24-164:2).

137. Mr. Solan testified that Mr. Slawin had violated Section 3.3.2 ("Information Handling") of the Global Information Security Policy, referring specifically to the opening paragraph of that section, and to subsection (f). (Solan Dep. 158:3-12).

138. The opening paragraph of the section requires that "Company information" be handled so as to safeguard it from unauthorized, " . . . use, access, disclosure, modification, destruction, damage, delay, or removal . . ." (Doc. 176-1, p. 10 of 19).

32

139. Mr. Solan admitted that there was no evidence that Mr. Slawin had modified, destroyed or damaged the emails, or that he had done anything else with them other than send them to his personal email. (Solan Dep. 158:13-159:3, 171:1-25, 172:22-173:12; Slawin Decl. ¶120.)

140. While Mr. Solan asserted that Mr. Solan had "removed" the emails from BAMS' server, he acknowledged that those emails were still on BAMS' server. (Solan Dep., 159:12-24).

141. Subsection (f) prohibits transfer by or storage on a device or network service not provided by BAMS/FDC (First Data), but Mr. Slawin did not save BAMS emails on any laptop. (Slawin Decl. ¶121.)

142. The termination letter required Mr. Slawin to return his company-issued laptop, which he did. (Solan Dep., Ex. 45 [Termination letter] [Doc. 175-27]; Slawin Decl. ¶122).

143. Slawin did not violate the Information Security Policy. (Doc. 176-1, p. 10 of 19; Solan Dep. 158:3-12, 158:13-159:3, 171:1-25, 172:22-173:12, 159:12-24; Solan Dep., Ex. 45 [Termination letter] [Doc. 175:27]),

**End User Policy**

144. The End User Policy provides only that emails sent *outside* the company must be encrypted, and also sets forth a retention policy for emails. (Solan Decl., Exs. 1, 2).

145. Slawin did not violate the End User Policy because BAMS does not assert that Slawin released or published the emails to anyone outside the company. (Solan Dep. 161:15-162:1, Solan Decl., Exs. 1, 2).

**December 8, 2017 Telephone Conference**
**Call with Solan and Kendall**

146. On Friday, December 8, 2017, late in the afternoon, Slawin received an electronic meeting invite, and dialed in to the meeting.  He spoke by telephone with Mike Solan from HR and Mark Kendall.  At the time, Mark Kendall was Slawin's immediate supervisor. (Slawin Decl., ¶87).

147. Solan asked Slawin why he had downloaded the emails. Slawin responded that he had downloaded some of them to work on them at home. (Slawin Decl., ¶88).

148. During the December 8, 2017 telephone conference, Solan did not identify the specific emails that he was talking about. (Slawin Decl., ¶88).

149. During the December 8, 2017 telephone conference, Slawin was not asked to return or delete the emails that Slawin had downloaded to my personal email account. (Slawin Decl., ¶89).

150. The December 8, 2017 telephone conference call was short; it lasted approximately 5 -10 minutes. (Slawin Decl., ¶90).

151. At the end of the telephone call, Solan said he was going to send Slawin some documents to review. Solan did not describe the contents of those documents

34

nor did he say that Slawin would be asked to sign any document. (Slawin Decl., ¶91).

152. During the telephone conversation on December 8, 2017, Slawin was courteous, business-like and professional. He answered the questions that he was asked. Slawin was not "apathetic, flippant, and unforthcoming" during the call. (Slawin Decl., ¶93).

153. During the December 8, 2017 telephone call Slawin did not confirm that he (Slawin) did not usually send emails from his BAMS email address to his personal email address. The question of whether Slawin usually did that was not raised by Mr. Solan and it was not discussed. (Slawin Decl., ¶94).

154. During the December 8, 2017 telephone conference call Slawin was not advised that he had been terminated, nor was the possibility of termination mentioned by Mr. Solan or Mr. Kendall. (Slawin Decl., ¶95).

