IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

      Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT SERVICES,

Civil Action File
Case No. 1:19-cv-04129-AT

<u>DECLARATION OF ERIC SLAWIN</u>

I, Eric Slawin, pursuant to 28 U.S.C. Sec. 1746, declare and state as follows
under penalty of perjury:

1. I am over 18 and mentally and physically capable to provide this sworn
statement.

2. I was hired by BAMS for the position of   VP Operations Control Officer
on or about November 5, 2015, and started my employment in that position on or
about December 7, 2015. In that position, I was the liaison between BAMS'
Independent Risk Management, Compliance and Internal Audit segments.

3. At the time I began employment at BAMS in December 2015, I had had
almost 25 years in the Securities and Banking Regulatory and Compliance field,

1

having started in this area in 1991. Prior to working at BAMS I had held numerous regulatory and compliance positions both for governmental regulatory agencies as well as for other banks and broker dealers.

4. During my employment, I reported directly to Natasha Collins, Mark Kendall and Brian Rubin.

5. Natasha Collins was Senior Vice President, Head of Sales Operations and Planning. I reported to Ms. Collins during the late summer and early fall of 2017 until in or about September 2017.

6. On information and belief, sometime during the summer of 2017, Ms. Collins started to report directly to Tim Tynan, BAMS' CEO.

7. Until in or about September 2017, Mark Kendall was Director of Risk and Control and also reported to Ms. Collins. In or about September 2017, Mr. Kendall was promoted and became my immediate supervisor instead of Ms. Collins.

8. Brian Rubin was Business Management, Project Management Office and Process Engineering Executive.

9. BAMS represented itself as a payment acquirer, an entity involved in payment processing to major private merchants such as Home Depot, Target, Amazon, Exon Mobile, Royal Caribbean Lines, MGM and others, as well as to numerous municipalities, to facilitate credit and debit card transactions between those entities and their customers.

2

10. At all relevant times, BAMS solicited the business, *i.e.* merchant and municipal customers, and was the "face" of the relationship between its customers, while First Data Corporation ("First Data") handled the payment processing from the back end.

11. In this relationship, First Data was in essence the back office so that private merchants' and municipalities' point of contact was BAMS.

12. A credit card or debit card has an account number on it. That is known as a Primary Account Number or PAN.

13. When an entity transmits or receives data containing a cardholder's complete account number, it is deemed to be transmitting or receiving "full PAN."

14. The payment card industry, known as PCI, has a series of data security standards, known as DSS. This includes, among other things, transmitting or receiving the data in an encrypted format. The payment card industry data security standards is known by the acronym PCI DSS.

15. The Payment Card Industry Data Security Standards ("PCI DSS") are a list of twelve information security requirements promulgated by the Payment Card Industry Security Standards Council. They apply to all organizations and environments where cardholder data is stored, processed, or transmitted and require financial institutions and providers of payment processing services such as

BAMS to protect cardholder data, ensure the maintenance of vulnerability management programs, implement strong access control measures, regularly monitor and test networks, and ensure the maintenance of information security policies. "PCI compliance" refers to adherence to this set of security standards embodied in the Payment Card Industry Data Security Standard (PCI DSS).

16. The PCI DSS requires that entities that transmit or receive PAN data comply with the requirements of the payment card industry data security standards, or PCI DSS. An entity that complies with the PCI DSS is considered to be PCI compliant. An entity that does not comply with the payment card industry data security standards, or PCI DSS is considered to be PCI noncompliant, which is alternatively expressed as not being PCI compliant.

17. In or about June 2017, I became aware that BAMS was receiving PAN data with respect to chargebacks, which required BAMS to be PCI compliant, but that BAMS was not PCI compliant.

