0IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

     Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT SERVICES,

     Defendant.

Civil Action File
Case No. 1:19-cv-04129-AT

## PLAINTIFF'S CORRECTED RESPONSES TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### I – PARTY BACKGROUND[1]

**1.** BAMS was a joint venture between FDS Holdings, Inc., then a

subsidiary of First Data Corporation, and BAMS Solutions, Inc., an indirect

subsidiary of Bank of America ("BOA"). (MSJ Ex. 40 at Requests for

Admissions Nos. 3-5.)

Undisputed.

**2**. BAMS is now known as JV Wind Down, LLC. (MSJ Ex. 40 at Requests

for Admissions No. 3.)

---

[1] For simplicity, Plaintiff is using the headings used by Defendant, without any express or implied acknowledgement that they are correct, appropriate, or material.

<u>Undisputed</u>.

**3.** Plaintiff Eric Slawin ("Slawin") is a former employee of BAMS. (Slawin Dep. 51:16-18.)

<u>Undisputed</u>.

**4**. Slawin began employment with BAMS in December 2015, and his signed offer letter from BAMS establishes December 7, 2015 as the effective date of employment. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 (offer letter identifying start date).

<u>Undisputed</u>.

**5**. Slawin's job title while at BAMS was Vice President, Operations Control Officer. (Solan Decl. ¶ 8.)

<u>Undisputed</u>.

**6**. Slawin's position and job responsibilities at BAMS required that he appropriately handle proprietary, confidential, and/or sensitive information. (Solan Decl. ¶ 9; Collins Decl. ¶ 3.)

**<u>Disputed</u>.**

BAMS does not define what it means by the use of the word "appropriately." The citation is not supported by any reference to any documentation, but only to uncorroborated statements of Mr. Solan and Ms. Collins. Slawin disputes this Undisputed Fact to the extent that it might be

2

construed to mean that sending emails to his personal email account was not "appropriately" handling proprietary, confidential, and/or sensitive information. *See*, Nos. 66-69, 71, 73, 74, 76, 77, 79 – 81, *infra*.

**7.**  The decision to terminate Slawin's employment with BAMS was made and effective December 8, 2017. (Solan Decl. ¶¶70-73; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25; 122:3-20, 129:12-130:13, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 51; Kendall Decl. ¶17).

**Disputed.**

It is undisputed that the termination letter is dated December 12, 2017, and that it was emailed to Mr. Salwin on that date. (Doc. 175-27 & Solan Dep. Ex. 45 [Termination letter]; Solan Dep. 132:25-134:2). In fact, Mr. Solan admitted at his deposition that Mr. Slawin was fired on December 12, 2017:

> Q.  . . . . Let's go down one more. It says on Tuesday, December 12, 2017 2:05 p.m. Mike Solan to Eric Slawin; you see that?
> A.  I do, yes.
> Q.  Okay. And that's the email at which you forwarded him the termination letter by email, correct?
> A.  It appears so, yes.
> Q.  All right.  Any reason not doubt that?
> A.  Nope.
> Q.  Okay. So Mr. Slawin was fired on December 12, 2017, correct?
> A.  To my knowledge, that's correct.
>      MR. GALANEK:  Objection, form.
>      THE WITNESS: That's when we – that's when we were able to notify him of his termination.

3

(Solan Dep. 131:21-132:12).

Obviously, BAMS will urge the factfinder to rely on the second part of Mr. Solan's answer, that December 12, 2017 was the first date on which BAMS was able to notify Mr. Slawin of his termination; and just as obviously, Mr. Slawin will urge the factfinder to rely on the first part of Mr. Solan's answer, that it is a correct statement that Mr. Slawin was fired on December 12, 2017. This is precisely why this is a *disputed* issue of material fact.

Further, Mr. Solan's excuse, that BAMS was not able to notify Mr. Slawin of his termination until December 12, 2017, is belied by the facts that 1) BAMS had Mr. Slawin's personal email at all relevant times, including the period December 8-12, 2017, and 2) the termination letter was emailed to Mr. Slawin's personal email on December 12, 2017. (Solan Dep. 131:25-132:5, 132:19-133:24). It thus makes no sense that BAMS was not able to email the termination letter to Mr. Slawin prior to December 12, 2017. Indeed, Mr. Solan acknowledged that he could have emailed the termination letter earlier, on Friday, December 8, 2017 or Monday, December 10, 2017. (Solan Dep. 134:15-23). But BAMS did not email Mr. Slawin the termination letter until after it had received his December 11, 2017 email wherein Mr. Slawin stated that he was refusing to sign the requested declaration because he did not want to go along with the fraud.

4

On December 11, 2107, Mr. Slawin sent an email to Mr. Solan explaining

why he would not sign the requested declaration:

> . . . .
> Should I acknowledge the statements in the declaration
> by writing my signature on the document I could make it
> appear that I as a declarant agree with the actions taken
> by other parties to withhold information possibly
> demonstrated by and referenced as "BAMS' confidential
> business information" in the declaration statement. I have
> not at any time taken nor will I ever agree with any
> actions taken by parties either individually or acting as
> joint tortfeasors which implies, demonstrates, or creates a
> belief that information should be withheld that could
> damage the counter-parties of Bank of America Merchant
> Services, Inc.
> . . . .

(Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11])

Mr. Slawin's reference to the "counter-parties" of BAMS was to the

merchants, and he was objecting to BAMS' ongoing efforts to withhold from the

merchants the information that BAMS was not PCI compliant. (Slawin Decl. ¶96).

He was fired the next day, December 12, 2017. (Doc. 175-27 [Termination letter],

Solan Dep., Ex. 45).

This email followed months of complaints by Mr. Slawin to his boss, Mark

Kendall who BAMS admits made the termination decision along with Mr. Solan,

to Natasha Collins, Sherra Grissom, and others about fraud, including fraud on

shareholders of several corporations. (Slawin Dep. 205:23-207:4, 218:11-220:10;

Slawin Decl. ¶¶45, 46, 48, 58, 59, 60, 62, 71, 75; BAMS' Supplemental Answers to Plaintiff's First Interrogatories, No. 3 [Ex. 76])

BAMS also seeks to rely on Ex. 47 (Doc. 175-28] to Mr. Solan's deposition as a record citation to support its assertion that the decision to fire Mr. Slawin was made and effective on December 8, 2017, but that alleged "evidence" is not properly before the Court and in any event is inadmissible hearsay.

Doc. 175-28 purports to be an email from Dan Mong at BAMSInfosec[2] to Larry Brennan on December 8, 2017, at 10:54 P.M., but it was not identified or introduced into evidence by anybody at any deposition.  There is no Declaration from anyone at BAMSInfosec, from Dan Mong, or from Larry Brennan identifying the email.  It was not sent to or from Mr. Solan, and Mr. Solan is not copied on the email.  Further, it is double hearsay, even assuming that the document could be construed as an exception to the hearsay rule as a business record.  The email purportedly is Dan Mong saying what Mr. Solan said to him.

Mr. Solan attempts to introduce the email into evidence by his Declaration, but it squarely contradicts his deposition testimony about the document and must thus be disregarded as a sham affidavit.  Thus, at Solan Declaration, ¶72, he states:

> Also on December 8, 2017, I informed members of
> BAMS' management and InfoSec team that Slawin's

---

[2] This appears to be BAMS title for its – or First Data's – IT department that deals with information security.

employment had been terminated. For example, I
communicated the decision to Dan Mong. This
communication is evidenced in the December 8, 2017
email from Dan Mong to other members of the InfoSec
team, which was introduced during my deposition as
Exhibit 47.

(Solan Decl. ¶72).

But this contradicts his deposition testimony when he was shown the

document and still could not remember if he had in fact spoken to Dan Mong:

> Q. . . . . Does the fact that this top email on page 40 –
> excuse me on Exhibit 47 is written, apparently by
> Dan Mong, does that refresh your recollection as to
> whether you spoke to him about the decision to fire
> Mr. Slawin?
> A. It would appear so, but I can't – it doesn't refresh my
> memory. I can't say for certain that I spoke to him
> directly. I might have but –
> Q. Okay.
> A. – I can't say for certain.

(Solan Dep. 78:11-20).  Mr. Solan's testimony at ¶72 of his Declaration squarely

contradicts his deposition testimony, is therefore a sham affidavit as a matter of

law, and must be rejected by the Court.  Therefore, the purported Exhibit 47 to Mr.

Solan's deposition must be disregarded as well.

Even assuming, *arguendo*, that the exhibit may be considered by the Court,

the substance of the purported exhibit is contradicted – again – by Mr. Solan's

deposition testimony.  The exhibit purports to state that Mr. Solan had told Mr.

Mong that, " . . . Eric Slawin is being terminated <u>because</u> <u>of</u> the BAMS sensitive

data that he . . . sent to his gmail account . . ." (Doc. 175-28, Solan Dep. Ex. 47) (emphasis added), but Mr. Solan testified that he did not tell anyone at InfoSec the reason for the termination decision:

> I don't believe I went into specifics about the reason for the termination . . . . I do not recall specifically saying the reasons why he was terminated, no.

(Solan Dep. 75:14-23).

**8.** Slawin's compensation at BAMS was not reduced prior to his termination. (Solan Decl. ¶10; Slawin Dep. 124:23-125:4)

Undisputed.

**9**. Slawin's benefits at BAMS were not reduced prior to his termination. (Solan Decl. ¶ 11; Slawin Dep. 124:23-125:4.)

Undisputed.

**10**. Slawin's title at BAMS was not taken away prior to his termination. (Solan Decl. ¶ 12; Slawin Dep. 125:5-7.)

Undisputed.

**11**. Slawin's title at BAMS was not taken away prior to his termination. (Solan Decl. ¶ 12; Slawin Dep. 125:5-7.)

Undisputed.

**12**. Slawin's office was not changed prior to his termination. (Solan Decl. ¶ 14; Slawin Dep. 125:11-13.)

Undisputed.

## II – BAMS' HUMAN RESOURCES PERSONNEL

**13.** Michael "Mike" Solan ("Solan") worked for BAMS from 2017 to 2019. (Solan Dep. 13:7-23; Solan Decl. ¶ 3.)

Undisputed.

**14.** While at BAMS, Solan served as an associate relations partner in BAMS's associate relations department, which is more colloquially referred to as the human resources ("HR"( Department. (Solan Dep. 15:11-16:6; Solan Decl. ¶4).

Undisputed.

**15.** Solan's job responsibilities at BAMS involved helping to investigate and to resolve a number of different employment-related matters, including investigations into alleged policy violations. (Solan Dep. 15:18-16:3, 18:4-7; Solan Decl. ¶ 5)

Undisputed.

**16.** Solan's job responsibilities at BAMS further included documenting the investigations and reviews that he was working on. (Solan Dep. 108:17-109:3; Solan Decl. ¶ 6.).

Undisputed.

**17.** Solan led the investigation that resulted in Solan's recommendation to terminate Slawin's employment with BAMS. (Solan Decl. ¶ 7.)

9

<u>Undisputed</u>.

**18.** Solan, as a requirement of his job, maintained contemporaneous notes (the "HR Notes") of his investigation of the activities related to Slawin's termination from BAMS, including information regarding Slawin's violations of BAMS's policies. (Solan Decl. ¶¶ 15, 56; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**<u>Disputed.</u>**

This is disputed to the extent that it suggests that Mr. Slawin violated any of BAMS' policies. *See*, Nos. 66-69, 71, 73, 74, 76, 77, 79 – 81, *infra*.

**19.** Solan prepared the HR Notes at or near the events described therein. (Solan Decl. ¶ 16; Solan Dep. 105:8-109:20.).

<u>Undisputed</u>.

**20.** Solan prepared the HR Notes based on his personal knowledge of the activities recorded therein, or from information provided by others with knowledge of the recorded activities. (Solan Decl. ¶ 17; *see also* Solan Dep. 105:8-111:18.)

<u>Undisputed</u>.

**21.** Solan prepared the HR Notes as part of his job responsibilities at BAMS. (Solan Decl. ¶ 18; Solan Dep. 105:8-111:18.)

<u>Undisputed</u>.

**22.** HR investigations and terminations, such as the one recorded in the HR Notes, were a regularly conducted activity at BAMS. (Solan Decl. ¶ 19; *see also* Solan Dep. 105:8-109:20.)

Undisputed.

**23.** Members of BAMS's HR department kept notes (including the HR Notes) as a regular practice in the course of investigations and terminations in which they were involved. (Solan Decl. ¶ 20; Solan Dep. 105:8-109:20.)

Undisputed.

### III – BAMS' HR LEARNS SLAWIN SENT EMAILS TO HIS PERSONAL EMAIL ADDRESS

**24.** On November 30, 2017, Dan Mong of BAMS' information security ("InfoSec") team emails BAMS' HR at AssociateRelations@BankofAmerica Merchant.com indicating that First Data's data loss prevention ("DLP") team had detected multiple instances of Slawin sending emails from his work email address (Eric.Slawin@bankofamericamerchant.com) to his personal email address (eslawin116@gmail.com). (Solan Decl. ¶21; MSJ Ex. 42 at Requests for Admissions Nos. 1-2).

Undisputed.

**25.** As detected by First Data's InfoSec team, between August 25, 2017 and November 28, 2017, Slawin sent at least ten emails from his work email

11

address to his personal email address. (Solan Dec. ¶ 22; MSJ Ex. 42 at Requests for Admissions Nos. 1-2.)

Undisputed.

**26.** Further investigation revealed that Slawin sent more than just the ten emails initially identified by First Data's InfoSec team. (Solan Decl. ¶¶ 23-24; Kendall Decl. ¶ 21.)

Undisputed.

## IV. SOLAN INVESTIGATES SLAWIN

**27.** Solan initiated his investigation into the conduct identified by First Data's DLP team on December 6, 2017. (Solan Decl. ¶ 25; Solan Dep. Ex. 51.)

Undisputed.

**28.** On December 6, 2017, Solan emailed First Data's DLP team requesting copies of the emails that Slawin forwarded to himself. (Solan Decl. ¶ 26; Solan Dep. 65:9-66:16, 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.**

This is disputed to the extent that it suggests that Mr. Slawin violated any of BAMS' policies. *See*, Nos. 66-69, 71, 73, 74, 76, 77, 79 – 81, *infra*.