155. Slawin subsequently on that same date, Friday, December 8, 2017, received an email stating that he had violated various company policies by downloading the emails, directing Slawin to "cease and desist" from downloading any further emails, requiring Slawin to delete the emails that he had downloaded, and requiring Slawin to sign a Declaration that he had done that. (Slawin Decl., ¶92).

**The Termination Date**

156. The decision to terminate Slawin's employment with BAMS was made and effective December 12, 2017. (Solan Dep., Ex. 45 [Termination letter] [Doc. 175:27], Solan Dep. 131:21-132:12, 132:25-134:2).

157.  Mr. Solan admitted at his deposition that Mr. Slawin was fired on December 12, 2017:

> Q.  . . . . Let's go down one more. It says on Tuesday,
> December 12, 2017 2:05 p.m. Mike Solan to Eric
> Slawin; you see that?
> A.  I do, yes.
> Q.  Okay. And that's the email at which you forwarded
> him the termination letter by email, correct?
> A.  It appears so, yes.
> Q.  All right.  Any reason not doubt that?
> A.  Nope.
> Q.  Okay. So Mr. Slawin was fired on December 12,
> 2017, correct?
> A.  To my knowledge, that's correct.

(Solan Dep. 131:21-132:8).

158. BAMS had Mr. Slawin's personal email at all relevant times, including the period December 8-12, 2017. (Solan Dep. 131:25-132:5, 132:19-133:24).

159.  After the December 8, 2017 telephone call, Mr. Solan did not call or Instant Message Slawin until the morning of Monday, December 11, 2017. (Slawin Decl.¶100).

160. The termination letter was emailed to Mr. Slawin's personal email on December 12, 2017. (Solan Dep. 131:25-132:5, 132:19-133:24).

161. BAMS could have emailed the termination letter earlier, on Friday, December 8,2017 or Monday, December 11, 2017. (Solan Dep. 134:15-23).

162.  On December 11, 2107, Mr. Slawin sent an email to Mr. Solan explaining why he would not sign the requested declaration:

> . . . .
>
> Should I acknowledge the statements in the declaration by writing my signature on the document I could make it appear that I as a declarant agree with the actions taken by other parties to withhold information possibly demonstrated by and referenced as "BAMS' confidential business information" in the declaration statement. I have not at any time taken nor will I ever agree with any actions taken by parties either individually or acting as joint tortfeasors which implies, demonstrates, or creates a belief that information should be withheld that could damage the counter-parties of Bank of America Merchant Services, Inc.
>
> . . . .

(Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).

162.A. Slawin testified that the email was a continuation of his repeated complaints about BAMS' fraud:

> The e-mails's clear. . . when you look at holistically. . . it's clear, okay, that those e-mails, I wasn't going to delete those e-mails because I was in the middle of a fraud. And I'm not going to be pulled into that. And I'm not going to be -- I'm not going to be set up so I -- you know, my contention is I told them that and they terminated me. And

they retaliated against me.

(Slawin Dep. 205:9-21) See also, (Slawin Dep. 203:17-205:2).

163. Mr. Slawin's reference to the "counter-parties" of BAMS was to the merchants, and he was objecting to BAMS' ongoing efforts to withhold from the merchants the information that BAMS was not PCI compliant. (Slawin Decl. ¶96).

164. Mr. Slawin was fired the next day, December 12, 2017. (Solan Dep., Ex. 45 [Termination letter] [Doc. 175:27]; Solan Dep. 131:25-132:5, 132:19-133:24).

164.A.  At his deposition, Mr. Solan was unable to testify as to when he made the termination recommendation to Ms. De Castro:

> Q. How many conversations did you have with Ms. De Castro about this – Mr. Slawin downloading emails?
> A. I would say at least three, but I don't recall exactly how many.
> Q. Okay. Do you recall any other than the one you've talked to me about?
> A. Yes.  I recall a conversation with her around a recommendation based on the findings of our review. The recommendation was to – around terminating his employment.
> Q. And whose recommendation was that?
> A. It was my recommendation.
> Q. Okay. And was that sometime on or about December 8, 2017?
> A. I don't recall the specific dates, but it was towards the end of 2017.