18. On June 13, 2017 Natasha Collins copied me on an email chain regarding BAMS sending full PAN data and not being PCI compliant. One email in the chain was from David Ades, dated June 13, 2017. Mr. Ades' email stated in pertinent part that BAMS was transmitting and receiving PAN data with respect to chargebacks, which required BAMS to be PCI compliant, but that BAMS was not

PCI compliant.  Mr. Ades also stated in his email, "We – BAMS don't want to go the route of PCI compliance as it would be a very costly and time consuming exercise. So the options are to have the merchants call directly to FD [First Data] to obtain info they request-might not be a great client experience." This email chain also contained a responding email from Brian Glynn, also dated June 13, 2017 stating, "We all agree that the main disadvantage of outsourcing this type of request handling to FD directly is the negative impact it could have on client experience, which you mentioned. That said, we understand that going down the path of making BAMS PCI compliant is not something we want to consider."

19. At all relevant times, I was aware that merchants for whom BAMS did credit or debit card processing had to certify that they were PCI compliant.

20.  In or about July 2017, I became aware  that BAMS was required to be PCI compliant under the Merchant Services Agreements (MSA's) that it had entered into, partnered with Bank of America, with merchants to do their credit or debit card processing. I became aware that BAMS had to be PCI compliant because of the June 13, 2017 email from David Ades, and senior management said that BAMS was receiving full PAN data. I looked up agreements available on the internet over the next month following Mr. Ades' June 13, 2017 email, and found boiler plate agreements for MSA's

21. In or about July 2-17 I also found on the internet the executed Merchant Processing Agreement (MPA) between BAMS and BOA and the state of Delaware which indicated that BAMS was PCI compliant.

22. In addition to the PCI DSS, credit card companies such as VISA and MASTERCARD have rulebooks which set forth rules that apply to merchants and acquiring banks such as BAMS. These rules include the right of companies like VISA and MASTERCARD to fine non-PCI compliant companies like BAMS up to $100,000 a month for each month that the company is not PCI compliant. I knew this during my employment because I had seen such rulebooks online.

23. At all relevant times, to my knowledge, First Data was PCI compliant.

24. One area in which the issue of BAMS' non-PCI compliance rose was in the context of how BAMS should respond to client questionnaires that raised questions regarding how data was secured by BAMS, and direct inquiries about whether BAMS was PCI compliant.

25. BAMS' highest level executives knew that BAMS was required to be PCI compliant and that it was not.

26. During May and throughout the summer of 2017, there were email exchanges including among the highest level of BAMS' executives regarding the magnitude of the PCI non-compliance issue given the large volume of PAN data that BAMS handled.

6

27. On June 13, 2017 I was copied on an email chain about how to handle the PAN data issue. This email chain included an email from David Ades, also June 13, 2017 which stated that BAMS used full PAN data and that BAMS did not want "to go the route of PCI compliance as it would be a very costly and time consuming exercise." This same email chain included an email from Brian Glynn, who reported to David Ades, that confirmed BAMS PCI non-compliance problem, stated that "we all agree that the main disadvantage of outsourcing" the "request handling" to First Data directly was the negative impact it would have on BAMS clients. Mr. Glynn further stated, "that said. . .going down the path of making BAMS PCI compliant is not something we want to consider." (EX 3).

28. These emails reflect the decision among BAMS' management that it was too costly for BAMS to become PCI complaint, and therefore that it would not become PCI compliant.

29. Joseph Moll had been Vice President Corporate Information Security Officer, Risk and Compliance at BAMS in the summer of 2017. My understanding is that Mr. Moll left that position at BAMS on information and belief in August 2017.

30. In or about July 2017 Mr. Moll described thousands of instances in which "PAN data was being mishandled by BAMS", noting that that figure was under-representative of all PCI violations since those numbers only reflected

instances of emailing PAN data and did not include all instances in which PAN data was stored, processed or otherwise transmitted.

31. I was assigned the job task of preparing what is known as a self-identified audit issue, or SIAI, to resolve the issue of BAMS PCI noncompliance.

32. The problem was that the only two ways of resolving the issue was either for BAMS to become PCI compliant, or to transfer all processing of PAN data to First Data, both of which options had effectively been taken off the table by Mr. Ades and the other high level executives at BAMS who agreed with the substance of his email.

33. In addition, there was an internal debate within BAMS regarding which business line or business area would own the SIAI, because it was toxic. It was toxic because the only way to fix the problem had effectively taken off the table. There was reluctance to be the owner of the SIAI. We were all surprised because we had all assumed that BAMS was PCI compliant.