**29.** In accordance with BAMS's standard practice for DLP incidents, on December 6, 2017, Solan communicated with Mark Kendall ("Kendall"), Slawin's manager at the time, regarding Slawin's apparent policy violations.

12

(Solan Decl. ¶ 27; Kendall Decl. ¶ 5; *see also* Solan Dep. 56:10-57:20.)

**Disputed.**

This is disputed to the extent that it suggests that Mr. Slawin violated any of BAMS' policies. *See*, Nos. 66-69, 71, 73, 74, 76, 77, 79 – 81, *infra*.

**30.**  Kendall became Slawin's manager in September 2017. (Slawin Dep. 149:16-150:14; Kendall Decl. ¶4).

Undisputed.

**31.**  Before becoming Slawin's manager, Kendall was Slawin's peer. (Slawin Dep. 149:16-150:14, 197:6-12, 239:6-25; Kendall Decl. ¶4).

Undisputed.

**32.**  On December 7, 2017, First Data's InfoSec team provided Solan with the incident reports for the ten emails that the DLP team identified as having been forwarded by Slawin to his personal email account, which Solan reviewed as part of his investigation. (Solan Decl. ¶¶ 28-29; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39.)

Undisputed.

**33.**  The incident reports contain a variety of information about the emails to which each report pertains, including a section on the message body of the forwarded email. (Solan Decl. ¶ 30; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39.)

13

Undisputed.

**34.** Solan communicated with Kendall to understand the substance of the emails at issue. (Solan Decl. ¶ 31; Kendall Decl. ¶ 6.)

Undisputed.

**35.** Multiple emails that Slawin sent to his personal account contained confidential information related to BAMS's business, including information related to the preparation of a self-identified audit issue ("SIAI") that Slawin was tasked with preparing. (Solan Decl. ¶ 32; Solan Dep. 179:12-188:15; Solan Dep. Exs. 30-39; Kendall Decl. ¶ 7.)

**Disputed.** Plaintiff disputes this asserted Undisputed Fact to the extent that it implies that Slawin violated any policy regarding confidential information. See No. 71, *infra*. Some of the downloaded emails dealt with the PCI noncompliance issue. See, No. 117, *infra*.

**36.** This SIAI pertained to concerns stemming from BAMS employees accessing and transmitting full primary account number ("PAN") data in a manner that was not compliant with Payment Card Industry ("PCI") Data Security Standards ("DSS"). (Solan Decl. ¶ 33; Kendall Decl. ¶ 8.)

Undisputed.

**37.** Solan further communicated with BAMS Asset Recovery as part of his investigation about possible reasons why Slawin may have forwarded business

14

emails to his personal address. (Solan Decl. ¶ 34; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**38.** For example, when BAMS HR personnel investigated DLP incidents, it was common for such incidents to result from BAMS employees emailing themselves documents for purposes of printing the materials for a client meeting, business travel, or in case of VPN issues. (Solan Decl. ¶ 35; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**39.** Based on Solan's investigation, Slawin had a personal printer and cell phone, neither of which were issued by BAMS. (Solan Decl. ¶ 36; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**40.** Based on Solan's investigation, Slawin did not travel frequently for work. (Solan Decl. ¶ 37; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**41.** Based on Solan's investigation, Slawin worked from home except for one or two days each month. (Solan Decl. ¶ 38; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

15

**42.** Based on Solan's investigation, Slawin had no prior history of emailing himself confidential business documents. (Solan Decl. ¶ 39; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.**

BAMS admits that Mr. Slawin had sent an email to Mr. Kendall on June 2, 2017, which indicated that a copy had been sent to his personal email account. Undisputed Facts Nos. 43 – 45. BAMS attempts to explain this away by implicitly asserting that the email was not confidential, and "sufficiently high level . . . as not to pose a concern regarding potential mishandling of confidential information." (*Id.*, Nos. 42 – 44). But a factfinder reasonably could find that the June 2, 2017 email did in fact merit being treated as confidential. In the email, (Slawin Dep., Ex. 20 [Doc. 175-11]), Mr. Slawin refers to anti-trust issues ("Remember that anti-trust conversation we had . . . where David was irate."). Discussion of anti-trust issues reasonably could be considered confidential. A jury reasonably could find that BAMS did not care about Mr. Sawin emailing confidential information to his personal email until it was about BAMS not being PCI compliant and not wanting to disclose that fact to merchants.

**43.** Slawin had, for example, sent to himself a June 2, 2017 email by cc'ing his personal account in which Slawin copied and pasted instant message communications complaining about Brian Rubin, who was Slawin's manager at

16

the time.  (Slawin Dep. 239:7-23; Slawin Dep. Ex. 20; Kendall Decl. ¶ 9; *see also* Solan Decl. ¶ 40.)

Undisputed.

**44.**  The substance of the June 2, 2017 email communication was sufficiently high level so as not to pose a concern regarding the potential mishandling of confidential business information.  (Solan Decl. ¶ 40; *see also* Slawin Dep. Ex. 20; Kendall Decl. ¶ 9.)

**Disputed.**  See No. 42.  Further, the record evidence is that <u>Mr. Kendall pointed to this exact email</u> as "important" when considering the termination decision in December 2017. Kendall Dep., Ex. 49 is the email that Mr. Kendall sent to Mr. Solan, saying, "Hi Mike, attached is a summary of the emails that Eric Slawin sent outside BAMS that I believe as being <u>important</u> for our review." (Kendall Dep., Ex. 49, p. 1) (Emphasis added).  The second page of the exhibit lists various emails, including for each listed email, "Email Subject."  The sixth box up on the chart on p. 2 of the email (Kendall Dep. Ex. 49), lists the email subject as, "check it out."  That is the exact subject of the June 2, 2017 email that Mr. Slawin sent to Mr. Kendall, with a copy to his (Mr. Slawin's) personal email. (Slawin Dep., Ex. 20 [Doc. 175-11].

**45.**  Although Kendall was a recipient of the June 2, 2017 email, Kendall was Slawin's peer at the time of the email and, in any event, did not notice that

17

Slawin had cc'd his personal email. (Kendall Decl. ¶ 9; Slawin Dep. 239:7-25;

Slawin Dep. Ex. 20.)

**Disputed.**

Mr. Kendall pointed to this exact email as "important" when considering the

termination decision in December 2017.  This is evidence from which a jury

reasonably could find that he had in fact noticed the email in June 2017, and that

he remembered it in December 2017.  Notably, the June 2, 2017 email was not

identified by the Infosec computer search, and is not one of the ten Incident

Reports.[3] A factfinder could reasonably conclude that the only way that BAMS

was able to refer to the June 2, 2017 email to Mr. Kendall, with a cc to Mr.

Slawin's personal email, was precisely because Mr. Kendall had noticed it at the

time and remembered it in December 2017. For these reasons, and for the

additional reasons set forth in response to No. 114, *infra*, a jury reasonably could

find that Mr. Kendall is not a credible witness.

**46.**  Because Slawin did not frequently travel for work, was able to print

work documents directly from his work laptop, and did not have a history of

routinely emailing himself documents despite primarily working from home,

Solan determined it was unlikely that Slawin sent the emails flagged by First

---

[3] The ten Incident Reports appear in the record as Docs. 175-17 through 175-26,
and are discussed in detail at No. 117, *infra*.

Data's DLP team in order to print them for work purposes. (Solan Decl. ¶ 41; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.**

Mr. Slawin told Mr. Solan that he had downloaded **some of** the emails so that he could work on them from home. (Slawin Dep. 177:15-22). (Slawin Decl.¶88).

**47.** The lack of any prior history by Slawin of routinely forwarding business emails to his personal account was particularly concerning given the confidential and sensitive nature of a number of emails that Slawin sent to himself. (Solan Decl. ¶ 42; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.**

See Nos. 42 – 44, *supra*.

## V.    SOLAN INTERVIEWS SLAWIN.

**48.** When investigating DLP incidents, members of BAMS's HR department routinely interviewed the employee responsible for the conduct at issue. (Solan Decl. ¶ 43.)

Undisputed.

**49.** One of the purposes of interviewing the employee responsible for a DLP incident was to assess whether the employee had a defensible business justification for their conduct. (Solan Decl. ¶ 44; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

19

Undisputed.

**50.** Another purpose of interviewing the employee responsible for a DLP incident was to determine whether the employee had disclosed the information to anyone else. (Solan Decl. ¶ 44.)

Undisputed.

**51.** Another purpose of interviewing the employee responsible for a DLP incident was to provide any instructions to the employee that were necessary to protect the information at issue, including the potential return or destruction of the information at issue. (Solan Decl. ¶ 44.)

Undisputed.

**52.** If the employees were honest and candid during the investigation interview, provided a defensible business justification for their conduct and acknowledged the concern with their conduct, and followed any instructions from members of BAMS's HR department regarding the return or destruction of the information at issue, the policy violation would not necessarily result in the employee's termination. (Solan Decl. ¶ 45.)

Undisputed.

**53.** On December 8, 2017, Solan scheduled a call with Slawin and Kendall to interview Slawin concerning the emails that Slawin sent to his personal account. (Solan Decl. ¶ 46; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

<u>Undisputed</u>.

**54.** Solan anticipated that Slawin would provide a business justification for his conduct. (Solan Decl. ¶ 47; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.** See Nos. 42, 44, 45, 47, 117, 118 *infra*.

**55.** Prior to the December 8, 2017 interview, Solan prepared a variety of probing questions to assess whether any business justification offered by Slawin for his conduct would validate why the behavior was exclusive only to emails/content, why the conduct occurred over multiple months, and whether the justification made sense when Slawin primarily worked from home. (Solan Decl. ¶ 48; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

<u>Undisputed</u>.

**56.** While Kendall attended the December 8, 2017 call as an observer, Solan conducted the interview and asked all questions. (Solan Decl. ¶¶ 49, 56; Kendall Decl. ¶ 10; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

<u>Undisputed</u>.

**57.** During the December 8, 2017 call, Slawin was provided an opportunity to explain why he sent the emails to his personal account. (Solan Decl. ¶¶ 50, 56; Kendall Decl. ¶ 11; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

<u>Undisputed</u>.

**58.** During the December 8, 2017 call, Slawin failed to provide any business

21

need for sending the emails to his personal email account. (Solan Decl. ¶¶ 51, 56; Kendall Decl. ¶ 12; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.** See, No. 46.

**59.** Instead, Slawin's behavior during the December 8, 2017 call was apathetic, flippant, and unforthcoming in a manner that demonstrated a complete lack of care for his actions, the risks or ramifications of those actions to BAMS, and the risks or ramifications of those actions to his own job (about which he did not even ask). (Solan Decl. ¶¶ 52, 56; Kendall Decl. ¶ 13; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.**

Slawin Decl. ¶93.

**60.** During the December 8, 2017 call, Slawin never expressed concerns related to noncompliance with PCI DSS by BAMS or related to any intent to act as a whistleblower with respect to any of the information within the emails that he forwarded to his personal account. (Solan Decl. ¶ 53; Kendall Decl. ¶ 14.)

Undisputed.

**61.** During the December 8, 2017 call, Slawin confirmed that he did not usually send emails from his BAMS email address to his personal email address. (Solan Decl. ¶¶ 54, 56; Kendall Decl. ¶ 15; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.** Slawin Decl. ¶94.

**62.** During the December 8, 2017 call, Slawin represented that he did not send or save the emails anywhere other than his personal email address. (Solan Decl. ¶¶ 55-56; Kendall Decl. ¶ 16; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**63.** After the December 8, 2017 call, Solan emailed Slawin to provide a cease-and-desist letter from Meg Troughton, BAMS's Senior Vice President Associate General Counsel, as well as a declaration for Slawin to execute related to his nondisclosure and handling of the information that Slawin emailed himself. (Slawin Dep. 207:13-208:6, 212:8-215:19; Slawin Dep. Exs. 8-9, 43; Solan Decl. ¶ 57.)

Undisputed.

**64.** The letter from Troughton provides, in part: "May we remind you that BAMS information shall be handled in such a way as to ensure that it is protected from unauthorized use, access, disclosure, modification, destruction, damage, delay, or removal, either intentional or accidental." (Slawin Dep. 207:13- 208:6, 212:8-215:19; Slawin Dep. Exs. 9, 43.)

Undisputed.

**65.** Based on Slawin's behavior during the December 8, 2017 call, Solan concluded (and Kendall agreed) there was a complete loss of trust that Slawin

23

could continue to handle proprietary, confidential, and/or sensitive information, which was a core requirement of Slawin's position and employment at BAMS.

**Disputed.** Both Mr. Kendall as well as Mr. Solan made the decision to terminate Mr. Slawin. See No. 114, *infra*. And the decision was not made based on any alleged policy violations, but in retaliation for Mr. Slawin opposing unlawful fraudulent practices by BAMS in colluding to keep from disclosing to merchants that BAMS was not PCI compliant. See No. 7, *supra*, and Nos. 42, 44, 45, 47, 66 – 69, 71, 73, 76, 77, 79 – 81, 117 and 118, *infra*.

## VI – SLAWIN'S POLICY VIOLATIONS

**66**. BAMS informed Slawin of his nondisclosure obligations with respect to BAMS's confidential information as early as the November 5, 2015 offer letter, which formally offered Slawin employment at BAMS. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152.)