(Solan Dep. 42:17-43:9).

165. The contemporaneous email chain (Doc. 175-29 [Solan Dep., Ex. 48]) reflects only one attempt to call Mr. Slawin, and that was on the morning of December 11, 2017. (*Id*., at BAMS 182, Page 4 of 11). The email chain does not refer to or memorialize any attempt to call Mr. Slawin on December 8, 2017, nor any attempt to contact Mr. Slawin by Instant Message. Moreover, none of the emails refer to any termination decision. To the contrary, Mr. Solan's email to Mr. Slawin on December 11, 2017 at 2:17 P.M. (*Id*., at BAMS 188, Page 10 of 11), refers only to the need "to talk through this situation, as well as next steps."

166. Mr. Solan did not call Mr. Slawin after the telephone conference on the afternoon of Friday December 8, 2017 until the morning of Monday, December 11, 2017. (Slawin Decl., ¶100).

**Causation**

167. Mr. Slawin was fired because of a concern that Mr. Slawin might disclose to merchants the fact that BAMS was not PCI compliant:

> A. No. As stated earlier, that the reason for termination was both the policy violation, as well as our loss in [sic] trust and confidence that he could continue in his role.
> Q. And the loss of trust – I'm sorry. I apologize. I thought you were done.
> The loss of trust and confidence had to do with the concern that Mr. Slawin might disclose to merchants the fact that BAMS was not PCI compliant, correct?
> A. Correct. He was –
> MR. GALANEK: Objection, form.

39

>        THE WITNESS: -- part of this – correct, to perform
>        his role (indiscernible) organized effort as business to
>        address the issues, have a communication plan, and he
>        -- so we had no confidence that he would be able to
>        continue in that role and –
>    BY MR. MARX:
>    Q. So it was –
>    A. – maintain confidentiality.
>    Q. So it was part of that issue, right?
>        MR. GALANEK: Objection, form.
>    A. Related to that issue.

(Solan Dep. 124:16-125:14).

168. The two decision makers were Michael Solan and Mark Kendall. In its

Supplemental Interrogatory Responses, No. 3, BAMS responded that:

>    . . . . By way of further and supplemental response,
>    BAMS responds that . . . Mike Solan, Human Resources,
>    and Mark Kendall, Plaintiff's manager concluded that
>    there was a loss of confidence . . . and, therefore, they
>    ultimately decided to terminate Plaintiff's employment
>    with BAMS.

(Ex. 76) (Emphasis added).  At his deposition, Plaintiff's counsel read that answer

to Mr. Kendall:

>    Q.  . . . And my question is: Is that a correct statement?
>    A.  It appears correct.

(Kendall Dep. 33:7-34:3).

169. Solan Dep., Ex. 51 [Doc. 175-31], purports to be Mr. Solan's record of

the interactions during the time period December 8 – 20, 2017. At Bates No.

BAMS 9587 [Doc. 175-31 at Page 3 of 5], Mr. Solan wrote in pertinent part,

> . . . . the decision (as approved by Mark Kendall (Mgr.)
> [sic] . . . is to terminate his [Mr. Slawin's] employment
> . . .

(Emphasis added).

170. Solan, the other decision maker, received Slawin's December 11, 2017 email stating that Slawin would not destroy the emails because he (Slawin) wanted to be able to demonstrate that he had not willingly participated in BAMS' fraudulent scheme. (Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).

171. Slawin was fired the next day. (Solan Dep., Ex. 45 [Termination letter] [Doc. 175:27]; Solan Dep. 131:25-132:5, 132:19-133:24).