34. The problem was not just that BAMS was not PCI compliant, but that it represented to merchants in its MSA's that it was. I had seen from the internet boilerplate MSA's, and it was common knowledge that BAMS represented to its clients/merchants in its MSA's that it was PCI compliant. I mentioned the blank agreements that I got from the internet to Mark Kendall on numerous occasions, including after he became my supervisor, when I discussed with him my concern

8

that BAMS was misrepresenting to merchants that it was PCI compliant, when it was not.

35. I researched the issue of what BAMS was telling its merchants.  I obtained a copy of the MPA with the State of Delaware off the internet. I was aware that Delaware is a municipality, and not a publicly traded merchant, but believed that individuals and businesses in Delaware made credit card transactions, and knew that BAMS and BOA had entered into a Merchant Processing Agreement with Delaware representing that BAMS was PCI compliant.

36. I discovered that BAMS was required under the MSA's it was entering into with the merchants to be PCI compliant and that it represented that it was in fact was PCI compliant, by reviewing blank agreements online and then discussing them with Mark Kendall, Natahsa Collins, Sherra Grissom and others during the SIAI scoping, so that I knew that BAMS was engaging in acts of fraudulent misrepresentations and/or instances of fraud by omission as to its customers.

37. I have investigated securities fraud for the State of Florida and NASDAQ, which became FINRA. Prior to my employment with BAMS, I had over twenty years of experience in the securities industry, including extensive experience on Wall Street on the trading floor, as a go-to person to answer questions from the syndicate desk and the investment bankers regarding disclosures in offering documents. The syndicate desk is the intermediary between

the investment bankers underwriting the proposed security and the sales force. As just one example, I investigated a securities violation by an entity in Florida that resulted in a several thousand dollar monetary settlement. I became aware that in many cases the fraud is one of omission.

38. BAMS' response to the PAN data issue and its non-PCI compliance was to deflect its non-PCI compliance by trying to get its parent, First Data, to answer customer questionnaires regarding data security, in order to camouflage that BAMS, which received, retained and transmitted its customers' PAN data, was not PCI compliant.

39. My task was to deflect questions from merchants as to whether BAMS was PCI compliant to First Data, and thereby conceal by fraudulent omission that BAMS was not PCI compliant.

40. I was uncomfortable being put in a position to misrepresent the facts.

41. I tried unsuccessfully for several months to get another job outside of BAMS so that I would not be in this position. I was afraid of being made a scapegoat or fall guy if it got out that BAMS was not PCI compliant.

42. Full PAN data was regularly transmitted between First Data and BAMS in non-PCI compliant batch files and spreadsheets, so that BAMS acquired, hosted, and transmitted that data in violation of PCI-DDS, and in breach of its Merchant

Processing Agreements and Merchant Services Agreements with it customers,

rendering that PAN data vulnerable to data security breach.

43. First Data being PCI compliant did not resolve the PAN data security

issues endemic to BAMS' not being PCI compliant.

44. I was expected to go along with BAMS' deflection and information

omission strategy.

45. I had at least four or five conversations with Mr. Kendall in which I told

Mr. Kendall that BAMS was acting fraudulently and misleading its customers, and

that I was not comfortable being a part of BAMS' conspiracy to mislead its clients.

These conversations were both when Mr. Kendall was my peer, and after

September 2017, when he was my immediate supervisor. I noted my concern that

it could affect shareholders, both of the merchants and of Bank of America.

46. During these conversations, I stated that BAMS' fraud was bad for the

clients, and bad for BAMS and its parents since the deception could expose the

whole organization to massive financial exposure if it got out that BAMS was not

PCI compliant. As noted above, there are huge fines that attach to PCI non-

compliance violations, and the potential costs of a data security breach were

astronomical. I believed that BAMS' failure to disclose or correct its non-PCI

compliance was a massive fraud, including on the shareholders of Bank of

America, particularly because of the Bank of America name association between BOA and BAMS.