**Disputed.** Slawin Decl. ¶99. Mr. Slawin denied this at his deposition. (Slawin Dep. 148:2-6). At the time that BAMS offered Slawin employment, it did not advise Slawin that he was prohibited from emailing BAMS' documents to his personal email. BAMS' citation to Slawin Dep. 147:5-148:9, to support its Undisputed Fact No. 66, is insufficient, because Slawin <u>denied</u> that that was advised at the time of "certain nondisclosure obligations", making it a disputed issue of material fact. (Slawin Dep. 148:2-6). Further, BAMS' reference in the

24

cited testimony to its counsel's question regarding "certain nondisclosure obligations" failed to specify what those alleged "certain nondisclosure obligations" were and does not refer at all to a BAMS employee emailing material to his personal email. BAMS' offer letter to Slawin (Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152), does not refer to emailing material to an employee's personal email. The nondisclosure obligations in BAMS' offer letter to Slawin referred to dissemination of BAMS' information outside the company, ". . . to any other person, organization, or entity . . ." (Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152, p.2, PLAINTIFF 000151). BAMS' offer letter to Slawin does not state anything about emailing material to one's personal email, without thereafter disseminating it to any other person, organization, or entity. (Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152). A reasonable construction of BAMS' offer letter to Slawin is that the nondisclosure obligations referred to in the letter involved dissemination of BAMS' information outside the company to another person, organization or entity. (Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152).  During his employment by BAMS, Slawin did not disseminate any of BAMS' materials or information outside BAMS, to any other person, organization or entity. (Slawin Decl. ¶120; (Solan Dep. 161:15-162:1).).

**67.**  The November 5, 2015 offer letter to Slawin required Slawin to agree to

nondisclosure restrictions. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151-PLAINTIFF 000152.)

**Disputed.**

See No. 66.

**68.** The November 5, 2015 offer letter to Slawin provides, in part, "The Company's trade secrets and confidential information include, but are not limited to, . . . technical information, business information and plans, manner of conducting business, . . . and similar information where: (a) such information has been treated as confidential by Company, or (b) such information is not publicly available and could be used in order to gain competitive advantage ('Confidential Information')." (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151.).

**Disputed.**

This is disputed to the extent that Defendant asserts that the offer letter prohibited Mr. Slawin from emailing BAMS' materials or information to his personal email, without thereafter disseminating any such materials or information outside the company to any other person, organization or entity. See, No. 66.

**69.** The November 5, 2015 offer letter to Slawin provides, in part, "You agree that, except as authorized by Company during the course of my [sic] employment, you will not, at any time during or after cessation of your

26

employment, use, disclose, or disseminate to any other person, organization, or entity or otherwise employ any of the Company's trade secrets or Confidential Information.  (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000151.)

**<u>Disputed</u>.**

This is disputed to the extent that Defendant asserts that the offer letter prohibited Mr. Slawin from emailing BAMS' materials or information to his personal email, without thereafter disseminating any such materials or information outside the company to any other person, organization or entity. See, No. 66.

**<u>70</u>.**  Slawin signed the November 5, 2015 offer letter. (Slawin Dep. 147:5-148:9; Slawin Dep. Ex. 5 at PLAINTIFF 000152).

<u>Undisputed</u>.

**<u>71</u>.**  Based upon Solan's personal investigation and evaluation of the facts at hand, Solan independently determined that Slawin violated the following  BAMS policies: Slawin's Proprietary Rights and Information Agreement with BAMS, the Associate Handbook, the Information Security Policy (which incorporates and by extension includes the End User Policy), and the Code of Ethics.  (Solan Decl. ¶¶ 59-63; Solan Decl. Exs. 1-2; Solan Dep. 42:22-44:18, 105:8-113:22,  122:3-123:18,  155:14-160:11,  160:22-161:19,  162:9-165:22, 167:16-22, 170:22-171:22, 172:22-173:8;  Solan Dep. Exs. 51, 69-72.)

**Disputed**.

Mr. Kendall as well as Mr. Solan made the determination leading up to the recommendation to terminate made the decision to terminate Mr. Slawin. See No. 114, *infra*. And the decision was not made based on any alleged policy violations, but in retaliation for Mr. Slawin opposing unlawful fraudulent practices by BAMS in colluding to keep from disclosing to merchants that BAMS was not PCI compliant. See Nos. 7, 42, 44, 45, 47, 66 – 69, *supra*, and Nos., 73, 76, 77, 79 – 81, 114, 117 and 118, *infra*.

BAMS' Undisputed Fact asserts that Mr. Solan violated the Proprietary Rights and Information Agreement, the Associate Handbook, the Information Security Policy (which incorporates and by extension includes the End User Policy), and the Code of Ethics.

<u>Proprietary Rights and Information Agreement</u>

BAMS' Proprietary Rights And Information Agreement (Doc. 175-7) (hereinafter "Proprietary Rights and Information Agreement") does not prohibit BAMS' employees from emailing BAMS' materials or information to their personal emails, as long as those materials or information is not subsequently disseminated outside the company, to another person, organization or entity. (*Id*.)   BAMS does not assert that Mr. Slawin released or published the emails to anyone outside the company. (Solan Dep. 161:15-162:1).

28

The Proprietary Rights and Information Agreement has 14 headings, 9 of which (1. Assignment of Inventions, 2. Prior Inventions, 6, Former Employer Information, 7. Third Party Information, 10. Governing Law, 11. Severability, 12. Survival, 13. Waiver, and 14. Entire Agreement), clearly have nothing to do with the factual issues in this case. (Doc. 175-7).

Heading Nos. 3 and 4 concern employee inventions, not emails. Heading No. 3 is entitled, Maintenance and Return of Records. It provides in part that, "I will keep and maintain adequate and current written records related to any <u>invention</u> made by me." (*Id*.), (Emphasis added). The rest of the language within that heading refers to employee obligations at the time of leaving BAMS, which Mr. Solan admitted was not material to BAMS' decision to terminate Mr. Slawin's employment. (Solan Dep. 166:3-7). Heading No. 4 is similarly concerned with Slawin ". . . disclos[ing] all inventions . . ."

Heading No. 5 is entitled Company Information, and requires the BAMS employee to maintain confidential information ". . . in strictest confidence . . ." and not to ". . . release or publish the information to anyone outside the Company . . ." (*Id*.) Again, BAMS does not assert that Mr. Slawin released or published the emails to anyone outside the company. (Solan Dep. 161:15-162:1).

Heading No. 8 ("Employment") is just a provision that the employment is at-will and Heading No. 9 ("Non-limitation of Rights") provides only that the

29

employer is not waiving any rights it might have. (*Id*.)

There is therefore no basis for Mr. Solan reasonably believing that Mr. Slawin had violated any provision of the Proprietary Rights And Information Agreement.

<u>Associate Handbook</u>

Mr. Solan testified that the relevant provisions of the Associate Handbook referred to the alleged use, access, disclosure, modification, destruction, damage and removal of confidential emails. (Solan Dep. 163:7-21). And Mr. Solan admitted that there was no evidence that Mr. Slawin disclosed any of the emails to anyone else, or that he modified, destroyed or damaged them. (Solan Dep. 158:13-159:3, 171:1-25). Mr. Solan admitted that BAMS made the decision to fire Mr. Solan before it had any evidence that Mr. Solan had disclosed any of the emails to anyone outside the company. (Solan Dep. 172:1-20). While Mr. Solan asserted that Mr. Solan had "removed" the emails from BAMS' server, he acknowledged that those emails were still on BAMS' server. (*Id*., 159:12-24). Mr. Solan asserted that Mr. Slawin had violated the provision of the Associate Handbook regarding intellectual property because he had not preserved the confidentiality of the emails, but again, admitted that there was no evidence that Mr. Solan had disclosed them or sent them to anyone outside the company, or that he had done anything else with them other than send them to his personal email. (Solan Dep. 172:22-173:12).

30

Code of Ethics

With respect to the Code of Ethics, Mr. Solan asserted that Mr. Slawin had

violated the section regarding making sound business decisions but was unable to

". . . recall a specific sentence that was . . . violated . . ." Id. Of citation in the next

sentence? Instead, Mr. Solan could only testify to his belief that Mr. Slawin had

violated the Code of Ethics " . . . just in general." (Solan Dep. 166:17-168:4).

Information Security Policy

Mr. Slawin never received the Global Information Security Policy. (Slawin

Dep. 163:24-164:2). Mr. Solan testified that Mr. Slawin had violated Section 3.3.2

("Information Handling") of the Global Information Security Policy, referring

specifically to the opening paragraph of that section, and to subsection (f). (Solan

Dep. 158:3-12).

The opening paragraph of the section requires that "Company information"

be handled so as to safeguard it from unauthorized, " . . . use, access, disclosure,

modification, destruction, damage, delay, or removal . . ." (Doc. 176-1, p. 10 of

19).

As demonstrated above, BAMS does not assert that Mr. Slawin released or

published the emails to anyone outside the company. (Solan Dep. 161:15-162:1).

Mr. Solan admitted that there was no evidence that Mr. Slawin had modified,

destroyed or damaged the emails, or that he had done anything else with them other

31

than send them to his personal email. (Solan Dep. 158:13-159:3; 171:1-25; 172:22-173:12). While Mr. Solan asserted that Mr. Solan had "removed" the emails from BAMS' server, he acknowledged that those emails were still on BAMS' server. (*Id*., 159:12-24).

The termination letter (Ex. 45; [Doc. 175-27), required Mr. Slawin to return his company issued laptop, which he did. (Slawin Decl. ¶122). There was therefore no basis for Mr. Solan reasonably to believe that Mr. Slawin had violated the Global Information Security Policy.[4]

_____

[4] For the first time on Defendant's motion for summary judgment, Mr. Solan and BAMS refer to an End User Policy, which they assert is incorporated in and by extension included in the Global Information Security Policy. But Mr. Solan did even mention this policy when he was questioned at his deposition about the Global Information Security Policy. Plaintiff's counsel did not question Mr. Solan about the End User Policy at his deposition because BAMS never produced it during discovery, even though Plaintiff's Second Document Requests, No. 1, had requested, "Copies of all policies referred to in Defendant Bank of America Merchant Services' Objections and Responses to Plaintiff's First Interrogatories, No. 1." BAMS' response to Interrogatory No. 1 had cited the "Proprietary Rights Agreement, the Confidential Information section of the Associate Handbook, the Information Security Policy, and the Code of Ethics." There had not been any citation to an End User Policy, or any indication that it existed. The document that Plaintiff's counsel understood to be the entirety of the Global Information Security Policy was Ex. 70 to Mr. Solan's deposition. (Marx Decl., *passim*). Since Plaintiff's counsel was deprived of the opportunity to question Mr. Solan about the End User Policy at his deposition, it is respectfully submitted that in fairness, this Court should not consider it when deciding this motion. Nevertheless, consideration of the End User Policy does not change anything. Mr. Solan attached two exhibits to his Declaration; Ex. 1 is the End User Policy effective January 23, 2017, and Ex. 2 is the revision effective November 30, 2017. Ex. 2 is

**72.** Slawin executed a Proprietary Rights and Information Agreement at the beginning of his employment. (Slawin Dep. 148:14-149:10; Slawin Dep. Ex. 6; MSJ Ex. 42 at Request for Admission No. 4; Ex. 41 at Request for Admission No. 4 and Ex. A; Solan Dep. 105:8-111:18; Solan Dep. Exs. 51, 69.)

Undisputed.

**73.** In sending confidential business emails to his personal email account, Slawin violated section 5 of his Proprietary Rights and Information Agreement with BAMS. (Solan Decl. ¶ 60; Solan Dep. Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 160:22-161:19; Solan Dep. Exs. 51, 69.)

**Disputed.**

*See*, No. 71.

**74.** In sending confidential business emails to his personal email account, Slawin violated the Confidential Information section of the Associate Handbook. (Solan Decl. ¶ 61; Solan Dep. Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-

---

irrelevant because there is no allegation that Mr. Slawin sent any email to his personal email after November 28, 2017. Undisputed Fact No. 25. Ex. 1 (which is not materially different from Ex. 2) provides only that emails sent *outside* the company must be encrypted, and also sets forth a retention policy for emails. As noted above, BAMS does not allege that Mr. Slawin sent any emails outside the company. Thus, by its own provisions, the End User Policy, attached at Ex. 1 to Mr. Solan's Declaration, did not prohibit Mr. Slawin from sending any emails to his personal email, and therefore, there was no basis for Mr. Solan reasonably to believe that Mr. Slawin had violated the End User Policy.

123:18, 162:9-165:22; Solan Dep. Exs. 51, 72.)

**Disputed.**

*See*, No. 71.

**75.** Slawin received and acknowledged the Associate Handbook while employed by BAMS. (Solan Decl. ¶ 61; Solan Decl. Ex. 3; MSJ Ex. 42 at Requests for Admissions Nos. 7-8; MSJ Ex. 41 at Requests for Admissions Nos. 7-8 and Exs. B-C.)

Undisputed.

**76.** In sending confidential business emails to his personal email account, Slawin violated the Information Security Policy and the incorporated End User Policy. (Slawin [sic] [Solan] Decl. ¶62, Exs. 1,2; Solan Dep. 42:22-44:18, 105:8-11322, 122:3-123:18, 155:14-160:11, Solan Dep. Exs. 51, 70).

**Disputed.**

*See*, No. 71.

**77.** In sending confidential business emails to his personal email account, Slawin violated the Code of Ethics. (Slawin Decl. ¶ 63; Solan Dep. 42:22-44:18, 105:8-113:22, 122:3-123:18, 167:16-22, 170:22-171:22, 172:22-173:8; Solan Dep. Exs. 51, 71.)

**Disputed.**

*See*, No. 71.

34

**78.** Slawin received and acknowledged the Code of Ethics while employed by BAMS. (Solan Decl. ¶ 63; Solan Decl. Ex. 3; MSJ Ex. 42 at  Requests for Admissions Nos. 12-14; MSJ Ex. 41 at Requests for Admissions  Nos. 12-14 and Exs. C-D; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

Undisputed.

**79.**  While the substance of the policies varies, together they establish a comprehensive set of expectations for BAMS employees regarding the handling of confidential company information in order to adequately protect it.  (Solan Decl. ¶ 64.)

**Disputed.**

*See*, No. 71.  Notably, BAMS fails to cite any textual support or record citation for this asserted Undisputed Fact other than Mr. Solan's self-serving opinion.

**80.**  While disclosing BAMS's confidential information to third parties without authorization or an adequate business justification would violate BAMS's policies, such disclosure is not necessary for a violation of BAMS's policies to occur.  (Solan Decl. ¶ 65.)