172. On December 7, 2017, Mr. Solan sent an email to Maryann De Castro, his immediate supervisor and the person whom BAMS asserts accepted the recommendation of Messrs. Solan and Kendall and made the ultimate termination decision. (Solan Dep., Ex. 42; Solan Dep., 111:19-25). He wrote in pertinent part:

> See below for my summary of the Information Security
> Escalation regarding high risk confidential information
> that Eric Slawin sent to his personal email address.
>
> . . . .
>
> The content of the material . . . is related to the way
> BAMS treats Primary Account Number (PAN) and
> associated implications.
>
> . . . . The emails . . . include our acknowledgement that
> this issue exists . . . as well as some potentially damaging
> quotes about not wanting to implement internal
> compliance because of the cost . . .

41

. . . .

There could be severe ramifications if the information . . . were to be shared publicly . . . . In addition to extensive reputational damage, Joe Moll also shared <u>a scenario</u> [emphasis in original]  with a company that did not take adequate steps  to protect customer data, where Visa and Amex dropped the processor with the issue.

. . . .

<u>Partner with Legal to understand whether he has any whistleblower protections</u> [emphasis added]

(Solan Dep., Ex. 42). (Emphasis added).

173. BAMS considered Slawin to be a potential whistleblower. (Solan Dep., Ex. 42).

174.  Mr. Solan testified that when he spoke to Ms. De Castro the issue of PCI noncompliance was part of the discussion. (Solan Dep. 38:19-40:2).

175. Notably absent from Mr. Solan's December 7, 2017 email to Ms. De Castro is any mention of any alleged policy violation.  (Solan Dep., Ex. 42)

176. In Solan's December 7, 2017 email to Ms. De Castro there is no mention of the Code of Ethics, Global Information Security Policy, End User Policy, Proprietary Rights and Information Agreement, Associate Handbook, or Mr. Slawin's offer letter.  (Solan Dep., Ex. 42).

177. The words "policy" and "violation" or "violated" are not anywhere in Mr. Solan's email. (*Id*.)  Instead it was all about BAMS PCI noncompliance, the

"reputational damage" that could result from disclosure that BAMS was not PCI compliant, the concern that a merchant who discovered that fact might terminate the MSA, and whether or not Mr. Slawin could be considered to be a "whistleblower."

178. The Incident Reports themselves reflect that the only thing that BAMS was concerned about was the PCI noncompliance issue and whether it would be disclosed to merchants that BAMS was not PCI compliant. There were ten Incident Reports, marked as Exhibits 30 – 39 at Mr. Solan's deposition [Docs. 175-17 – 175-26]. (Solan Decl. [Doc. 176-4], ¶¶28 – 29). Each one of the Incident Reports contains the following introductory description:

> Comment= [sic] Between 8/25/2017 and 11/28/2017, Eric Slawin forwarded 10 critical BAMS related emails to what appears to be a personal account, eslawin116@gmail.com. The first email dates back to 6/13/2017 where David Ades sent an email to a group of BAMS employees noting that BAMS was discovered as using full PAN data in client support situations, and debating whether BAMS should become PCI Compliant, or to have First Data dedicate a team for BAMS requests. The other emails were of the same topic, but with engagement with other BAMS VP's, and the user also forwarded Excel documents which outline the course of action they plan to take to remediate the issue.[1]

---

[1] (Solan Dep., Exs. 30 [Doc. 175-17], p. 3 of 7, 31 [Doc. 175-18], p. 3 of 7, Ex. 32 [Doc. 175-19] at Page 4 of 8, Ex. 33 [Doc. 175-20] at Page 3 of 9, Ex. 34 [Doc. 175-21] at Page 3 of 9, Ex. 35 [Doc. 175-22] at Page 3 of 9, Ex. 36 [Doc. 175-23]

But three of the ten Incident Reports <u>did</u> <u>not</u> concern BAMS' PCI noncompliance. Solan Dep., Ex. 31 [Doc. 175-18] referred only to the preparations for Hurricane Irma, Ex. 32 [Doc. 175-19] referred only to Mr. Slawin's Management Form, and Ex. 39 [Doc. 175-26] dealt with an entirely different issue, data entered into SalesForce without independent verification. A reasonable conclusion from this is that BAMS Infosec, Mr. Solan, Mr. Kendall and BAMS as a whole were so focused on the PCI noncompliance issue that they did not even notice that three of the ten Incident Reports did not involve PCI noncompliance.