47. I raised my concern about and objection to BAMS' misleading its clients by misdirecting them to First Data.

48. During the period August through September 2017, I had biweekly meetings with Natasha Collins. During these meetings I discussed the creation of a self-identified audit issue and mitigation of BAMS' non-PCI compliance. I repeatedly advised Ms. Collins about my concerns regarding BAMS' non-PCI compliance. I reiterated several times that I was uncomfortable being asked to represent to BAMS' clients and to internal BAMS' teammates that BAMS was PCI compliant when I knew that it was not.

49. I know that omission is part of the definition of fraud. I understand that the core requirement for the SEC is disclosure, that a public entity is required to disclose all information that might affect share price, so that an investor can then make an informed decision as to whether or not the potential investor wants to purchase shares of that company. I came to a belief in or about July 2017 that BAMS was committing fraud by omission by not disclosing the fact that it was not PCI compliant, which could affect the shareholders of public entities that were having their customers' purchases processed by BAMS, especially if there was a data breach. I also believed that the omission could affect shareholders of one of

12

BAMS' parent companies, Bank of America. While I did not know the specific

provisions or even the existence of Sarbanes-Oxley, Dodd-Frank, the CFPA, or any

other federal statute giving jurisdiction to the SEC, or to the CFPB, I believed that

the fraudulent omission could constitute bank fraud and securities fraud, at the very

least, and possibly other types of fraud made unlawful under federal statutes. I

became aware that the conduct in which BAMS was engaging could be

investigated by the SEC and be found to constitute unlawful acts under the statutes

enforced by the SEC. In particular, I was thinking about the 1933 and 1934 acts of

the SEC. In my job at FINRA, I was involved mostly with the 1934 act from the

perspective of the public, regarding representations for sales of securities, and at

J.P. Morgan, in the private sphere, I was mostly involved with the 1933 act for

underwriting and disclosures in offering documents for the sales of securities.

50. At the time that I was tasked with the SIAI I understood that the option

of removing all job tasks involving PAN data and transferring them to First Data,

who was PCI compliant, was undesirable from BAMS' point of view because it

would negatively affect client relations with the merchants. This is what Brian

Glynn had written on June 13, 2017 in the email chain that was sent to me.

51. I am aware that BAMS has criticized me for not "completing" the SIAI.

I was reluctant to put my name on the SIAI because I did not want it to look like I

had covered up the fact that BAMS was not PCI compliant and yet was

representing that they were. I did not "complete" the SIAI because I kept seeking a resolution that effectively was impossible.

52. I was aware that communications between the merchants and BAMS regarding the PCI issue, their questionnaires, and BAMS responses was sent by email over the internet.

53. I believed that fraudulent communications communicated by email over the internet constitutes wire fraud.

54. Everybody I spoke to knew that BAMS should become PCI compliant, but they didn't want to do it. Nobody said that BAMS did not need to become PCI compliant.

55. Brian Glynn and I were talking about this issue one day. I mentioned this is PAN data, we have to be PCI compliant to get that, and he agreed.

56. Mark Kendall agreed with me that it was a problem that we were receiving PAN data and we were not PCI compliant. He also told me that it would be problematic if it got out that BAMS was not PCI compliant.

57. To become PCI complaint would have required an audit by a Qualified Security Assessor (QSA) who, after an audit, would issue an Attestation of Compliance (AOC). However, the QSA inevitably would have discovered that BAMS had been representing that it was PCI compliant during a time when it was not and should have been.

58. Throughout the summer and continuing through the fall of 2017 I participated in numerous conversations in which I discussed with my immediate superiors and other senior executives at BAMS the problems surrounding BAMS being PCI noncompliant, and my concerns and objections to BAMS' actions, which it intended to continue, to mislead and defraud its customers into believing that it was PCI compliant when it was not and had no intention of becoming PCI compliant.

59. Among the numerous individuals whom I spoke to about BAMS' non-PCI compliance and my concerns about fraud and the ramifications if this information were to become public, were Brian Rubin, Sherra Grissom, Mark Kendall, Natasha Collins, and Walt Zimerman, who was a Senior Sales executive at BAMS assigned to the Home Depot relationship.

60. Sherra Grissom was a Senior Vice President, Business Controls Manager of Respondent BAMS who reported to Thomas Fontana.