**Disputed.**

*See*, No. 71.  Notably, BAMS fails to cite any textual support or record citation for this asserted Undisputed Fact other than Mr. Solan's self-serving opinion.

**81.**  Mishandling BAMS's confidential information in a manner that

35

compromises the measures undertaken to protect that confidential information—
such as by sending BAMS's confidential information to unapproved email
accounts beyond BAMS's control and outside of its firewall—violates BAMS's
policies regardless of whether the confidential information is in fact disclosed to
others.  (Solan Decl. ¶ 66.)

**<u>Disputed</u>.**

*See*, No. 71.  Notably, BAMS fails to cite any textual support or record citation
for this asserted Undisputed Fact other than Mr. Solan's self-serving opinion.

**82.**  While employed at BAMS, Slawin received training on the Code of
Ethics, the Associate Handbook, and global information security.  (Solan Decl. ¶
67; Solan Decl. Ex. 3; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

<u>Undisputed</u>.

## VII.  THE ONLY DECISION MAKERS IN SLAWIN'S TERMINATION WERE SOLAN AND DE CASTRO IN CONJUNCTION WITH BAMS' LEGAL DEPARTMENT

**83.**  The only people who Slawin contends retaliated against Slawin are those
who made the decision to terminate Slawin's employment at BAMS.   (Slawin
Dep. 184:21-185:1.)

<u>Undisputed</u>.

**84.** Slawin does not contend Rubin had any role in the termination of
Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

36

Undisputed.

**85.** Slawin does not have any knowledge of whether Rubin had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-220:13.)

Undisputed.

**86.** Rubin did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 92.)

Undisputed.

**87.** Rubin did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 92.)

Undisputed.

**88.** Slawin does not contend Leonard Ebel had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

Undisputed.

**89.** Slawin does not have any knowledge of whether Ebel had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

Undisputed.

**90.** Ebel did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 93.)

Undisputed.

**91.** Ebel did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 93.)

Undisputed.

**92.** Slawin does not contend the relationship manager with Home Depot had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

Undisputed.

**93.** Slawin does not have any knowledge of whether the relationship manager with Home Depot had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 215:24-218:10.)

Undisputed.

**94.** The relationship manager with Home Depot did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 94.)

Undisputed.

**95.** The relationship manager with Home Depot did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 94.)

Undisputed.

**96.** Slawin does not contend Trecia Brooks had any role in the termination

of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 190:17-24, 215:24-218:10.)

Undisputed.

**97.** Brooks was a peer of Slawin. (Slawin Dep. 190:10-16.)

Undisputed.

**98.** Slawin does not have any knowledge of whether Brooks had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 190:17-24, 215:24-218:10.)

Undisputed.

**99.** Brooks did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 95.)

Undisputed.

**100.** Brooks did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 95.)

Undisputed.

**101.** Slawin does not contend Sherra Grissom had any role in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 189:24- 190:9, 215:24-218:10.)

Undisputed.

**102.** Slawin does not have any knowledge of whether Grissom had any role

in the termination of Slawin's employment at BAMS. (Slawin Dep. 185:2-6, 187:15-190:9, 215:24-218:10.)

    <u>Undisputed</u>.

**103.** Grissom did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 96.)

    <u>Undisputed</u>.

**104.** Grissom did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 96.)

    Undisputed.

**105.** Slawin does not have any knowledge of whether Collins had any role in the termination of Slawin employment at BAMS. (Slawin Dep. 200:9-201:9.)

    <u>Undisputed</u>.

**106.** The only people who Slawin contends made the decision to terminate Slawin's employment at BAMS are Kendall, Collins, BAMS HR, and BAMS's General Counsel. (Slawin Dep. 185:2-6.)

    <u>Undisputed</u>.

**107.** Slawin only assumes Collins had input in the decision to terminate Slawin's employment at BAMS. (Slawin Dep. 200:9-14.)

    <u>Undisputed</u>.

**108.** No one has told Slawin that Collins was involved in the decision to terminate Slawin's employment at BAMS. (Slawin Dep. 200:15-201:2.)

Undisputed.

**109.** Slawin's only basis for his assumption that Collins had input in the decision to terminate him is that BAMS produced "some type of verification or something to – questions or something." (Slawin Dep. 200:9-201:9.)

Undisputed.

**110.** Collins verified interrogatory responses from BAMS, but this verification does not reflect any involvement by Collins in the decision to terminate Slawin's employment at BAMS. (MSJ Ex. 38; Collins Decl. ¶ 18.)

Undisputed.

**111.** Collins did not have any role in the termination of Slawin's employment at BAMS. (Solan Decl. ¶ 97; Collins Decl. ¶ 19.)

Undisputed.

**112.** Collins did not make or recommend the decision to terminate Slawin's employment at BAMS. (Solan Decl. ¶ 97; Collins Decl. ¶ 20.)

**113.** Slawin's only basis for his contention that Kendall was involved in the determination to terminate Slawin's employment at BAMS is that "[h]e was at the meeting where they terminated" Slawin and Kendall responded "yes" when

41

Slawin asked him, "Are you in agreement with this, Mark?" (Slawin Dep. 201:10-25.)

**Disputed.** See No. 114, *infra*.

**114.** Kendall did not make or recommend the decision to terminate Slawin's employment at BAMS, though he was supportive of HR's recommendation. (Solan Decl. ¶ 98; Kendall Decl. ¶ 31; Solan Dep. 111:19- 112:10, 123:19-124:2.)

**Disputed.**

This is squarely contradicted by BAMS' Supplemental Responses to Plaintiff's First Interrogatories, Px. 76.[5] It states in pertinent part:

> By way of further and supplemental response, BAMS responds that . . . Mike Solan, Human Resources, <u>and Mark Kendall</u>, Plaintiff's manager concluded that there was a loss of confidence . . . and, therefore, <u>they</u> ultimately decided to terminate Plaintiff's employment with BAMS.

(Px. 76) (Emphasis added).

And at his deposition, Plaintiff's counsel read that answer to Mr. Kendall:

> Q. . . . And my question is: Is that a correct statement?
> A. It appears correct.

(Kendall Dep. 33:7-34:3).

---

[5] Plaintiff pre-marked the deposition exhibits, so that the number of each exhibit would remain the same through all of the depositions. Plaintiff is using the same numbering here.

Presumably, BAMS will point to Mr. Kendall's subsequent testimony denying that he made the termination decision, but BAMS' aforementioned Supplemental Interrogatory Responses, verified on August 11, 2023 by Ali Davis, Vice President, Relationship Management Leader for Strategic Partner Fiserv, and Mr. Kendall's above-cited testimony, comprise ample record evidence to make this a disputed fact. Further, since Mr. Kendall's above-cited deposition testimony contradicts his Declaration, the latter could be deemed a sham affidavit and disregarded by the Court. Even were his Declaration testimony to be considered by the Court because he subsequently changed his deposition testimony, it not only comprises a disputed issue of material fact, but simultaneously places his credibility in issue. A jury reasonably could find that Mr. Kendall is not credible, and discount <u>all</u> of his testimony.

Defendant's asserted Undisputed Fact is also contradicted by its own document. Solan Dep., Ex. 51 [Doc. 175-31], purports to be Mr. Solan's record of the interactions during the time period December 8 – 20, 2017. At Bates No. BAMS 9587 [Doc. 175-31 at Page 3 of 5], Mr. Solan wrote in pertinent part,

> . . . . the decision (<u>as</u> <u>approved</u> <u>by</u> <u>Mark</u> <u>Kendall</u> (Mgr.)
> [sic] . . . is to terminate his [Mr. Slawin's] employment
> . . .

(Emphasis added).

**<u>115.</u>**  Because Slawin's termination was based on violations of company

43

policy, the final termination decision was made exclusively by BAMS's HR department—namely, Solan and De Castro—in conjunction with BAMS's legal department. (Solan Dep. 111:19-112:10; 120:12-124:2; Solan Decl. ¶¶ 68-69, 92-98; Kendall Decl. ¶ 31.)

**Disputed.**  See Nos. 114, *supra*. And the decision was not made based on any alleged policy violations, but in retaliation for Mr. Slawin opposing unlawful fraudulent practices by BAMS in colluding to keep from disclosing to merchants that BAMS was not PCI compliant. See Nos. 7, 42, 44, 45, 47, 66 – 69, 71, 73, 76, 77, 79 – 81, 117 and 118, *supra*.

## VIII. SLAWIN'S EMPLOYMENT WAS TERMINATED DECEMBER 8, 2017

**116.**  Based on the interview of Slawin and on Slawin's policy violations, Solan recommended on December 8, 2017 that Slawin be terminated to Maryann De Castro, Solan's supervisor. (Solan Decl. ¶ 68; Solan Dep. 42:22-44:18, 105:8-114:22, 120:12-124:19, 127:8-12, 141:11-24; Solan Dep. Ex. 51.)

**Disputed.**

First, there were no policy violations. See Nos. 7, 42, 44, 45, 47, 66 – 69, 71, 73, 76, 77, 79 – 81, 117 and 118, *supra*.  Second, Mr. Solan could not remember at his deposition whether he spoke with Ms. De Castro about terminating Mr. Slawin before or after he received Mr. Slawin's December 11, 2017 email wherein Mr.

44

Slawin objected to going along with BAMS' fraudulent concealment from merchants the fact that BAMS was not PCI compliant.

On December 11, 2107, Mr. Slawin sent an email to Mr. Solan explaining why he would not  sign the requested declaration:

> . . . .
> Should I acknowledge the statements in the declaration by writing my signature on the document I could make it appear that I as a declarant agree with the actions taken by other parties to withhold information possibly demonstrated by and referenced as "BAMS' confidential business information" in the declaration statement. I have not at any time taken nor will I ever agree with any actions taken by parties either individually or acting as joint tortfeasors which implies, demonstrates, or creates a belief that information should be withheld that could damage the counter-parties of Bank of America Merchant Services, Inc.
> . . . .

(Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).

Mr. Slawin's reference to the "counter-parties" of BAMS was to the merchants, and he was objecting to BAMS' ongoing efforts to withhold from the merchants the information that BAMS was not PCI compliant. (Slawin Decl. ¶96). He was fired the next day, December 12, 2017. (Doc. 175-27 [Termination letter], Solan Dep., Ex. 45).

At his deposition, Mr. Solan was unable to testify as to when he made the termination recommendation to Ms. De Castro:

Q. How many conversations did you have with Ms. De Castro about this – Mr. Slawin downloading emails?

A. I would say at least three, but I don't recall exactly how many.

Q. Okay. Do you recall any other than the one you've talked to me about?

A. Yes. I recall a conversation with her around a recommendation based on the findings of our review. The recommendation was to – around terminating his employment.

Q. And whose recommendation was that?

A. It was my recommendation.

Q. Okay. And was that sometime on or about December 8, 2017?

A. I don't recall the specific dates, but it was towards the end of 2017.

(Solan Dep. 42:17-43:9).

**117.** Solan did not base his termination recommendation on any information besides Slawin's policy violations and the loss of trust that resulted from Slawin's conduct during his interview with Solan. (Solan Decl. ¶ 69; Solan Dep. 42:22-44:18, 105:8-114:22, 120:12-124:19; Solan Dep. Ex. 51.)

**Disputed.**

First, there is ample record evidence that there were no policy violations. *See*, Nos. 71, 73, 74, 76, 77, 79, 80, 81.

Second, there is ample record evidence that BAMS was not concerned about any technical or inferred violation of any policy, but instead was concerned exclusively about the specific issue of its PCI noncompliance.

46

On December 7, 2017, Mr. Solan sent an email to Maryann De Castro, his immediate supervisor and the person whom BAMS asserts accepted the recommendation of Messrs. Solan and Kendall and made the ultimate termination decision. (Solan Dep., Ex. 42; Solan Dep., 111:19-25 [Doc. 175-16, Page 17 of 33]). He wrote in pertinent part:

> See below for my summary of the Information Security Escalation regarding high risk confidential information that Eric Slawin sent to his personal email address.
> . . . .
> The content of the material . . . is related to the way BAMS treats Primary Account Number (PAN) and associated implications.
> . . . . The emails . . . include our acknowledgement that this issue exists . . . as well as some potentially damaging quotes about not wanting to implement internal compliance because of the cost . . .
> . . . .
> There could be severe ramifications if the information . . . were to be shared publicly . . . . In addition to extensive reputational damage, Joe Moll also shared a scenario [emphasis in original]  with a company that did not take adequate steps  to protect customer data, where Visa and Amex dropped the processor with the issue.
> . . . .
> Partner with Legal to understand whether he has any whistleblower protections [emphasis added]

(Solan Dep., Ex. 42). Mr. Solan testified that when he spoke to Ms. De Castro the issue of PCI noncompliance was part of the discussion. (Solan Dep. 39).

Mr. Solan's own summary of the situation to his boss, and to the person who BAMS asserts made the termination decision, is all about BAMS' PCI

47

noncompliance and about Mr. Slawin's potential status as a whistleblower.  And

Mr. Solan identified the real concern that BAMS had: that merchants night stop

using BAMS for their credit card processing if they became aware that BAMS was

not PCI compliant.

David Ades confirmed BAMS' concern. He testified that if a merchant

found out that BAMS was not PCI complaint, the merchant could terminate its

credit card processing contract with BAMS, known as the merchant services

agreement or MSA.  More specifically, he testified that Disney could terminate its

MSA with BAMS if it discovered that BAMS was not PCI compliant. (Ades Dep.

60:18-61:9).  Ades was BAMS' Executive Vice President/General Manager and

Head of Client Managed Sales. (Ades Dep., Ex. 16).  Mr. Ades also had been on

the Visa Advisory Board which was involved with Payment Card Information Data

Standards (PCI DSS) and confirmed that in 2017 BAMS was transferring data that

was transmitting full PAN (Primary Account Number) "outside of that standard."

(Ades Dep. 36:14-38:8).

Notably absent from Mr. Solan's December 7, 2017 email to Ms. De Castro

is any mention of any alleged policy violation.  There is no mention of the Code of

Ethics, Global Information Security Policy, End User Policy, Proprietary Rights

and Information Agreement, Associate Handbook, or Mr. Slawin's offer letter.