179.  David Ades confirmed BAMs' concern. He testified that if a merchant found out that BAMS was not PCI complaint, the merchant could terminate its credit card processing contract with BAMS, known as the merchant services agreement or MSA.  More specifically, he testified that Disney could terminate its MSA with BAMS if it discovered that BAMS was not PCI compliant. (Ades Dep. 60:18-61:9).

180.  David Ades was BAMS' Executive Vice President/General Manager and Head of Client Managed Sales. (Ades Dep., Ex. 16).

181.  Mr. Ades also had been on the Visa Advisory Board which was involved with Payment Card Information Data Standards (PCI DSS) and

---

at Page 3 of 6, Ex. 37 [Doc. 175-24] at Page 175-24] at Page 3 of 7, Ex. 38 [Doc. 175-25] at Page 3 of 7, Ex. 39 [Doc. 175-26] at Page 3 of 7).

confirmed that in 2017 BAMS was transferring data that was transmitting full PAN (Primary Account Number) "outside of that standard." (Ades Dep. 36:14-38:8).

Other Material Disputed Facts

182. Slawin traded stocks during ordinary business hours, but it was not often. (Slawin Decl., ¶103).

183. During his employment at BAMS, Slawin's use of alcohol increased as he was put under increasing pressure to misrepresent BAMS non-PCI compliance to merchants, and his distress at BAMS' fraud. In 2016 Slawin drank alcohol one a month. From July 2017 on, after he was pulled into BAMS' PCI non-compliance/PAN data problem Slawin started drinking around the equivalent of a fourth of a bottle of alcohol daily. Slawin self-medicated by drinking to deal with the stress and anxiety caused by his situation at BAMS, which he continued to do (Slawin Dep. 101:11-25, 102:22-103:10).

184. Between mid-December 2017 and November 2018 Slawin was unemployed even though he had been diligently looking for work. (Slawin Dep. 120:23-121:1).

185. In 2018, I spent around $120 per week on alcohol. (Slawin Dep. 98:8-11).

186.   After a short time at UPS, Slawin's next job after BAMS was at Wells Fargo, where he was employed from December 2018 through June of 2019. (Slawin Decl., ¶108).

187.  Slawin was drinking heavily while employed at Wells Fargo because of the emotional turmoil and family upheaval my experience and termination from BAMS was causing him. (Slawin Decl., ¶108).

188. Slawin attended an off premises Wells Fargo company party. He has no recollection of the events at that party because he was intoxicated. (Slawin Decl., ¶109).

189.   As a result of his conduct at that party, which he cannot precisely recall because he was intoxicated, Slawin was put on administrative leave. (Slawin Decl., ¶110).

190. Slawin was also referred to Wells Fargo EAP and saw a psychiatrist as a result of this referral in the ensuing months while he was on administrative leave. (Slawin Dep. 44:6-21, 130:6-131:8).

191. Slawin was not brought back from administrative leave, but was terminated by Wells Fargo. He was terminated for the alleged policy violation involving the above described after hours party at which he had been intoxicated. Slawin was never told that at that event he had been verbally abusive, made any

46

threatening comments or had made an inappropriate sexual advance. He was only told that he was terminated for a policy violation. (Slawin Decl., ¶111).