61. Thomas Fontana was BAMS' Chief Risk Officer and reported to CEO Tim Tynan.

62. I had at least one conversation with Walt Zimmerman who was a Senior Sales executive at BAMS assigned to the Home Depot relationship. I objected to answering Home Depot's question in its questionnaire it sent to BAMS about whether BAMS was PCI compliant in any way that would indicate that BAMS was

PCI compliant, when it was not. I was unequivocal that I would not indicate that BAMS was PCI compliant.

63. Mr. Zimmerman expressed extreme concern about BAMS not being PCI compliant and indicated that he had been led to believe that BAMS was PCI complaint.

64. I was aware that Home Depot, one of BAMS' customers, was very concerned about PCI compliance issues since Home Depot's own auditors had been brought in to evaluate the handling of PAN data.

65. It was part of my job to provide answers to customers' inquiries, like those from Home Depot, about whether BAMS was PCI compliant.

66. I told my superiors that I was not going to answer that BAMS was PCI compliant when it was not.

67. Invariably the question was not answered, and other BAMS' employees who handled the Home Depot relationship, actively mislead Home Depot, and other similar BAMS' merchant and municipal customers, into believing that BAMS was PCI compliant by diverting the response to First Data.

68. However, BAMS owned the relationship with Home Depot, and did not want First Data to usurp its primacy in the relationship with Home Depot.

69. BAMS' response to Home Depot's concern and direct inquiry about BAMS' PCI compliance was to omit any disclosure that it was not PCI compliant.

16

Such a disclosure would have been cataclysmic for the relationship since BAMS handled all the chargeback issues, not First Data, which meant that all the involved PAN information was being mishandled.

70. I was concerned about BAMS' strategy of sidestepping its customers' concerns and inquiries about PAN data security and PCI compliance instead of becoming PCI compliant.

71. I repeatedly expressed my concern that BAMS was engaging in fraud by not disclosing its non-PCI compliance, instead misleading its potential and existing customers into believing that it was PCI compliant by having First Data (which was PCI compliant) answer those questions.

72. I was expected to keep quiet, and to participate in BAMS' practice of misleading its merchant and municipal customers, to perpetuate their erroneous belief that BAMS was handling their PAN data in a PCI compliant manner.

73. Other BAMS' employees who were not aware that BAMS was not PCI compliant could not believe it when I discussed the issue with them.

74. For example, I had a conversation with Leonard Ebel regarding a potential customer, L Brands. Mr. Ebel had not been aware that BAMS was not PCI compliant and had just assumed that it was, since PCI compliance is standard in the industry. Mr. Ebel expressed disbelief at this situation and understood the huge risks to potential customers like L Brands.

17

75. While I do not recall using the word "fraud" or "fraudulent" in my discussions with Natasha Collins, Brian Rubin, and Leonard Ebel, as I did when I talked to Mark Kendall and Sherra Grissom, I communicated that BAMS actions in concealing its PCI non-compliance from its customers was deceptive, and could impact shareholders in various companies.

76. I also believed and understood that BAMS conduct violated consumer laws that protected people against data breaches, and I was aware of multimillion dollar losses from large data breaches.

77. While I did not know the exact name of the CFPA, I was aware from my experience in banking and regulation that entities involved in handling personal account information data, including entities involved in payment processing, were regulated under federal laws that protected the data security of personal account information, including credit card personal account information.

78. BAMS' own senior management understood the seriousness of this issue, directing that all written references to BAMS being non-PCI compliant be deleted.

79. Mark Kendall, as my immediate supervisor, directed that discussion of the PAN data and PCI non-compliance issue be kept quiet, and that written references to this issue be deleted. At this time, there was no explicit statement

about keeping the matter confidential, but Mark Kendall stated that it would be a problem if BAMS PCI non-compliance got out.

80. In or about August 2017, I began downloading emails to my personal email regarding the PAN data and BAMS' PCI noncompliance issue. I did this because I was concerned about being drawn into fraudulent and improper data security practices by BAMS, and to demonstrate that I had not willingly participated in a fraudulent scheme to mislead merchants into believing that BAMS was PCI compliant.