(Solan Dep., Ex. 42). The words "policy" and "violation" or "violated" are not

anywhere in Mr. Solan's email. (*Id.*)  Instead it was all about BAMS PCI
noncompliance, the "reputational damage" that could result from disclosure that
BAMS was not PCI compliant, the concern that a merchant who discovered that
fact might terminate the MSA, and whether or not Mr. Slawin could be considered
to be a "whistleblower."

The Incident Reports themselves reflect that the only thing that BAMS was
concerned about was the PCI noncompliance issue and whether it would be
disclosed to merchants that BAMS was not PCI compliant.  There were ten
Incident Reports, marked as Exhibits 30 – 39 at Mr. Solan's deposition [Docs. 175-
17 – 175-26]. (Solan Decl. [Doc. 176-4], ¶¶28 – 29). Each one of the Incident
Reports contains the following introductory description:

> Comment= [sic] Between 8/25/2017 and 11/28/2017,
> Eric Slawin forwarded 10 critical BAMS related emails
> to what appears to be a personal account,
> eslawin116@gmail.com. The first email dates back to
> 6/13/2017 where David Ades sent an email to a group of
> BAMS employees noting that BAMS was discovered as
> using full PAN data in client support situations, and
> debating whether BAMS should become PCI Compliant,
> or to have First Data dedicate a team for BAMS requests.
> The other emails were of the same topic, but with
> engagement with other BAMS VP's, and the user also
> forwarded Excel documents which outline the course of
> action they plan to take to remediate the issue.[6]

---

[6] (Solan Dep., Exs.  30 [Doc. 175-17], p. 3 of 7, 31 [Doc. 175-18], p. 3 of 7, Ex. 32
[Doc. 175-19] at Page 4 of 8, Ex. 33 [Doc. 175-20] at Page 3 of 9, Ex. 34 [Doc.

But three of the ten Incident Reports <u>did</u> <u>not</u> concern BAMS' PCI noncompliance. Solan Dep., Ex. 31 [Doc. 175-18] referred only to the preparations for Hurricane Irma, Ex. 32 [Doc. 175-19] referred only to Mr. Slawin's Management Form, and Ex. 39 [Doc. 175-26] dealt with an entirely different issue, data entered into SalesForce without independent verification. A reasonable conclusion from this is that BAMS Infosec, Mr. Solan, Mr. Kendall and BAMS as a whole were so focused on the PCI noncompliance issue that they did not even notice that three of the ten Incident Reports did not involve PCI noncompliance.

**118.** The specific subject matter of the emails that Slawin sent to himself was irrelevant to Solan's recommendation; instead, what mattered was that the emails contained BAMS's confidential, proprietary, and sensitive information. (Solan Decl. ¶ 70.)

**Disputed.** See, No. 117 above.

**119.** De Castro approved the recommendation on December 8, 2017. (Solan Dec. ¶ 71; Solan Dep. 105:8-111:25, 122:3-20, 139:10-17, 141:11-24, Solan Dep. Ex. 51.)

**Disputed.** See Nos. 7, 116, *supra*.

---

175-21] at Page 3 of 9, Ex. 35 [Doc. 175-22] at Page 3 of 9, Ex. 36 [Doc. 175-23] at Page 3 of 6, Ex. 37 [Doc. 175-24] at Page 175-24] at Page 3 of 7, Ex. 38 [Doc. 175-25] at Page 3 of 7, Ex. 39 [Doc. 175-26] at Page 3 of 7).

**120.** Also on December 8, 2017 Solan informed members of BAMS management and InfoSec team that Slawin's employment had been terminated. (Solan Decl. ¶ 72; Solan Dep. 70:14-75:9, 88:13-19, 141:11-24; Solan Dep. Ex. 47.)

**Disputed.** See Nos. 7, 116, *supra*.

**121.** Slawin's employment with BAMS terminated effective December 8, 2017. (Solan Decl. ¶ 73; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-20, 129:12-130:13, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 51; Kendall Decl. ¶ 17.)

**Disputed,** See Nos. 7, 116, *supra*.

**122.** Slawin's access to BAMS's systems terminated with his employment on December 8, 2017. (Solan Decl. ¶¶ 56, 74; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51; Kendall Decl. ¶ 17.

**Disputed.** This is disputed to the extent that it suggests that Mr. Slawin was terminated on December 8, 2017. See Nos. 7, 116, *supra*.

## IX. SOLAN COULD NOT REACH SLAWIN TO PROVIDE VERBAL NOTICE OF THE TERMINATION UNTIL DECEMBER 12, 2017

**123.** Solan attempted to contact Slawin via telephone and instant message to inform him of the termination on December 8, 2017, but Slawin did not respond to Solan's calls or messages on December 8, 2017. (Solan Decl. ¶ 75; Solan Dep.

105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.** The contemporaneous email chain (Doc. 175-29 [Solan Dep., Ex. 48]) reflects only one attempt to call Mr. Slawin, and that was on the morning of December 11, 2017. (*Id.*, at BAMS 182, Page 4 of 11). The email chain does not refer to or memorialize any attempt to call Mr. Slawin on December 8, 2017, nor any attempt to contact Mr. Slawin by Instant Message. Moreover, none of the emails refer to any termination decision. To the contrary, Mr. Solan's email to Mr. Slawin on December 11, 2017 at 2:17 P.M. (*Id.* at BAMS 188, Page 10 of 11), refers only to the need "to talk through this situation, as well as next steps." Mr. Solan did not call Mr. Slawin after the telephone conference on the afternoon of Friday December 8, 2017 until the morning of Monday, December 11, 2017. (Slawin Decl., ¶100).

**124.** BAMS's typical practice was to notify individuals of termination verbally before providing notice in writing. (Solan Dep. 133:25-134:11; Solan Decl. ¶ 76.)

Undisputed.

**125.** Solan attempted to call Slawin multiple times from December 8, 2017 to December 11, 2017. (Solan Decl. ¶ 77; Solan Dep. 105:8-111:18; Solan Dep. Ex. 51.)

**Disputed.** See No. 123 above.

52

**126.**  Solan emailed Slawin again on December 11, 2017 to attempt to schedule a call. (Solan Decl. ¶ 78; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

**Disputed.**  This is disputed with respect to use of the word "again." See No. 123 above.

**127.**  Slawin responded to Solan on December 11, 2017, confirming that he was "unable to log into the network this morning." (Solan Decl. ¶ 79; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

Undisputed.

**128.**  Slawin was aware he was unable to access BAMS's systems as of the morning of December 11, 2017.  (Solan Decl. ¶ 79; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

Undisputed.

**129.**  After Slawin's initial response on December 11, 2017, Solan again emailed Slawin on December 11, 2017 to schedule a call. (Solan Decl. ¶ 80; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

Undisputed.

**130.**  Thereafter Slawin emailed Solan on December 11, 2017 to indicate that he would not sign the declaration. (Solan Decl. ¶ 81; Solan Dep. 105:8-111:18, 136:17:137:20; Solan Dep. Exs. 48, 51.)

Undisputed.

53

**131.**  On December 12, 2017, Slawin and Solan engaged in further email exchanges in which Slawin finally agreed to speak with Solan over the phone. (Solan Decl. ¶ 82; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

    Undisputed.

132.  On December 12, 2017, Solan (joined by Kendall) spoke with Slawin over the phone and informed Slawin of his termination. (Solan Decl. ¶ 83; Kendall Decl. ¶ 18; Solan Dep. 105:8-111:18, 128:12-129:4, 132:6-18, 133:25-134:11; Solan Dep. Ex. 51.)

    Undisputed.

**133.**  Kendall attended the call as an observer, but Solan conducted the call. (Solan Decl. ¶ 83; Kendall Decl. ¶ 19.)

    Undisputed.

**134.**  During the December 12, 2017 call, Solan further informed Slawin that BAMS still required Slawin to execute the declaration regarding the nondisclosure, return, and destruction of the confidential information, a version of which Solan emailed to Slawin on December 8, 2017 following Solan's interview of Slawin. (Solan Decl. ¶ 84; Kendall Decl. ¶ 20; Solan Dep. 105:8-111:18, Ex. 51.)

    Undisputed.

**135.** After the December 12, 2017 call, Solan emailed Slawin to provide him with a termination notice letter, an amended declaration letter, and the previously provided cease-and-desist letter. (Solan Decl. ¶ 85; Solan Dep. 105:8- 111:18, 129:12-132:5; Solan Dep. Exs. 45, 50, 51.)

Undisputed.

**136.** The termination notice contains typographical errors identifying Slawin's date of termination as December 7, 2017, when in fact his date of termination is December 8, 2017. (Solan Decl. ¶ 86; Solan Dep. 105:8-111:18, 129:12-130:13, 151:14-153:24; Solan Dep. Ex. 45, 51.)

**Disputed.** See No. 7, 116, 119, 121, 122.

**137.** During the December 12, 2017 call, Slawin neither affirmed nor denied that he would execute the declaration concerning the nondisclosure, return, and destruction of the confidential information that Slawin sent to himself, but previously indicated via email on December 11, 2017 that he would not execute the declaration provided to him on December 8, 2017. (Solan Decl. ¶ 87; Solan Dep. 105:8-111:18, Ex. 51.)

Disputed.  Mr. Slawin was not asked during the December 12, 2017 telephone call whether he would execute the declaration concerning the nondisclosure, return, and destroy the confidential information that he sent to himself. Slawin Decl. ¶101.

**138.** Even after the decision was made to terminate Slawin, BAMS continued its investigation into the nature of the information that Slawin emailed to himself, including information beyond the ten emails initially identified by First Data's InfoSec team, in order to continue assessing the risks related to such information. (Solan Decl. ¶¶ 23-24; Kendall Decl. ¶ 21.)

Undisputed.

## X. PLAINTIFF'S POST-TERMINATION ACTVITIES

**139.** Slawin began work at Wells Fargo Securities in December 2018. (Slawin Dep. 38:4-19.)

Undisputed.

**140.** Slawin's job title while at Wells Fargo Securities was Operational Risk Consultant. (Slawin Dep. 38:20-21.)

Undisputed.

**141.** Slawin's job responsibilities at Wells Fargo Securities included handling operational risk matters for securities trading. (Slawin Dep. 42:18-21.)

Undisputed.

**142.** Slawin's base salary at Wells Fargo Securities was approximately $125,000 per year. (Slawin Dep. 39:15-21.)

Undisputed.

**143.** Slawin's compensation at Wells Fargo Securities also included the opportunity to receive a bonus. (Slawin Dep. 39:22-40:1.)

Undisputed.

**144.** Slawin's base salary at BAMS at the time of his termination was $125,000. (MSJ Ex. 43 at Interrogatory No. 4.)

Undisputed.

**145**. Slawin's compensation at BAMS also included the opportunity to receive a bonus. (MSJ Ex. 43 at Interrogatory No. 4.)

Undisputed.

**146**. Slawin received health benefits through his employment at Wells Fargo Securities. (Slawin Dep. 40:6-14.)

Undisputed.

**147.** Slawin received retirement benefits through his employment at Wells Fargo Securities, including a matching 401(k) plan. (Slawin Dep. 40:15-23.)

Undisputed.

**148.** Wells Fargo Securities terminated Slawin's employment in June 2019. (Slawin Dep. 45:4-7.)

Undisputed.

**149.** Wells Fargo Securities terminated Slawin's employment for policy violations after he became intoxicated at a company event. (Slawin Dep. 42:22-

43:11.)

<u>Undisputed</u>.

## XI. BAMS WAS ACTIVELY ASSESSING AND REMEDIATING ISSUES RELATED TO PCI  COMPLIANCE

**150.**  At least as of January 2017, BAMS identified potential instances in which BAMS personnel were accessing or transmitting unencrypted full Primary Account Number ("PAN") data through the DLP process managed by Joe Moll ("Moll"). (Davis Decl. ¶ 4.)

<u>Undisputed</u>.

**151.**  Slawin did not first identify the issue, but rather learned of it from others.  (Slawin Dep. 180:24-181:16.)

<u>Undisputed</u>.

**152.**  The accessing or transmitting of unencrypted full PAN data by  BAMS personnel would potentially require BAMS to be Payment Card Industry ("PCI") Data Security Standard ("DSS") compliant. (Davis Decl. ¶ 5.)

**<u>Disputed</u>.** The accessing or transmitting of unencrypted full PAN data by BAMS personnel did in fact require BAMS to be Payment Card Industry ("PCI") Data Security Standard ("DSS") compliant.  There was nothing "potential" about it.  It is clear from David Ades' June 13, 2017 email that BAMS personnel were receiving full PAN data, and that as a result, the Payment Card Industry Data

Security Standards required BAMS to be PCI compliant. (Ades Dep., Ex. 16 [Doc. 176-6], Ades Dep., Ex. 79).

**153.** The accessing or transmitting of full PAN data was outside of the expectations for BAMS personnel. (Davis Decl. ¶ 6.)

**Disputed.** This is disputed to the extent that the asserted Undisputed Fact refers to any expectations after it was discovered that BAMS personnel were in fact receiving and transmitting full PAN data. See No. 152 above.

**154.** Instead, it was expected that BAMS personnel would not access or transmit full PAN data, such that PCI DSS would not be applicable and BAMS would not be required to certify its compliance with the same. (Davis Decl. ¶ 7.)

**Disputed.** See Nos. 152, 153 above.

**155.** Moll informed Ali Davis ("Davis") of the DLP findings concerning the use of PAN data by BAMS employees. (Davis Decl. ¶ 8.)

Undisputed.

**156.** Davis's role at BAMS during 2017 was Senior Vice President, Risk and Compliance at BAMS. (Davis Decl. ¶ 3.)

Undisputed.

**157.** Davis oversaw the Information Security Product Governance Group in the Risk Department. (Davis Decl. ¶ 9.)

Undisputed.

59

**158.** Davis informed BAMS's Chief Risk Officer Tom Fontana ("Fontana") of the issues identified by Moll concerning the use of PAN data by BAMS employees. (Davis Decl. ¶ 10.)

Undisputed.