192.  Slawin attempted to commit suicide after my termination. (Slawin Dep. 130:6-131:8).

193. Slawin's experience at and termination from BAMS precipitated a downward emotional spiral, during which he self medicated by overuse of alcohol to the point of blacking out. This was the catalyst for his termination from Wells Fargo. (Slawin Decl., ¶113).

194. After Wells Fargo, Slawin continued to look for work and obtained subsequent employment at Citibank in or about August 2019 where he made $90,000 a year with an opportunity for a $10,000 bonus.  (Slawin Decl., ¶114).

195. Slawin voluntarily left Citibank for a position at USAA in or about January 2020, where he is still currently employed. (Slawin Decl., ¶114).

196. Slawin started at USAA with a base salary of $115,000. (Slawin Decl., ¶114).

197. The SIAI that Mr. Kendall prepared on December 15, 2017, said nothing of substance and effectively just "kicked the can down the road."  Thus the proposed "Remediation Plan" was:

1) Validate current situation and identify PAN data gaps.

2) Explore solutions to address, and select best solution.
3) Create project plan to implement solution.
4) Implement solution.
5) Test solution.
6) Implement ongoing controls (if applicable)

(Kendall Dep., Ex. 28)

198. Mr. Kendall acknowledged that there was no remediation plan in the December 2017 SIAI, and testified when asked about the actual remediation, "I don't see it on these two pages." (Kendall Dep. Ex. 28, 99:11-15).

199. It is clear from David Ades' June 13, 2017 email that BAMS personnel were receiving full PAN data, and that as a result, the Payment Card Industry Data Security Standards required BAMS to be PCI compliant. (Ades Dep., Ex. 16 [Doc. 176-6]; Ex. 79).

200. Slawin believed that "management across the board. . .engaged in wrongful conduct [which was] not disclosing . . .[the PCI non-compliance] problem. I mean it's omission. It's fraud. And I felt that the implications of this . . could ultimately affect shareholders of various companies." (Slawin Dep. 183:5-15).

201. Kendall agreed with Slawin that nondisclosure was fraud. (Slawin Dep. 194:5-14).

48

202. Kendall does not dispute that Slawin made these complaints to him. (Kendall Dep. 93:25-94:5),

203. Kendall testified that the whole PCI noncompliance issue was traumatic for him as well. (Kendall Dep. 175:7-16).

204. Ali Davis admitted that merchants serviced by BAMS had customers who were consumers purchasing goods and services for their personal use. (Davis Dep. 103:3-22, 104:24-105:4, 105:23-106:19).

205. BAMS' general counsel advised that BAMS' employees, when asked by merchants about BAMS' PCI compliance, should just refer the merchants to First Data  (Ex. 63).

This 25th day of February 2025.


   /s/Robert N. Marx
  Georgia Bar Number 475280
  Jean Simonoff Marx
  Georgia Bar Number 475276
  Marx & Marx, L.L.C.
  1050 Crown Pointe Parkway
  Suite 500
  Atlanta, Georgia 30338
  (404) 261-9559
  lawyers@marxlawgroup.com
  jeannie.marx@marxlawgroup.com

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

            Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT
SERVICES,

            Defendant.

Civil Action File No.
1:19-cv-04129-AT

Certificate of Service

This is to certify that on February 25, 2025, I electronically filed: **Plaintiff's Statement of Disputed Material Facts,** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

Christopher P. Galanek, Esq.
Chris.Galanek@bclplaw.com
Brian Underwood, Esq.
Brian.Underwood@bclplaw.com
Bryan Cave Leighton Paisner
LLP One Atlantic Center, 14th
Floor 1201 West Peachtree
Street, N.W. Atlanta, GA 30309-3471

This 25th day of February 2025.

        /s/Robert N. Marx
        Robert N. Marx, Esq.
        Georgia Bar No. 475280
        Jean Simonoff Marx, Esq.
        Georgia Bar No. 475276

Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
Tel. (404) 261-9559
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com
*Attorneys for Plaintiff*