81. These emails also reflect the decision among BAMS' management that it was too costly for BAMS to become PCI complaint, and therefore that it would not become PCI compliant.

83. Not all of the emails I downloaded referred to BAMS' PCI noncompliance. One of the emails was about my Management Form and I believe I downloaded it to work on it from home.  I understand that one of the downloaded emails referred to BAMS' preparations for Hurricane Irma.  In all candor, I cannot remember why I downloaded it to my personal email. It may have been to work on the hurricane preparations at home or it may just have been a mistake. I understand that another of the downloaded emails dealt with an entirely different issue, data entered into SalesForce without independent verification. I also cannot remember why I did that or if it was downloaded in error.

19

84. To my understanding and knowledge at the time, and now, downloading the emails did not violate any policy of BAMS.

85. I did not ask the Legal Department for a copy of an MSA because I was concerned that if someone in the Legal Department asked why I wanted to see an MSA, it would raise a red flag.

86. In or about the last week of October 2017 there was a meeting at which Mark Kendall specifically discussed that the PCI non-compliance issue was "confidential". This meeting occurred after I received and seen numerous emails about the PCI non-compliance problem that were not marked confidential, which included emails that I had downloaded.

87. On Friday, December 8, 2017, late in the afternoon, I received an electronic meeting invite, and dialed in to the meeting. I spoke by telephone with Mike Solan from HR and Mark Kendall. At the time, Mark Kendall was my immediate supervisor.

88. Mr. Solan asked me why I had downloaded the emails. I responded that I had downloaded some of them to work on them at home. He did not identify the specific emails that he was talking about.

89. I was not asked during that telephone conversation to return or delete the emails that I had downloaded to my personal email account.

90. The telephone call was short; it lasted approximately 5 -10 minutes.

91. At the end of the telephone call, Mr. Solan said he was going to send me some documents to review. He did not describe the contents of those documents nor did he say that I would be asked to sign any document.

92. I subsequently on that same date, Friday, December 8, 2017, received an email stating that I had violated various company policies by downloading the emails, directing me to "cease and desist" from downloading any further emails, requiring me to delete the emails that I had downloaded, and requiring me to sign a Declaration that I had done that.

93. During the telephone conversation on December 8, 2017, I was courteous, business-like and professional. I answered the questions that I was asked. I categorically deny that I was "apathetic, flippant, and unforthcoming" during the call.

94. During the telephone call I <u>did</u> <u>not</u> confirm that I did not usually send emails from my BAMS email address to my personal email address. The question of whether I usually did that was not raised by Mr. Solan and it was not discussed.

95. I was not advised that I had been terminated during the December 8, 2017 telephone call, nor was the possibility of termination mentioned by Mr. Solan or Mr. Kendall.

96. On Monday, December 11, 2017, I sent an email to Mr. Solan explaining why I would not sign the requested declaration. It reads in part:

> . . . .
>
> Should I acknowledge the statements in the declaration by writing my signature on the document I could make it appear that I as a declarant agree with the actions taken by other parties to withhold information possibly demonstrated by and referenced as "BAMS' confidential business information" in the declaration statement. I have not at any time taken nor will I ever agree with any actions taken by parties either individually or acting as joint tortfeasors which implies, demonstrates, or creates a belief that information should be withheld that could damage the counter-parties of Bank of America Merchant Services, Inc.
>
> . . . .

(Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).  My reference in the email to the "counter-parties" of BAMS was to the merchants, and I was objecting to BAMS' ongoing efforts to withhold from the merchants the information that BAMS was not PCI compliant.

97. I was fired the next day.

98. The reference to David in my June 2, 2017 email, Ex. 20 to my deposition (Doc. 175-11) was to David Ades, who was Executive Vice President/General Manager and Head of Client Managed Sales.

99. My November 5, 2015 offer letter did not advise me of any specific nondisclosure obligations and specifically did not advise me that it would be a

violation of any BAMS policy were I to download any information from my work email account to my personal email account.

100. After the December 8, 2017 telephone call, Mr. Solan did not call or Instant Message me until the morning of Monday, December 11, 2017.