**159.** The population of BAMS employees attempting to transmit full PAN data included members of David Ades's ("Ades") team. (Davis Decl. ¶ 11.)

**Disputed.** The members of David Ades' team were not "attempting" to transmit full PAN data, they were in fact doing it, which was why the issue of BAMS not being PCI complaint arose in this first place. See No. 152 above.

**160.** In June 2017, Davis and Moll had a call with Ades to discuss issues related to members of his team using full PAN data. (Davis Decl. ¶ 12.)

Undisputed.

**161.** On the call, Davis recommended that the accessing or transmitting of unencrypted full PAN data by Ades's team be self-identified as an audit issue. (Davis Decl. ¶ 13.)

Undisputed.

**162.** A self-identified audit issue ("SIAI") is a potential issue identified by the owner of the activity and investigated internally by BAMS for assessing the scope of the issue, identifying and implementing appropriate remediation, and ultimately reporting to external or third-party auditors or regulators during an

audit or similar evaluation. (Davis Decl. ¶ 14.)

    <u>Undisputed</u>.

**163.**  It was not uncommon for SIAIs to be treated as confidential until the issue was fully assessed and appropriate remediation was determined such that it could be disseminated more broadly within BAMS. (Davis Decl. ¶ 14; Kendall Decl. ¶ 30.)

    <u>Undisputed</u>.

**164.**  BAMS personnel were encouraged to self-identify issues as part of their job, and annual performance goals of a number of BAMS employees, , including a ratio for the number of self-identified audit issues raised by the employee versus issues raised by other internal and external auditors. (Davis Decl. ¶ 15; Ades Dep. 93:11-95:11.)

    <u>Undisputed</u>.

**165.**  BAMS personnel were never punished for self-identifying issues. (Davis Decl. ¶ 15; Ades Dep. 95:7-11.)

    <u>Undisputed</u>.

**166.**  Ades agreed with Davis's recommendation to self-identify the issue related to the accessing or transmitting of unencrypted full PAN data by BAMS personnel on Ades's team.  (Ades Dep. at 95:12-96:16.)

    <u>Undisputed</u>.

**167.**  On June 13, 2017, Ades sent an email to Natasha Collins, Brian Glynn, and Monica Kennedy regarding his discussion with Davis and Moll. (Ades Dep. 29:15-30:14;  Ades Dep. Ex. 16;  Collins  Decl. ¶ 4.)

Undisputed.

**168.**  Natasha Collins was Slawin's manager until September 2017.  (Slawin Dep. 149:13-23; *see also* Slawin Dep. 147:5-148:9, Ex. 5 (offer letter identifying Collins  as  Slawin's  manager);  Collins Decl. ¶ 3.)

Undisputed.

**169.**  Ades's email discusses potential forms of remediation. (Collins Decl. ¶ 4; Ades Dep. 96:17-100:19; Ades Dep. Ex. 16.)

**Disputed.** What Mr. Ades' email really discussed was the fact that, "We – BAMS don't want to go the route of PCI compliance . . ." (Ades Dep, Ex. 16 [Doc. 176-6, BAMS 1821, Page 3 od 3]).

**170.**  One possible form of remediation included allowing the use and transmission of full PAN data to continue, in which case BAMS would potentially be required to become PCI compliant, which in turn would be costly and time-consuming. (Collins Decl. ¶ 5; Davis  Decl. ¶ 16;  Ades Dep. 96:17-97:21.)

**Disputed.** This is disputed with respect to the use of the word "potentially." It is undisputed that if BAMS continued to receive and transmit PAN data it would be required to become PCI compliant. See No. 152 above.

62

**171.** Another possible form of remediation was to revise internal processes such that BAMS employees would no longer use or transmit full PAN data, in which case BAMS would not need to become PCI compliant. (Collins Decl. ¶ 6; Davis Decl. ¶ 17; Ades Dep. 96:17-100:19.)

Undisputed.

**172.** A revision of internal processes may have resulted in the need to terminate the employment of a number of BAMS employees on certain teams. For that reason, Ades informed those dealing with the SIAI regarding PCI compliance that the matter should be treated as confidential to the team discussing and investigating the issue so as not to raise unwarranted concerns within the workforce prior to any final decisions on direction were made. (Collins Decl. ¶ 7; Davis Decl. ¶ 17; Ades Dep. 98:11-100:19.)

**Disputed.** The reason that this issue was kept confidential was because BAMS wanted to conceal from the merchants that it was not PCI compliant. (Slawin Decl. ¶102).

**173.** It was decided that members of Ades's team would work with Davis to initiate an SIAI to ensure Ades's team developed new requirements around the handling of PAN data so as not to require a new level of PCI compliance. (Collins Decl. ¶ 8; Davis Decl. ¶ 18.)

**Disputed.** This asserted Undisputed Facts misrepresents the record by

63

suggesting that BAMS had *any* "level of PCI compliance." As David Ades' email makes clear, there was **no** "level of PCI compliance." (Ades Dep., Ex. 16[ Doc. 176-6, BAMS 1821, Page 3 od 3]). At all times during 2017, BAMS was simply not PCI compliant. (*Id.*)

**174.** On June 13, 2017, Natasha Collins tasked Slawin with initiating the SIAI. (Collins Decl. ¶ 9; *see also* Kendall Decl. ¶ 23.)

Undisputed.

**175.** Slawin did not timely initiate the SIAI related to the use of PAN data by Ades's team. (Collins Decl. ¶10; Kendall Decl. ¶ 24.)

**Disputed.** It is not clear what BAMS means by use of the words "timely initiate." The SIAI was impossible to complete because the only realistic options were for BAMS to become PCI compliant, which BAMS did not want to do because it would be too costly and would precipitate the awareness by the QSA that BAMS had been receiving and transmitting full PAN data at a time when it was not PCI compliant, or to transfer the processes to First Data, which BAMS also did not want to do because it wanted to retain the client contact with the merchants as the "face" of the credit card processor. So Mr. Slawin was given an impossible task when he was assigned the SIAI. Mr. Slawin did not complete the SIAI precisely because it was realistically impossible to do so. (Slawin Decl. ¶¶31-34, 51). The SIAI that Mr. Kendall prepared on December 15, 2017, said nothing

64

of substance and effectively just "kicked the can down the road." Thus the

proposed "Remediation Plan" was:

> 1) Validate current situation and identify PAN data gaps.
> 2) Explore solutions to address, and select best solution.
> 3) Create project plan to implement solution.
> 4) Implement solution.
> 5) Test solution.
> 6) Implement ongoing controls (if applicable)

(Kendall Dep., Ex. 28)

**176.** Slawin's delay in initiating the SIAI caused a corresponding delay in

BAMS's ability to fully assess and remediate issues related to the use of PAN

data by Ades's team. (Collins Decl. ¶ 11; Kendall Decl. ¶ 25.)

**Disputed.** See No. 175 above.

**177.** In fact, as of September 2017, there were four audit issues from the

start of 2017 or earlier that Slawin had failed to timely resolve and that remained

open. (Collins Decl. ¶¶ 12-13.)

**Disputed.** This is disputed to the extent that it suggests that Mr. Slawin was

derelict in not completing the SIAI related to BAMS' PCI noncompliance. See

Nos. 175-177 above.

**178.** On September 26, 2017, Collins provided a coaching form to Slawin.

(Collins Decl. ¶ 13.)

Undisputed.

**179.** The coaching form was provided to Slawin due to his failure to timely complete tasks and meet deadlines. (Collins Decl. ¶ 14.)

**Disputed.** See Nos. 175-177 above.

**180.** The coaching form was issued due to Slawin's failure to timely develop and submit audit and remediation plans, his failure to adequately follow up to ensure the remediation plan was being implemented in a timely fashion, and his failure to provide reporting on status or to escalate challenges unless requested to do so. (Collins Decl. ¶¶ 13, 15.)

**Disputed.** See Nos. 175-177 above.

**181.** In his deposition, Slawin stated he believed a September 2017 coaching form was retaliation, but ultimately conceded he "was behind on some task" and that he does "not recall disputing the accuracy" of the coaching form with HR, only its tone. (Slawin Dep. 122:21-1231; 154:1-159:19.)

Undisputed.

**182.** Slawin failed to finalize the draft SIAI by the time of his termination. (Davis Decl. ¶ 19; Collins Decl. ¶ 16; Kendall Decl. ¶ 26.)

**Disputed.** See Nos. 175-177 above.

**183.** In fact, Slawin often day traded during ordinary business hours and admitted the same to Mark Kendall, then Slawin's peer. (Kendall Decl. ¶ 22; Slawin Dep. 61:7-63:17.)

**Disputed.** Mr. Slawin traded stocks during ordinary business hours, but it was not often. (Slawin Decl. ¶103)

**184.** The SIAI related to the use of PAN data by Ades's team continued after Slawin's termination. (Davis Decl. ¶ 20; Kendall Decl. ¶ 27.)

Undisputed.

**185.** An initial draft of the SIAI related to the use of PAN data by Ades's team was prepared by Mark Kendall on December 15, 2017. (Davis Decl. ¶ 21; Kendall Decl. ¶ 28.)

**Disputed.** This is disputed to the extent that it suggests that Mr. Kendall prepared a draft of the SIAI that said anything of substance. It was realistically possible to complete the SIAI. The SIAI was impossible to complete because the only realistic options were for BAMS to become PCI compliant, which BAMS did not want to do because it would be too costly and would precipitate the awareness by the QSA that BAMS had been receiving and transmitting full PAN data at a time when it was not PCI complaint, or to transfer the processes to First Data, which BAMS also did not want to do because it wanted to retain the client contact with the merchants as the "face" of the credit card processor. So Mr. Slawin was given an impossible task when he was assigned the SIAI. Mr. Slawin did not complete the SIAI precisely because it was realistically impossible to do so. The SIAI that Mr. Kendall prepared on December 15, 2017, said nothing of

substance and effectively just "kicked the can down the road." Thus the proposed

"Remediation Plan" was:

> 1) Validate current situation and identify PAN data gaps.
> 2) Explore solutions to address, and select best solution.
> 3) Create project plan to implement solution.
> 4) Implement solution.
> 5) Test solution.
> 6) Implement ongoing controls (if applicable)

(Kendall Dep., Ex. 28).

**186.** The issue identified by the SIAI was accepted on January 26, 2018.

(Davis Decl. ¶ 22.)

Undisputed.

**187.** The action plan identified by the SIAI was accepted on February 28,

2018. (Davis Decl. ¶ 22.)

Undisputed.

**188.** The SIAI for Ades's group was closed on December 19, 2018. (Davis

Decl. ¶ 22.)

**189.** At the same time as the SIAI for Ades's group, other SIAIs for other

groups within BAMS were opened regarding the handling of PAN data by BAMS

employees. (Davis Decl. ¶ 23.)

Undisputed.

**190.** For example, there was an SIAI for the processing of PAN data by

BAMS contact centers. (Davis Decl. ¶ 23.)

    <u>Undisputed</u>.

**191.** In addition, there was an SIAI for the processing of PAN data by the BAMS settlement exceptions team. (Davis Decl. ¶ 23.)

    <u>Undisputed</u>.

**192.** Aside from Slawin, there is no evidence that anyone else working on any of the PAN data SIAIs were terminated from BAMS. (Davis Decl. ¶ 24; Kendall Decl. ¶ 29; Collins Decl. ¶ 17.)

    <u>Undisputed</u>.

**193.** Moll, who initially identified the issue, was not terminated from BAMS nor was Ali Davis. (Davis Decl. ¶ 24.)

    <u>Undisputed</u>.

## XII. SLAWIN LACKED REASONABLE BELIEF IN ANY STATUTORY VIOLATION

**194.** Slawin did not learn or believe any conduct at BAMS violated any provision of the Consumer Financial Protection Act until after his termination from BAMS. (Slawin Dep. 27:21-24, 162:17-21.)

    <u>Undisputed</u>.

**195.** Slawin did not understand any conduct at BAMS violated the Dodd-Frank Act until after his termination from BAMS. (Slawin Dep. 162:22-163:1.)

69

Undisputed.

**196.** Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding how BAMS was handling credit card data would violate the Consumer Financial Protection Act.  (Slawin Dep. 223:19-24.)

Undisputed.

**197.** Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding how BAMS was handling credit card data would violate Sarbanes-Oxley. (Slawin Dep. 223:19-224:3.)

Undisputed.

**198.** Slawin does not know how BAMS's noncompliance with PCI DSS or any alleged fraudulent misrepresentation by BAMS to its customers regarding how BAMS was handling credit card data would violate the Dodd-Frank Act. (Slawin Dep. 223:19-224:7.)

Undisputed.

**199.** PCI DSS are set forth by the PCI Security Standards Council and governed by the card brand networks (Visa and MasterCard), not government requirements.  Instead, entities operating in the payment industry agree to comply

with PCI DSS through various contractual agreements. (Davis Decl. ¶ 25.)

Undisputed.

**200.** A person working within the payment processing or financial industries could not reasonably believe PCI DSS are government requirements. (Davis Decl. ¶ 26.)

**Disputed**. A person working within the payment processing or financial industries reasonably could believe that, although the PCI DSS rules are not themselves government requirements, fraudulent misrepresentations or fraudulent concealment regarding those rules could be considered within the scope of unlawful acts that might interest the SEC. This is why, in July 2017– prior to his termination – Mr. Slawin concluded that the SEC would be interested in BAMS' fraudulent misrepresentations and/or fraudulent concealment regarding its noncompliance with the PCI DSS rules and that such unlawful acts could be within the scope of statutes that the SEC enforces. (Slawin Dep. 160:24-161:23; Slawin Decl. ¶49).

**201.** A person working within the payment processing or financial industries could not reasonably believe that the failure to be compliant with PCI DSS is fraud or somehow illegal. (Davis Decl. ¶ 27.)

**Disputed.** See No. 200 above.

**202.** A person working within the payment processing or financial industries could not reasonably believe that the failure to disclose any noncompliance with PCI DSS is fraud or somehow illegal; instead, such a person would instead understand that any disclosure obligation would be governed by a contractual relationship, and that the failure to meet that obligation is a breach of said contract. (Davis Decl. ¶ 28.)