101. I was not asked during the December 12, 2017 telephone call whether I would execute the declaration concerning the nondisclosure, return and destroy the confidential information that I had sent to my personal email.

102. While it may not have been uncommon for SIAI's to be treated as confidential until the issue was fully assessed and appropriate remediation was determined such that it could be disseminated more broadly within BAMS, with respect to the SIAI that I was tasked with remediating, it was kept confidential because BAMS wanted to conceal the fact that it was not PCI compliant.

103. I traded stocks during ordinary business hours, but it was not often.

104. In July 2017 I concluded that the SEC would be interested in BAMS' fraudulent misrepresentations and/or fraudulent concealment regarding its noncompliance with the PCI DSS rules and that such unlawful acts could be within the scope of statutes that the SEC enforces.

105. During my employment at BAMS my use of alcohol increased in 2017 as I was put under increasing pressure to misrepresent BAMS non-PCI compliance

to merchants, and my distress at to participate in BAMS fraud. In 2016 I drank alcohol once a month. From July 2017 on, after I was pulled into BAMS' PCI non-compliance/PAN data problem I started drinking around the equivalent of a fourth of a bottle of alcohol daily. I self-medicated by drinking to deal with the stress and anxiety caused by my situation at BAMS, which I continued to do. This is what I testified to at pages 101:11-25; 102:22-103:10 of my deposition.

106. Between mid-December 2017 and November 2018 I was unemployed even though I had been diligently looking for work. This is what I testified to at pages 120:23-121:1 of my deposition.

107. As I testified in my deposition at 98:8-11, in 2018, I spent around $120 per week on alcohol. (Slawin Dep. 98:8-11).

108. My next job after BAMS was at Wells Fargo, where I worked from December 2018 through June of 2019. I was drinking heavily while employed at Wells Fargo because of the emotional turmoil and family upheaval my experience and termination from BAMS was causing me.

109. I attended an off premises Wells Fargo company party. I have no recollection of the events at that party because I was intoxicated.

110. As a result of my conduct at that party, which I cannot precisely recall because I was intoxicated, I was put on administrative leave. I was also referred to

Wells Fargo EAP and saw a psychiatrist as a result of this referral in the ensuing months while I was on administrative leave. I gave this testimony at my deposition at 44:6-21 and 130:6-131:8.

111. I was not brought back from administrative leave, but was terminated by Wells Fargo. I was terminated for the alleged policy violation involving the above described after hours party at which I was intoxicated. I was never told that at that event I was verbally abusive, made any threatening comments or that I had made an inappropriate sexual advance. I was simply told that I was terminated for a policy violation.

112. I attempted to commit suicide after my termination from Wells Fargo as I testified at 130:6-131:8.

113. My experience at and termination from BAMS precipitated a downward emotional spiral, during which I self medicated by overuse of alcohol to the point of blacking out. This was the catalyst for my termination from Wells Fargo.

114. After Wells Fargo, I continued to look for work and obtained subsequent employment at Citibank in or about August 2019 where I made $90,000 a year with an opportunity for a $10,000 bonus. I voluntarily left Citibank

for a position at USAA in or about January 2020, where I am still currently employed. I started at USAA with a base salary of $115,000.

115. Mark Kendall did not speak to me about sending the June 2, 2017 email to my personal email account.

116. Kendall did not tell me orally or in writing that there was anything objectionable about my having sent a copy of my June 2, 2017 email to my personal email account.

117. Even after Mark Kendall became my immediate supervisor in September 2017, Ms. Collins, as Mr. Kendall's supervisor, remained on a higher supervisory level than me and was within my chain of supervision.

118.  First Data was sometimes referred to as "FD" or "FDMS" for First Data Merchant Services.

119. Brian Rubin was my supervisor into approximately the second quarter of 2017.

120. I did not disseminate any of the downloaded emails outside of BAMS.

121. I did not save any BAMS emails onto any laptop.

122. I returned the BAMS provided laptop upon my termination from BAMS as was required by the termination letter BAMS sent to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of February 2025.

26

_Eric Slawin_
Eric Slawin (Feb 25, 2025 22:39 EST)

Eric Slawin