**Disputed.** See No. 200 above.

**203.** Slawin at all relevant times was aware that PCI DSS are not government requirements. (Slawin Dep. 179:14-21.)

**Disputed.** See No. 200 above.

**204.** Slawin lacked an understanding of whether resolving the PAN data issue at BAMS would have avoided any need for BAMS to become PCI compliant. (Slawin Dep: 179:5-180:18.)

**Disputed.** It is ambiguous as to what BAMS means by use of the terms, "lacked an understanding" and "PAN data issues." Mr. Slawin testified that while he might not have known all of the ramifications and requirements of PCI compliance under the [PCI DSS] standards, he had an understanding that if BAMS was receiving PAN data it needed to be PCI compliant. (Slawin Dep. 179:22-180:9).

**205.** At the time of his employment by BAMS, Slawin had nearly 25 years

of experience in the Securities and Banking Regulator and Compliance field. (ECF No. 1 at ¶ 75.)

    <u>Undisputed</u>.

**206.** Prior to working with BAMS, Slawin held numerous regulatory and compliance positions both for governmental regulatory agencies as well as for banks. (ECF No. 1 at ¶ 75.)

    <u>Undisputed</u>.

**207.** Prior to working with BAMS, Slawin had experience investigating fraud including stock manipulations and misrepresentations to clients. (Slawin Dep. 193:10-17.)

    <u>Undisputed</u>.

**208.** Slawin has familiarity with fiduciary obligations and the circumstances in which fiduciary obligations arise between contracting parties. (Slawin Dep. 193:18-194:4.)

    **<u>Disputed</u>.**  The citation to Mr. Slawin's deposition testimony does not support such a broad asserted Undisputed Fact.  Mr. Slawin did not testify that he has a complete understanding of all aspects of fiduciary obligation and the circumstances under which they might arise, either by contract or otherwise.  He only testified that he was aware that brokers owe a fiduciary obligation to their clients and that fiduciary obligations might arise from contracts ". . . to the extent

the contracts lay that out . . ." (Slawin Dep. 193:18-194:4).

**209.** Slawin reviewed one such agreement in connection with his purported concerns about fraud. (Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34.)

Undisputed.

**210.** A true and correct copy of PLAINTIFF 000612-PLAINTIFF 000695, which is the full version of the agreement that Slawin stated he reviewed in connection with his purported concerns about fraud, is attached hereto as MSJ Exhibit 44 which has been redacted to omit pricing information. (Slawin Dep. 173:11-175:2; Slawin Dep. Ex. 34; MSJ Ex. 44.)

Undisputed.

**211.** Slawin describes this purported fraud as "a twofold omission that the firm [BAMS] needs to be PCI compliant and that . . . it's being represented to clients that the firm's PCI compliant." (Slawin Dep. 175:25-176:7.)

Undisputed.

**212.** Slawin also contends that he "was positioned to being forced to represent that the company [BAMS] was PCI compliant." (Slawin Dep. 204:2-205:2.)

**Disputed.** This is only a partial and therefore misleading summary of Mr. Slawin's deposition testimony. He also testified that, "I felt I was positioned in

74

the middle of a fraud to be a fall guy." The complete testimony is as follows:

> The basis is that I – after months of telling people that I oppose this fraud, management, along with – not just fraud but also talking with Natasha Collins, Brian Rubin, talking about many other things about these questionnaires, they – I was positioned to being forced to represent that the company was PCI compliant. I was totally uncomfortable with that. But in the end, my e-mail was clear as to why I was not going to delete those e-mails. I was not – I was positioned – I felt I was positioned in the middle of a fraud to be a fall guy. And I was clear in that e-mail, and if anybody reads that – I know you have a different opinion – but if anybody reads that in an e-mail, they will come to the same conclusion. It was clear what my – what – where I stood.

(Slawin Dep. 204:11-205:2).

## XIII. SLAWIN DID NOT EXPRESS CONCERNS ABOUT STATUTORY VIOLATIONS TO ANYONE, AND HE NEVER PUT ANY CONCERNS OF ANY KIND IN WRITING

**213.** Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated the Dodd-Frank Act.  (Slawin Dep. 186:20-24.)

**Disputed.**  This is disputed only because the asserted Undisputed Fact is ambiguous as written.  Plaintiff admits he did not mention the statute by name, but he did tell individuals at BAMS that he believed it was engaging in fraudulent and illegal conduct.  He testified that he believed the SEC would be interested in the fraudulent and illegal conduct.  See Nos. 200-202, Slawin Decl.

¶¶37, 49.

**214.**  Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated Sarbanes-Oxley.  (Slawin Dep. 186:25-187:4.)

**Disputed.**  See Nos. 213, 200-202, Slawin Decl. ¶¶37, 49.

**215.**  Prior to the termination of his employment at BAMS, Slawin did not tell anyone at BAMS that he felt BAMS was engaging in conduct that violated the Consumer Financial Protection Act.  (Slawin Dep. 186:25-187:8.)

**Disputed.**  See Nos. 213, 200-202, Slawin Decl. ¶¶37, 49.

**216.**  Prior to the termination of his employment at BAMS, Slawin did not put any of his concerns that BAMS was engaged in illegal conduct or fraud in writing and provide them to anyone within BAMS.  (Slawin Dep. 188:21-25, 198:23-199:12, 200:3-8.)

Undisputed.

## XIV.  SLAWIN DID NOT EXPRESS CONCERNS ABOUT ANY FORM OF WRONGDOING WITH BAMS' HR OR LEGAL DEPARTMENTS

**217.**  Slawin did not express concerns to anyone in BAMS's Office of the General Counsel that BAMS was somehow engaged in fraudulent conduct.  (Slawin 185:15-20.)

Undisputed.

76

**218.**  Slawin did not tell anyone in BAMS's HR department that BAMS was engaged in fraudulent conduct.  (Slawin Dep. 185:21-23; Solan Decl. ¶¶ 88- 89.)

**Disputed.**  On December 11, 2017, Mr. Slawin sent an email to Mr. Solan, who was part of BAMS' HR Department [Undisputed Fact Nos. 13, 14], in which Mr. Slawin complained that BAMS was withholding information that could damage the merchants. (Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).

**219.**  Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated Sarbanes-Oxley.  (Slawin Dep. 185:24-186:5; Solan Decl. ¶¶ 88-89.)

Undisputed.

**220.**  Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated the Consumer Financial Protection Act.  (Slawin Dep. 186:6-11; Solan Decl. ¶¶ 88-89.)

Undisputed.

**221.**  Slawin did not tell anyone in BAMS's HR or BAMS's General Counsel's Office that he believed BAMS was engaged in conduct that violated Dodd-Frank Act.  (Slawin Dep. 186:12-15; Solan Decl. ¶¶ 88-89.)

Undisputed.

**224.** Through the investigation into Slawin's conduct, no one ever told anyone in BAMS's HR that Slawin had expressed that he believed BAMS was engaged in fraudulent conduct; that BAMS was defrauding its customers; that BAMS was engaged in conduct that violated Sarbanes-Oxley, the Consumer Financial Protection Act, or the Dodd-Frank Act; or that Slawin was being placed in an inappropriate position by his managers. (Solan Decl. ¶¶ 88-89.)

**Disputed.** On December 11, 2017, Mr. Slawin sent an email to Mr. Solan, who was part of BAMS' HR Department [Undisputed Fact Nos. 13, 14], in which Mr. Slawin complained that BAMS was withholding information that could damage the merchants. (Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11]).

**225.** While employed at BAMS, Slawin did not contact BAMS's Legal Department to indicate that he felt he was being placed in an inappropriate position by his managers. (Slawin Dep. 135:15-19.)

Undisputed.

**226.** While employed at BAMS, Slawin did not reach out to anyone in BAMS's Office of the General Counsel to express concern about the way he was being treated by management. (Slawin Dep. 136:22-137:1.)

Undisputed.

**227.** While employed at BAMS, Slawin did not reach out to anyone in the

78

General Counsel's Office to express that he was being placed in an inappropriate position based on decisions being made by his managers with respect to the handling of primary account numbers by BAMS. (Slawin Dep. 137:2-138:4.)

> Undisputed.

**228**.  Slawin was aware of how to contact BAMS's General Counsel's Office as part of his job.  (Slawin Dep. 136:14-17.)

> Undisputed.

**229.**  Slawin frequently contacted BAMS's Legal Department as part of his job duties.  (Slawin Dep. 136:6-13, 136:18-21.)

> Undisputed.

**230.**  BAMS maintained an Ethics hotline through which employees could anonymously report conduct that they believed was inappropriate or unethical. (Solan Decl. ¶ 90.)

> Undisputed.

**231.**  Slawin possessed contact information for the HR Service Center Associates Line, the Employee Assistance Program, and the Discrimination and Harassment Hotline.  (Slawin Dep. 128:10-13, 131:22-134:19; Slawin Dep. Ex. 4 at PLAINTIFF 000149; Solan Decl. ¶ 91.)

> Undisputed.

**232.**  The same documentation provided instructions for accessing

79

BAMS's Code of Ethics and Associate Handbook, as well as a link to the same. (Slawin Dep. 128:10-13; Slawin Dep. Ex. 4, Solan Decl. ¶ 91.)

Undisputed.

**233.** Exhibit 4 to the Deposition of Eric Slawin is an onboarding toolkit that all new BAMS employees received upon the commencement of their employment. (Solan Decl. at ¶ 91; Slawin Dep. Ex. 4.)

## XV.  SLAWIN DID NOT EXPXRESS CONCERNS TO BAMS' JOINT VENTURERS OR CLIENTS

**234.** Slawin did not contact any clients of BAMS about concerns related to any fraudulent conduct by BAMS. (Slawin Dep. 176:8-17.)

Undisputed.

**235.** Slawin did not reach out to Bank of America about concerns related to fraudulent conduct by the management of BAMS. (Slawin Dep. 176:23-177:6.)

Undisputed.

**236.** Slawin did not reach out to First Data about concerns related to fraudulent conduct by the management at BAMS. (Slawin Dep. 176:23-177:10.)

Undisputed.

## XVI.  SLAWIN IDENTIFIES ONLY THREE INDIVIDUALS TO WHOM HE EXPRESSD CONCERNS ABOUT FRAUD

**237.** Slawin admits he did not disclose any concern that BAMS was engaged in illegal conduct or fraud to anyone besides Mark Kendall, Treicia

80

Brooks, and Sherra Grissom.  (Slawin Dep. 198:23-199:7.)

**Disputed.**  Even though he did not use the word, "fraud", Mr. Slawin told

Natasha Collins, Brian Rubin and Leonard Ebel that he was being positioned to

misrepresent the facts and that, " . . .misrepresenting your piece [sic] as compliant

on those questionnaires is tantamount to fraud and being illegal." (Slawin Dep.

216:15-217:2)

**238.**  Slawin contends he orally told Sherra Grissom that not disclosing the

conduct with which BAMS was engaged concerning PCI compliance was fraud.

(Slawin Dep. 187:15-189:23.)

Undisputed.

**239.**  Slawin stated he raised concerns with Grissom on two different

occasions in November 2017. (Slawin Dep. 188:16-189:6.)

Undisputed.

**240.**  Slawin testifies Grissom was his superior.  (Slawin Dep. 188:5-11.)

Undisputed.

**241.**  Slawin does not know if Grissom ever discussed Slawin's concerns

with anyone else.  (Slawin Dep. 189:19-23.)

Undisputed.

**242.**  Slawin contends he had "numerous conversations" during October and

November 2017 with Brooks in which they "talked about how – what a mess this

was and can't believe it's going on.  And every time I say something to somebody about it no one's doing anything." (Slawin Dep. 190:25-191:20.)

Undisputed.

**243.** Brooks was Slawin's peer at BAMS.  (Slawin Dep. 190:10-16.)

Undisputed.

**244.** Slawin contends that he began expressing concerns to Kendall in July 2017. (Slawin Dep. 191:21-192:1.)

Undisputed.

**245.** Slawin said he had an opinion that the SEC could be "interested" in the conduct at BAMS as of July 2017, but he did express those concerns to the SEC, the CFPB, or any government regulator at the time.  (Slawin Dep. 160:24- 162:16.)

Undisputed.

**246.** Slawin cannot remember precisely what he conveyed to Kendall in July 2017, but states  they "discussed next steps, what  a large  mess  it was." (Slawin Dep. 191:21-192:1, 194:5-11.)

**Disputed.**  BAMS misleadingly suggests that Mr. Slawin cannot remember if he told Mr. Kendall in July 2017 that BAMS was engaging in fraudulent and illegal actions, by artificially splitting up Mr. Slawin's deposition testimony into two separate asserted Undisputed Facts, Nos.246 and 247.  A fair reading of Mr. Slawin's *complete* testimony is that he told Mr. Kendall, starting in July 2017 and

ongoing "virtually daily" that BAMS was engaged in fraudulent and illegal

activity:

> Q. And you indicated that you also told Mark
> Kendall that you believed BAMS was engaging in
> fraud. When did you tell this to Mr. Kendall?
> A. It was routinely. I spoke to Mark virtually daily. And I
> started saying that July 2017.
> Q. Okay. Can you explain to me how you started telling
> Mr. Kendall in July of 2017 that you felt that BAMS
> was committing fraud when less than five minutes ago,
> you testified that you did not have the opinion that
> BAMS was committing fraud until August or
> September of 2017?
> A. Well, I think you misstated. I understood your question
> for that was representation of, you know, PCI
> compliance. When I spoke with Mr. Kendall, it was
> always clear that this was going to be an omission. And
> I know omission is – is part of the definition of fraud.
> And the fact that once I saw what was being said by
> senior management that this wasn't going to be fixed or
> disclosed, that's – that's the conclusion I reached.

(Slawin Dep. 191:21-192:16)

> .  .  .  .
> Q. . . . So when did you tell Mr. Kendall that you felt that
> BAMS was somehow engaged in illegal conduct?
> A. July 2017.

(Slawin Dep. 193:3-6)

> . . . .
> Q. Tell me precisely what you told Mr. Kendall
> in July of 2017.
> A. I can't remember absolutely, precisely, but it was that
> we discussed next steps, what a large mess this was.

> And I routinely told him that this needs to be
> disclosed, that it's omission. It's a fraud.

(Slawin Dep. 194:5-11).

**247.** Slawin further contends he "routinely told [Kendall] that this needs to be disclosed, that it's omission. It's a fraud." (Slawin Dep. 194:5-11.)

Undisputed.

**248**. Slawin further contends he told Kendall and Grissom "it could become an issue with it getting out that data wasn't secure at merchants and that could affect their bottom line. And ultimately, the bottom line leads to earnings per share/shareholders," referring to the shareholders of merchants. (Slawin Dep. 218:11-219:13.)

Undisputed.

**249**. Kendall was Slawin's peer until September 2017 when he became Slawin's manager. (Slawin Dep. 150:5-14, 197:6-16, 239:21-25; Kendall Decl. ¶ 4.)

**250.** Mark Kendall is the only person who Slawin contends directed him to delete written references to BAMS not being PCI compliant. (Slawin Dep. 224:14-225:15.)

Undisputed.

**251.** The only instance of any such directive about which Slawin complains

84

occurred in a November 8, 2017 email. (Slawin Dep. 224:14-225:15, 233:24-235:22; Slawin Dep. Ex. 13.)

>  Undisputed.

**252.** In the November 8, 2017 email communication in which Slawin contends Kendall directed him to delete written references to BAMS not being PCI complaint, Slawin asked Kendall whether such references should be deleted prior to Kendall providing him the purported directive. (Slawin Dep. 224:14-225:15, 233:24-235:22; Slawin Dep. Ex. 13.)

>  Undisputed.

**253.** Slawin did not object in the November 8, 2017 email chain to Kendall's purported directive to delete written references to BAMS not being PCI complaint. (Slawin Dep. 233:24-235:22; Slawin Dep. Ex. 13.)

>  Undisputed.

## XV11.  ANY CONCERNS THAT SLAWIN PURPORTEDLY EXPRESSED TO OTHERS WERE NOT ABOUT FRAUD OR ILLEGAL CONDUCT

**254.** Slawin further contends he expressed concerns regarding merchant questionnaires to Natasha Collins, Brian Rubin, Leonard Ebel, and the relationship manager for Home Depot. (Slawin Dep. 215:24-218:10.)

>  Undisputed.

**255.** Slawin reported to Collins until September 2017 when he began

85

reporting to Mark Kendall.  (Slawin Dep. 149:13-150:14; *see also* Collins Decl. ¶ 3.)

    <u>Undisputed</u>.

**256.**  Slawin reported to Rubin from April or May 2017 until September 2017 when Rubin was replaced by Mark Kendall.  (Slawin Dep. 150:5-151:4.)

    <u>Undisputed</u>.

**257.**  Slawin contends he told Collins, Rubin, Ebel, and the relationship manager for Home Depot "that the questionnaires I was being asked to complete, I was not going to do that because representing that was not appropriate." (Slawin Dep. 215:24-216:14.)

    <u>Uncontested</u>.

**258.**  Slawin contends as to Collins, Rubin, Ebel, and the relationship manager for Home Depot that "I was just expressing my concerns routinely about being positioned to misrepresent the facts . . . ." (Slawin Dep. 215:24-217:11.)

    <u>Undisputed</u>.

**259.**  Slawin further contends he told Collins and Rubin "it could become an issue with it getting out that data wasn't secure at merchants and that could affect their bottom line. And ultimately, the bottom line leads to earnings per share/shareholders," referring to the shareholders of merchants.  (Slawin Dep.

218:11-220:13.)

Undisputed.

**260.** Slawin contends he expressed the aforementioned concerns regarding merchant shareholders to Collins in September 2017. (Slawin Dep. 218:11-219:22.)

Undisputed.

**261.** Slawin contends he expressed the aforementioned concerns regarding merchant shareholders to Rubin in October 2017. (Slawin Dep. 218:11- 220:10.)

Undisputed.

**262.** In October 2017, Rubin's duties had changed and he was no longer Slawin's manager. (Slawin Dep. 150:19-23, 219:23-220:10.)

Undisputed.

**263.** Slawin does not know if Rubin communicated Slawin's concerns further. (Slawin Dep. 219:23-220:13.)

**264.** Slawin did not use the word "fraud" with Collins, Rubin, Ebel, or the relationship manager with Home Depot. (Slawin Dep. 216:15-21.)

Undisputed.

**265.** Slawin did not use the word "illegal" with Collins, Rubin, Ebel, or the relationship manager with Home Depot. (Slawin Dep. 216:22-217:11.)

Undisputed.

**266.** Slawin did not tell Collins, Rubin, Ebel, or the relationship manager

with Home Depot that the conduct that BAMS was engaging in somehow violated any state or federal law or regulation. (Slawin Dep. 217:20-218:5.)

Undisputed.

## XVIII. OTHER FACTS RELATED TO PLAINTIFF'S CLAIM OF PROTECTED ACTIVITY

**267.** A [sic] Merchants occasionally submitted questionnaires regarding data security, including PCI compliance, to BAMS pursuant to their contractual agreements. (Collins Decl. ¶ 21.)

Undisputed.

**268.** Slawin had a role in responding to client questionnaires regarding PCI compliance. (Collins Decl. ¶ 22.)

Undisputed.

**269.** Slawin's role with to merchant questionnaires was to define a process for handling those requests, respond to questions where he was able, and to work with others to answer any remaining questions so that the completed questionnaire could be returned to the clients. (Collins Decl. ¶ 23.)

**Disputed.** Slawin Decl. ¶¶38-40.

**270.** First Data Merchant Services ("FDMS") was the intended service provider responsible for processing merchant transactions and thus maintained PCI compliance for itself, its systems (on which BAMS conducted business), and

88

its services. (Collins Decl. ¶ 24.)

Undisputed.

**271.**  In response to merchant questionnaires, BAMS disclosed FDMS's

role as the service provider and providing information concerning FDMS's PCI

compliance, including the then-current attestation of compliance for FDMS.

Slawin, in his role regarding responding to merchant questionnaires, was familiar

with BAMS responding to merchant questionnaires in this manner. (Collins Decl.

¶ 25.)

**Disputed.** Slawin Decl. ¶¶38-40.

**272.**  Collins is unaware of any instance in which BAMS responded to a

merchant questionnaire by affirmatively representing that it maintained an

independent certification of its own PCI compliance.  (Collins Decl. ¶ 26.)

Undisputed.

**273.**  Slawin did not intend to disclose any of the emails that he forwarded

from his work email address to his personal email address, including to regulators.

(Slawin Dep. 159:22-160:23.)

Undisputed.

**274.**  Instead, Slawin forwarded the emails from his work email address to

his personal email address for purposes of preserving them so that he could

exonerate himself "should the fraud become known broadly" because he did not

want to be "set up." (Slawin Dep. 159:22-160:23, 205:23-206:18.)

Undisputed.

**275.**  Slawin did not file any complaints with any regulatory agencies until after his termination. (Slawin Dep. 243:8-245:5, 248:4-250:18; Slawin Dep. Exs. 36, 37, 49.)

Undisputed.

**276.**  Slawin did not express concerns regarding potential harm to consumers while at BAMS; instead, Joe Moll (not Slawin) discussed risks posed by a potential data breach with Slawin and Kendall, which Slawin did not communicate to others within BAMS. (Slawin Dep. 197:22-198:16.)

Undisputed.

**277.**  In addition, Slawin claims an email that he sent to Mike Solan on December 11, 2017 refusing to execute the declaration was a protected activity. (Slawin Dep. 203:17-205:2, 205:23-207:4; *see also* Slawin Dep. 124:12-17; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

Undisputed.

**278.**  The December 11, 2017 email in which Slawin refused to execute the declaration was sent by Slawin after BAMS made the decision to terminate him. (Solan Decl. ¶ 99; Solan Dep. 105:8-111:18, 136:17-137:20; Solan Dep. Exs. 48, 51.)

**Disputed.** See Nos. 7, 116, 120, 121, *supra*.

**279.**   The December 11, 2017 email in which Slawin refused to execute the declaration was sent by Slawin after the effective date of his termination.  (Solan Decl. ¶ 100; Solan Dep. 70:14-75:9, 88:13-19, 105:8-111:25, 122:3-20, 129:12-130:13, 136:17-137:20, 139:10-17, 141:11-24, 151:14-153:24; Solan Dep. Exs. 45, 47, 48, 51; Kendall Decl. ¶ 17)

**Disputed.** See Nos. 7, 116, 120, 121, *supra*.

**280.**   The December 11, 2017 email in which Slawin refused to execute the declaration does not use the word "fraud."  (Solan Decl. ¶ 101;  Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

Undisputed.

**281.**   The December 11, 2017 email in which Slawin refused to execute the declaration does not disclose any allegations of fraud.  (Solan Decl. ¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

**Disputed.**   Mr. Slawin's December 11, 2017 email refers to withholding information from "the counter-parties" of BAMS, referring to the merchants. (Solan Dep., Ex. 48 [Doc. 175-29, BAMS 180, Page 2 of 11], Slawin Decl. ¶__) That was an allegation of fraudulent omission. (*Id.*)

**282.**   The December 11, 2017 email in which Slawin refused to execute the declaration does not mention any statute or regulation.  (Solan Decl. ¶ 101; Solan

Dep. 136:17-137:20; Solan Dep. Ex. 48.)

    <u>Undisputed</u>.

**283.**  The December 11, 2017 email in which Slawin refused to execute the declaration does not disclose any regulatory or statutory violations.  (Solan Decl.¶ 101; Solan Dep. 136:17-137:20; Solan Dep. Ex. 48.)

    <u>Undisputed</u>.

**284.**  Solan did not interpret Slawin's December 11, 2017 email refusing to execute the declaration as reporting or objecting to any fraud, regulatory violation, or statutory violation.  (Solan Decl. ¶ 102.)

    **<u>Disputed</u>.**  (Slawin Dep. 203:17-205:2, 205:9-21).

**285.**  Slawin did not express any concerns to Ali Davis that he believed BAMS was engaged in fraudulent conduct; that BAMS was defrauding its customers; that BAMS was engaged in conduct that violated Sarbanes-Oxley, the Consumer Financial Protection Act, or the Dodd-Frank Act; or that Slawin was being placed in an inappropriate position by his managers.  (Davis Decl. ¶ 29.)

    <u>Undisputed</u>.

**286.**  Davis did not have any role in the termination of Slawin's employment at BAMS.  (Davis Decl. ¶ 30.)

**287.**  Davis did not make or recommend the decision to terminate Slawin's

employment at BAMS.  (Davis Decl. ¶ 31.)

    Undisputed.

    **288.**  In response to an interrogatory asking him to "identify those documents [he] contend[s] support his claim that [he] was retaliated against by BAMS," Slawin identified only the following bates labeled documents from his own production:  000001-2; 000007-8; 000009-000014; 000015-17; 000018-19; 000020; 000021-24; 000025-31; 000032-33; 000034-36; 000037-39; 000040-41; 000042-43; 000045-46; 000047-50; 000051-55; 000056-57; 000058-59; 000060-63; 000064-67; 000068-69; 000070-71; 000072-73; 000076-80; 000084-000138; 0000141-148;  0000149;  000153-156;  0000157-000241; 0000242-274;  000330- 364; 000365-405; 000406-505; 000612-659; 0000711-713; 000720-21.  (MSJ Ex. 46.)

    Undisputed.

    **289.**  In response to an interrogatory asking him to "identify those documents [he] contend[s] support [his] claim [his] employment with BAMS was terminated not as a result of a violation of BAMS policy, but instead because of [his] engagement in protected activity," Slawin identified only the following bates labeled documents from his own production: 000001-2; 000007-8; 000009-000014; 000015-17; 000018-19; 000020; 000021-24; 000025-31; 000032-33;

000034-36; 000037-39; 000040-41; 000042-43; 000045-46; 000047-50;

000051-55; 000056-57; 000058-59; 000060-63; 000064-67; 000068-69;

000070-71; 000072-73; 000076-80; 000084-000138; 0000141-148; 0000149;

000153-156; 0000157-000241; 0000242-274; 000330-364; 000365-405; 000406-

505; 000612-659; 0000711-713; 000720-21. (MSJ Ex. 46.)

    <u>Undisputed</u>.

    This 28th day of February 2025.

                               /s/Robert N. Marx
                               Georgia Bar Number 475280
                               Jean Simonoff Marx
                               Georgia Bar Number 475276
                               Marx & Marx, L.L.C.
                               1050 Crown Pointe Parkway
                               Suite 500
                               Atlanta, Georgia 30338
                               (404) 261-9559
                               <u>lawyers@marxlawgroup.com</u>
                               <u>jeannie.marx@marxlawgroup.com</u>

                               *Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ERIC SLAWIN,

                Plaintiff,

v.

BANC OF AMERICA MERCHANT
SERVICES, LLC, s/h/a BANK OF
AMERICA MERCHANT
SERVICES,

                Defendant.

Civil Action File No.
1:19-cv-04129-AT

---

<u>Certificate of Service</u>

This is to certify that on February 28, 2025, I electronically filed: **Plaintiff's Corrected Responses to Defendants Statement of Undisputed Material Facts,** with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorney of record:

> Christopher P. Galanek, Esq.
> Chris.Galanek@bclplaw.com
> Brian Underwood, Esq.
> Brian.Underwood@bclplaw.com
> Bryan Cave Leighton Paisner
> LLP One Atlantic Center, 14th
> Floor 1201 West Peachtree
> Street, N.W. Atlanta, GA 30309-
> 3471

This 28th day of February 2025.

                       /s/Robert N. Marx
                       Robert N. Marx, Esq.
                       Georgia Bar No. 475280

Jean Simonoff Marx, Esq.
Georgia Bar No. 475276
Marx & Marx, L.L.C.
1050 Crown Pointe Parkway
Suite 500
Atlanta, Georgia 30338
Tel. (404) 261-9559
lawyers@marxlawgroup.com
jeannie.marx@marxlawgroup.com
*Attorneys for Plaintiff*